# Exhibit 1



U.S. Department of Justice

*Special Counsel's Office*

February 5, 2024

The Attorney General of the United States

Re:    Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.

Dear Attorney General Garland:

Enclosed please find a "confidential report explaining the prosecution or declination decisions" I have reached, as required by 28 C.F.R. § 600.8(c).

As we previously discussed, at the request of the White House Counsel and personal counsel to President Biden (collectively, "counsel"), I agreed, with certain conditions including nondisclosure, to allow counsel to review a draft of the report for purposes of determining whether to assert any claim of privilege, and otherwise providing comments to the Special Counsel's Office. Counsel reviewed a draft of the report on February 3 and 4, 2024.

Earlier today, counsel submitted to my office the enclosed letter. After reviewing their letter, my team and I corrected the following minor errors:

- The draft report stated that "[w]e reviewed the materials that were deemed to be classified at the Top Secret/Sensitive Compartmented Information level when the National Security Council conducted prepublication review for the Reagan Diaries." Draft Report n.811. We have amended that sentence by adding "some of" after the word "reviewed."

- In Chapter Twelve, the draft report cited Chapter Four in a footnote. Draft Report n.892. We have amended that footnote to read "*See id.*; NARA Archivist 1 Tr. at 56-59, 77-78, 81-82, 93-94, 122-23."

- The draft report included a section heading that read, "MARKED CLASSIFIED DOCUMENT IN SECOND-FLOOR OFFICE." Draft Report at 333. We have amended that heading to read, "MARKED CLASSIFIED DOCUMENT IN THIRD-LEVEL DEN."

The Attorney General of the United States
February 5, 2024
Page 2

My team and I also corrected several typographical errors that we identified on our own, and we removed a watermark and headers that designated the document as a confidential draft.

After reviewing the draft report, the relevant intelligence agencies have identified no content that is classified or otherwise unfit for public disclosure. The White House Counsel has not conveyed to me the President's decisions as to assertions of executive privilege; I understand that the White House Counsel will convey such decisions to you directly.

Thank you for allowing the Special Counsel's Office to conduct our investigation independently and for supporting us with the necessary resources.

I am extraordinarily grateful for the thorough, careful, and diligent work of the Department of Justice employees who worked on this matter. I am deeply honored to have served with them.

Respectfully,

Robert K. Hur
Special Counsel

Enclosures:  Report
             Letter from counsel

# Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.

Special Counsel Robert K. Hur

*Submitted pursuant to 28 C.F.R. § 600.8(c)*

Washington, D.C.

February 2024

TABLE OF CONTENTS

EXECUTIVE SUMMARY.................................................................................... 1

CHAPTER ONE: LEGAL FRAMEWORK GOVERNING CLASSIFIED INFORMATION ............... 15

CHAPTER TWO: OVERVIEW OF THE INVESTIGATION....................................... 19

CHAPTER THREE: HANDLING OF CLASSIFIED INFORMATION IN THE OFFICE OF THE VICE PRESIDENT ......................................................................................... 33

CHAPTER FOUR: MR. BIDEN'S CLASSIFIED NOTECARDS AND NOTEBOOKS ..................... 53

CHAPTER FIVE: MR. BIDEN'S SECOND BOOK, PROMISE ME, DAD, AND THE DISCOVERY OF CLASSIFIED AFGHANISTAN DOCUMENTS ............................................... 95

CHAPTER SIX: THE CLASSIFIED AFGHANISTAN DOCUMENTS ....................................... 116

CHAPTER SEVEN: TRACING THE AFGHANISTAN DOCUMENTS ...................................... 150

CHAPTER EIGHT: MR. BIDEN'S FIRST BOOK, PROMISES TO KEEP, AND THE CLASSIFIED SENATE DOCUMENTS IN THE DELAWARE GARAGE .................................... 170

CHAPTER NINE: LEGAL STANDARDS ................................................................... 178

CHAPTER TEN: HISTORICAL BACKGROUND .............................................................. 192

CHAPTER ELEVEN: ANALYSIS OF THE EVIDENCE – CLASSIFIED AFGHANISTAN DOCUMENTS ................................................................................................. 200

CHAPTER TWELVE: ANALYSIS OF THE EVIDENCE – CLASSIFIED NOTEBOOKS ............... 223

CHAPTER THIRTEEN: ANALYSIS OF PRINCIPLES OF FEDERAL PROSECUTION FACTORS 249

CHAPTER FOURTEEN: CLASSIFIED DOCUMENTS FOUND AT THE PENN BIDEN CENTER 256

CHAPTER FIFTEEN: CLASSIFIED DOCUMENTS FOUND AT THE UNIVERSITY OF DELAWARE.................................................................................................. 312

CHAPTER SIXTEEN: OTHER CLASSIFIED DOCUMENTS FOUND IN MR. BIDEN'S DELAWARE HOME ........................................................................................ 326

CHAPTER SEVENTEEN: DELETION OF AUDIO RECORDINGS BY MARK ZWONITZER, MR. BIDEN'S GHOSTWRITER ........................................................................... 334

CONCLUSION................................................................................................. 345

APPENDIX A: RECOVERED DOCUMENTS ................................................................. A-1

APPENDIX B: CLASSIFICATION REVIEW RESULTS FOR SELECT NOTEBOOK ENTRIES AND OTHER HANDWRITTEN MATERIAL ............................................................ B-1

APPENDIX C: EVIDENCE ITEMS ........................................................................... C-1

## EXECUTIVE SUMMARY

We conclude that no criminal charges are warranted in this matter.[1] We would reach the same conclusion even if Department of Justice policy did not foreclose criminal charges against a sitting president.[2]

Our investigation uncovered evidence that President Biden willfully retained and disclosed classified materials after his vice presidency when he was a private citizen. These materials included (1) marked classified documents about military and foreign policy in Afghanistan, and (2) notebooks containing Mr. Biden's handwritten entries about issues of national security and foreign policy implicating sensitive intelligence sources and methods. FBI agents recovered these materials from the garage, offices, and basement den in Mr. Biden's Wilmington, Delaware home.

However, for the reasons summarized below, we conclude that the evidence does not establish Mr. Biden's guilt beyond a reasonable doubt. Prosecution of Mr. Biden is also unwarranted based on our consideration of the aggravating and mitigating factors set forth in the Department of Justice's Principles of Federal Prosecution. For these reasons, we decline prosecution of Mr. Biden.

\* \* \*

The classified documents and other materials recovered in this case spanned Mr. Biden's career in national public life. During that career, Mr. Biden has long seen

---

[1] We submit this report to the Attorney General pursuant to 28 C.F.R. § 600.8(c), which states that, "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General a confidential report explaining the prosecution or declination decisions reached by the Special Counsel."

[2] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 260 (2000).

himself as a historic figure. Elected to the Senate at age twenty-nine, he considered running for president as early as 1980 and did so in 1988, 2008, and 2020. He believed his record during decades in the Senate made him worthy of the presidency, and he collected papers and artifacts related to significant issues and events in his career. He used these materials to write memoirs published in 2007 and 2017, to document his legacy, and to cite as evidence that he was a man of presidential timber.

In 2009, then-Vice President Biden strongly opposed the military's plans to send more troops to Afghanistan. U.S. policy in Afghanistan was deeply important to Mr. Biden, and he labored to dissuade President Obama from escalating America's involvement there and repeating what Mr. Biden believed was a mistake akin to Vietnam. Despite Mr. Biden's advice, President Obama ordered a surge of additional U.S. troops, and Mr. Biden's views endured sharp criticism from others within and outside of the administration. But he always believed history would prove him right. He retained materials documenting his opposition to the troop surge, including a classified handwritten memo he sent President Obama over the 2009 Thanksgiving holiday, and related marked classified documents. FBI agents recovered these materials from Mr. Biden's Delaware garage and home office in December 2022 and January 2023.

Also, during his eight years as vice president, Mr. Biden regularly wrote notes by hand in notebooks. Some of these notes related to classified subjects, including the President's Daily Brief and National Security Council meetings, and some of the notes are themselves classified. After the vice presidency, Mr. Biden kept these

2

classified notebooks in unsecured and unauthorized spaces at his Virginia and Delaware homes and used some of the notebooks as reference material for his second memoir, *Promise Me, Dad*, which was published in 2017. To our knowledge, no one has identified any classified information published in *Promise Me, Dad*, but Mr. Biden shared information, including some classified information, from those notebooks with his ghostwriter. FBI agents recovered the notebooks from the office and basement den in Mr. Biden's Delaware home in January 2023.

\* \* \*

***Marked classified documents about Afghanistan.*** These documents from fall 2009 have classification markings up to the Top Secret/Sensitive Compartmented Information level. They were found in a box in Mr. Biden's Delaware garage that contained other materials of great personal significance to him and that he appears to have personally used and accessed. The marked classified documents were found along with drafts of the handwritten 2009 Thanksgiving memo Mr. Biden sent President Obama in a last-ditch effort to persuade him not to send additional troops to Afghanistan. These materials were proof of the stand Mr. Biden took in what he regarded as among the most important decisions of his vice presidency.

Mr. Biden wrote his 2007 and 2017 memoirs with the help of a ghostwriter. In a recorded conversation with his ghostwriter in February 2017, about a month after he left office, Mr. Biden said, while referencing his 2009 Thanksgiving memo, that he had "just found all the classified stuff downstairs." At the time, he was renting a home in Virginia, where he met his ghostwriter to work on his second memoir. Downstairs from where they met was Mr. Biden's office, where he stored his papers. He moved

3

out of the Virginia home in 2019, consolidating his belongings in Delaware—where FBI agents later found marked classified documents about the Afghanistan troop surge in his garage.

Evidence supports the inference that when Mr. Biden said in 2017 that he had "just found all the classified stuff downstairs" in Virginia, he was referring to the same marked classified documents about Afghanistan that FBI agents found in 2022 in his Delaware garage.

Nevertheless, we do not believe this evidence is sufficient, as jurors would likely find reasonable doubt for one or more of several reasons. Both when he served as vice president and when the Afghanistan documents were found in Mr. Biden's Delaware garage in 2022, his possession of them in his Delaware home was not a basis for prosecution because as vice president and president, he had authority to keep classified documents in his home. The best case for charges would rely on Mr. Biden's possession of the Afghanistan documents in his Virginia home in February 2017, when he was a private citizen and when he told his ghostwriter he had just found classified material.

Several defenses are likely to create reasonable doubt as to such charges. For example, Mr. Biden could have found the classified Afghanistan documents at his Virginia home in 2017 and then forgotten about them soon after. This could convince some reasonable jurors that he did not retain them willfully. When Mr. Biden told his ghostwriter about finding "all the classified stuff downstairs," his tone was matter-of-fact. For a person who had viewed classified documents nearly every day

4

for eight years as vice president, including regularly in his home, finding classified documents at home less than a month after leaving office could have been an unremarkable and forgettable event. Notably, the classified Afghanistan documents did not come up again in Mr. Biden's dozens of hours of recorded conversations with the ghostwriter, or in his book. And the place where the Afghanistan documents were eventually found in Mr. Biden's Delaware garage—in a badly damaged box surrounded by household detritus—suggests the documents might have been forgotten.

In addition, Mr. Biden's memory was significantly limited, both during his recorded interviews with the ghostwriter in 2017, and in his interview with our office in 2023. And his cooperation with our investigation, including by reporting to the government that the Afghanistan documents were in his Delaware garage, will likely convince some jurors that he made an innocent mistake, rather than acting willfully—that is, with intent to break the law—as the statute requires.

Another viable defense is that Mr. Biden might not have retained the classified Afghanistan documents in his Virginia home at all. They could have been stored, by mistake and without his knowledge, at his Delaware home since the time he was vice president, as were other classified documents recovered during our investigation. This would rebut charges that he willfully retained the documents in Virginia.

Given Mr. Biden's limited precision and recall during his interviews with his ghostwriter and with our office, jurors may hesitate to place too much evidentiary weight on a single eight-word utterance to his ghostwriter about finding classified

5

documents in Virginia, in the absence of other, more direct evidence. We searched for such additional evidence and found it wanting. In particular, no witness, photo, e-mail, text message, or any other evidence conclusively places the Afghanistan documents at the Virginia home in 2017.

In addition to this shortage of evidence, there are other innocent explanations for the documents that we cannot refute. When Mr. Biden told his ghostwriter he "just found all the classified stuff downstairs," he could have been referring to something other than the Afghanistan documents, and our report discusses these possibilities in detail.

We have also considered that, at trial, Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory. Based on our direct interactions with and observations of him, he is someone for whom many jurors will want to identify reasonable doubt. It would be difficult to convince a jury that they should convict him—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness.

We conclude the evidence is not sufficient to convict, and we decline to recommend prosecution of Mr. Biden for his retention of the classified Afghanistan documents.

* * *

***Notebooks containing classified information.*** FBI agents recovered from unlocked drawers in the office and basement den of Mr. Biden's Delaware home a set

6

of notebooks he used as vice president. Evidence shows that he knew the notebooks contained classified information. Mr. Biden wrote down obviously sensitive information discussed during intelligence briefings with President Obama and meetings in the White House Situation Room about matters of national security and military and foreign policy. And while reading his notebook entries aloud during meetings with his ghostwriter, Mr. Biden sometimes skipped over presumptively classified material and warned his ghostwriter the entries might be classified, but at least three times Mr. Biden read from classified entries aloud to his ghostwriter nearly verbatim.

Some evidence also suggests Mr. Biden knew he could not keep classified handwritten notes at home after leaving office. Mr. Biden, who had decades of experience with classified information, was deeply familiar with the measures taken to safeguard classified information and the need for those measures to prevent harm to national security. Asked about reports that former President Trump had kept classified documents at his own home, Mr. Biden wondered how "anyone could be that irresponsible" and voiced concern about "[w]hat data was in there that may compromise sources and methods." While vice president, he kept his notebooks in a White House safe for a time, in contrast with his decision after leaving office to keep them at home in unlocked drawers.

When Mr. Biden left office, he also knew his staff decided to store *notecards* containing his classified notes in a Secure Compartmented Information Facility (SCIF) at the National Archives, and he knew his *notebooks* contained the same type

7

of classified information. As he told his ghostwriter during a recorded interview, the same staff who arranged to secure his classified notecards "didn't even know" he had retained possession of his classified notebooks. Twice in 2017, Mr. Biden visited the National Archives SCIF to review his classified notecards while writing his book. Yet he kept his notebooks, which also contained classified information, in unlocked drawers at home. He had strong motivations to do so and to ignore the rules for properly handling the classified information in his notebooks. He consulted the notebooks liberally during hours of discussions with his ghostwriter and viewed them as highly private and valued possessions with which he was unwilling to part.

We do not, however, believe this evidence would meet the government's burden at trial—particularly the requirement to prove that Mr. Biden intended to do something the law forbids. Consistent with statements Mr. Biden made during our interview of him and arguments made by the White House Counsel and Mr. Biden's personal counsel, we expect Mr. Biden's defense at trial would be that he thought his notebooks were his personal property and he was allowed to take them home, even if they contained classified information. During our interview of him, Mr. Biden was emphatic, declaring that his notebooks are "my property" and that "every president before me has done the exact same thing," that is, kept handwritten classified materials after leaving office. He also cited the diaries that President Reagan kept in his private home after leaving office, noting that they included classified information.

Contemporaneous evidence suggests that when Mr. Biden left office in 2017, he believed he was allowed to keep the notebooks in his home. In a recorded

conversation with his ghostwriter in April 2017, Mr. Biden explained that, despite his staff's views to the contrary, he did not think he was required to turn in his notecards to the National Archives—where they were stored in a SCIF—and he had not wanted to do so. At trial, he would argue plausibly that he thought the same about his notebooks.

If this is what Mr. Biden thought, we believe he was mistaken about what the law permits, but this view finds some support in historical practice. The clearest example is President Reagan, who left the White House in 1989 with eight years' worth of handwritten diaries, which he appears to have kept at his California home even though they contained Top Secret information. During criminal litigation involving a former Reagan administration official in 1989 and 1990, the Department of Justice stated in public court filings that the "currently classified" diaries were Mr. Reagan's "personal records." Yet we know of no steps the Department or other agencies took to investigate Mr. Reagan for mishandling classified information or to retrieve or secure his diaries. Most jurors would likely find evidence of this precedent and Mr. Biden's claimed reliance on it, which we expect would be admitted at trial, to be compelling evidence that Mr. Biden did not act willfully.

As with the marked classified documents, because the evidence is not sufficient to convict Mr. Biden for willfully retaining the notebooks, we decline prosecution.

We also considered whether Mr. Biden willfully disclosed national defense information to his ghostwriter by reading aloud certain classified notebook passages to the ghostwriter nearly verbatim on at least three occasions. Mr. Biden should have

9

known that by reading his unfiltered notes about classified meetings in the Situation Room, he risked sharing classified information with his ghostwriter. But the evidence does not show that when Mr. Biden shared the specific passages with his ghostwriter, Mr. Biden knew the passages were classified and intended to share classified information. Mr. Biden's lapses in attention and vigilance demonstrate why former officials should not keep classified materials unsecured at home and read them aloud to others, but jurors could well conclude that Mr. Biden's actions were unintentional. We therefore decline to charge Mr. Biden for disclosure of these passages to his ghostwriter.

* * *

***Principles of Federal Prosecution.*** We have also evaluated "all relevant considerations" in aggravation and mitigation, as outlined in the Justice Manual, and determined that on balance, these factors do not support prosecution of Mr. Biden.[3]

Historically, after leaving office, many former presidents and vice presidents have knowingly taken home sensitive materials related to national security from their administrations without being charged with crimes. This historical record is important context for judging whether and why to charge a former vice president— and former president, as Mr. Biden would be when susceptible to prosecution—for similar actions taken by several of his predecessors.

With one exception, there is no record of the Department of Justice prosecuting a former president or vice president for mishandling classified documents from his

---

[3] U.S. Dep't of Just., Just. Manual §§ 9-27.001, 9-27.220, 9-27.230 (2023).

10

own administration. The exception is former President Trump. It is not our role to assess the criminal charges pending against Mr. Trump, but several material distinctions between Mr. Trump's case and Mr. Biden's are clear. Unlike the evidence involving Mr. Biden, the allegations set forth in the indictment of Mr. Trump, if proven, would present serious aggravating facts.

Most notably, after being given multiple chances to return classified documents and avoid prosecution, Mr. Trump allegedly did the opposite. According to the indictment, he not only refused to return the documents for many months, but he also obstructed justice by enlisting others to destroy evidence and then to lie about it. In contrast, Mr. Biden turned in classified documents to the National Archives and the Department of Justice, consented to the search of multiple locations including his homes, sat for a voluntary interview, and in other ways cooperated with the investigation.

In reaching our decision, we did not consider every circumstance in which criminal charges against a former president or vice president for mishandling classified information may be warranted. But on the facts of this case, "the fundamental interests of society" do not "require" criminal charges against Mr. Biden.[4] For this additional reason, applying the Principles of Federal Prosecution set forth in the Justice Manual, we decline prosecution.

The practices of retaining classified material in unsecured locations and reading classified material to one's ghostwriter present serious risks to national

---

[4] U.S. Dep't of Just., Just. Manual §§ 9-27.001, 9-27.220 (2023).

11

security, given the vulnerability of extraordinarily sensitive information to loss or compromise to America's adversaries. The Department routinely highlights such risks when pursuing classified mishandling prosecutions. But addressing those risks through criminal charges, the only means available to this office, is not the proper remedy here.

\* \* \*

*Other classified materials.* For other recovered classified documents, after a thorough investigation the decision to decline criminal charges was straightforward. The FBI recovered additional marked classified documents at the Penn Biden Center, elsewhere in Mr. Biden's Delaware home, and in collections of his Senate papers at the University of Delaware, but the evidence suggests that Mr. Biden did not willfully retain these documents and that they could plausibly have been brought to these locations by mistake. We also investigated whether persons other than Mr. Biden knowingly mishandled these classified documents, and our investigation showed that they did not. In reaching these conclusions, we note the numerous previous instances in which marked classified documents have been discovered intermixed with the personal papers of former Executive Branch officials and members of Congress.

\* \* \*

*Mr. Biden's ghostwriter and destruction of evidence.* After learning of the special counsel's appointment in this matter, Mr. Biden's ghostwriter deleted audio recordings he had created of his discussions with Mr. Biden during the writing of Mr. Biden's 2017 memoir. The recordings had significant evidentiary value.

12

After telling the Special Counsel's Office what he had done, the ghostwriter turned over his computer and external hard drive and consented to their search. Based on the FBI's analysis, it appears the FBI recovered all deleted audio files relating to the memoir, though portions of a few of the files appear to be missing, which is possible when forensic tools are used to recover deleted files. The ghostwriter kept, and did not delete or attempt to delete, his near-verbatim transcripts of the recordings and produced those transcripts to us, including for each of the incomplete recovered files.

We considered whether to charge the ghostwriter with obstruction of justice, but we believe the evidence would be insufficient to obtain a conviction and therefore declined to prosecute him.

While the ghostwriter admitted that he deleted the recordings after he learned of the special counsel's investigation, the evidence falls short of proving beyond a reasonable doubt that he intended to impede an investigation, which is the intent required by law. In his interviews, the ghostwriter offered plausible, innocent reasons for why he deleted the recordings. He also preserved his transcripts that contain some of the most incriminating information against Mr. Biden—including his statement about finding "all the classified stuff downstairs" in 2017—which is inconsistent with an intent to impede an investigation by destroying evidence. And the ghostwriter voluntarily produced to investigators his notes and the devices from which the recordings were recovered.

For these reasons, we believe that the admissible evidence would not suffice to obtain a conviction of the ghostwriter for obstruction of justice. On balance, relevant aggravating and mitigating factors also do not support his prosecution.

*  *  *

14

CHAPTER ONE

LEGAL FRAMEWORK GOVERNING CLASSIFIED INFORMATION

The Constitution vests the president with "authority to classify and control access to information bearing on national security."[5] By executive order, presidents since Franklin Roosevelt have prescribed a system for classifying and safeguarding national security information.[6] In 1994, Congress directed the president to establish by executive order or regulation uniform procedures governing access to classified information across the executive branch.[7] President Obama issued the current order when Mr. Biden was vice president.[8] Among other things, the order sets forth rules that determine whether a person may access classified information and how that information must be handled.[9]

The 1994 statute—and, by implication, the current executive order governing classified information—do not apply to a sitting president or vice president, members of Congress, justices of the Supreme Court, and federal judges.[10]

There is, however, no statutory exception for a former president or vice president, and the restrictions on access to classified information in the executive

---

[5] *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988); *see* U.S. CONST. art. II, § 2.

[6] KEVIN R. KOSAR, CONG. RSCH. SERV., R41528, CLASSIFIED INFORMATION POLICY AND EXECUTIVE ORDER 13526 3 (2010).

[7] 50 U.S.C. § 3161.

[8] Classified National Security Information, Executive Order 13526, 75 Fed. Reg. 707 (2009).

[9] *Id.* § 4.1.

[10] 50 U.S.C. §§ 3161(a), 3163.

order and the rules prescribed under its authority appear to apply to such former officials.[11]

The order defines classified information to include: (a) military plans, weapons systems, or operations; (b) foreign government information; and (c) intelligence activities, including covert actions and intelligence sources, methods, or cryptology.[12] Information is classified only if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security."[13] Information is classified as "Confidential" if its unauthorized disclosure reasonably could be expected to cause *damage* to the national security. It is classified as "Secret" if its unauthorized disclosure reasonably could be expected to cause *serious damage* to the national security. And it is classified as "Top Secret" if its unauthorized disclosure reasonably could be expected to cause *exceptionally grave damage* to the national security.[14]

The order also sets forth conditions that any person (other than the current officeholders listed above) must meet to access to classified information.[15] To receive such access, a person is required to:

1. Have a favorable determination of eligibility (generally after completion of a background investigation);

2. Sign an approved nondisclosure agreement; and

---

[11] 50 U.S.C. § 3163; Executive Order 13526 §§ 4.1(a), 4.4; *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sept. 21, 2022) (per curiam).

[12] Executive Order 13526 § 1.4.

[13] *Id.* § 1.4.

[14] *Id.* § 1.2.

[15] *Id.* § 4.1.

16

3. Have a need-to-know the information.[16]

For former presidents and vice presidents, the order expressly allows for the need-to-know requirement (but not the others listed above) to be waived by an agency.[17] A former official may obtain such a waiver only if a senior official of the agency that originated the classified information "determines in writing that access is consistent with the interest of the national security," "takes appropriate steps to protect [the] classified information from unauthorized disclosure or compromise," and "ensures that the information is safeguarded in a manner consistent with [the executive order]."[18]

In addition to establishing rules that govern access to classified information, the order also requires agency heads to establish controls over how it must be stored.[19] Among other things, Top Secret and Secret information must be kept in a storage container approved by the General Services Administration or an approved and locked storage area.[20] Information that is even more sensitive—called Sensitive Compartmented Information and sometimes referred to as "codeword" information— must be stored in an accredited Sensitive Compartmented Information Facility, or SCIF.[21]

---

[16] *Id.* § 4.1(a).

[17] *Id.* § 4.4.

[18] *Id.* § 4.4; *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8.

[19] Executive Order 13526 § 4.1(g).

[20] *See* 32 C.F.R. §§ 2001.43(b)(1) and (2), 2001.53.

[21] Office of the Director of National Intelligence, Intelligence Community Directive 705 (2010). Sensitive Compartmented Information is a subset of classified information "concerning or derived from intelligence sources, methods or analytical processes that is required to be protected within formal access control systems established by the [Director of

The restrictions described above apply to classified information in any documentary form, whether it is printed, typed, or handwritten.[22]

---

National Intelligence]." Office of the Director of National Intelligence, Intelligence Community Directive 703, "Protection of Classified National Intelligence, Including Sensitive Compartmented Information," § D2 (2013).

[22] *See* Executive Order 13526 §§ 1.1, 2.1, 6.1(i), 6.1(p), 6.1(t).

18

CHAPTER TWO

OVERVIEW OF THE INVESTIGATION

I.   DISCOVERY OF CLASSIFIED DOCUMENTS

A.   **Personal counsel to Mr. Biden discovered marked classified documents at the Penn Biden Center**

On November 2, 2022, Patrick Moore—one of Mr. Biden's personal counsel—reviewed boxes of material belonging to Mr. Biden, which were stored at the Penn Biden Center for Diplomacy and Global Engagement in Washington, D.C., an office space formerly used by Mr. Biden. During this review, Moore found documents with classification markings dating to Mr. Biden's vice presidency.

Moore notified Robert Bauer, another personal counsel to Mr. Biden, who then notified the White House Counsel. That evening, the White House Counsel's Office informed the general counsel for the National Archives and Records Administration.[23]

The next morning, November 3, 2022, the National Archives sent two archivists to retrieve the documents and the three boxes in which they were found.[24] Upon reviewing the documents in a SCIF, the National Archives found nine documents, totaling 44 pages, with classification markings.[25] The documents were

---

[23] NARA General Counsel 11/10/22, FBI Serial 4 at 1-2; FBI Serial 4 1A5 at 2-3. An FBI Serial refers to a numbered entry in the FBI's case file, which may have evidentiary attachments that are often designated as "1A" files. When an FBI agent logs a new report, for example, into the case file, the report is given a serial number corresponding to the order in which the new file was logged.

[24] NARA Archivist 2 11/10/22, FBI Serial 3 at 1-2; NARA COS 11/16/22, FBI Serial 6 at 1-2; NARA COO 11/15/22, FBI Serial 10 at 2-3; NARA General Counsel 11/10/22, FBI Serial 4 at 2.

[25] NARA Archivist 2 11/10/22, FBI Serial 3 at 2; NARA COO 11/15/1022, FBI Serial 10 at 3 and 1A8 11-422 e-mail with notes on boxes.

classified up to the Top Secret level and included codes indicating some of the information was Sensitive Compartmented Information.[26] The marked classified documents were located in two of the three boxes.[4] All three boxes contained records dating from Mr. Biden's time as vice president.[27]

The day after the National Archives retrieved the classified documents, on November 4, 2022, the Archives notified officials in the National Security Division of the Department of Justice (DOJ) and the Office of the Director of National Intelligence of the discovery of "classified records related to President Biden's time as Vice President."[28] A few days later, on November 9, the FBI opened an initial assessment to begin investigating the matter.[29]

The following day, November 10, the Chief of DOJ's Counterintelligence and Export Control Section sent Bauer a letter describing the steps that Bauer and others acting on the president's behalf should take.[30] The Chief informed Bauer that "[t]he prospect that classified material may have been stored in an unsecure location over a prolonged period may have national security implications."[31] He also told Bauer that, pending further action by DOJ, the Penn Biden Center and Mr. Biden's post-Vice Presidential Office should (1) secure "rooms and locations that contain any

---

[26] NARA Archivist 2 11/10/22, FBI Serial 3 at 2; NARA COO 11/15/22, FBI Serial 10 at 3 and 1A8 11-422 e-mail with notes on boxes.

[27] NARA COO 11/15/22, FBI Serial 10 at 3.

[28] 11/4/22 e-mail from NARA OIG, FBI Serial 28, 1A35.

[29] The FBI opened an initial assessment on November 9, 2022. See FBI Serial 1; FBI Serial 2; FBI Serial 28. On January 13, 2023, the FBI converted the initial assessment to a full investigation after receiving approval from the Attorney General and other appropriate authorities. FBI Serial 68.

[30] 11/10/22 ltr. from CES Chief, FBI Serial 9, 1A7.

[31] Id.

additional potential government records and materials from President Biden's time as Vice-President," (2) preserve the status quo as to the location of such materials and refrain from reviewing them, (3) preserve all video footage, visitor logs, and other access records from the Penn Biden Center, (4) provide a list of all locations where material from Mr. Biden's time as vice president have been stored, and (5) give express consent for FBI and Department of Justice personnel to review the records retrieved by the National Archives.[32]

Bauer responded the next day stating that President Biden had no objection to the requested steps and would "cooperate fully with the Department and, as directed by the Department, with [the Archives]."[33] Bauer stated, "[w]e do not know of any rooms or locations that contain additional potential government records and materials from President Biden's time as Vice President, but will immediately acknowledge and act as directed in the event we learn of any, as we did here."[34]

On November 14, 2022, the Attorney General assigned John Lausch, then the U.S. Attorney for the Northern District of Illinois, to lead the initial investigation and assess whether the Attorney General should appoint a special counsel to investigate the matter.[35] Among other steps, investigators interviewed witnesses, reviewed the recovered documents, obtained security video footage from the Penn Biden Center,

---

[32] 11/10/22 ltr. from CES Chief, FBI Serial 9, 1A7.

[33] 11/11/22 e-mail from Bauer, FBI Serial 9, 1A7.

[34] *Id.*

[35] Attorney General Merrick B. Garland Delivers Remarks on the Appointment of a Special Counsel, Office of Public Affairs, U.S. Dep't of Justice (Jan. 12, 2023), https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-appointment-special-counsel-0 (last visited Feb. 2, 2024).

21

and conducted a consensual search of the Penn Biden Center to ensure there were no other classified materials there.[36]

**B.    Personal counsel discovered marked classified documents relating to Afghanistan in Mr. Biden's Delaware garage**

On December 20, 2022, nearly seven weeks after the initial discovery of classified documents at the Penn Biden Center, Bauer and Moore traveled to Mr. Biden's personal residence in Wilmington, Delaware to search the garage for classified documents or other Obama-era presidential records.[37] They later explained that through discussions with current and former Biden staffers, they came to believe that documents from Mr. Biden's time as vice president may have been moved into the garage.[38] We considered the possibility that Mr. Biden alerted his counsel that classified documents were in the garage, but our investigation revealed no evidence of such a discussion because, it if happened, it would be protected by the attorney-client privilege.

Bauer searched a closet in the garage and found documents with classification markings inside a binder.[39] After Bauer made this discovery, Moore found documents with classification markings in an unsealed box in another area of the garage, including documents from 2009 relating to U.S. policy in Afghanistan.[40] After finding

---

[36] *E.g.*, NARA COS 11/16/22, FBI Serial 6; NARA COO 11/15/22, FBI Serial 10; NARA Archivist 3 11/16/22, FBI Serial 7; Moore 11/18/22, FBI Serial 16; Staff Assistant 3 12/21/22, FBI Serial 36; Executive Assistant 1/4/22, FBI Serial 64; FBI Serial 19; FBI Serial 26; FBI Serial 41; FBI Serial 693; FBI Serial 14.

[37] *See* Moore 2/17/23, FBI Serial 96; 12/28/22 Narrative from Bauer, FBI Serial 8 1A5.

[38] *See* Moore 12/21/22, FBI Serial 33.

[39] *Id.* at 2; 12/28/22 Narrative from Bauer at 2, FBI Serial 8 1A5.

[40] Moore 12/21/22, FBI Serial 33 at 2; 12/28/22 Narrative from Bauer at 2, FBI Serial 8 1A5; FBI Serial 75 at 2.

22

these marked classified documents in two locations in the garage, Bauer and Moore stopped their search.[41]

Later that same day, Bauer notified Lausch of the discoveries in Mr. Biden's garage.[42] On Mr. Biden's behalf, Bauer provided consent for FBI agents to search the garage and seize classified or other government records from the time of the Obama administration.[43]

The FBI dispatched two agents to retrieve the boxes in the garage the following day.[44] The agents met Moore at the garage, expecting he would point them to all of the boxes potentially containing classified material.[45] Upon learning, however, that counsel had not searched the entire garage, the agents conducted a limited search of the garage intended to determine whether it contained other classified documents.[46] The agents seized the containers Mr. Biden's counsel had identified and several other containers, documents, and materials.[47]

The two agents lacked sufficient resources to conduct a comprehensive search of the entire garage given the volume of material stored there.[48] Accordingly, Lausch e-mailed Bauer and asked that he ensure "that the garage remains secure, access to it is strictly limited, and no items are removed from that location until a further

---

[41] Moore 12/21/22, FBI Serial 33 at 2; 12/28/22 Narrative from Bauer at 2, FBI Serial 8 1A5.

[42] Moore 2/17/23, FBI Serial 96 at 3-4, 11; Moore 11/18/22, FBI Serial 16 at 2; 12/28/22 Narrative from Bauer, FBI Serial 8 1A5.

[43] 12/20/22 Consent to Search, FBI Serial 35 1A39.

[44] FBI Serials 29, 35.

[45] FBI Serial 35 at 1.

[46] *Id.* at 1-2.

[47] *Id.* at 3-5; FBI Serial 29.

[48] FBI Serial 35 at 1-2.

23

review of the remaining materials occurs."[49] Lausch also wrote that they needed to "continu[e] our conversation about the Department receiving appropriate assurances that no records from President Biden's prior term as Vice-President remain at any unauthorized location, including within the Wilmington Residence, or any other residence, storage facility, or space."[50]

### C. Personal counsel discovered more marked classified documents in Mr. Biden's basement den

After the holidays, Bauer and Jennifer Miller, another personal counsel for Mr. Biden, continued their efforts to determine whether there were any other classified records in Mr. Biden's Delaware home.[51] On the evening of January 11, 2023, counsel traveled to the house to search areas other than the garage.[52] Bauer and Miller remained together during the search.[53] They first searched Mr. Biden's primary office—sometimes called "the library"—on the main floor of the house.[54] They identified no documents with classification markings there.[55] They moved on to the den in the basement.[56] There, in a wooden two-drawer file cabinet, counsel found a document with classification markings from the Obama administration in a notebook

---

[49] *Id.*; 12/22/22 e-mail from Lausch to Bauer; FBI Serial 34, 1A38.

[50] 12/22/22 e-mail from Lausch to Bauer; FBI Serial 34, 1A38.

[51] Miller Tr. at 9-10; FBI Serial 51.

[52] FBI Serial 51; 1/17/23 Description of Searches from Bauer, FBI Serial 55, 1A67; Miller Tr. at 4-5.

[53] Miller Tr. at 10-12; FBI Serial 51.

[54] 1/17/23 Description of Searches from Bauer at 1-7, FBI Serial 55, 1A67; Miller Tr. at 6.

[55] *See* 1/17/23 Description of Searches from Bauer at 1-7, FBI Serial 55, 1A67.

[56] 1/17/23 Description of Searches from Bauer at 7; Miller Tr. at 40.

labeled "1/6/12 #2 Foreign Policy."[57] Bauer and Miller stopped their detailed search at this point and performed a cursory visual inspection of the rest of the house after that.[58]

The next day, January 12, 2023, Bauer informed Lausch of the discovery in the basement den.[59] The FBI sent agents to the house that evening to recover the classified material.[60] Bauer informed Lausch that, at that time, Bauer did not have Mr. Biden's consent for the FBI to search and seize his notebook that contained the marked classified document. Thus, on Bauer's instructions, Richard Sauber of the White House Counsel's Office met agents at the house and escorted them to the marked classified material found in the notebook in the basement cabinet.[61]

Agents observed Sauber pick up the notebook and leaf through it. Sauber and the agents eventually found two documents with classification markings: (1) a three-page PowerPoint presentation marked as "Secret//NOFORN//Pre-decisional" dated May 22, 2013, relating to Afghanistan; and (2) a three-page memorandum labeled "TS/SCI"—shorthand for Top Secret/Sensitive Compartmented Information—dated November 1, 2013, relating to Iraq.[62] The agents seized the documents with classification markings and secured the "1/6/12 #2 Foreign Policy" notebook in a locking classified-document courier bag.[63] After discussions with Lausch, Sauber

---

[57] 1/17/23 Description of Searches from Bauer at 7; Miller Tr. at 40-42, 44; FBI Serial 44.

[58] 1/17/23 Description of Searches from Bauer at 7-8; Miller Tr. at 46, 51, 59.

[59] 1/13/23 Conference Call with Bob Bauer and personal counsel, FBI Serial 51 at 1-2.

[60] *See* FBI Serial 44.

[61] FBI Serials 44, 694.

[62] FBI Serial 43; FBI Serial 44 at 1-2.

[63] FBI Serial 44 at 2; FBI Serial 160 at 2.

provided the "1/6/12 #2 Foreign Policy" notebook to FBI agents two days later.[64] The

notebook, like other notebooks described below, contained Mr. Biden's handwritten

notes as vice president relating to foreign policy and national security.[65]

### D.    The Attorney General appointed a special counsel to investigate

On January 12, 2023—the same day FBI agents retrieved marked classified

documents from the basement cabinet—the Attorney General appointed Robert Hur

as special counsel to investigate the matter.[66] The Attorney General's Order

authorized Hur to conduct the investigation initially led by Lausch, "including

possible unauthorized removal and retention of classified documents or other records

discovered at the Penn Biden Center for Diplomacy and Global Engagement and the

Wilmington, Delaware, private residence of President Joseph R. Biden, Jr., as well as

any matters that arose from the initial investigation or may arise directly from the

special counsel's investigation or that are within the scope of 28 C.F.R. § 600.4(a)."[67]

### E.    FBI agents discovered more marked classified documents and handwritten classified notes in various parts of Mr. Biden's home

After the discovery of the classified documents in Mr. Biden's basement, Mr.

Biden consented to a search of the entirety of the Delaware home by the FBI for

---

[64] FBI Serials 46, 51.

[65] Notebook 1B15; FBI Serial 199.

[66] Office of the Attorney General, Order No. 5588-2023, Appointment of Robert K. Hur as Special Counsel (January 12, 2023).

[67] *Id.* Section 600.4(a) of Title 28 of the Code of Federal Regulations provides, in relevant part, that the jurisdiction of a special counsel "shall also include the authority to investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses." 28 C.F.R. § 600.4(a).

relevant materials, including documents with classification markings and other potentially classified information.[68]

FBI agents searched the home on January 20, 2023.[69] Agents searched all areas of the house, including the garage, which agents had partially searched on December 21, 2022.[70] The house has a lower-level basement, a first-level main floor, a second level with the primary bedroom, and a third-level top floor with additional rooms and attic storage space.[71] Agents seized items that fell primarily into two categories: (1) boxes or folders containing documents with classification markings, most of which date to the 1970s and relate to foreign trips Mr. Biden took as a senator; and (2) notebooks containing his handwritten notes from his time as vice president relating to foreign policy and national security. Two of these notebooks had marked classified documents stored inside them, and several notebooks contained handwritten information that was itself classified.[72]

In Mr. Biden's garage, agents found several documents with classification markings dating from Mr. Biden's time in the Senate in the 1970s and 1980s.[73] Some of those documents relate to foreign trips Mr. Biden took as a senator, some of which he chronicled in his 2007 memoir, *Promises to Keep*. Agents found those Senate-era documents in a storage closet in Mr. Biden's garage.

---

[68] 1/20/23 Consent to Search for the Wilmington House, FBI Serial 77.

[69] FBI Serial 77.

[70] FBI Serials 77, 35.

[71] FBI Serial 77.

[72] *Id.*; FBI Serial 676.

[73] FBI Serials 77, 639; Recovered documents D1-D17, D17-1 to D19.

In Mr. Biden's main-floor office, basement den, and second-floor office, agents found and seized seventeen notebooks and a stack of notecards, all of which contained Mr. Biden's handwritten notes on foreign policy and national security matters as vice president.[74] Two of the notebooks, found in the main-floor office, had documents with classification markings stored inside them.[75]

Elsewhere in the house, agents found one document with classification markings in the third-level den.[76] And in an office attached to the primary bedroom on the second level agents found a binder (similar to a binder previously found in the garage), which contained most of the same marked classified documents as the binder found in the garage.[77]

### F.    FBI agents found more marked classified documents from the Senate era at the University of Delaware

Between January and June 2023, FBI agents searched over 300 boxes containing Mr. Biden's Senate papers, which were stored in two locations at the University of Delaware. Within those boxes, agents found documents with potential classification markings, dating from 1977 to 1991, during Mr. Biden's service in the Senate.[78]

## II.    SUMMARY OF INVESTIGATIVE ACTIVITY

The FBI and the Special Counsel's Office undertook an extensive investigation into Mr. Biden's handling of classified information and of the classified documents

---

[74] FBI Serial 77.
[75] *Id.*; FBI Serials 178, 682.
[76] FBI Serial 77.
[77] *Id.*; FBI Serial 701.
[78] FBI Serials 83, 91, 98, 290.

28

the FBI seized. We applied our best efforts to conduct the investigation thoroughly and expeditiously.

Investigators conducted 173 interviews of 147 witnesses, including Mr. Biden himself. All told, the investigation collected over seven million documents, including e-mails, text messages, photographs, videos, toll records, and other materials from both classified and unclassified sources.

We also coordinated with the government agencies that had equities in the classified and potentially classified documents the FBI seized from locations associated with Mr. Biden. The agencies conducted classification review of seized documents to recommend the appropriate classification level, compartmentation, and dissemination controls for each document. Investigators met with subject-matter experts in the intelligence community to determine whether the documents contained information that a jury could conclude was national defense information under the Espionage Act.[79]

Mr. Biden's notebooks, which contained, among other things, his handwritten notes taken during classified meetings as vice president, presented a challenge. None of the pages contained classification markings but investigators assessed some of the content was potentially classified. Classification review by intelligence agencies of unmarked information is more challenging and time-consuming than for marked documents. We therefore reviewed all of Mr. Biden's handwritten notes and selected thirty-seven excerpts totaling 109 notebook pages to submit for classification review.

---

[79] *See* Chapter 9, Section I.B for a discussion of the term "national defense information."

29

Investigators selected entries they believed were most likely highly classified and that a jury of laypeople would find was national defense information under the Espionage Act.

For both marked classified documents and unmarked documents, the Office of the Director of National Intelligence reviewed each document and provided a list of agencies with potential equities in each document. The FBI requested classification review from each identified agency accordingly. For documents where multiple agencies had equities, the Special Counsel's Office used the highest level of classification identified by an agency as the current classification of the document. Results of the classification review are summarized in Appendix A, which provides an unclassified summary of the recovered documents submitted for classification review.

Classification review conducted in the context of a criminal investigation has limitations. Agencies with equities in the information in the seized documents have applied their best efforts to determine the current classification of the material we submitted to them. In so doing, some have indicated that classification determinations are subject to change. Real-world events and changed circumstances can affect the harm to national security that would result from unauthorized disclosure of the information. Changed circumstances and events could therefore result in future modifications to classification determinations.

Some agencies have also noted that, in the typical context of a classification review, such as pursuant to a Freedom of Information Act request, they consult with

one another before making a final classification determination. That is to ensure an agency does not, for example, release information another agency considers classified. In this investigation, however, the Special Counsel's Office and FBI have asked agencies to determine only the classification of information belonging to them, without consulting other agencies to determine the overall classification of a document. Consistent with how the Department of Justice has handled the issue in similar investigations, the Special Counsel's Office enlisted the help of the Office of the Director of National Intelligence to determine which information should be submitted to which agency. Classification determinations provided to the Special Counsel's Office, therefore, are not "final" determinations of the agencies, in the sense that each agency cannot unequivocally state the classification level of a document without having undertaken that interagency coordination themselves. Instead, agencies have provided classification determinations specific to the information they originated or own, and nothing more.

Finally, the National Security Council is an equity holder in a large volume of the classified or potentially classified information recovered in this investigation. The National Security Council, however, works in direct support of Mr. Biden in his current position as president. To avoid a conflict of interest in having Mr. Biden's own National Security Council determine the classification level of documents recovered in this investigation, the White House asked the Department of State to "stand in" for the National Security Council in conducting classification review of White House or National Security Council information. The State Department did so by applying

31

the National Security Council's classification guide to the documents with such information, rather than by following its internal State Department classification review process. The State Department, however, is not the National Security Council. And the classification authorities at the State Department do not have the legal authority to classify information belonging to the National Security Council. Results received from the State Department as a "stand-in" for the National Security Council, therefore, are the government's current best estimate of classification under the circumstances. The National Security Council could reach different conclusions.

CHAPTER THREE

## HANDLING OF CLASSIFIED INFORMATION IN THE OFFICE OF THE VICE PRESIDENT

As vice president, Mr. Biden received and stored classified materials at the White House, his official residence at the Naval Observatory, his private home in Delaware, and—very briefly—his rental home in Virginia.[80] He relied on staff to help deliver, store, and retrieve these classified materials.

The task of tracking and retrieving these documents was challenging given the relatively small size of Mr. Biden's staff and the volume of classified material Mr. Biden received through various channels on a near-daily and often urgent basis. While many members of Mr. Biden's staff sought to ensure that classified information was handled and stored properly, the Office of Vice President as a whole was unable to account for all the classified material Mr. Biden received and retained. Mr. Biden was known to remove and keep classified material from his briefing books for future use, and his staff struggled—and sometimes failed—to retrieve these materials. And there was no procedure at all for tracking some of the classified material Mr. Biden received outside his briefing books.

Mr. Biden also kept some material on his person or in his briefcase that he carried between the West Wing and his residences.[81] Staff did not go through the briefcase to retrieve or archive material from it.[82]

---

[80] *See* Chapter Seven.

[81] Staff Assistant 3 10/4/23 Tr. at 49; Executive Assistant 9/28/23 Tr. at 73-74; Personal Aide 1 4/26/23 Tr. at 58; Personal Aide 2 Tr. at 35.

[82] *See* Staff Assistant 3 10/4/23 Tr. at 67-68; Military Aide 10 Tr. at 22.

These gaps in the tracking and retrieval of Mr. Biden's classified materials made it more difficult to determine when, how, and why many of the classified documents later found in Mr. Biden's home and think tank ended up where they did not belong.

## I.    STRUCTURE OF THE OFFICE OF THE VICE PRESIDENT

Numerous witnesses told us that Mr. Biden relied on his staff to help transport, store, or return classified materials he received as vice president, and to ensure that those materials were handled properly.[83] As summarized below, several groups of staff were involved with the handling of classified material.

*National Security Affairs staff.* The Office of the Vice President had its own National Security Affairs staff that supported the vice president, his national security advisor, and his deputy national security advisor.[84] This office was distinct from President Obama's much larger National Security Council staff, which had its own systems for tracking and logging classified material that went to the president.[85]

The National Security Affairs staff consisted of (1) the national security advisor and staff, and (2) the Executive Secretary team. The national security advisor's staff included a mix of political staff and detailees from agencies such as the State Department; they provided substantive advice to the vice president on matters of foreign policy and national security.[86] While the national security advisors often

---

[83] Military Aide 4 Tr. at 7; Military Aide 9 Tr. at 7.

[84] *See, e.g.*, Executive Secretary 3 Tr. at 14-17.

[85] NSC Records Director Tr. at 18-31; McKeon Tr. at 36-40; Executive Secretary 1 Tr. at 73; Executive Secretary 3 Tr. at 14-15; Bakotic 7/19/23 Tr. at 9.

[86] 11/1/16 Memorandum from Outgoing OVP NSA, SCOH-000143. *See also* OVP NSA Staffer 3 Tr. at 5.

34

attended meetings and briefings with Mr. Biden where classified documents were discussed, these advisors did not view themselves as responsible for retrieving any classified materials from Mr. Biden or ensuring that he stored them properly.[87]

The Executive Secretary team had an administrative role: It compiled, provided, tracked, and retrieved classified material for Mr. Biden.[88] It was a small group, composed mostly of detailees from agencies, who provided administrative support and assisted in compiling classified briefing books for Mr. Biden.[89] The Executive Secretary—an experienced, career military officer—worked closely with the Director of Programs, who continued through the transition from the Bush administration and served through the entirety of the Obama administration.[90]

The Executive Secretary team had little direct access to Mr. Biden and relied on others to deliver and retrieve classified briefing books.[91] These others included military aides, naval enlisted aides, personal aides, and front office assistants.

---

[87] OVP NSA Staffer 2 Tr. at 41-42; OVP NSA Staffer 1 Tr. at 41; Blinken Tr. at 13; Sullivan Tr. at 19.

[88] *See, e.g.*, Director of Programs Tr. at 55-58, 105; Executive Secretary 1 Tr. at 14-18, 65; Executive Secretary 3 Tr. at 13; Bakotic 7/19/23 Tr. at 9-10; Executive Secretary 2 Tr. at 6, 9, 30; 11/1/16 Memorandum from Outgoing OVP NSA, SCOH-000143.

[89] Executive Secretary 1 Tr. at 14, 21-22; Bakotic 7/19/23 Tr. at 10; Director of Programs Tr. at 17-18; Executive Secretary 2 Tr. at 9; Executive Secretary Staffer 3 Tr. at 24-25; Executive Secretary Staffer 1 Tr. at 34, 41; Executive Secretary Staffer 2 7/7/23 Tr. at 8-9.

[90] Executive Secretary 1 Tr. at 7, 11-12, 17, 65; Executive Secretary 2 Tr. at 5, 8; Executive Secretary 3 Tr. at 11-13, 37-39; Bakotic 7/19/23 Tr. at 6-12; 11/1/16 Memorandum from Outgoing OVP NSA, SCOH-000143; Director of Programs Tr. at 5-6.

[91] *See, e.g.*, Director of Programs Tr. at 12; Executive Secretary 3 Tr. at 46; Bakotic 7/19/23 Tr. at 52-53; 1/14/17 e-mail amongst OVP National Security Affairs staff, Military Aides, and Naval Enlisted Aides, SCOH-000447.

35

*Military aides.* Military aides were servicemembers on detail from the Department of Defense.[92] Their primary role was to ensure continuity of operations should something happen to the president.[93] They also helped deliver classified material from the National Security Affairs staff to Mr. Biden when he was not at the White House, and brought classified material back when Mr. Biden was finished with it.[94] This included printing classified materials and compiling classified binders for Mr. Biden when he was traveling.[95]

Military aides were not responsible for ensuring that all materials delivered to the vice president were retrieved or properly disposed of, or for otherwise tracking classified documents.[96] But they assisted with the handling of classified documents because of their high-level security clearances, proximity to the vice president, and access to proper storage containers for classified material, such as lockable bags.[97]

*Naval enlisted aides.* Naval enlisted aides supported Mr. Biden at the Naval Observatory and at his personal home in Delaware, as well as on all foreign and domestic travel.[98] Their primary duties included cooking, cleaning, and laundry for the vice president.[99] Like military aides, they served as go-betweens for the delivery and retrieval of classified information due to their security clearances and proximity

---

[92] *See, e.g.*, Military Aide 9 Tr. at 7.

[93] Military Aide 4 Tr. at 7; Military Aide 9 Tr. at 7.

[94] Military Aide 4 Tr. at 13-14, 17; Military Aide 5 Tr. at 10-11, 13-14; Military Aide 8 Tr. at 24-25, 44; Military Aide 11 Tr. at 25; NEA 2 Tr. at 33-34.

[95] *See, e.g.*, Military Aide 4 Tr. at 8-9.

[96] *See, e.g.*, Military Aide 3 Tr. at 32-33.

[97] *See, e.g.*, Military Aide 1 Tr. at 14-15; Military Aide 8 Tr. at 24-25; Military Aide 10 Tr. at 23-24; Military Aide 12 Tr. at 14, 16.

[98] NEA 5 Tr. at 16-18.

[99] *Id.* at 13-14.

to the vice president.[100] They were the only staff members who regularly accessed Mr. Biden's private spaces on the second floor of the Naval Observatory Residence and at the Delaware residence.[101] At times they delivered classified material to him on the second floor of the Naval Observatory,[102] and when Mr. Biden left classified material out and unattended in those private spaces, they retrieved and secured it.[103]

Mr. Biden regularly received and reviewed classified material in the Naval Observatory and his Delaware home and left that material out where the naval enlisted aides collected it when he was finished with it. During his vice presidency, naval enlisted aides occasionally found classified material in various locations on the second floor of the Naval Observatory and in Delaware.[104] They either sent those materials back to the White House directly or through the military aides, who brought them to the Executive Secretary team for proper disposal.[105]

***Personal aides ("body men").*** Mr. Biden's personal aide, or "body man," who was always physically present with him at the White House and when traveling except to Delaware, also delivered and retrieved classified documents for him.[106] Personal aides typically had Top Secret/Sensitive Compartmented Information

---

[100] NEA 5 Tr. at 7, 28; NEA 1 Tr. at 13.

[101] *See, e.g.*, NEA 5 Tr. at 29; Military Aide 3 Tr. at 31; Military Aide 5 Tr. at 21; Residence Manager Tr. at 13; Personal Aide 1 4/26/23 Tr. at 113-14; Personal Aide 2 Tr. at 32, 36.

[102] NEA 5 Tr. at 28-30.

[103] *Id.* at 28-30, 35-36.

[104] NEA 2 Tr. at 30-31, 36; NEA 3 Tr. at 12, 40; NEA 4 Tr. at 11, 15, 21-22, 24, 25, 34; NEA 5 Tr. at 53-54, 59, 84-85; NEA 6 Tr. at 14-15, 24. *But see* NEA 1 Tr. at 18, 25, 31, 32, 44 (did not recall seeing classified material left out at Naval Observatory or Delaware).

[105] *See, e.g.*, Military Aide 5 Tr. at 11; Military Aide 1 Tr. at 9; Military Aide 3 Tr. at 30-31; NEA 2 Tr. at 19-20; NEA 5 Tr. at 42-43, 104, 107-108; NEA 6 Tr. at 15, 18.

[106] Personal Aide 1 4/26/23 Tr. at 20, 22.

clearances and were read into codeword compartments (involving Sensitive Compartmented Information) as needed.[107] They handled the logistics of Mr. Biden's schedule and ensured he had everything he needed.[108] They coordinated with military aides and National Security Affairs staff to handle the flow of classified material to and from Mr. Biden, but they did not track it.[109]

*Front office assistants.* At the White House, two assistants sat in the front office of Mr. Biden's West Wing office along with the personal aide and, at various times, a Counselor to the Vice President.[110] Staffers believed the West Wing office was a SCIF or otherwise approved for the discussion of classified information and treated it as such.[111] The assistants did not intentionally keep classified material for Mr. Biden in their front office space, and recalled that the only storage area they knew of for classified material in the Vice President's West Wing space was the safe in his office closet, which they generally did not access.[112] Assistants retrieved unclassified material from an outbox on Mr. Biden's desk, kept it in a box in their office space, and periodically sent it to the White House Office of Records Management to be archived in compliance with the Presidential Records Act.[113] When

---

[107] Personal Aide 1 4/26/23 Tr. at 18; Personal Aide 2 Tr. at 29-30; Personal Aide 3 3/28/23 Tr. at 21; 2/3/09 e-mail from OVP Counsel to Personal Aide 1, 1B001_03201938.

[108] Personal Aide 1 4/26/23 Tr. at 19-20.

[109] *Id.* at 20-22, 52, 145-146 (delivery and retrieval of classified material at the Wilmington Residence "wasn't my role").

[110] *See, e.g.*, Staff Assistant 2 Tr. at 25; Executive Assistant 1/4/23 Tr. at 6-7, 17-19.

[111] Executive Assistant 1/4/23 Tr. at 28; Staff Assistant 2 Tr. at 33-34; Director of Programs Tr. at 25-26; Blinken Tr. at 23-24.

[112] Staff Assistant 2 Tr. at 31-32; Executive Assistant 1/4/23 Tr. at 32; Staff Assistant 3 10/4/23 Tr. at 18.

[113] Staff Assistant 2 Tr. at 19-20; Staff Assistant 1 Tr. at 49; Staff Assistant 3 10/4/23 Tr. at 15-16; 5/22/12 Duties and Responsibilities, 1B001_02941293.

Mr. Biden left classified material in his outbox or handed it to an assistant, the assistant typically called his National Security Affairs team to retrieve it or returned it to the Situation Room.[114]

***Counsel to the Vice President.*** The various staff members within the Office of Vice President responsible for delivering, storing, retrieving, and tracking classified documents relied on guidance from the Counsel to the Vice President.[115] Mr. Biden had his own Counsel, separate from the White House Counsel's Office.[116] The Counsel had a Top Secret/Sensitive Compartmented Information clearance.[117] In the early days of the administration, Cynthia Hogan, Mr. Biden's first Counsel, developed policies and procedures for the proper handling and storage of classified materials in the Office of the Vice President.

The White House Counsel's Office and other White House components also provided guidance on the proper handling of classified material.[118] According to schedules and other documents, Hogan met with a number of White House employees

---

[114] Staff Assistant 2 Tr. at 19-21, 37-38, 45; Staff Assistant 3 10/4/23 Tr. at 17; Executive Assistant 9/28/23 Tr. at 33-35; 5/22/12 Duties and Responsibilities, 1B001_02941293; August 2016 West Wing Guide, SCOH-000427; 9/6/11 e-mail from front office assistant to Executive Secretary team, 1B001_02872534; 4/3/12 e-mail from front office assistant to Executive Secretary team, 1B001_02854428. *But see* Staff Assistant 1 Tr. at 62-63 (never returned classified material to his National Security Staff, his personal aide "did all of that").

[115] *See, e.g.*, 8/17/10 Memo from OVP Counsel to Mr. Biden re "Handling of Classified Documents," NARAWH_00000050; 8/23/10 e-mail from Military Aide 14 to OVP military aides re "Handling of Classified Material," NARAWH_00014447.

[116] Hogan 5/23/23 Tr. at 23-24.

[117] 2/25/09 e-mail from OVP Counsel, NARAWH_00002839; Lambros Tr. at 20; Nourse Tr. at 48; McGrail 5/2/23 Tr. at 54.

[118] Hogan 5/23/23 Tr. at 24-29.

39

to discuss the handling of classified material, including employees from the National Security Council and the White House Office of Records Management.[119]

## II.   THE PRESIDENTIAL RECORDS ACT AND ARCHIVING OF RECORDS

Mr. Biden's staff was also responsible for ensuring that documents were properly archived as required by the Presidential Records Act.[120] The Act gives the United States "complete ownership, possession, and control" of all presidential records and vice-presidential records, which must be retained and sent to the National Archives at the end of the administration.[121] The statute defines presidential records and vice-presidential records broadly to include documentary materials created or received "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties" of the president or vice president, including memoranda, correspondence, papers, photographs, and electronic records.[122]

Mr. Biden's Executive Secretary team was responsible for ensuring that classified documents were properly archived according to the Act.[123] The White House Office of Records Management handled the archiving of unclassified documents.[124]

---

[119] OVP Counsel's Office Weekly Report for Feb. 12 to Feb. 19, 2009, 1B001_00040596_0001-0002; OVP Counsel's Office Weekly Report for Feb. 27 to March 5, 2009, 1B001_00040491_0018-0019; OVP Counsel's Office Weekly Report for June 4-10, 2009, 1B001_00049811_0011-0015.

[120] WH Records Director Tr. at 14-16.

[121] 44 U.S.C. §§ 2201-09; 9/26/16 Memo by White House Counsel re Preservation and Retention of Records, NARAWH_00000905.

[122] 44 U.S.C. §§ 2201(2), 2207. We discuss the Presidential Records Act again in Chapters Nine and Ten.

[123] WH Records Director Tr. at 14-16.

[124] *Id.* at 13-14.

40

During the first week of the administration, a member of the White House Counsel's Office briefed Mr. Biden on the Act's recordkeeping requirements.[125] Hogan put in place a procedure to make sure that presidential and vice presidential records were collected and properly archived. She circulated a White House Counsel memo on the Act's requirements to employees in the Office of the Vice President.[126] She also met with Mr. Biden's personal aide to discuss the Act and its recordkeeping requirements, including the need to collect and preserve Mr. Biden's briefing books.[127]

## III.    THE HANDLING OF CLASSIFIED MATERIAL IN THE OFFICE OF THE VICE PRESIDENT

### A.    Classified products

Mr. Biden received classified documents in three primary forms: a classified binder prepared by his national security staff; the President's Daily Brief; and materials delivered to him as needed by his staff.

***Classified briefing book.*** Most days, the Executive Secretary team compiled a classified briefing book for Mr. Biden.[128] It was a binder of materials drafted or selected by Mr. Biden's advisors to prepare him for the day and upcoming trips.[129]

---

[125] 1/25/09 Memo re Briefing from White House Counsel on the Presidential Records Act and Ethics Rules, NARAWH_00000049; 1/26/09 Mr. Biden's Schedule for January 26, 2009, 1B001_03202545.

[126] 3/17/09 e-mail from Hogan to All OVP employees, 1B001_03199194; 3/11/09 Memo re the Presidential Records Act from White House Counsel to All EOP Staff, 1B001_03199195.

[127] 1/23/09 e-mail from Hogan to Personal Aide 1, 1B001_03061921.

[128] *See, e.g.,* Executive Secretary 2 Tr. at 9; 7/18/12 e-mail to all OVP staff, 1B001_00213201; 7/29/15 e-mail between Personal Aide and Mr. Biden, 1B001_02072094.

[129] *See, e.g.,* Executive Secretary 3 Tr. at 14, 16, 21-24, 29-30; Executive Secretary 1 Tr. at 20.

The Executive Secretary team assembled the book and ensured its delivery to Mr. Biden, in coordination with other staff as described above.[130] The Executive Secretary team also tracked the book's return.[131] Once returned, the books were stored in a safe in the Executive Secretary team's office.[132] Periodically, the team sent the books to the White House Office of Records Management to be archived.[133]

***President's Daily Brief.*** The Office of the Director of National Intelligence compiled a collection of intelligence community products known as the President's Daily Brief. Mr. Biden was assigned his own briefer, who also briefed his national security advisor, deputy national security advisor, and his last chief of staff.[134] The Director of National Intelligence required inclusion of a core group of articles, while the briefer supplemented articles tailored to Mr. Biden's interests and requests.[135]

Early in his vice presidency, Mr. Biden declined to receive oral briefings from his own briefer and instead joined President Obama for his briefings in the Oval

---

[130] *See, e.g.*, Executive Secretary 3 Tr. at 28, 33-34; Executive Secretary 1 Tr. at 26; Executive Secretary 2 Tr. at 13-14; 10/26/16 e-mail amongst OVP staff, SCOH-000239.

[131] Executive Secretary 3 Tr. at 34-35; Director of Programs Tr. at 55-56; Executive Secretary Staffer 2 7/7/23 Tr. at 24-25.

[132] Director of Programs Tr. at 53-54.

[133] *Id.* at 53, 61, 100; Executive Secretary 3 Tr. at 35; 2/4/09 e-mail from Hogan to Personal Aide 1, 1B001_03201837; 6/19/09 National Security Advisory Staff Assistant Standard Operating Procedures, NARAWH_00000712.

[134] PDB Briefer 1 Tr. at 3.

[135] *Id.* at 22-24, 36-37.

Office.[136] Throughout his tenure, Mr. Biden received a written brief, first on paper in a binder, and beginning in 2014, on a portable electronic device.[137]

Mr. Biden's briefer generally retrieved the copy of the brief delivered to Mr. Biden. Mr. Biden's Executive Secretary team stored the briefs in their safe until the briefer retrieved them.[138]

*"As-needed" materials.* Mr. Biden also received classified documents on an as-needed basis, hand-delivered to him by staff or printed to his West Wing office on a secure printer.[139] The Naval Observatory also had a classified printer the military aides used to print and deliver such materials to Mr. Biden there.[140] The Executive Secretary team lacked a formal system for tracking classified documents delivered to

---

[136] PDB Briefer 1 Tr. at 20-22; 1/28/09 e-mail to Personal Aide 1 listing Mr. Biden's schedule, 1B001_03202433; 12/15/09 e-mail between listing Mr. Biden's schedule, 1B001_03185236 ("9:45-10:15 am- Attend POTUS PDB"); 9/12/11 e-mail listing Mr. Biden's schedule, 1B001_02872037 ("9:30-10:00am POTUS PDB in Oval").

[137] PDB Briefer 1 Tr. at 42-43. In the early years, the PDB was printed for the Vice President, received at the Naval Observatory, and brought with him to the West Wing. 2/10/10-2/11/10 e-mail between Executive Secretary 1 and staff, 1B001_03060726. When interviewed, Mr. Biden said he received the PDB in a binder. Biden 10/8/23 Tr. at 19. When Mr. Biden was traveling, he received the PDB in paper copy via secure fax. PDB Briefer 1 Tr. at 40-43. *See also* 1/13/17 e-mail amongst Secret Service describing PDB delivery, USSS-0000477389.

[138] PDB Briefer 1 Tr. at 42-44; PDB Briefer 2 Tr. at 15, 24, 33.

[139] OVP NSA Staffer 2 Tr. at 24-26; 10/15/14 e-mail from Director of Programs to Executive Assistant ("There is a high side printer under your desk that I understand does not work correctly."), 1B001_03521121; 11/30/16 e-mail amongst OVP staff (requesting "toner for the classified printer"), SCOH-000224; 9/13/16 e-mail (discussing fixing the "classified printer"), SCOH-000269; 8/29/16 e-mail (requesting assistance with the "high side printer" in "the Vice President's West Wing Office"), SCOH-000425.

[140] 2/8/11 e-mail from Military Aide 15 to Personal Aide 1 and OVP National Security Affairs staff ("If they have a SECRET or higher classification, please have the WHSR send them to our VP MILAIDE (high side) printer here at the VPR."), 1B001_03155733; 11/17/16 e-mail amongst military aides and OVP National Security Affairs staff ("There is one piece of traffic/cable that I just printed to the Naval Observatory printer. Mil Aides, can you please deliver with morning traffic?"), SCOH-000241; Military Aide 5 Tr. at 10; Military Aide 1 Tr. at 8-9. The naval enlisted aides did not have access to a classified computer. NEA 5 Tr. at 30-31.

Mr. Biden on an as-needed basis, and no one else in the Office of the Vice President appears to have tracked them either.[141] Several of the marked classified documents recovered by the FBI in this investigation appear to have been given to Mr. Biden outside the briefing books.[142]

### B.    Efforts to retrieve and track classified material

In the early days of Mr. Biden's vice presidency, his Counsel, Hogan, instructed Mr. Biden's personal aide that all classified material provided to Mr. Biden should be returned to the Executive Secretary team.[143] Although there was a safe in Mr. Biden's office, Hogan told Mr. Biden's personal aide that "we don't want to store any classified material in the [West Wing] office, so just look to hand this stuff off as soon as it comes to you."[144]

The Executive Secretary team sought to retrieve Mr. Biden's classified briefing books every day but could not always do so.[145] At times, he kept one or more classified briefing books for his own reference or because he was not done with the material.[146]

---

[141] Executive Secretary Staffer 2 7/7/23 Tr. at 32-35; OVP NSA Staffer 2 Tr. at 40-42; OVP NSA Staffer 1 Tr. at 41; Blinken Tr. at 13.

[142] For example, document A2 was a memorandum recovered at the Penn Biden Center. *See* Chapter Fourteen. E-mail correspondence indicates it was printed to the West Wing printer, after the regular classified briefing book (which also contained a copy of the document) was returned. 9/27/16 Memo amongst OVP NSA and West Wing staff, 1B001_02306967. *See also* Chapter Sixteen.

[143] 2/4/09 e-mail from Hogan to Personal Aide 1, 1B001_03061837.

[144] 2/16/09 e-mail from Hogan to Personal Aide 1, 1B001_03201046.

[145] Director of Programs Tr. at 54, 57-58, 78.

[146] *Id.* at 54, 57-59; Executive Secretary Staffer 2 7/7/23 Tr. at 28-29. 11/8/10 e-mails amongst Personal Aide 1, military aides, and Executive Secretary team, 1B001_03161903.

And on occasion, he removed one or more briefing memos from the classified briefing book before returning it.[147]

In 2010, the Executive Secretary team raised concerns about the number of classified briefing books that Mr. Biden had not returned, and the fact that, even when they were returned, some of the content was missing.[148] These concerns were raised with Hogan as well as Mr. Biden's personal aide and military aides. E-mails indicate that the Executive Secretary team alerted Hogan to the issue at least in June 2010, when nearly thirty of the classified briefing books from the first six months of 2010 were outstanding, and in August 2010, when Mr. Biden failed to return Top Secret, Sensitive Compartmented Information (also referred to as "codeword") contents of a classified briefing book that he had received during a trip to the Hamptons, in New York.[149] We were unable to determine whether these materials were ever recovered, although they were likely found and disposed of by military aides or naval enlisted aides.[150]

---

[147] Director of Programs Tr. at 54-60; Executive Secretary Staffer 2 7/7/23 Tr. at 28-29; 11/8/10 e-mails amongst Personal Aide 1, military aides, and Executive Secretary team, 1B001_03161903.

[148] Director of Programs Tr. at 69-76, 90-91; Executive Secretary 3 Tr. at 36-37; Executive Secretary Staffer 2 7/7/23 Tr. at 28-29 (seeing the same in 2016-18).

[149] 6/29/10 e-mail from Director of Programs to Personal Aide 1 and military aides, 1B001_03171078; 8/16/10 e-mail from Executive Secretary to Hogan, 1B001_03168570; 8/17/10 e-mails between Military Aide 14 and Personal Aide 1, 1B001_03168569; Military Aide 10 Tr. at 24-25.

[150] 8/17/10 to 8/18/10 e-mails between Hogan and the Executive Secretary team and naval enlisted aides, NARAWH_00017121; Executive Secretary Staffer 2 7/7/23 Tr. at 31-33.

The return of classified briefing books without all of their contents frustrated the Executive Secretary team.[151] In response, Hogan implemented additional security procedures described below.[152] But even after those measures were implemented, the Executive Secretary team continued to struggle to retrieve classified briefing books from Mr. Biden.

We were able to trace one of the marked classified documents recovered by the FBI to a briefing book—a 2015 memorandum recovered from the Penn Biden Center.[153] But we were not able to determine whether other recovered documents came from briefing books or were handed or sent to Mr. Biden on an as-needed basis.

### C.    August 2010 briefing of Mr. Biden on the handling of classified material

Days after the Top Secret, codeword book went missing in 2010, Hogan met with Mr. Biden to discuss the handling of classified material.[154] Before the meeting, she prepared a briefing memo for him.[155] The memo, which was addressed to Mr. Biden and dated August 17, 2010, outlined "our procedures for handling your

---

[151] Director of Programs Tr. at 72-73; Executive Secretary 3 Tr. at 36-37; 11/8/10 e-mail from Director of Programs to military aides and others, 1B001_03161902. *See also* Executive Secretary Staffer 2 7/7/23 Tr. at 30-31 (seeing the same in 2016-2018).

[152] Director of Programs Tr. at 72-75, 90-91; 8/17/10 Memo from OVP Counsel to Mr. Biden re "Handling of Classified Documents," NARAWH_00000050.

[153] A review of the classified book or binder from the Archives showed that the binder from the date of document A8 was missing a tab and attachment which matched document A8. FBI Serial 692. Document A8 was also hole-punched, indicating it may have been the copy that was originally placed in that binder. FBI Serial 238.

[154] 8/17/10 e-mails between Military Aide 10, Military Aide 12, and Personal Aide 1, 1B001_03168569; 8/16/10 e-mail from Executive Secretary to Hogan, 1B001_03168570; 8/19/10 e-mail from OVP Counsel to Executive Secretary and others, 1B001_03168426.

[155] 8/17/10 Memo from OVP Counsel to Mr. Biden re "Handling of Classified Documents," NARAWH_00000050.

46

classified briefing material" that "must be maintained at all times," including the following:

- "Classified information of any kind may only be reviewed or discussed in secured locations, and never in a public place such as on a train."

- "The [classified briefing] books must remain in your custody, or that of your cleared staff, at all times unless they are in your safe. Classified material must be returned to your national security staff as soon as you are finished with them."

- "Classified materials may never be left unattended, but must be secured in an appropriate safe or transferred to an individual authorized to transport them in an appropriate locked bag whenever they are not in your personal custody."

- "Whenever possible, classified materials should remain at the White House complex. . . . If you need to receive classified materials while at your residence at NAVOBS or in Delaware, the military aides will bring the material to you and then wait to take the material back when you are finished so that it can be stored safely."[156]

When interviewed, Hogan did not recall the August 2010 meeting with Mr. Biden. She did, however, identify her handwritten talking points on "best practices."[157] Even though she did not remember their content, she identified her handwriting and said she likely created them in advance of her meeting with Mr. Biden.[158] According to her talking points, she briefed Mr. Biden on such best practices as making sure that "classified info stays in the WH complex whenever possible" and is "returned to N[ational] S[ecurity] staff at end of each day."[159] She also counseled Mr. Biden that any classified material taken from the White House must be

---

[156] 8/17/10 Memo from Hogan to Mr. Biden re "Handling of Classified Documents," NARAWH_ 00000050.

[157] Undated handwritten notes, NARAWH_00000050 at 4

[158] Hogan 9/19/23 Tr. at 66-69.

[159] Undated handwritten notes, NARAWH_00000050 at 4.

transported by military aides in locked bags and that military aides must retrieve the classified material when Mr. Biden was done with it.[160]

After the briefing, Mr. Biden sent Hogan an e-mail through one of his front office assistants, thanking her for the "security briefing."[161]

Despite the Hogan memo's language that the Office of the Vice President "must" follow certain procedures for handling classified information, Hogan conceived of the memo as describing "best practices" rather than legal requirements.[162] That view is consistent with the executive order governing handling and storage of classified information, which, as explained in Chapter One, does not apply to a sitting vice president. As outlined below, Mr. Biden and his staff did not follow Hogan's guidance to the letter.

**D.     The handling of classified material in Mr. Biden's personal spaces after August 2010**

As part of his duties as vice president, Mr. Biden accessed and stored classified material in the Naval Observatory and at his Delaware home, outside of containers normally authorized for such information. His staff, following Hogan's advice, tried

---

[160] Undated handwritten notes, NARAWH_00000050. *See also* 8/23/10 e-mail from Military Aide 14 to other OVP military aides re "Handling of Classified Material," NARAWH_00014447; Hogan 5/23/23 Tr. at 53-55.

[161] 8/17/20 e-mail from front office assistant to OVP Counsel, NARAWH_00017043.

[162] Hogan 9/19/23 Tr. at 65-68, 81, 113-14; 8/17/10 Memo from Hogan to Mr. Biden re "Handling of Classified Documents," NARAWH_00000050.

to ensure that classified material was handled securely.

### 1.    Tracking of classified briefing books

In the wake of the August 2010 Hamptons trip and the difficulty in retrieving Top Secret, codeword documents, Executive Secretary staff implemented a more formal system for tracking Mr. Biden's classified briefing books. The team began numbering and recording the contents of each book,[163] and created a spreadsheet that logged the date, book number, how the book was delivered, and date of return.[164] Despite these new procedures, the Executive Secretary team continued to struggle to retrieve Mr. Biden's classified briefing books.[165]

### 2.    Delivery of classified material to personal spaces

Hogan orally instructed military aides that the classified briefing books must be delivered directly to Mr. Biden and "could not be left on the 'round table'" in the front hall on the main floor of the Naval Observatory residence.[166] During our interview, Hogan said that she "wanted to make sure that a book with classified information wasn't just sitting on the hallway table."[167] According to notes taken by one of Mr. Biden's military aides, Hogan instructed that "if [Mr. Biden] asks us to

---

[163] 8/23/10 e-mail from Director of Programs to OVP National Security Staff, NARAWH_00017126; 8/17/10 Memo from Hogan to Mr. Biden re "Handling of Classified Documents," NARAWH_00000050.

[164] 8/23/10 e-mail from Director of Programs to OVP National Security Staff, NARAWH_00017126; VP Classified book tracking.xlsx, NARAWH_00014902.

[165] Executive Secretary Staffer 2 7/7/23 Tr. at 25-28; In November 2010, Military Aide 14 e-mailed Personal Aide 1 asking him to help retrieve multiple of Mr. Biden's classified briefing books. 11/8/10 e-mail from Director of Programs to military aides and others, 1B001_03161902.

[166] Hogan 5/23/23 Tr. at 45-46. 8/23/10 e-mail from Military Aide 14 to OVP Military Aides re "Handling of Classified Material," NARAWH_00014447.

[167] Hogan 5/23/23 Tr. at 46-47.

leave it on the 'round table' we should place it on the table and then maintain eyes on it until he picks it up."[168] But in practice, military aides regularly left his classified briefing books unattended on the round table at Mr. Biden's request.[169]

### 3.    Storage of classified material in personal spaces

According to a military aide's notes of a meeting with Hogan in August 2010, she communicated to staff that Mr. Biden "understands that classified material needs to be kept in one of two places a. Personal Custody, or b. a safe."[170] His staff then installed identical safes for him to use to store classified material, installing one safe

---

[168] *Id.* 8/23/10 e-mail from Military Aide 14 to OVP Military Aides re "Handling of Classified Material," NARAWH_00014447.

[169] Military Aide 1 Tr. at 10-11, 42-44; Military Aide 4 Tr. at 9, 16 ("He knew that at some point in the evening there would be a book available for him on the table."); Military Aide 8 Tr. at 21-22 ("We would make contact with him and he would say, hey, can you leave it on the table at the bottom of the stairs in the Naval Observatory. So, he would request that and we would leave it for him to retrieve."); Military Aide 10 Tr. at 15 ("his direction to me was to put it on a table in the foyer . . . . [H]is direction to me was to set it on that table."). *But see* Military Aide 11 Tr. at 28 ("You couldn't . . . [I]f you couldn't positively hand it off to somebody, you didn't. I wasn't going to leave, you know, secrets sitting on the kitchen counter in the Naval Observatory."); Military Aide 13 Tr. at 15 ("All of the handoffs that I'm thinking about, I don't think we left classified sitting around for him."). Some military aides described ensuring the material was picked up from the table that evening. Military Aide 3 Tr. at 40 ("I wouldn't stand there waiting for him to come down and get them, say if he was, you know, upstairs. But I would make sure they were picked up."); Military Aide 6 Tr. at 30 ("[W]e would leave them on the table on the first floor, and I would always kind of wait, and he would walk or let the dog out, Champ, and so you'd see that he let [the] dog out, and then I would go back up to make sure that those documents were not on the table after I saw him."). At least one military aide pushed back if the material was particularly sensitive. Military Aide 5 Tr. at 13-15, 33 (would not leave anything above Top Secret/Sensitive Compartmented Information classification on the round table and Mr. Biden would be informed it couldn't be left on the table; would not leave the book on the table for more than 30 minutes.). On at least one occasion, Mr. Biden's personal aide sent an e-mail to Mr. Biden himself via Mr. Biden's personal e-mail account notifying him that the "classified book was delivered and is on the round table downstairs[.]" 7/11/11 e-mail from personal aide to Mr. Biden, 1B001_03223432.

[170] 8/23/10 e-mail from Military Aide 14 to OVP Military Aides, NARAWH_00014447.

each in his West Wing office closet, the second-floor personal space of the Naval Observatory, and his personal residence in Delaware.[171]

There is some evidence that after the new safes were installed at the residences, Mr. Biden used them to store classified information, at least for a time. In December 2010, for example, Mr. Biden's personal aide e-mailed members of the Executive Secretary team saying that Mr. Biden had "just put" classified material in a safe in the Naval Observatory, including classified briefing books and one of Mr. Biden's handwritten notebooks.[172] And in November 2010, the personal aide sent another e-mail saying that "the system put in place by [Hogan] of using safes at his residence has been working."[173]

But we also found that Mr. Biden continued frequently to leave classified documents unattended, outside of safes, at the Naval Observatory and his Delaware home. As to the Naval Observatory, only one of the eight naval enlisted aides we interviewed recalled a safe there ever being used to store classified material.[174] Several did not recall a second-floor safe at all.[175] And only one aide recalled a safe being in the library of the Delaware home, but the aide never opened it.[176]

---

[171] 8/23/10 e-mail from Military Aide 14 to OVP Military Aides, NARAWH_00014447; 12/11/10 e-mail from Personal Aide 1 to Director of Programs, 1B001_03159080 (referring to safe in Mr. Biden's "room" in his residence at the Naval Observatory).

[172] 12/11/10 e-mail from Personal Aide 1 to Director of Programs and Executive Secretary, 1B001_03159095 (listing a "classified binder" with materials from "two books" on "Af/Pak"); Notebook 1B63.

[173] 11/8/10 e-mail from Personal Aide 1 to Director of Programs, et al., 1B001_03161902.

[174] NEA 5 Tr. at 35-36, 39, 40-41.

[175] NEA 1 Tr. at 17; NEA 4 Tr. 16; NEA 8 at 23-24.

[176] 5/2/13 e-mail from Director of Programs, 1B001_03097089; 10/18/10 Memorandum, NARAWH_00014906; NEA 5 Tr. at 80-83.

Despite Hogan's admonishments never to leave classified material unattended, several aides observed classified material left out on the second floor of the Naval Observatory[177] or in the Delaware home.[178] Some thought it was fine for documents to be left out in those spaces, and only recalled moving them if asked.[179] When interviewed, Mr. Biden recalled that at the Naval Observatory his practice was to "leave something on the desk that I was working out of in the office . . . and they'd come and clear it out . . . when I got finished."[180]

### E.    Lack of counseling on the handling of classified material after 2010

Hogan left her position as Counsel to the Vice President in June 2013.[181] After her guidance in 2010 and 2011, it does not appear the Counsel's office provided Mr. Biden with any additional advice of significance about how to handle and store classified information until the very end of the administration, when an issue arose relating to his handwritten classified notecards. That matter is discussed in detail in Chapter Four.

---

[177] NEA 2 Tr. at 29-32; NEA 3 Tr. at 12, 40; NEA 4 Tr. at 11-13; NEA 5 Tr. at 53-55, 59; NEA 6 Tr. at 14-15; NEA 7 Tr. at 51-53.

[178] NEA 2 Tr. at 36; NEA 4 Tr. at 21, 24-25, 34, 35-38; NEA 5 Tr. at 53-54, 84-85; NEA 6 Tr. at 24.

[179] NEA 4 Tr. at 23-24, 47; NEA 5 Tr. at 84; NEA 7 Tr. at 51-53.

[180] Biden 10/8/23 Tr. at 30-31.

[181] Hogan 5/23/23 Tr. at 36; Lambros Tr. at 13; 6/21/13 e-mail from Hogan, 1B001_00180811.

## CHAPTER FOUR

### MR. BIDEN'S CLASSIFIED NOTECARDS AND NOTEBOOKS

In addition to the marked classified documents Mr. Biden received through the President's Daily Brief, classified briefing books, and other avenues, he also regularly created classified documents in the form of his own handwritten notes. Throughout the eight years of the Obama administration, Mr. Biden took notes during classified meetings and about classified information in notebooks and on notecards. Although the substantive information in the notebooks and notecards was similar—and similarly classified—the notebooks and notecards were handled differently, both during the administration and after.

During the Obama administration, Mr. Biden's staff regularly collected and reviewed his notecards to determine if they contained classified information and so they could eventually be archived as presidential records. At the end of the administration, Mr. Biden's staff arranged for him to store most of his classified notecards, which contained notes on the President's Daily Brief and other classified information, in a SCIF at the National Archives. In contrast, Mr. Biden held his notebooks close, and his staff did not review them. After the administration, Mr. Biden brought his notebooks home with him and stored them in unsecured locations that were not authorized to store classified information—even though the notebooks, like the notecards, contained classified information.

Some information in the notebooks remains classified up to the Top Secret level and includes Sensitive Compartmented Information, including from compartments used to protect information concerning human intelligence sources.[182]

## I.    MR. BIDEN'S NOTECARDS

### A.    As vice president, Mr. Biden carried and took notes on notecards every day

Mr. Biden regularly took notes on 4-inch by 7.5-inch notecards. Many of them had "The Vice President," or "Office of the Vice President" printed at the top.[183]



*Examples of vice presidential notecards*[184]

---

[182] Office of the Director of National Intelligence, 12/31/13 Memorandum for Distribution from the Principal Deputy Director of National Intelligence (2013), https://sgp.fas.org/othergov/intel/hcs-update.pdf; FBI Serial 676.

[183] Staff Assistant 2 Tr. at 100; 12/20/10 e-mail from OVP staffer to Staff Assistant 2, 1B001_02888681; Staff Assistant 3 10/4/23 Tr. at 34-35.

[184] NARA_SCAN_00001317, NARA_SCAN_00001320, NARA_SCAN_00001305; FBI Serial 3.

Mr. Biden's staffers printed a copy of his schedule on a notecard for him to carry and refer to each day.[185] He also had staffers print other information on the notecards, such as the number of troops who had died during the war in Afghanistan and talking points for meetings and speeches.[186] Mr. Biden carried the notecards in his inner jacket pocket, and he referred to them throughout the day and jotted down notes on them.[187]

Mr. Biden also carried blank notecards that he used to take notes. According to staffers, he used the notecards to take notes during and after meetings.[188]



*Mr. Biden with handwritten notecards (June 30, 2010)*[189]

---

[185] 9/1/16 West Wing Guide, SCOH-000434; Klain Tr. at 43; Personal Aide 1 4/26/23 Tr. at 26-27; Hogan 5/23/23 Tr. at 33; Executive Assistant 9/28/23 Tr. at 50-51.

[186] 9/1/16 West Wing Guide, SCOH-000434; Klain Tr. at 43; Personal Aide 1 4/26/23 Tr. at 29-30; McKeon Tr. at 82-83; Personal Aide 3 3/28/23 Tr. at 31-32.

[187] 9/1/16 West Wing Guide, SCOH-000434; Klain Tr. at 43-44; Personal Aide 1 4/26/23 Tr. at 26-27; Hogan 5/23/23 Tr. at 33; Staff Assistant 3 10/4/23 Tr. at 25-26.

[188] Personal Aide 1 4/26/23 Tr. at 28-29; Personal Aide 3 3/28/23 Tr. at 31-34; Staff Assistant 3 10/4/23 Tr. at 25-26.

[189] 1B001_00506500.

In addition to taking notes in unclassified settings, Mr. Biden used notecards to take notes on a variety of classified meetings and briefings, including the President's Daily Brief,[190] Situation Room meetings, and other briefings from the intelligence community.[191]

## B.    Mr. Biden's notecards were collected and organized by his staff

Mr. Biden's front office staff regularly collected his notecards. Generally, Mr. Biden handed them to his personal aide or staff assistants or left them in an outbox on the desk in his office, where his front office staff collected material at each day's end.[192] Staff then organized the notecards by date or topic so that Mr. Biden could reference them.[193] Front office staff stored the notecards in their work area outside of Mr. Biden's West Wing office.[194]

When notecards contained notes related to foreign policy meetings or other potentially classified information, Mr. Biden's staff turned them over to the National Security Affairs team, who stored them in a secure location.[195] At times, the National

---

[190] *E.g.*, NARA-Bx1_1682, 2428, 2432-39, 2444-46, 2452, 2458, 2460; Staff Assistant 3 10/4/23 Tr. at 31-32; Personal Aide 1 4/26/23 Tr. at 26-29; Personal Aide 3 3/28/23 Tr. at 31; FBI Serial 281 1A300, 1A301.

[191] *E.g.*, NARA-Bx1_0123, 195-96, 274, 277, 422, 1074-75, 1100, 1197, 1692-93, 1702, 1737-38, 2140-41, 2159, 2218, 2372, 2403, 2442; NARA-Bx2_VP Notecards 2016_0090; Staff Assistant 3 10/4/23 Tr. at 31-32; FBI Serial 281 1A300, 1A301.

[192] Staff Assistant 2 3/16/23 Tr. at 19-20, 27-28; Executive Assistant 9/28/23 Tr. at 43, 60-61; 9/1/16 West Wing Guide, SCOH-000434; Staff Assistant 3 10/4/23 Tr. at 15-17, 26-27.

[193] Staff Assistant 3 10/4/23 Tr. at 24-27; 9/1/16 West Wing Guide, SCOH-000434; Staff Assistant 2 3/16/23 Tr. at 31, 98-99; Executive Assistant 9/28/23 Tr. at 43, 45.

[194] Staff Assistant 2 3/16/23 Tr. at 31, 98; Staff Assistant 3 10/4/23 Tr. at 25-26, 33, 37; 9/1/16 West Wing Guide, SCOH-000434.

[195] Staff Assistant 4 Tr. at 37-39, 52-53, 101-102; Staff Assistant 2 3/16/23 Tr. at 20-21; Personal Aide 1 4/26/23 Tr. at 28-29, 52, 56; 2/5/11 e-mail from Deputy Counsel to WH Records Director et al. re "VP Notecards," 1B001_02886522; Staff Assistant 3 10/4/23 Tr. at 31-32; Executive Secretary Staffer 2 11/21/23 Tr. at 6-7; Bakotic 1/11/24 Tr. at 20-22.

Security Affairs team marked some of the notecards as classified.[196] Mr. Biden also marked some of his own notecards as classified.[197]

### C. Mr. Biden wanted to take copies of his notecards when he left office to help write his book

As explained in Chapter Five, in the final year of his vice presidency, Mr. Biden began writing a memoir about his time in office. When conceiving of and writing the book, Mr. Biden worked with a ghostwriter, Mark Zwonitzer. In 2016, Zwonitzer reached out to Mr. Biden's staff and requested help with locating Mr. Biden's journals and notes that would be helpful in writing the book.[198] As he approached the end of his vice presidency, Mr. Biden sought to keep copies of his notecards and other records for use in the book-writing process. According to a staffer involved in the project, Mr. Biden wanted to take copies of the notecards "so that he didn't have to go to [the National Archives] every day to help write this book."[199]

In late September 2016, Zwonitzer e-mailed Mr. Biden's chief of staff to schedule an interview with Mr. Biden.[200] Zwonitzer said he wanted to cover "very specific topics and time frames" and said he would "tell you exactly what ground/time period I want to cover in the session so the VP could have relevant notes/diaries etc, with him when we talk."[201]

---

[196] Executive Secretary Staffer 2 11/21/23 Tr. at 6-11; Ratner Tr. at 42-43, 51.

[197] Staff Assistant 3 10/4/23 Tr. at 31-32; NARA-Bx1_2438, 2446; FBI Serial 281 1A300, 1A301.

[198] 5/21/16 e-mail from Zwonitzer to Ricchetti, Zwonitzer-00007399.

[199] Associate Counsel 3/29/23 Tr. at 59.

[200] 9/26/16 e-mail from Zwonitzer to Ricchetti, Zwonitzer-00007613.

[201] Id.

Around this same time, Mr. Biden's staff made copies of the notecards and organized them into binders so that he could take them after he left office.[202] The notes were organized by topic or date.[203] For example, one binder contained copies of notes Mr. Biden took during President's Daily Briefs and his lunches with President Obama.[204] The binder contained notes on classified meetings and information.



*Copies of notecards regarding lunches with President Obama*[205]

Other binders contained copies of Mr. Biden's notecards organized by year:[206]

---

[202] Staff Assistant 3 10/4/23 Tr. at 25-31; Associate Counsel 3/29/23 Tr. at 54-55; Executive Secretary Staffer 2 7/7/23 Tr. at 71-74.

[203] Staff Assistant 2 3/16/23 Tr. at 31, 98; Staff Assistant 3 10/4/23 Tr. at 36, 38-40; 9/1/16 West Wing Guide, SCOH-000434.

[204] BlendedBoxes-0026, BlendedBoxes-0028; Staff Assistant 3 10/4/23 Tr. at 36, 38-40; FBI Serial 392 1A469.

[205] BlendedBoxes-0026, BlendedBoxes-0028; FBI Serial 392 1A469.

[206] *E.g.*, BlendedBoxes-0040 to BlendedBoxes-0044 (binder labeled "2009-2013" with tabs corresponding to those years); FBI Serial 392 1A469.



*Copies of notecards organized by year*[207]

In addition to notecards, some of the binders contained copies of Mr. Biden's

schedules and other material.[208]



*Copies of notecards and Mr. Biden's schedules*[209]

---

[207] BlendedBoxes-0040, BlendedBoxes-0044.

[208] *E.g.*, BlendedBoxes-0037; FBI Serial 392 1A469.

[209] BlendedBoxes-0035, BlendedBoxes-0037; FBI Serial 392 1A469.

### D.    Near the end of the administration, staff determined that some of the notecards contained classified information

The counsel in the Office of the Vice President were involved in reviewing the copies of the notecards that Mr. Biden wanted to take with him after his vice presidency.[210] While reviewing the notecards, an associate counsel noticed that some of them contained notes about the President's Daily Brief.[211] Although the associate counsel did not see any classification markings, she understood the President's Daily Brief was classified and was concerned because a non-classified copier had been used to make the copies.[212]

The associate counsel raised the issue with the Executive Secretary team, which, as explained in Chapter Three, was responsible for the delivery and handling of classified material in the Office of the Vice President.[213] E-mail correspondence from early October 2016 indicates the notecards were temporarily stored in the deputy national security advisor's office "until the lawyers determine the appropriate next steps."[214] In an interview, the deputy national security advisor recalled "reviewing materials" at the end of the administration "to understand what was classified or not."[215]

---

[210] Associate Counsel 3/29/23 Tr. at 54-60; 10/6/16 e-mail from Associate Counsel to Executive Assistant, et al., NARAWH_00017698 (indicating Associate Counsel would deliver the "2009-2013" binder to the Executive Assistant when she was finished reviewing it).

[211] Associate Counsel 3/29/23 Tr. at 54-55.

[212] *Id.* at 55.

[213] *Id.*

[214] 10/7/16 e-mail between Associate Counsel, Deputy National Security Advisor Ely Ratner, and others, NARAWH_00017743.

[215] Ratner Tr. at 40.

Soon after, a military detailee working on the Executive Secretary team raised her own concerns about the handling of Mr. Biden's notecards. After learning that Mr. Biden wanted copies of the notecards for use in writing his book "after the administration has ended," the detailee raised concerns that the notes contained classified material commingled with Mr. Biden's personal notes.[216] According to the detailee, the executive secretary, Kristen Bakotic (who was also on detail from the military), disagreed and concluded that "the notes belong to the Vice President and should be made available to him without restriction."[217] Because Bakotic outranked the detailee, the detailee sent an e-mail to herself "for the record," in which she explained her belief that the notes were "being mishandled" and documented her request not to participate "in any project or meetings that involve these records."[218]

---

For the Record

On October 18th, 2016 in the Office of the Vice President's National Security Affairs office, there began a discussion of the use and disposition of the Vice President's notes. These notes, which are currently being stored in the EEOB room 291 contain classified information that is comingled with personal notes of the Vice President. They cover a span of several years. None of the notes have classification markings or are otherwise indicated as containing classified information. The determination of classified content was made by the Deputy National Security Advisor, after reviewing the content.

Kristen Bakotic, the Vice Presidents Executive Secretary, insist that the notes belong to the Vice President and should be made available to him without restriction. She has indicated that she is aware that these notes will be used during this book-writing process, but she is confident that he (the Vice President) understands which information is classified and which information is not.

Kristen has stated that these notes should not be subjected to the regulations of the Presidential Records Act, because they fall under the category of personal notes. She has stated that the Vice President can keep these notes, including the classified portions (without redaction), after the administration has ended.

She has repeatedly stated that his position as the Vice President of the United States excludes him from the guidance that other members of the administration are required to adhere to.

I do not agree with Kristen Bakotic. I believe these records are being mishandled; however, Kristen is my superior officer and I am not in a position to challenge her authority. I have requested to not participant in any project or meetings that involve these records.

---

*Detailee's e-mail "For the Record" (Oct. 18, 2016)*[219]

[216] 10/18/16 e-mail from Executive Secretary Staffer 2, NARAWH_00015190.
[217] *Id.*
[218] *Id.*
[219] *Id.*

When interviewed by our office, the detailee said she believed providing the notes to Mr. Biden after the administration "without restriction" would be "outside of the protocols and policies that . . . had been put in place for our office for safeguarding the material."[220] The detailee did not recall the ultimate disposition of the notecards or whether the discussion percolated up to Mr. Biden.[221]

As for Bakotic, during an interview with our office, she said that she did not recall ever taking the position that Mr. Biden could take classified notes home with him after his vice presidency.[222] According to Bakotic, she believed in the fall of 2016, when the detailee wrote her e-mail, that there was still time for Mr. Biden to review his notes and get the information he needed in a secure fashion before the administration ended.[223] She also did not recall ever advising Mr. Biden that he could retain classified notes after his term in office, and said it was not her role to advise the vice president about classified record-handling.[224] Nor did she recall anyone else in the Obama administration taking the position that Mr. Biden could take classified material home with him in an unsecure environment after the vice presidency.[225] Based on her own training, she knew that classified materials were supposed to be stored in a secure facility.[226] A memorandum from the National Security Council sent to all Office of the Vice President staff in December 2016 and January 2017 confirmed

---

[220] Executive Secretary Staffer 2 11/21/23 Tr. at 19.

[221] *Id.* at 32, 38.

[222] Bakotic 1/11/24 Tr. at 45-47, 50-52, 56.

[223] *Id.* at 11, 43-45.

[224] *Id.* at 56-57, 59, 62.

[225] *Id.* at 62-63.

[226] *Id.* at 50, 53-54.

this understanding, instructing that "[m]eeting notes . . . , and classified notes of any kind, are NOT personal notes" and that only unclassified personal records could be removed from the White House at the end of the administration, though there is no evidence this guidance was ever communicated to Mr. Biden.[227]

E.    In October 2016, Mr. Biden's staff installed a new safe at the Naval Observatory for the storage of Mr. Biden's notecards

Shortly after the Executive Secretary detailee raised an objection to the handling of Mr. Biden's notecards in October 2016, Mr. Biden's staff installed a new safe at the Naval Observatory. E-mail traffic from that time suggests the safe was meant to store Mr. Biden's classified notecards.

On October 20, 2016—two days after the Executive Secretary detailee objected to the handling of the notecards—Mr. Biden's deputy national security advisor reached out to Mr. Biden's personal aide asking to "run something" by Mr. Biden.[228] Later that night, the personal aide replied that he had talked to Executive Secretary Bakotic and "[s]ounds like we're good. Let me know if there's anything additional beyond the safe issue."[229]

That same day, the deputy national security advisor sent an e-mail with the subject line "New Safe at NavObs" to Mr. Biden's chief of staff, Counsel, national security advisor, and others.[230] In the e-mail, the deputy national security advisor

---

[227] 12/22/16 e-mail from Director of Programs to #ALL-OVP, NARAWH-CLASS_00015305; 1/3/17 e-mail from Director of Programs to #ALL-OVP, NARAWH-CLASS_00015634.

[228] 10/20/16 e-mail from Ratner to Personal Aide, 1B001_02137508.

[229] 10/20/16 e-mail from Personal Aide to Deputy National Security Advisor, 1B001_02137508.

[230] 10/20/16 e-mail from Ratner to Ricchetti, McGrail, Kahl et al., 1B001_03798594.

63

said that "[t]he VP approved the placement of a new safe at NavObs and conveyed his desired location."[231] He explained that the safe would be installed the following day and would be "load[ed] up with the relevant materials."[232] Later that evening, a career employee on the Executive Secretary team e-mailed the detailee to let her know "for [her] awareness" that a safe was being installed.[233]

Although these e-mails suggest that Mr. Biden's staffers installed the new safe at the Naval Observatory to store the notecards, the staffers told investigators that they did not remember why the safe was installed or what was stored in it.[234]

F.    **At the same time Mr. Biden's staff was considering how to handle the notecards, he told his ghostwriter that "they didn't even know" he had notebooks containing similar classified notes**

Mr. Biden appeared to reference the notecards issue during a recorded interview with his ghostwriter Zwonitzer on October 10, 2016—the same time period during which his staff were discussing and arranging the secure storage of his classified notecards. At the time, Mr. Biden was reading aloud from his "Foreign Policy" notebook, including reading notes from meetings in the Situation Room.[235] As explained below, Mr. Biden's notebooks were separate from his notecards, though he often took similar—and similarly classified—notes in each. Referring to his "Foreign Policy" notebook, Mr. Biden added, "[t]hey didn't even know I have this."

---

[231] *Id.*

[232] 10/20/16 e-mail from Ratner to Ricchetti, McGrail, Kahl et al., 1B001_03798594.

[233] 10/20/16 e-mail from Director of Programs to Executive Secretary Staffer 2, SCOH-000268.

[234] *E.g.*, Executive Secretary Staffer 2 11/21/23 Tr. at 29-30; Bakotic 1/11/24 Tr. at 66-69; Ratner Tr. at 60-62.

[235] Notebook entries 1B58-50-51, 56-60.

> Mr. Biden:    There was a lot of stuff going on at the same time in foreign policy. You said—they said, you didn't wanna go into . . . but I have extensive notes over this period of time.
>
> Zwonitzer:    Oh, you actually have those here?
>
> Mr. Biden:    Yeah, now there's a lot of other notes too. But, I mean, this is my . . . **They didn't even know I have this**. Some of this stuff I'm not, you know, going . . . I have stuff all the way up to 5-19. May 19. And then it skips in my notes to . . . 6-16 is the next entry.[236]

In this exchange, Mr. Biden seemed to distinguish between his notecards, which his staff were in the process of implementing protocols to safeguard, and his notebooks, which, "[t]hey didn't even know I have." As explained below, although the notecards and notebooks both contained classified information, most of the notecards were handled differently than the notebooks after the vice presidency.

### G.    The investigation did not determine what, if anything, staff told Mr. Biden about the proper storage of classified information in his notecards

After staff raised concerns about the possibility that Mr. Biden's notecards may contain classified material, his staff discussed how to properly handle and store the notecards. There is some indication that Mr. Biden's staff may have advised him that his notecards contained classified information and needed to be held in a secured location. But the investigation did not determine what, if anything, Mr. Biden's staffers actually told him on this subject.

---

[236] Zwonitzer recording Carved_000246 (emphasis added); Carved_000246 Tr. at 3-5; FBI Serials 315, 335; Notebook entries 1B58-50-51, 56-60.

As explained above, e-mails obtained during the investigation show that in October 2016, Mr. Biden's national security staff appear to have installed a new safe at the Naval Observatory in which to store Mr. Biden's notecards during the rest of his vice presidency. After an e-mail from Mr. Biden's deputy national security advisor asked Mr. Biden's personal aide to "run something" by Mr. Biden, a follow up e-mail from the personal aide referred to the "safe issue," suggesting that the personal aide had talked to Mr. Biden about the decision to install a new safe at the Naval Observatory to hold Mr. Biden's notecards.[237] But when interviewed, neither the deputy national security advisor nor the personal aide recalled talking to Mr. Biden about the installation of the safe or the handling of his notecards.[238]

For her part, the associate counsel who initially raised concerns about potentially classified material in Mr. Biden's notecards believed the then-Counsel to the Vice President, John McGrail, was going to meet with Mr. Biden to address the issue.[239] According to the associate counsel, after she flagged the issue of classified information in Mr. Biden's notes, she thought "someone had a conversation" with the Vice President "about the binders [containing copies of the notecards] and probably about making sure classified documents are put in the safe."[240] The associate counsel believed McGrail had this conversation with Mr. Biden, but she was not part of it and did not know what, if anything, was discussed.[241] As explained below, for his part,

---

[237] 10/20/16 e-mail from Ely Ratner to Personal Aide, 1B001_02137508; 10/20/16 e-mail from Personal Aide to Ratner, 1B001_02137508.
[238] Ratner 11/21/23 Tr. at 55, 74.
[239] Associate Counsel 3/29/23 Tr. at 61.
[240] *Id.*
[241] *Id.* at 55.

McGrail did not recall any such conversation, and indeed, said he did not remember anything about the notecard project or about concerns that Mr. Biden's notecards could contain classified information.[242]

Mr. Biden's deputy chief of staff recalled discussions about a slightly different issue. As he described it, during the last year of the Obama administration, members of Mr. Biden's staff flagged that Mr. Biden had written personal notes by hand on the pages of classified documents.[243] Mr. Biden's deputy chief of staff had discussions with McGrail and the associate counsel, as well as others, about the proper disposition of these notes.[244] They determined that the Counsel's office would convey to Mr. Biden that he could not keep the notes after the end of the administration, because "classified documents belong with either the creator of the documents," or, "if they were native to our office," to the National Archives.[245] The deputy chief of staff was not involved in any conversation between McGrail and Mr. Biden on this issue.[246] Again, McGrail did not recall having any conversations with Mr. Biden about the proper disposition of classified documents, though McGrail did recall telling Mr. Biden that all his records (which McGrail understood to encompass notes) would be sent to the National Archives.[247]

E-mails obtained during the investigation suggest that McGrail and others in the Office of the Vice President conducted some research on the handling and

---

[242] McGrail 1/22/24 Tr. at 9, 15, 16-18, 42, 48, 78, 98-99, 127.

[243] Amin Tr. at 29-33.

[244] *Id.* at 35-37.

[245] *Id.* at 29-33, 35-37.

[246] *Id.* at 35-37.

[247] McGrail 1/22/24 Tr. at 78-83, 86-87, 94, 98-99, 107, 113, 123-26.

accessing of classified materials after the vice presidency. In November 2016, for example, McGrail sent an e-mail containing a reference to the executive order governing classification, specifically citing the provision that would apply when a former vice president sought to gain access to classified information.[248]



*McGrail Nov. 14, 2016 e-mail about Executive Order 13,526*[249]

Six weeks later, in January 2017, the associate counsel sent McGrail an e-mail containing information about the same executive order and about one use of Ronald Reagan's diaries after he was president,[250] a topic that is discussed in more detail in Chapter Ten. The subject line of the e-mail was "per our discussions today."[251]

---

[248] 11/14/16 e-mail from McGrail, SCOH-000340.

[249] *Id.*

[250] 1/05/17 e-mail from Associate Counsel to McGrail, SCOH-000339.

[251] *Id.*

68

```
Message
─────────────────────────────────────────────────────────────────────────────

From:        ███████████████████████████████ @ovp.eop.gov]
Sent:        1/5/2017 9:43:47 PM
To:          McGrail, John [john_p_mcgrail@ovp.eop.gov]; McGrail, John ["/o=eop/ou=exchange administrative group
             /cn=recipients/cn=mcgrail, john p. mcgrail_jf85"]
Subject:     Per our discussions today


- President Reagan voluntarily allowed in camera review of his diaries re Iran Contra. The Court allowed in some
relevant sections. 732 F. Supp. 135

http://www.nytimes.com/1990/01/31/us/reagan-is-ordered-to-provide-diaries-in-poindexter-case.html


- This executive order is helpful when discussing the President's declassification authority. This is an Executive Order
issued by President Obama. Part 3 explains the declassification process:
https://www.whitehouse.gov/the-press-office/executive-order-classified-national-security-information


I'm still doing research. But I think these are a good start.
```

*Associate counsel Jan. 5, 2017 e-mail referencing Mr. Reagan's diaries*[252]

During his interview, McGrail did not recall these e-mails or any discussions about the executive order or the Reagan diaries, except that he recalled having conversations about getting Mr. Biden's "security clearance" extended so Mr. Biden could access classified material after the vice presidency.[253] According to McGrail, he could not recall having any discussions about Mr. Biden's notecards, notes, or diaries containing classified information.[254]

McGrail explained that he and an archivist at the National Archives had arranged for all of Mr. Biden's records from the vice presidency, including all his notes, to be sent to the National Archives when he left office.[255] In this arrangement, McGrail made no distinctions between presidential vs. personal records, or classified

---

[252] *Id.*

[253] McGrail 1/22/24 Tr. at 51-55, 59-62, 68-70, 73-74, 76-77, 92, 118-19.

[254] *Id.* at 78-80, 98-99.

[255] *Id.* at 80-83.

69

vs. unclassified records; they simply arranged to send all of Mr. Biden's records to the Archives.[256] From there, McGrail said his understanding was that the Archives would undertake the time-consuming task of sorting through the records to determine what was personal and what was presidential.[257]

According to McGrail, near the end of the administration he told Mr. Biden they would send all his records to the Archives.[258] McGrail's message was simple: "It was just, 'Your records are going to the Archives.' That was it."[259] McGrail told Mr. Biden this more than once, and Mr. Biden understood the arrangement and accepted it.[260] McGrail said he did not discuss with Mr. Biden the specific requirements of the Presidential Records Act or the treatment of personal vs. presidential records under the Act.[261] McGrail also said he did not discuss Mr. Biden's notecards, notebooks, or diaries with him.[262]

McGrail said he never spoke with Mr. Biden about withholding personal notes from the National Archives.[263] Mr. Biden never told McGrail he had notes he wanted to take home instead of sending to the Archives, and McGrail saw no indication that Mr. Biden believed he could take classified notes home with him at the end of his vice presidency.[264] If Mr. Biden had such a belief or plan, McGrail would have expected

---

[256] *Id.* at 80-83, 126.
[257] *Id.* at 83, 109.
[258] *Id.* at 86-87, 94, 99, 107, 113, 123-26.
[259] *Id.* at 107.
[260] *Id.* at 86-87, 94, 99, 107, 113, 115, 123-26.
[261] *Id.* at 85-87, 94.
[262] *Id.* at 78-79, 83-85, 98-99, 117-19.
[263] *Id.* at 83-84.
[264] *Id.* at 83-84, 99, 117-18.

him to raise it during their conversations about sending all Mr. Biden's records to the Archives at the end of the administration.[265] McGrail never advised Mr. Biden one way or the other about whether he could keep classified documents, including classified handwritten notes, outside a secure, authorized facility, after leaving office, and McGrail was unaware of such advice from anyone else.[266]

More generally, McGrail said he was unaware of any conversations among staff in the Office of the Vice President suggesting that Mr. Biden could take classified materials home after leaving office and keep them outside a SCIF, noting, "It was the opposite. It was how are we going to find him a SCIF in case he ever has a reason to go to a SCIF?"[267] When asked during his interview about whether anyone told Mr. Biden that the Presidential Records Act authorizes a former vice president to keep certain materials at home, even if they are classified, McGrail said no, and added "[T]hat doesn't make logical sense to me . . . . [M]y understanding is that . . . if you copy or write down classified information on a piece of paper, it maintains its classified status."[268]

According to McGrail, Mr. Biden did not, and would not, come to him for legal advice about whether he could take classified information home after the vice presidency, because, in McGrail's words, "I think he knows."[269] In McGrail's view, the rule that you cannot take classified information out of a secure facility is "obvious."[270]

---

[265] *Id.* at 117-18.
[266] *Id.* at 98-99, 107-08, 119, 126.
[267] *Id.* at 126.
[268] *Id.* at 107-08.
[269] *Id.* at 100.
[270] *Id.* at 102.

McGrail explained that Mr. Biden knew classified information "needs to be maintained in a secure facility. . . . [H]e was the chairman of the Foreign Relations Committee. . . . [H]e understands how it works."[271]

Finally, McGrail said it would be "very surprising" if Mr. Biden intentionally took home classified information after the vice presidency.[272] In McGrail's words, Mr. Biden knew that "information is classified for a good reason, that its disclosure can harm sources and methods and the national security interests of the United States, and he has been committed to the national security interests of the United States as long as I've known him."[273] According to McGrail, if Mr. Biden took home classified information after the vice presidency, "[i]t would be completely inconsistent with everything that we were killing ourselves to try to accomplish" at the end of the administration by sending all of Mr. Biden's records to the National Archives.[274]

## H.    After Mr. Biden left office, copies of many of his notecards were held in a SCIF at the National Archives

Ultimately, the associate counsel and McGrail arranged for Mr. Biden's classified notecards to be held in a SCIF at the National Archives under a deposit

---

[271] *Id.* at 100-01.
[272] *Id.* at 111, 112, 117-18.
[273] *Id.* at 111.
[274] *Id.* at 112.

agreement that allowed Mr. Biden to store personal material at a National Archives facility.[275]

On January 12, 2017, Mr. Biden signed a deposit agreement allowing him to store "certain personal effects" in a "secure and protected area" at the National Archives.[276] According to the agreement, the material consisted of "correspondence, memorabilia, personal notes, and other miscellaneous personal property."

When the associate counsel made arrangements to bring the deposit agreement to Mr. Biden's executive assistant for Mr. Biden's signature, she indicated that McGrail "has spoken with him [Mr. Biden] about the issues."[277] But in an interview, McGrail said that he thought the deposit agreement related to personal records from Mr. Biden's Senate tenure, and he did not recall binders of classified notecards going into Mr. Biden's personal storage at the Archives.[278]

On January 16, 2017—four days before Mr. Biden left the vice presidency—the associate counsel asked a member of the Executive Secretary team to "pick up the Vice President's classified materials" at the Naval Observatory.[279] Soon after, another member of the Executive Secretary team explained that the material consisted of four

---

[275] Associate Counsel 8/29/23 Tr. at 9-10, 76; 1/5/17-1/6/17 e-mails between Associate Counsel, McGrail, and NARA Archivist 1, SCOH-000326, SCOH-000330, SCOH-000332, SCOH-000334.

[276] 1/12/17 Deposit Agreement regarding the Administration of Personal Materials of Vice President Joseph R. Biden, NARA-H-700000012.

[277] 1/10/17 - 1/11/17 e-mails between Associate Counsel and Executive Assistant, 1B001_01915351.

[278] McGrail 1/22/24 Tr. at 82, 120-21.

[279] 1/16/17 e-mail from Associate Counsel to Executive Secretary Staffer 2, SCOH-000246.

73

to five binders and that "[o]nce you return [you] will need to place in 1-2 pra [Presidential Records Act] boxes along with the originals."[280]

The following day was the associate counsel's last day in the Office of the Vice President. She sent McGrail and others an outstanding to-do list.[281] Among other things, she reminded McGrail to approve the deposit agreement to allow Mr. Biden to store his personal materials at the Archives. She also wrote, "[w]e need to send his personal diaries to storage at the Archives. [A National Archives employee] has offered to come and pick them up. I think this is the best option."[282] When interviewed, the associate counsel clarified that she was "referring to the binders that we copied," meaning the binders of Mr. Biden's notecards containing classified information, discussed above.[283] The associate counsel said, "I believe we were using diaries as shorthand because they were personal notes, thoughts."[284] She explained that "it was the safest decision to have [the notecards] be in a SCIF since there w[ere] likely classified documents."[285]

On January 18, 2017, a National Archives employee visited the White House, picked up the copies of the notecards in Mr. Biden's West Wing office from McGrail, and brought them to the National Archives.[286] McGrail said in his interview with our

---

[280] 1/16/17 e-mail from Director of Programs to Executive Secretary Staffer 2, SCOH-000246.

[281] 1/17/17 e-mail from Associate Counsel to McGrail, SCOH-000141 ("I wanted to send along the list of items that still needs to be taken care of after I leave.").

[282] Id.

[283] Associate Counsel 8/29/23 Tr. at 65.

[284] Id.

[285] Id. at 9-10, 76.

[286] 1/18/17 e-mail from NARA Archivist 1 to McGrail, NARA-H-700000010.

74

office that he had no memory of giving the Archives employee the binders of notecards, or that they contained classified information, but the Archives employee recalled McGrail telling him that the materials contained classified information.[287] Accordingly, the Archives stored the materials inside a SCIF.[288]

## I. After he left the vice presidency, Mr. Biden twice visited the National Archives to review copies of his notecards in a SCIF

Soon after he left office in 2017 and while researching his book, Mr. Biden visited the National Archives twice to consult the copies of his notecards that were being held in a SCIF.[289]

During a recorded interview on April 24, 2017, Mr. Biden told his ghostwriter, Zwonitzer, that he took separate notes regarding his private lunches with President Obama.[290] Mr. Biden said that before each lunch, he and his chief of staff prepared and wrote an agenda on "one of those little cards of mine"—an apparent reference to the long narrow notecards that Biden carried in his jacket pocket.[291] After each lunch, Mr. Biden dictated notes about the lunch to his executive assistant.[292] Mr. Biden explained that he previously "had all those [notes] at the house in a safe" but that "I don't know what they made me do with them."[293]

Zwonitzer:    Can we spend some time on that lunch?

---

[287] McGrail 1/22/24 Tr. at 121-22; NARA Archivist 1 Tr. at 56, 62.

[288] NARA Archivist 1 Tr. at 56, 62.

[289] 5/11/17 and 7/11/17, National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

[290] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

[291] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

[292] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80; Executive Assistant 9/28/23 Tr. at 47.

[293] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 28-30; Evidence item 1B80.

Mr. Biden:     I had all those presidential notes.

Zwonitzer:     I know you gave me this much from the diaries.

Mr. Biden:     But I actually, I wonder where those . . .

Zwonitzer:     Do you have separate notebooks of the presidential [lunches]?

Mr. Biden:     Yeah. What I would do is after every lunch I would dictate to, um, I would call in [the Executive Assistant] and I would dictate to her what the lunch was about. **I had all those at the house in a safe. I don't know what they made me do with them.** But what I would do is I would make up a card, one of those little cards of mine. Before I'd have lunch, I'd meet with Steve [Ricchetti] and anything anybody thought I should be bringing up [I'd put] on our agenda. And when I came back, I'd dictate notes to [the Executive Assistant] as to what actually transpired at the lunch.[294]

Two days later, in another recorded interview, Mr. Biden said he had learned that his notecards had been "turned in" to the National Archives and that Mr. Biden would have to go through his former counsel, McGrail, to get them.[295] Mr. Biden also told Zwonitzer that he had not wanted to turn the notecards in:

Mr. Biden:     I'm told by [a personal aide], I guess he checked with you, in order for me to get my, uh, get all those presidential notes I had for lunch, the luncheon meetings, I have to go to McGrail?

Assistant:     Yes, McGrail has them. We were supposed to turn it in and that is the last person who had them.

---

[294] Zwonitzer recording 170424_0091 (emphasis added); 170424_0091 Tr. at 28-30; Evidence item 1B80.

[295] Zwonitzer recording Carved_000599; Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

Mr. Biden:    OK. Uh. See if you can get me McGrail on the line while I have you now. OK? And stay on okay?

Assistant:    Got it sir. Hold on.

Zwonitzer:    **This is probably something that goes to the presidential papers.**

Mr. Biden:    **I don't think so. It was in between. I didn't want to turn them in.**

Zwonitzer:    **Right, so, it's the gray area.**[296]

The next day, Zwonitzer sent an e-mail to the assistant and personal aide, explaining that Mr. Biden "may try to review some of his notes from lunches with the President and asked [Zwonitzer] to give him a list of the dates of the lunches that would be important."[297] Zwonitzer included a list of the dates of several such lunches in his e-mail. Zwonitzer forwarded the list to Mr. Biden's personal e-mail account on May 11, 2017.[298]

On that day and again two months later, Mr. Biden visited the National Archives to review copies of his notecards, which were held in a SCIF.[299] McGrail accompanied him.[300] During both visits, Archives staff made clear to Mr. Biden that, by viewing the notecards in the Archives SCIF, he was accessing classified

---

[296] Zwonitzer recording Carved_000599 (emphasis added); Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

[297] 4/27/17 e-mail from Zwonitzer to Executive Assistant and Personal Aide 3, Zwonitzer-00001464.

[298] *Id.*

[299] 5/11/17 and 7/11/17 National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

[300] McGrail recalled only the first visit to the Archives, but visitor logs show he accompanied Mr. Biden on both visits. 5/11/17 and 7/11/17 National Archives Visitor Logs, NARA-H-700002505; NARA Archivist 2 6/1/23 Tr. at 14; McGrail 5/2/23 Tr. at 169-80.

77

information.[301] Nonetheless, in his interview with our office, McGrail said he believed the material was in a SCIF at the Archives simply to keep it secure, not necessarily because it was classified.[302]

During the first visit on May 11, Archives staff followed a detailed checklist to ensure they properly safeguarded the classified information in the notecards.[303] The staff ensured that Mr. Biden did not bring his phone or other electronic device into the SCIF.[304] They announced that the visit involved access to classified information.[305] They remained in the SCIF and monitored Mr. Biden while he reviewed the notecards.[306] They also reminded him of his continuing responsibility to protect all classified information after his visit.[307]

On July 11, 2017, two months after their first visit to the Archives, Mr. Biden and McGrail returned.[308] Before the second visit, Zwonitzer e-mailed Mr. Biden another list of lunches and events for which his notes would be helpful.[309] During the second visit, Archives staff followed the same general procedures to safeguard classified information.[310] Mr. Biden also signed a form entitled "Notice to Users of NARA Classified Research Rooms."[311] The first sentence of the form read, "You will

---

[301] 5/11/17 and 7/11/17 National Archives Checklist for Classified Visits and Meetings, NARA-H-700002505.

[302] McGrail 1/22/24 Tr. at 69-70, 113-14, 129-30.

[303] 5/11/17 National Archives Visitor Logs, NARA-H-700002505.

[304] *Id.*

[305] *Id.*

[306] *Id.*; NARA Archivist 1 Tr. at 70-71; NARA Archivist 2 Tr. at 18-19.

[307] 7/11/17 National Archives Visitor Logs, NARA-H-700002505.

[308] *Id.*

[309] 7/9/17 e-mail from Zwonitzer to Mr. Biden, Zwonitzer-00000631, Zwonitzer-00000632.

[310] 7/11/17 National Archives Visitor Logs, NARA-H-700002505.

[311] *Id.*

be viewing materials containing classified national security information," and the remainder of the form explained the various procedures and rules necessary to safeguard such classified information.[312]

Not all of Mr. Biden's notecards made their way to the SCIF at the Archives. When the FBI searched Mr. Biden's Delaware home on January 20, 2023, they discovered a stack of Mr. Biden's notecards in his office.[313] While many of these notecards were from after his term as vice president, some of them dated from his vice presidency and included handwritten notes about intelligence products and matters of national security.[314] One notecard included a handwritten classification marking.[315] Some of the notecards found in the Delaware home remain classified up to the Top Secret level.[316]

## II.    MR. BIDEN'S NOTEBOOKS

### A.    Mr. Biden used notebooks during his vice presidency to record both official and personal events

As with his notecards, Mr. Biden also frequently took notes about classified information in notebooks. Most of the classified notecards were stored differently from the classified notebooks after the vice presidency. As explained above, most of

---

[312] *Id.*

[313] FBI Serial 77.

[314] FBI Serials 77, 691, 530, 664; Handwritten material 1B23.

[315] FBI Serials 691, 530, 664; Handwritten material 1B23.

[316] FBI Serial 619; Handwritten material 1B23.

the classified notecards went to an Archives SCIF, but Mr. Biden took his classified

notebooks home with him and stored them in unsecured and unauthorized locations.

Mr. Biden regularly took notes in notebooks throughout his vice presidency.[317]

Most of these notebooks were bound with black covers.[318] Some had labels identifying

the date range or general subject matter of their contents.[319] Photos of some of these

notebooks are below:



*Notebooks seized from file cabinet under television in*
*Delaware home office* [320]

---

[317] Personal Aide 3 3/28/23 Tr. at 31-32, 35; McKeon Tr. at 120-21; Personal Aide 1 4/26/23 Tr. at 30-31, 129-30; Staff Assistant 2 Tr. at 101-02; OVP NSA Staffer 2 Tr. at 80-81; Klain Tr. at 44, 129; Staff Assistant 3 10/4/23 Tr. at 47-48; Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-63, 1B65-67.

[318] Klain Tr. at 129; Personal Aide 1 4/26/23 Tr. at 30-31, 103; Personal Aide 3 3/28/23 Tr. at 32; Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-63, 1B65-67.

[319] Personal Aide 1 9/18/23 Tr. at 110-11; Staff Assistant 3 10/4/23 Tr. at 48-49; Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-63, 1B65-67.

[320] 20230120_FBI_0156. FBI Serial 77 1A 86.



*Notebooks seized from file cabinet under printers*
*in Delaware home office*[321]



*Notebooks seized from bookcase in Delaware home's second-level office*[322]

---

[321] 20230120_FBI_0132. FBI Serial 77 1A86.
[322] 20230120_FBI_0218. FBI Serial 77 1A86.

The content of Mr. Biden's notebooks took several forms.[323]

(1) <u>Work notes</u>. Mr. Biden wrote these notes during or soon after meetings he attended as vice president. These notes memorialize, often in bullet-point format, things such as the issues presented, comments of meeting participants, and decisions made. For example, Mr. Biden often took notes during meetings of the National Security Council and the President's Daily Brief.[324] Most of the notes in Mr. Biden's collection of notebooks recovered by FBI agents from his Wilmington residence are work notes of this type.

(2) <u>Work reflections</u>. These were Mr. Biden's impressions, reflections, opinions, and commentary about people and issues he encountered as vice president. For example, during the 2009 review of U.S. military strategy and foreign policy in Afghanistan, discussed in Chapter Six, Mr. Biden recorded his deep concerns that President Obama's eventual decision about Afghanistan would be a terrible mistake.[325]

(3) <u>Political notes and reflections</u>. These were Mr. Biden's summaries of and commentary about political or electoral issues—for example, his notes about his decision whether to run for president in 2016.

(4) <u>Personal reflections</u>. These were entries about purely personal subjects, such as the illness and death of his son, Beau.

(5) <u>To-do lists</u>. These were reminders about issues ranging from policy deliberations, to political concerns, to personal matters.

While Mr. Biden often organized his notebooks roughly based on subject matter, many notebooks contained entries on a variety of topics. He typically added entries sequentially by date, so that a given notebook could contain, for example, real-time notes of White House meetings, purely personal entries about Mr. Biden's family, and entries about an upcoming election. Most of the notebooks contained

---

[323] *See generally* Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-68.

[324] Klain Tr. at 44, 51; Personal Aide 1 4/26/23 Tr. at 130-31; *see generally* Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-68.

[325] Personal Aide 1 4/26/23 Tr. at 30-31, 130-32; Executive Assistant 9/28/23 Tr. at 75; Chapter Six.

predominantly "work notes"—summaries or minutes of work meetings—but a few writings were more diary-like and personal in nature.[326]

## B.    The notebooks contained classified information

Though none of the notebooks have classification markings, some of the notebooks contain information that remains classified up to the Top Secret/Sensitive Compartmented Information level.[327]

As with his notecards, Mr. Biden routinely took notes in his notebooks about classified subjects and during meetings where classified information was discussed.[328] For example, he regularly took notes related to the President's Daily Brief, which typically contains classified information.[329] He also regularly took notes during meetings in the White House Situation Room, and numerous photographs document this practice.[330]

---

[326] *See generally* Notebooks 1B15, 1B20, 1B22, 1B25, 1B30, 1B51-52, 1B57-59, 1B62-68.

[327] FBI Serial 676.

[328] Notebooks 1B15, 1B20, 1B22, 1B30, 1B51-52, 1B57-58, 1B63-64, 1B66-67.

[329] *E.g.,* Notebook entries 1B30-0065, 0093-94; 1B67-0076.

[330] *E.g.,* Notebook entries 1B15-0012; 1B20-0034; 1B51-0073-74, 0080-81; 1B58-0029-31; 1B63-0016, 0026-29; 1B66-0082-84; 1B67-0019-20.



*Mr. Biden using a notebook at a Principals Committee meeting*
*(Sept. 29, 2009)*[331]



*Mr. Biden writing in a notebook at a meeting with the Joint Chiefs of Staff (Oct. 30, 2009)*[332]

---

[331] SCOH-000756.
[332] SCOH-000757.

84

Often, Mr. Biden's notes contained real-time minutes of National Security Council meetings, during which the President deliberated with his senior military, intelligence, and foreign policy advisers.[333] These meetings regularly involved discussions of classified information.[334] For this reason, they took place in the Situation Room, which is itself a SCIF, and signs conspicuously designated National Security Council meetings as "Top Secret."[335]

Some of the handwritten notes Mr. Biden took in his notebooks during these meetings included classified information.[336] The notebooks contained such information about the following subjects:

- U.S. intelligence sources, methods, and capabilities.[337]

- U.S. intelligence activities.[338]

- The activities of foreign intelligence services.[339]

- U.S. military programs and capabilities.[340]

- Foreign military programs and capabilities.[341]

- Plans and capabilities of foreign terrorist organizations.[342]

---

[333] *E.g.*, Notebook entries 1B15-0012; 1B20-0034; 1B51-0073-74, 0080-81; 1B58-0029-31; 1B63-0016, 0026-29; 1B66-0082-84; 1B67-0019-20.

[334] *E.g.*, Notebook entries 1B15-0012-13; 1B51-0073-74; 1B63-0016, 0026-29.

[335] *See* photographs above; SCOH-000756; SCOH-000757.

[336] FBI Serial 676.

[337] *E.g.*, Notebook entries 1B22-0026; 1B52-0091; 1B57-0014; 1B63-0012;80-0028; 1B66-0082.

[338] *E.g.*, Notebook entries 1B51-0080-81; 1B66-0082.

[339] *E.g.*, Notebook entries 1B51-0074; 1B66-0082.

[340] *E.g.*, Notebook entries 1B58-0029-30; 1B63-0028.

[341] *E.g.*, Notebook entries 1B15-0012; 1B51-0080; 1B58-0033; 1B64-0056; 1B67-0019-20.

[342] *E.g.*, Notebook entries 1B20-0034; 1B58-0094.

85

The FBI and the Special Counsel's Office selected thirty-seven excerpts totaling 109 pages from Mr. Biden's handwritten materials—including mostly notebook entries and a few notecards seized from his Delaware home—to submit to classification authorities in the intelligence community and the Department of Defense to determine the appropriate classification level for each. Investigators selected a sampling of excerpts across Mr. Biden's notebooks that both appeared to be classified and that they expected a jury could find are national defense information under 18 U.S.C. § 793.

Subject to the limitations discussed in Chapter Two, classification authorities identified each excerpt as containing presently classified information.[343] Of the thirty-seven excerpts:

- Eight are Top Secret with Sensitive Compartmented Information, seven of which include information concerning human intelligence sources,

- Six are Top Secret,

- Twenty-one are Secret, and

- Two are Confidential.[344]

A more detailed description of the results of the classification review is in Appendix B.

Mr. Biden also sometimes placed marked classified documents inside his notebooks.[345] Photos in the Situation Room show documents tucked inside his

---

[343] FBI Serial 676.

[344] *Id.*

[345] SCOH-000758, SCOH-000759; Recovered documents C1, C2, C3, C4, D20, D21.

notebooks, and the FBI recovered marked classified documents from inside three notebooks found in Mr. Biden's Delaware home.[346]



*Notebook with inserted documents, at a meeting with the Joint Chiefs of Staff (Oct. 30, 2009)*[347]



*Notebook with additional inserted documents at the end of the same meeting (Oct. 30, 2009)*[348]

[346] SCOH-000758, SCOH-000759; Recovered documents C1, C2, C3, C4, D20, D21.
[347] SCOH-000758.
[348] SCOH-000759.

**C.    At times during his vice presidency, Mr. Biden stored his notebooks in a White House safe**

During his vice presidency and afterward, Mr. Biden kept his notebooks close, and even his most trusted advisers did not read them.[349] Ron Klain, Mr. Biden's Chief of Staff as both vice president and president, explained that Mr. Biden considered his notes to be "his personal reflections and [he] didn't want people looking at them."[350] As shown below in a photograph from 2009, and as witnesses explained, Mr. Biden carried the notebooks himself in his own briefcase.[351] Unlike his notecards, which, as explained above, he often handed to staff to collect and organize, he did not give the notebooks to his staff.[352]



*Vice President Biden with notebook (Aug. 7, 2009)*[353]

---

[349] Personal Aide 1 9/18/23 Tr. at 112; Klain Tr. at 51, 63.

[350] Klain Tr. at 63.

[351] Personal Aide 3 3/28/23 Tr. at 35; Staff Assistant 3 10/4/23 Tr. at 49, 51; Executive Assistant 9/28/23 Tr. at 73-74.

[352] Executive Assistant 9/28/23 Tr. at 74; Staff Assistant 3 10/4/23 Tr. at 49.

[353] 1B001_00674466.

Early in the Obama administration, the first Counsel to the Vice President, Cynthia Hogan, personally advised him about the proper handling of classified information and Mr. Biden agreed to follow her advice.[354] As explained in Chapter Three, the advice was codified in a 2010 memo from Hogan, which instructed Mr. Biden that "[c]lassified materials may never be left unattended," but must be kept in the custody of Mr. Biden or an authorized staff member, or secured in a safe.[355] According to Hogan's notes, among her concerns were Mr. Biden's "notes on codeword info" which were kept in his "AFPAK – notebooks," that is, his notebooks concerning various policy reviews relating to Afghanistan and Pakistan, which are discussed further in Chapter Six.[356] Hogan's notes say that Mr. Biden's personal aide "will collect" those notebooks.[357] But in interviews with the Special Counsel's Office in 2023, Hogan did not remember Mr. Biden's notebooks, or whether she ever advised Mr. Biden about how he should store notes he took during classified meetings.[358]

In 2011, Hogan provided Mr. Biden further written guidance about the proper handling of classified notes.[359] In a memo to Mr. Biden about protocols for hiring a historian to work in the Office of the Vice President, Hogan explained that:

---

[354] Hogan 5/23/23 Tr. at 27, 53.

[355] 8/17/10 Hogan memo to VP, NARAWH_00000050; *see also* 8/23/10 e-mail from Military Aide to VP MILAIDEs, NARAWH_00014447 ("The VP understands that classified material needs to be kept in one of two places[:] a. Personal Custody, or b. a safe."); Hogan 5/23/23 Tr. at 27, 53, 91-92; Hogan 9/19/23 Tr. at 68-69, 79-80, 83, 106.

[356] 8/17/10 Hogan memo to VP, NARAWH_00000050; Evidence items 1B63, 1B66. In her interview with the Special Counsel's Office over a decade later, Hogan did not remember her note on this topic, or any of her concerns or advice about Mr. Biden's notebooks. Hogan 5/23/23 Tr. 39, 90-93; Hogan 9/19/23 Tr. at 86.

[357] 8/17/10 Hogan memo to VP, NARAWH_00000050.

[358] Hogan 5/23/23 Tr. at 39, 90-93; Hogan 9/19/23 Tr. at 69, 82-83, 86, 120-21.

[359] 4/27/11 memo from Hogan et. al. to the Vice President, 1B001_02881350.

any discussions with you that cover classified topics will need to take place in accordance with Executive Order 13526 on Classified National Security Information. This means that such discussions must occur in a secure facility like your West Wing office, and that **any notes or other materials that contain classified information must be maintained in secure safes, produced on a classified computer, and stored in a secure facility**[.][360]

For a time—at least during the early part of his vice presidency—Mr. Biden stored his notebooks relating to national security, along with other classified documents, in a safe in his West Wing office.[361] As Mr. Biden's first personal aide explained, Mr. Biden stored these notebooks—including the Af/Pak notebook—in the safe because "[t]hat safe was for classified information. It was the purpose of the safe."[362] Periodically, Mr. Biden removed certain classified items from his safe and asked his personal aide to return them to members of his national security staff, but Mr. Biden never let anyone else possess his notebooks.[363]

---

[360] *Id.* (emphasis added).

[361] Personal Aide 1 4/26/23 Tr. at 30-31, 103-04, 125-27, 129-130, 134-35; Personal Aide 1 9/18/23 Tr. at 122; Klain Tr. 38-40.

[362] Personal Aide 1 4/26/23 Tr. at 104, 129. In a second interview, the personal aide said he could not say that the reason Mr. Biden stored the notebooks in a safe was because they were classified, explaining that the personal aide did not read the notebooks, was not an expert in classification, and that Mr. Biden could have stored the notebooks in the safe simply because they were private. Personal Aide 1 9/18/23 Tr. at 123. In contrast, in his first interview, the personal aide said Mr. Biden only stored materials in the safe if they were related to national security and explained, "it's not like he ever felt like, oh my God, if I leave this on my desk, somebody's going to come steal this thing out of my West Wing office . . . at the White House." Personal Aide 1 4/26/23 Tr. at 129 In both interviews, the personal aide explained his belief that because Mr. Biden was taking notes about classified subjects in classified meetings, the notebooks contained classified information. Personal Aide 4/26/23 Tr. at 104, 129; Personal Aide 9/18/23 Tr. at 121. Other witnesses confirmed generally that the purpose of the safe was to store classified information and that classified information was stored in it. *See, e.g.,* Director of Programs Tr. at 26-28, 59, 79, 111-14; Staff Assistant 1 Tr. at 46-50.

[363] Personal Aide 1 4/26/23 Tr. at 128, 132-33.

At some point during his vice presidency, Mr. Biden appears to have stopped storing his notebooks in the West Wing safe.[364] Mr. Biden's first personal aide, who regularly retrieved the notebooks from the safe for Mr. Biden, left the administration in 2014.[365] After that, there is no evidence Mr. Biden or his staff stored his notebooks in the West Wing safe.[366]

Mr. Biden also appears to have kept his notebooks and other classified information in a safe when he was at the Naval Observatory, again, at least for a time near the beginning of the administration.[367] For example, a 2010 e-mail from Mr. Biden's personal aide to members of his staff notes that Mr. Biden had "just put" classified material into the Naval Observatory safe, including several sets of marked classified documents and Mr. Biden's notebook documenting the 2010 Afghanistan/Pakistan policy review.[368]

## D.    After his vice presidency, Mr. Biden stored the notebooks in unlocked and unauthorized containers in his home

After Mr. Biden left the White House in 2017, while most of his classified notecards went to a SCIF at the National Archives, his notebooks went to his private homes, where they were not secured in a safe, and were in a setting that was not authorized for the storage of classified information.[369] The notebooks first went to Mr.

---

[364] Personal Aide 3 3/28/23 Tr. at 48-49, 52-54.

[365] Personal Aide 1 4/26/23 Tr. at 63.

[366] Personal Aide 2 Tr. at 47; Personal Aide 3 3/28/23 Tr. at 48-49, 52-54; Executive Assistant 1/4/23 Tr. at 32; Executive Assistant 9/28/23 Tr. at 32.

[367] 12/11/10 e-mail from Personal Aide 1 to Executive Secretary 3 and Director of Programs, 1B001_03159095; Notebook 1B63.

[368] 12/11/10 e-mail from Personal Aide 1 to Executive Secretary 3 and Director of Programs, 1B001_03159095; Notebook 1B63.

[369] Biden 10/9/23 Tr. at 30, 41; FBI Serial 77 1A86; 20230120_FBI_0127, 0151.

Biden's rental home in Virginia, where he kept them in a room he used for meetings.[370] As explained in the next chapter, in the months after he left the White House, Mr. Biden gathered the notebooks and referred to several of them while writing his book, *Promise Me, Dad*. During their conversations while writing the book, Mr. Biden told his ghostwriter, Zwonitzer, that the notebooks might contain classified information.[371]

When Mr. Biden moved out of the Virginia home, his notebooks were eventually moved to his home in Delaware.[372] In January 2023, during a search of the Delaware home, FBI agents found the notebooks in unlocked and unauthorized locations, primarily in Mr. Biden's main-floor office and basement den.

---

[370] Biden 10/9/23 Tr. at 26-28, 30, 41.
[371] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Evidence item 1B80.
[372] FBI Serial 77 1A86; 20230120_FBI_0127, 0151.



*File cabinet under television in Delaware home's main-floor office,*
*containing the "Af/Pak 1" and "DAILY/MEMO" notebooks (Jan. 20, 2023)*[373]



*File cabinet under printers in Delaware home's main-floor office,*
*containing three seized notebooks (Jan. 20, 2023)*[374]

---

[373] 20230120_FBI_0151.
[374] 20230120_FBI_0127.

In Mr. Biden's interview with our office, he explained that he took his notebooks with him after his vice presidency because "[t]hey are mine," and explained that "every President before me has done the same exact thing."[375] He also specifically referenced President Reagan, who, after leaving office, kept handwritten diaries containing classified information at his private home, as discussed in Chapter Ten.[376] In later written answers, Mr. Biden wrote that, "[l]ike presidents and vice presidents before me, I understand these notes to be my personal property."[377] He declined to answer several questions about whether he believed his notes contained classified information; whether he believed he was authorized to possess classified information after his vice presidency; and whether he took steps to avoid writing classified information in his notebooks.[378]

[375] Biden 10/9/23 Tr. at 42-43.
[376] Biden 10/8/23 Tr. at 111-12.
[377] Biden 12/1/23 written responses at 1.
[378] *Id.* at 1-2.

## CHAPTER FIVE

### MR. BIDEN'S SECOND BOOK, *PROMISE ME, DAD,* AND THE DISCOVERY OF CLASSIFIED AFGHANISTAN DOCUMENTS

Like many presidents, Mr. Biden has long viewed himself as a historic figure. Elected to the Senate at age twenty-nine, he considered running for president as early as 1980 and did so in 1988, 2008, and 2020. During his thirty-six years in the Senate, Mr. Biden believed he had built a record in both domestic and foreign affairs that made him worthy of the presidency.

In addition to the notebooks and notecards on which he took notes throughout his vice presidency, Mr. Biden collected papers and artifacts related to noteworthy issues and events in his public life. He used these materials to write memoirs published in 2007 and 2017, to document his legacy, and to cite as evidence that he was a man of presidential timber.

For example, as a young senator in the 1970s, Mr. Biden led several congressional delegations to Europe and the Soviet Union.[379] As explained in Chapter Eight, he viewed these trips as historic and believed they prepared him to be president. Mr. Biden wrote about these trips in his 2007 memoir, *Promises to Keep.* In 2023, FBI agents recovered official documents, including marked classified documents, related to these trips in Mr. Biden's Delaware garage.[380]

In 2009, while serving as vice president, Mr. Biden strongly opposed the military's plan to send tens of thousands of additional troops to Afghanistan.[381] Mr.

---

[379] *See* Chapter Eight.

[380] Evidence items 1B17, 1B18.

[381] *See* Chapter Six.

95

Biden endured sharp criticism both during the debate and after President Obama rejected his advice and decided to send additional troops to Afghanistan. But Mr. Biden always believed he was right and that he would be vindicated by history. He kept documents related to the debated troop surge, including a classified handwritten memo he sent President Obama in 2009 opposing the surge and marked classified documents supporting his position. In December 2022 and January 2023, FBI agents recovered these materials from Mr. Biden's Delaware garage and office.[382]

Finally, as explained in Chapter Four, during his eight years as vice president, Mr. Biden regularly wrote notes by hand in notebooks. One such notebook entry makes clear that Mr. Biden had long contemplated writing a book about his vice presidency. In July 2010, he documented a meeting to discuss a possible book about "my V.P. years."[383] In Mr. Biden's view, "there were three plausible reasons for having one written or writing one.

1. Defense – others will write and I want a record

2. Future – who knows about 2016

3. Profit – retirement[.]"[384]

One function of Mr. Biden's notebooks was to provide raw material for his eventual second memoir. After leaving office, Mr. Biden kept his notebooks at his homes in Virginia and Delaware and used them to write that book, *Promise Me, Dad.*

---

[382] Evidence items 1B04, 1B17, and 1B18.

[383] Notebook entry 1B30-0012.

[384] *Id.*

96

In January 2023, FBI agents recovered these notebooks, primarily in Mr. Biden's home office and den.[385]

## I.    MR. BIDEN'S 2017 MEMOIR: *PROMISE ME, DAD*

After his vice presidency, Mr. Biden wrote and published a memoir in 2017 titled *Promise Me, Dad*. Evidence suggests that, while researching and writing the book, Mr. Biden found marked classified documents in the basement of his rental home in Virginia and told his ghostwriter about it during an audio-recorded conversation. And while the published book is not known to contain classified information, while writing the book in unsecure locations, Mr. Biden used notebooks containing notes he took during his vice presidency about classified meetings and information.

### A.    *Promise Me, Dad*

Unlike Mr. Biden's earlier idea for a book that would chronicle all eight years of his vice presidency, *Promise Me, Dad* has a narrower focus.[386] The book recounts a 14-month period of Mr. Biden's vice presidency from Thanksgiving 2014 to January 2016, during which he dealt with the illness and eventual death of his elder son, Beau, who died in May 2015.[387] The book discusses the toll that loss took on Mr. Biden, the foreign policy issues in Ukraine, Central America, and Iraq he addressed during that time, and the role his son's death played in Mr. Biden's decision not to run for

---

[385] Evidence items 1B17 and 1B18.

[386] *See generally* Joe Biden, PROMISE ME, DAD: A YEAR OF HOPE, HARDSHIP, AND PURPOSE (Flatiron Books 2017); Notebook entry 1B30-0012.

[387] *See generally* Biden, PROMISE ME, DAD.

president in 2016.[388] Published in November 2017, *Promise Me, Dad* quickly became a #1 *New York Times* bestseller.[389]

### 1.   Mark Zwonitzer

Mr. Biden worked with a ghostwriter, Mark Zwonitzer, to write *Promise Me, Dad*.[390] Zwonitzer is an author and documentary filmmaker specializing in American history and politics.[391] He had previously ghostwritten Mr. Biden's 2007 memoir, *Promises to Keep*.[392]

Zwonitzer has never held a security clearance or become familiar with the restrictions on the handling of classified material.[393] Mr. Biden knew this.[394] In 2011, he proposed hiring Zwonitzer as an official historian for the Office of the Vice President.[395] At Mr. Biden's request, Counsel to the Vice President Hogan prepared a memorandum assessing the proposal and any issues that could arise.[396] The memorandum noted that if hired, Zwonitzer "will likely need a security clearance" and that any discussions that cover classified topics would have to "occur in a secure facility like your West Wing office."[397] The memo explained that "any notes or other

---

[388] *See generally* Biden, PROMISE ME, DAD.

[389] The New York Times Best Sellers, N.Y. TIMES, https://www.nytimes.com/books/best-sellers/2017/12/03/ (last visited January 30, 2024); Promise Me, Dad, Pan MacMillan, https://www.panmacmillan.com/authors/joe-biden/promise-me-dad/9781509890088 (last visited Jan. 30, 2024).

[390] Zwonitzer 7/31/23 Tr. at 56.

[391] *Id.* at 12.

[392] *Id.* at 31-32.

[393] *Id.* at 98-100.

[394] *Id.* at 102; Zwonitzer recording 170424_0091; 4/27/11 Memo, Cynthia Hogan to Mr. Biden, 1B001_02881350.

[395] 4/27/11 Memo from Cynthia Hogan to Mr. Biden, 1B001_02881350.

[396] *Id.*

[397] *Id.* at 5.

material that contained classified information must be maintained in secure safes, produced on a classified computer, and stored in a secure facility."[398] Mr. Biden did not go through with the proposal.[399]

## 2.  Book planning and research

In late 2015, shortly after his son's death, Mr. Biden began planning to write a memoir that drew upon his time as vice president.[400] He met with Zwonitzer and other aides to discuss book ideas and logistics.[401] They also solicited input from editors and publishers.[402] During these early meetings in late 2015 and early 2016, Mr. Biden and Zwonitzer decided to focus the book on a "small window in time" during which Mr. Biden balanced his responsibilities as vice president with his family responsibilities during and in the wake of his son's illness and death.[403]

From approximately April 2016 through February 2017, Mr. Biden worked with Zwonitzer to outline the book and draft a proposal to submit to publishers.[404] Zwonitzer compiled a chronology of Mr. Biden's day-to-day activities in late 2015 and early 2016 using Mr. Biden's daily schedules and calendars from his time as vice president.[405] Mr. Biden's staffers gathered the schedules for Zwonitzer.[406]

---

[398] *Id.*

[399] Zwonitzer 7/31/23 Tr. 53-54.

[400] *Id.* at 56.

[401] *Id.* at 59; 2/10/16 e-mail from Executive Assistant re "Thursday, 2/11, mtg/dinner, 6:30 pm," Zwonitzer-00000447; 4/6/16 e-mail from Executive Assistant re "Meeting/dinner, Monday, April 11 6:30 – 8:30 pm," Zwonitzer-00008802.

[402] Zwonitzer 7/31/23 Tr. at 59.

[403] 5/21/16 Document named "JRB-Book-Idea.doc" circulated on May 21, 2016, Zwonitzer-00007400; Zwonitzer 7/31/23 Tr. at 56-59; Draft Book Proposal circulated on June 22, 2016, Zwonitzer-00003463.

[404] Zwonitzer 7/31/23 Tr. at 59.

[405] *Id.* at 62-64.

[406] *Id.* at 63-65; 9/29/16 e-mail from Zwonitzer to Ricchetti, Zwonitzer-00007613.

### 3.    The writing process

Zwonitzer interviewed Mr. Biden more than a dozen times while researching and writing *Promise Me, Dad*.[407] During the interviews, Mr. Biden recounted the events of 2015, including the challenges of dealing with profound personal tragedy while fulfilling his duties as vice president. Zwonitzer also interviewed Mr. Biden's family members and former staffers.[408] Zwonitzer audio-recorded the interviews, then transcribed the recordings for use in writing *Promise Me, Dad*.[409]

The interviews began in the spring of 2016 and continued through the summer of 2017. Zwonitzer interviewed Mr. Biden several times at the Naval Observatory in 2016 while Mr. Biden was still serving as vice president. After Mr. Biden left office, he met with Zwonitzer at his rental home in Virginia.[410] During the summer of 2017, Zwonitzer and Mr. Biden worked together to finalize the manuscript at Mr. Biden's beach home in Rehoboth Beach, Delaware.[411]

### B.    Mr. Biden used his notebooks in writing *Promise Me, Dad*

In writing *Promise Me, Dad*, Mr. Biden relied extensively on the notebooks containing notes he took during his vice presidency. Mr. Biden referred to and read from his notebooks during his interviews with Zwonitzer.[412] According to Zwonitzer,

---

[407] FBI Serials 315, 335.

[408] Zwonitzer 7/31/23 Tr. at 144-45.

[409] *Id.* at 95-96.

[410] FBI Serial 315, 335.

[411] Zwonitzer 7/31/23 Tr. at 130.

[412] *Id.* at 96.

100

the notebooks "made the book possible" by providing the "emotional arc of the . . . story."[413]

One of the primary sources of material for *Promise Me, Dad* was Mr. Biden's "Daily" notebook for "August 2014-September 2016."[414] This notebook contained notes of meetings Mr. Biden attended as well as entries about his other activities during this period. Many of the meetings related to foreign policy and classified information, including the President's Daily Brief, National Security Council meetings, and other briefings. Some of these entries remain classified up to the Secret level.[415]

The notebook also contained notes on matters other than foreign policy, including Mr. Biden's private lunches with President Obama and meetings with advisors to discuss whether to run for president in 2016. Some of the entries were highly personal—most notably, entries reflecting on his son's illness and death.

While this notebook provided much of the framework for *Promise Me, Dad*, Mr. Biden also used other notebooks in writing the book. Mr. Biden used and referred to a notebook labeled "Foreign Policy 11/2013-2014."[416] This notebook also contained his notes on the President's Daily Brief, National Security Council and other Situation Room meetings, and other foreign policy briefings. As explained below, at one point

---

[413] *Id.* at 63, 65.
[414] Notebook 1B57.
[415] FBI Serial 676.
[416] Notebook 1B67.

Mr. Biden told Zwonitzer that some of the information in the notebook may be classified. Some of these entries remain classified up to the Top Secret level.[417]

Mr. Biden also referred to a notebook labeled "Foreign Policy," which contained similar notes on classified briefings.[418] Some of these entries remain classified up to the Secret level.[419] Finally, Mr. Biden also used a notebook labeled "Obama/Biden 7-15-13 → 10-10-16."[420] It contained mainly notes on meetings with political advisors and upon preliminary inspection it does not appear to contain classified information.[421]

### C.    Mr. Biden referred to and read from his notebooks during his interviews with Zwonitzer

During many of the interviews with his ghostwriter, Mr. Biden read from his notebooks nearly verbatim, sometimes for an hour or more at a time. Zwonitzer later transcribed the recordings of the interviews. Zwonitzer described this process of listening to and transcribing Mr. Biden's reading from his notebooks as "incredibly painstaking."[422]

At times during these interviews, Mr. Biden took steps to ensure that Zwonitzer did not read or have access to the classified portions of the notebooks. With one exception of which we are aware, discussed below, Mr. Biden did not let Zwonitzer read or handle the notebooks. On multiple occasions, Zwonitzer suggested it would

---

[417] FBI Serial 676.
[418] Notebook 1B58.
[419] FBI Serial 676.
[420] Notebook 1B68.
[421] FBI Serial 676.
[422] Zwonitzer 7/31/23 Tr. at 74, 121.

be easier if Mr. Biden photocopied the relevant notebook entries and allowed Zwonitzer to use the copies, but Mr. Biden declined.[423] According to Zwonitzer, Mr. Biden "really never let the journals out of his hand" and did not let others access them.[424]

### D.    Mr. Biden disclosed classified information in his notebooks to Zwonitzer

Based on our review of the notebooks and recorded interviews, when Mr. Biden came to potentially classified material in his notebook entries, he appears to have sometimes stopped at or skipped over the potentially classified material.[425] Zwonitzer also recalled Mr. Biden mentioning the need to be careful "because he was worried that there was a possibility that . . . some of this stuff [handwritten entries in the notebooks] could be classified."[426] According to Zwonitzer, "there were things he couldn't tell me, lines he couldn't cross."[427]

At other times, however, Mr. Biden read his notes from classified meetings to Zwonitzer nearly word-for-word.[428]

*Notes of Situation Room meeting during summer of 2015.* On February 16, 2017, for example—when Mr. Biden was no longer vice president—he met with

---

[423] *Id.* at 75, 121-22.

[424] *Id.* at 71-72, 113.

[425] *Id.* at 102; Evidence items 1B57, 1B58, 1B67, 1B79, 1B81.

[426] Zwonitzer 7/31/23 Tr. at 83.

[427] *Id.*

[428] Zwonitzer recording Carved_000571; Notebook entry 1B57-0062-65; Zwonitzer recording 170424_0091; 170424_0091 Tr. at 4-22; Notebook entry 1B67-0063-65; Evidence items 1B79 and 1B81; FBI Serials 315, 335.

103

Zwonitzer at the rental house in Virginia.[429] During this meeting, Mr. Biden read from notes he took during a meeting in the Situation Room in the summer of 2015, which was attended by senior military officials, the CIA Director, and others.[430] Mr. Biden appeared to tell Zwonitzer this notebook entry related to "a long meeting on the Security Council on – it probably was classified."[431] Mr. Biden's meeting notes summarized the actions and views of U.S. military leaders and the CIA Director relating to a foreign country and a foreign terrorist organization.[432] Mr. Biden had skipped over this same notebook entry during a previous conversation with Zwonitzer in October 2016, when Mr. Biden was still vice president.[433]

But on February 16, 2017, after he was no longer vice president, Mr. Biden read portions of the same notebook entry aloud and nearly verbatim to Zwonitzer, including portions containing information that remains classified up to the Secret level.[434] Though Mr. Biden read these portions of the notebook entry, he also skipped over other portions of the entry.

Two months later, on April 10, 2017, during another recorded conversation with Zwonitzer, Mr. Biden returned to the same notebook entry detailing the same

---

[429] Recording Carved_000556; Carved_000556 Tr. at 5-6; 2/15/17 e-mail re "VP's Schedule – Thu, Feb 16, 2017," USSS-0000523776; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[430] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; Notebook entry 1B57-0062-65; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[431] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; Notebook entry 1B57-0062-65; FBI Serials 315, 335; Evidence items 1B79, 1B81. Mr. Biden's precise words are difficult to discern. This quotation is our best attempt to do so.

[432] Notebook entry 1B57_0062-65.

[433] Zwonitzer recording Carved_000241; FBI Serials 315, 335.

[434] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; Notebook entry 1B57-0062-65; FBI Serials 315, 335, 676.

104

Situation Room meeting from the summer of 2015.[435] Immediately before discussing the notebook entry, Mr. Biden discussed extremely personal notebook entries touching on the illness and death of his son Beau, its effect on his family, and the wrenching decision about whether to run for president in 2016.[436] After discussing these highly emotional topics, Mr. Biden turned immediately to the notebook entry from the summer 2015 Situation Room meeting, which began on the very next page of the notebook, and read additional portions of the entry nearly verbatim, including the portions of the entry he read to Zwonitzer during the February 16, 2017 meeting.[437] The passages Mr. Biden read to Zwonitzer on April 10, 2017 contain information that remains classified up to the Secret level.[438]

*Notes of National Security Council meeting in November 2014.* In a later recorded conversation with Zwonitzer on April 24, 2017, Mr. Biden read from a different notebook entry, this time from notes he took during a National Security Council meeting in the Situation Room in November 2014.[439] Mr. Biden read aloud from notes summarizing a range of issues relating to a foreign terrorist organization, including specific activities of the U.S. military and views expressed by the

---

[435] Zwonitzer recording Carved_000571; Carved_000571 Tr. at 2-6; FBI Serials 315, 335; Notebook entry 1B57-0062-65; Evidence items 1B79, 1B81.

[436] Zwonitzer recording Carved_000571; Carved_000571 Tr. at 1-2.

[437] Zwonitzer recording Carved_000571; Carved_000571 Tr. at 2-6; Notebook entry 1B57-0062-65; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[438] FBI Serial 676.

[439] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 4-22; Notebook entry 1B67-0063-65; Evidence items 1B79, 1B81.

105

intelligence community, including the Director of National Intelligence and the CIA Director.[440]

While reading these notes, Mr. Biden struggled to read his handwriting, and he showed part of the handwritten passage to Zwonitzer. The two then had the following exchange:

Mr. Biden:    Do you have any idea what the hell I'm saying there? Less on the number of what? Isn't that awful?

Zwonitzer:    Something. Number, something – quality. I can't.

Mr. Biden:    **Some of this may be classified, so be careful.**

Zwonitzer:    Okay.

Mr. Biden:    **I'm not sure. It isn't marked classified, but.**[441]

Mr. Biden then continued to read nearly verbatim from portions of his notes on the 2014 Situation Room meeting.[442] Some of the portions that Mr. Biden read to Zwonitzer remains classified at the Secret level.[443]

More generally, during his dozens of hours of interviews with Zwonitzer, Mr. Biden read from notebook entries related to many classified meetings, including National Security Council meetings, CIA briefings, Department of Defense briefings, and other meetings and briefings with foreign policy officials.[444]

---

[440] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 4-22; Notebook entry 1B67-0063-65; Evidence items 1B79, 1B81.

[441] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Notebook entry 1B67-0065.

[442] Zwonitzer recording 170424_0091 (emphasis added); 170424_0091 Tr. at 14-22; Notebook entry 1B67-0063-65.

[443] FBI Serial 676.

[444] *E.g.*, Notebook entries 1B57-0039, 1B57-0062-63, 1B67-0059-61, 1B67-0063-65.

### E.    Mr. Biden also used his notecards in writing his book

In addition to his notebooks, Mr. Biden used other notes he wrote on notecards while vice president.[445] These included notes that he took during his private lunches with President Obama, several of which featured prominently in the book.[446]

In the book, Mr. Biden described his weekly lunches with President Obama as "the one setting where we could talk frankly, without fear of being overheard."[447] They were an opportunity to "discuss the most important issues facing the administration, the country, and the world at that moment; and we could talk through any personal issues we were having."[448] "If something one of us had done angered or disappointed the other, the weekly lunch was the time to clear the air."[449] The lunches were often personal in nature, as Mr. Biden described in the book:

> The conversation at our lunches was just as often personal. We talked about our wives. We talked about the close friendship between his daughters and my granddaughter, and what was going on in their lives. We talked about golf.[450]

Many of Mr. Biden's notes on his lunches with President Obama were taken on the long, narrow notecards that he used regularly as vice president.[451]

---

[445] *See* Chapter Four.

[446] *See, e.g.,* Biden, PROMISE ME, DAD 21, 57-59, 66-79, 88-89, 156-59, 203-04, 206-07, 232-33.

[447] *Id.* at 67.

[448] *Id.*

[449] *Id.* at 66.

[450] *Id.* at 68.

[451] *See* Chapter Four; Staff Assistant 2 3/16/23 Tr. at 100; 12/20/10 e-mail from OVP staffer to Staff Assistant 2, 1B001_02888681; Staff Assistant 3 10/4/23 Tr. at 34-35; FBI Serial 3; NARA_SCAN_00001317.

### F.    Mr. Biden's staff made copies of his notecards for use in writing *Promise Me, Dad*

As explained in Chapter Four, Mr. Biden's staff made copies of his notecards for him to take after he left the vice presidency and use in writing *Promise Me, Dad*. After his staffers raised concerns that some of the notecards contained classified information, it appears that Mr. Biden's staff arranged for his copies of the notecards to be stored in a safe at the Naval Observatory, and then to be held in personal storage in a SCIF at the National Archives.[452] Mr. Biden visited the National Archives twice after he left office in 2017 to review the notecards as part of the book-writing process.[453] Both trips were occasioned by Zwonitzer's requests for notes related to specific events during Mr. Biden's vice presidency, including several of Mr. Biden's lunches with President Obama that were later featured in *Promise Me, Dad*.[454]

## II.    FEBRUARY 16, 2017: "I JUST FOUND ALL THE CLASSIFIED STUFF DOWNSTAIRS"

During a recorded interview on February 16, 2017, at Mr. Biden's rental home in Virginia after the end of his vice presidency, Mr. Biden told Zwonitzer he had just found classified material downstairs.[455]

From context, Mr. Biden appears to have been referring to classified documents relating to American military and foreign policy in Afghanistan. When he

---

[452] *See* Chapter Four; 1/12/17 Deposit Agreement regarding the Administration of Personal Materials of Vice President Joseph R. Biden, NARA-H_700000012.

[453] *See* Chapter Four.

[454] *See* Chapter Four; 5/21/16 e-mail from Zwonitzer to Ricchetti, Zwonitzer-00007399.

[455] Recording Carved_000556; Carved_000556 Tr. at 5-6; 2/15/17 e-mail re "VP's Schedule – Thu, Feb 16, 2017," USSS-0000523776; FBI Serials 315, 335; Evidence items 1B79, 1B81.

made his statement to Zwonitzer, Mr. Biden was discussing a handwritten memo he had sent to President Obama opposing the deployment of more troops to Afghanistan in 2009.[456]

Before meeting with Mr. Biden on February 16, 2017, Zwonitzer e-mailed a Biden staffer explaining that he "wanted to concentrate on the personal diaries from June 2015 through Thanksgiving 2015" and asking if Mr. Biden "could have those on hand."[457] When they met on February 16, 2017, Mr. Biden and Zwonitzer talked for several hours. Mr. Biden's sister, Valerie Biden Owens, was also present.[458] Zwonitzer recorded the conversation and later transcribed it.[459] They sat on the main floor of the Virginia house in the library/den, which is shown below:[460]



*Main floor library/den of Virginia home (July 10, 2019)*[461]

---

[456] Recording Carved_000556; FBI Serial 315, 335; Evidence items 1B66, 1B79, 1B81.

[457] 2/14/17 e-mail from Zwonitzer to Oval Office Operations Director, Zwonitzer-00006071.

[458] Zwonitzer 7/31/23 Tr. at 109; Carved_000556; Carved_000556 Tr. at 2, 4; 2/15/17 e-mail re "VP's Schedule – Thu, Feb 16, 2017," USSS-0000523776.

[459] Zwonitzer 7/31/23 Tr. at 109-10.

[460] *Id.* at 84, 97; Biden 10/9/23 Tr. at 28.

[461] FBI Serial 624 1A719; SCOH-000760

Mr. Biden began the interview with a long discussion about the murder of nine worshippers at the Emanuel African Methodist Church in Charleston, South Carolina, and a discussion of his son Beau.[462] During this portion of the recording, Mr. Biden did not sound like he was reading from notes.[463]

He then turned to his "Daily" notebook for "August 2014-September 2016."[464] Mr. Biden read from an entry containing notes on a July 7, 2015 National Security Council meeting about Iraq.[465]

While reading from his notebook, Mr. Biden listed four points he made about the Iraq situation during the July 7, 2015 meeting. Mr. Biden explained to Zwonitzer that he had made similar arguments years earlier, during the 2009 debate about the troop surge in Afghanistan.[466] Mr. Biden told Zwonitzer he had sent President Obama a 40-page, handwritten memo arguing against the deployment of additional troops in Afghanistan "on the grounds that it wouldn't matter."[467] Mid-sentence during this narrative, Mr. Biden said, in a matter-of-fact tone, that he had "just found all the classified stuff downstairs."

> So this was – I, early on, in '09—**I just found all the classified stuff downstairs**—I    wrote    the    President    a    handwritten    40-page

---

[462] Zwonitzer recording Carved_000556; ZWONITZER-TR_0064-78; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[463] Zwonitzer recording Carved_000556; ZWONITZER-TR_0064-78; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[464] Zwonitzer recording Carved_000556: ZWONITZER-TR_0079; FBI Serials 315, 335; Notebook 1B57; Evidence items 1B79, 1B81.

[465] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[466] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

[467] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079; FBI Serials 315, 335; Evidence items 1B79, 1B81.

memorandum arguing against deploying additional troops to Iraq—I mean, to Afghanistan—on the grounds that it wouldn't matter, that the day we left would be like the day before we arrived. And I made the same argument . . . I wrote that piece 11 or 12 years ago.[468]

As discussed in the next chapter, Mr. Biden was referring to a long, handwritten memo he faxed to President Obama from Nantucket over the Thanksgiving weekend in 2009. In the memo—which Bob Woodward later detailed in his book, *Obama's Wars*—Mr. Biden argued against engaging in full-scale counterinsurgency and nation-building in Afghanistan.[469]

As noted above, this February 2017 meeting with Zwonitzer was on the main floor of the Virginia home. "Downstairs" from where Mr. Biden and Zwonitzer sat was Mr. Biden's basement office, where he kept his personal papers.[470] The photo below shows the basement office in October 2017, several months after the February 2017 meeting with Zwonitzer:

---

[468] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 5-6; ZWONITZER-TR_0079 (emphasis added); FBI Serials 315, 335; Evidence items 1B79, 1B81.

[469] Bob Woodward, OBAMA'S WARS 309 (Simon & Schuster 2010).

[470] Biden 10/9/23 Tr. at 36-37; SCOH-000322.

111



Former vice president Joe Biden at his home in McLean, Virginia.

*Mr. Biden's basement office in the Virginia home (Oct. 2017)*[471]

During Mr. Biden's interview with the special counsel, he said that at the time of the February 2017 meeting, which was about a month after he moved into the Virginia house, he was likely still going through boxes of materials.[472] He said his belongings were "taking up a lot of room" in the house, and he was trying to figure out "what'd they [his staff] pack up, what's here?" "where in the hell is all this stuff going?" and "what do I clear out . . . what do I get out of the way? . . . ."[473] Among the

---

[471] David Kamp, *Why Joe Biden Didn't Run . . . And Why He's Not Ruling Out 2020,* VANITY FAIR (Oct. 25, 2017), https://www.vanityfair.com/news/2017/10/why-joe-biden-didnt-run-for-president-and-why-hes-not-ruling-out-2020 (last visited Jan. 30, 2024).

[472] Biden 10/9/23 Tr. at 32-34.

[473] Biden 10/9/23 Tr. at 33.

things he probably searched for in boxes were his notebooks, which he believed he gathered and kept on the main floor of the Virginia house.[474]

All three participants in the February 16, 2017 meeting—Mr. Biden, Zwonitzer, and Mr. Biden's sister, Ms. Biden Owens—said they did not remember Mr. Biden's statement that he had "just found all the classified stuff downstairs."[475] For his part, Mr. Biden said he did not remember anything at all about this incident, including whether he actually found classified documents in his basement office.[476]

During his interview with our office, Mr. Biden said he did not remember finding marked classified documents at any time after the end of the Obama administration and before he was elected President, but that if he had found such classified material, he would have given it to his personal aide at the time, or to another trusted staff member such as his former chief of staff.[477] We have interviewed the personal aide, former chief of staff, and several other staffers with whom Mr. Biden interacted at the Virginia house in and around February 2017. Except for a separate incident involving different classified material given to the personal aide in January 2017, some weeks before the Zwonitzer conversation, no one recalled Mr. Biden turning in classified documents after the end of his vice presidency.[478]

---

[474] *Id.* at 41.

[475] *Id.* at 32; Zwonitzer 7/31/23 Tr. at 82-84; Biden Owens Tr. at 28-30, 71-73; 2/15/17 e-mail re "VP's Schedule – Thu, Feb 16, 2017," USSS-0000523776.

[476] Biden 10/9/23 Tr. at 32-33.

[477] *Id.* at 32, 39-40.

[478] *E.g.*, Ricchetti Tr. at 187; Executive Assistant 9/28/23 Tr. at 165; Personal Aide 3 3/28/23 Tr. at 197-212. As explained in Chapter Seven, Mr. Biden's personal aide recalled that during the first week after the end of the administration—several weeks before Mr. Biden told Zwonitzer he "just found all the classified stuff downstairs"—Mr. Biden returned

113

The Special Counsel's Office worked with the National Archives to identify whether Mr. Biden returned any classified documents after the end of the Obama administration. The National Archives has no awareness or records indicating that Mr. Biden returned classified records to the White House (to then be turned over to the Archives) in the weeks following the end of the administration.[479] As is the case with every presidential transition, the National Archives continued to receive Obama administration presidential records from the White House after the end of the administration.[480] There would therefore have been nothing unusual or notable for the National Archives about also receiving vice presidential records after the end of the administration.[481]

Several years after Mr. Biden's February 2017 meeting with Zwonitzer, in December 2022, FBI agents recovered marked classified documents from a cardboard box in the garage of Mr. Biden's Delaware home.[482] These marked classified documents related to Afghanistan and the U.S. troop surge in 2009—the very same subject that Mr. Biden addressed with Zwonitzer in 2017 when he said that he had "just found all the classified stuff downstairs." In one of the folders containing these marked classified documents, agents also found drafts of Mr. Biden's 2009

---

a slim binder of classified material he had found at the Virginia home, which the personal aide believed was related to foreign leader calls Mr. Biden made in the last days of the administration. Personal Aide 3 3/28/23 Tr. at 197-212.

[479] 1/30/24 e-mail from NARA General Counsel to Special Counsel's Office, SCOH-000761.

[480] *Id.*

[481] *Id.*

[482] *See* Chapter Six.

handwritten Thanksgiving memo to President Obama. Agents later found the final

Thanksgiving memo in the office of Mr. Biden's Delaware home.[483]

---

[483] *See* Chapter Six.

CHAPTER SIX

THE CLASSIFIED AFGHANISTAN DOCUMENTS

To fully appreciate Mr. Biden's references to Afghanistan in his conversation with Zwonitzer on February 16, 2017, it is helpful to understand Mr. Biden's place in the fraught debate about American policy in Afghanistan in the early days of the Obama administration.

In that debate, Mr. Biden played a conspicuous role. He strongly opposed the military's effort to send large numbers of U.S. troops to Afghanistan, and this opposition culminated in the lengthy handwritten memo Mr. Biden sent President Obama over the Thanksgiving holiday in 2009. By 2017, Mr. Biden believed his judgment as reflected in the memo had been vindicated by history. Years later, in December 2022 and January 2023, FBI agents found the handwritten Thanksgiving memo and marked classified documents containing his advice to President Obama in Mr. Biden's Delaware home.

## I.    MR. BIDEN'S ROLE IN THE 2009 AFGHANISTAN POLICY REVIEWS

At the beginning of 2009, one of the incoming administration's first and most significant foreign policy challenges was the war in Afghanistan, which was then in its eighth year. Early in the administration, Mr. Biden opposed President Obama's decision to deploy additional American troops to Afghanistan, and in the administration's internal debates, Mr. Biden was the lone dissenter.[484] Privately, he worried the nation was drifting into another Vietnam.[485]

---

[484] Barack Obama, A PROMISED LAND 317-19 (Crown 2020).
[485] Notebook entry 1B64-0012-13.

Soon after the announcement of additional troops in March 2009, General Stanley McChrystal assumed command of forces in Afghanistan and conducted his own review of the war effort.[486] McChrystal's written assessment concluded that America must send yet more troops and adopt a counterinsurgency strategy to protect the Afghan population.[487] McChrystal soon followed this assessment with a request for another 40,000 U.S. troops.[488]

Around the time McChrystal submitted his assessment, "the Obama foreign policy team was splintering" and the divisions between two opposing sides "began to harden."[489] On one side, Defense Secretary Robert Gates, Secretary of State Hillary Clinton, Chairman of the Joint Chiefs of Staff Michael Mullen, and General David Petraeus supported McChrystal's call for a counterinsurgency campaign and for significantly more American troops in Afghanistan.[490] On the other side, Mr. Biden and a number of National Security Council and other White House advisers were deeply skeptical of these proposals.[491]

---

[486] Obama, A PROMISED LAND 323.

[487] Stanley McChrystal, COMISAF's INITIAL ASSESSMENT (unclassified version) 1-1, 1-4 (Aug. 30, 2009), https://nsarchive.gwu.edu/document/24560-headquarters-international-security-assistance-force-kabul-afghanistan-gen-stanley (last visited Feb. 2, 2024).

[488] Kevin Whitelaw, *Can Obama Say No To His Generals On Afghanistan?,* NATIONAL PUBLIC RADIO (Sept. 30, 2009), https://www.npr.org/2009/09/30/113339833/can-obama-say-no-to-his-generals-on-afghanistan (last visited Feb. 2, 2024).

[489] Robert Gates, DUTY: MEMOIRS OF A SECRETARY AT WAR 323 (Knopf 2014); Obama, A PROMISED LAND 432-33; Klain Class. Tr. at 19-21; Klain Tr. at 25-26, 56-57.

[490] Gates, DUTY 323; Obama, A PROMISED LAND 432-33; Klain Class. Tr. at 19-21, 34; Klain Tr. at 25-26, 56-57.

[491] Obama, A PROMISED LAND 432-33; Klain Tr. at 25-26, 56-57.

Mr. Biden left no doubt where he stood. The military's public lobbying for more troops was, he said at the time, "fucking outrageous."[492] Privately, Mr. Biden continued to fret that President Obama was poised to repeat the disastrous mistakes of Vietnam.[493]

### A.    Fall 2009 review

Against this backdrop, from September to November 2009, President Obama convened nine meetings of the National Security Council to debate McChrystal's troop request and the strategy in Afghanistan.[494] One such meeting is shown below.



*A National Security Council meeting to debate Afghanistan strategy (Oct. 9, 2009)*[495]

---

[492] Obama, A PROMISED LAND 434-35; Notebook entry 1B66-0050.
[493] Notebook entry 1B64-0012-13.
[494] Obama, A PROMISED LAND 437.
[495] SCOH-000762.

Photos of other meetings during the course of this policy review show Mr. Biden taking notes in his "Af/Pak" notebook and reviewing marked classified documents, including two marked classified documents that were later recovered from his Delaware garage.[496]



*National Security Council (Nov. 11, 2009) with marked classified document later found in Delaware garage (B37)*[497]

During the fall 2009 review, Mr. Biden's voice was one of the strongest.[498] As Mr. Biden put it during an interview with the special counsel:

The President thought that I knew a lot more about Afghanistan than he did and other members of the administration. . . . [H]e didn't have overwhelming foreign policy experience, and how could he take on the most premier members of the foreign policy establishment in his

---

[496] *E.g.,* SCOH-000763, SCOH-000764, SCOH-000765, SCOH-000766; Recovered documents B32, B37; Notebook entries 1B66-0092, 102.

[497] SCOH-000764: Recovered document B37.

[498] Obama, A PROMISED LAND 319; Klain Tr. at 56-57.

administration[] . . . . So he was looking for me to make the strongest case I could . . . which I was prepared to do because I knew as much about it as they did.[499]

Playing the role of leading in-house skeptic, Mr. Biden consistently and forcefully opposed McChrystal's call for a fully resourced counterinsurgency strategy in Afghanistan and the request for 40,000 more troops to implement this strategy.[500] As an alternative, Mr. Biden advocated a narrower strategy involving a reduced U.S. military footprint.[501]

Mr. Biden's notebook entry after the first meeting of the fall 2009 review reveals the depth of his opposition to McChrystal's proposed counterinsurgency strategy (often abbreviated "COIN").[502] Mr. Biden wrote that in his presentation during the meeting, he was "able to punch a hole in the logic of" those advocating COIN and noted that another official in attendance praised Mr. Biden's critique as "devastating."[503] Summing up, Mr. Biden's notebook entry explained:

> If I succeed in slowing down or stopping this misguided (policy) buildup it will make taking this job worthwhile.
>
> This decision will define our Admin[istration] in history – hanging out there alone is worth it. I don't want history to associate me with the adoption of a COIN.[504]

---

[499] Biden 10/9/23 Tr. at 17-18.

[500] Notebook entries 1B66-0067-69, 1B66_0098-99; Blinken Class. Tr. at 40-41; Klain Tr. at 46-47; Sullivan Class. Tr. at 53-54; FBI Serials 683 1A772, 512 1A614; Recovered documents B18, B24, B25, B28, B29.

[501] Blinken Class. Tr. at 41; Klain Class. Tr. at 41-42; FBI Serials 683 1A772, 512 1A614; Recovered document B24.

[502] Gates, DUTY 339; FBI Serial 77 1A86; Notebook entry 1B66_0068-69.

[503] Notebook entry 1B66-0069.

[504] *Id.*

Deep into the fall 2009 review, when, in President Obama's words, "everyone was sick of Afghanistan, sick of meetings, and sick of one another," Secretary Gates offered a compromise.[505] This modified version of McChrystal's proposal called for an "extended surge" of approximately 30,000 troops, with a plan to begin drawing this number down within 18 to 24 months.[506] The troop number was far larger than what Mr. Biden wanted but the drawdown was meant to avoid what Mr. Biden feared most: an open-ended American commitment.[507] The last National Security Council meeting to discuss the president's options was held near the end of November, with President Obama promising a final decision soon after.[508]

## B.    Mr. Biden's Thanksgiving memo to President Obama

With the Thanksgiving holiday looming, Mr. Biden made one final push to change President Obama's mind about the way forward.[509] The day before Thanksgiving, Mr. Biden sent a typewritten memo to the president emphasizing Mr. Biden's concerns that adding more troops was a potential "strategic blunder."[510]

As was his longstanding tradition, Mr. Biden spent Thanksgiving with his family in Nantucket.[511] For much of the holiday weekend, Mr. Biden and his staff

---

[505] Obama, A PROMISED LAND 438, 442-43; FBI Serials 683 1A772, 512 1A614; Recovered documents B26, B30, B37.

[506] Obama, A PROMISED LAND 442-43; FBI Serials 683 1A772, 512 1A614; Recovered documents B26, B30, B37.

[507] FBI Serials 77 1A86, 683 1A772, 512 1A614, 682; Recovered documents B18-1, B24, B25, B25-1, B28, B29; Handwritten material 1B66-0004-28; Biden 10/9/23 Tr. at 14-19; Blinken Tr. at 85-86.

[508] Obama, A PROMISED LAND 442-43; Gates, DUTY 352-53; Bob Woodward, OBAMA'S WARS 289.

[509] Biden 10/9/23 Tr. at 14-15.

[510] FBI Serials 683 1A772, 512 1A614; Recovered document B25.

[511] Biden, PROMISE ME, DAD 5-7; Notebook entry 1B66-0099; 11/29/09 VP Schedule 1B001_00010833; 11/27/09 e-mail from Blinken to Klain, SCOH-000228; FBI Serial 77 1A86;

worked on yet another memo to the president on Afghanistan.[512] That Saturday, two days after Thanksgiving, Mr. Biden sent President Obama a lengthy handwritten memo offering Mr. Biden's final thoughts—the same memo he recalled in his 2017 discussion with Zwonitzer.[513] The memo strongly criticized the premises underpinning the military's counterinsurgency strategy.[514] Mr. Biden also vented his frustration with senior military officials, noting that he was "tired and angry at the way they have tried to box you [in] through leaks and less than straightforward analysis of the alternative offered."[515] Mr. Biden's notes from that day reflect that the memo was sent by secure fax and "placed in Pres. Hands."[516] The handwritten Thanksgiving memo, later found in Mr. Biden's home office in 2023, contains information that remains classified up to the Secret level.[517]

As Mr. Biden explained to the special counsel, he sent the handwritten Thanksgiving memo "because I was trying to change the President's mind, and I wanted to let him know I was ready to speak out . . . and to really, quite frankly, save his ass[.]"[518] Mr. Biden said he "spent a lot of time" writing the memo, and he "stayed up Thanksgiving writing it."[519] It was, he said, the "first and only time" he ever wrote

---

[512] Notebook entry 1B66-0096; Recovered documents B25-1, B25; 11/27/09 e-mail from Blinken to Klain and Carney, SCOH-000230; Biden 10/9/23 Tr. at 14-15.

[513] Handwritten material 1B66-0003-0022; Evidence items 1B79, 1B81; Military Aide 9 Tr. at 47-57; Chapter 5.

[514] Handwritten material 1B66-0003-0022; FBI Serial 682.

[515] Handwritten material 1B66-0006; FBI Serial 682.

[516] Notebook entry 1B66-0098; FBI Serial 682.

[517] FBI Serials 77 1A86, 676, 682; Handwritten material 1B66-0003-0022.

[518] Biden 10/9/23 Tr. at 14-15.

[519] *Id.* at 14-15.

the President a memo such as this by hand, and without distributing it to anyone else in the government.[520]

The same day Mr. Biden sent the memo, he wrote in his Af/Pak notebook that, based on his deep disagreement with what he anticipated would be President Obama's decision, he considered resigning as Vice President.

> Tomorrow the President is going to make a fateful decision regarding Afghanistan – as I sat looking out the window at the sea – thinking I should resign in protest over what will bring his administration down.
> . . .
> Although I obviously wasn't there[,] I feel like this is what it must have felt like for Kennedy then Johnson in the early days of VTN [Vietnam].
> . . .
> I feel guilty and boxed in myself. Guilty for not having been more successful w/ the President – and staying.
>
> Boxed in by knowing or at least feeling that my resignation would only harden his position and leave him with one less voice.[521]

## C.    President Obama's final decision

The next day, Mr. Biden left his family in Nantucket to be by the President's side for the final decision.[522] Before a scheduled Oval Office meeting, Mr. Biden tried to schedule a last-minute conversation with the President but his request was rebuffed.[523] Undaunted, Mr. Biden showed up to the White House early and waited for the President to come down from the residence.[524] Mr. Biden used the short walk to the Oval Office to urge the President not to bend any further to the wishes of his

---

[520] *Id.* at 18; *see also* Military Aide 9 Tr. at 47-49, 62-63.

[521] FBI Serial 77 1A86; Notebook entry 1B66-0098-99.

[522] Notebook entry 1B66-0099; 11/29/09 VP schedule, 1B001_00010833; 11/28/09 e-mail discussing meeting with POTUS on 11/29/09, SCOH-000228.

[523] Klain Tr. at 59; Klain Class. Tr. at 39-40, 44-45.

[524] *Id.*

generals.[525] After the day's meetings ended on November 29, Mr. Biden recorded this final reflection:

> I think – I hope – I did all I could have done to move us as far away from [Petraeus and McChrystal] as possible.
>
> On the short walk over from the WH to Oval, I emphasized [President Obama's] need to be strong. He said that is why I brought them in "face to face." I said good he was Pres[ident] and not me – I would have gone to war with them – he smiled and said – "I know – I would have enjoyed seeing that."[526]

Two days later, in a speech at West Point, President Obama announced the Afghanistan troop surge: an additional 30,000 American troops, who would begin to draw down after 18 months.[527]

As Ron Klain—one of Mr. Biden's longest-serving and most-trusted aides—explained, although Mr. Biden publicly supported the President, privately, he "deep[ly] disagree[d]" with the decision, which he considered to be a "historic mistake."[528] Among other things, he feared "a second Vietnam," with the United States "sending tens of thousands of Americans over to a pointless war."[529] Mr. Biden's personal aide at the time likewise explained that the 2009 Afghanistan decision was a "huge" issue for Mr. Biden that was "very, very important" to him.[530]

---

[525] Notebook entry 1B66-0101-105.

[526] Notebook entry 1B66-0105.

[527] Remarks by the President in Address to the Nation on the Way Forward in Afghanistan and Pakistan, The White House (Dec. 1, 2009), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-address-nation-way-forward-afghanistan-and-pakistan (last visited Feb. 1, 2024).

[528] Klain Class. Tr. at 43.

[529] *Id.*

[530] Personal Aide 1 9/18/23 Tr. at 137.

In the years since the 2009 surge, including when Mr. Biden, as president, decided to withdraw all U.S. troops from Afghanistan in 2021, he has invoked his Thanksgiving memo and claimed that history has confirmed his good judgment.[531]

## II. IN DECEMBER 2022, THE FBI FOUND IN MR. BIDEN'S DELAWARE GARAGE MARKED CLASSIFIED DOCUMENTS FROM THE FALL 2009 AFGHANISTAN REVIEW

As explained in Chapter Two, in November 2022, marked classified documents were found in Mr. Biden's files at the Penn Biden Center in Washington, D.C. After this discovery, Mr. Biden's personal counsel then searched his Delaware home for additional classified documents.[532] Their first search occurred on December 20, 2022, when counsel searched his garage, found additional marked classified documents there, and alerted the Department of Justice.[533] The next day, December 21, 2022, with Mr. Biden's written consent, FBI agents searched the garage.[534]

### A. The garage box

The garage contained a significant volume of boxes, storage, and clutter, as shown in the photographs the agents took upon arrival:

---

[531] Klain Class. Tr. at 41-42.
[532] FBI Serials 33, 34.
[533] *Id.*
[534] FBI Serial 35.



*Mr. Biden's Delaware garage (Dec. 21, 2022)*[535]



*Mr. Biden's Delaware garage (Dec. 21, 2022)*[536]

[535] 20221221_ERT_0013.
[536] 20221221_ERT_0022.

126

Among the places Mr. Biden's lawyers found classified documents in the garage was a damaged, opened box containing numerous hanging folders, file folders, and binders.[537] The box, which was labeled "Cabinet" and "Desk file," was in a mangled state with ripped corners and two top flaps torn off.[538] Photos of the box, as the FBI encountered it, are below.



*Garage box (Dec. 21, 2022)*[539]

Because the box was damaged and not able to properly package classified material, the agents transferred its contents to a new box for transport.[540] The

---

[537] FBI Serials 33, 35 1A42.
[538] FBI Serials 35 1A42, 680 1A770; 20221221_ERT_0024; 20221221_ERT_0025; 20221221_ERT_0026; 1/22/24 photograph, GarageBox-001.
[539] 20221221_ERT_0024.
[540] FBI Serial 35.

photographs below show the contents of the garage box in the original box and in the new box:



*Garage box (Dec. 21, 2022)*[541]

---

[541] FBI Serial 35 1A42 20221221_ERT_0025.



*Garage box in original condition (Dec. 21, 2022)*[542]



*Garage box after repackaging (Jan. 3, 2023)*[543]

[542] 20221221_ERT_0026; FBI Serial 35 1A42.
[543] 20230103_DSC_0003; FBI Serials 35, 195 1A212.

Inside the box, the FBI located two folders containing marked classified documents related to the fall 2009 policy review on Afghanistan.[544]

### 1.   "Facts First" folder

One of the folders containing marked classified documents about Afghanistan was an unlabeled red file folder with handwriting on the front, which included the phrase "Facts First."[545] In his interview with the special counsel, Mr. Biden identified the handwriting as his, but said he recalled nothing about how this folder or its contents got into his garage.[546]

---

When FBI agents repackaged the contents of the ripped garage box into a new box on December 21, 2022, it appears the order of a few of the materials changed slightly. This chapter discusses in detail below two folders that contained marked classified documents about Afghanistan: the manila "Afganastan" folder and the red "Facts First" folder. It appears the "Afganastan" folder was near the "Facts First" folder in the garage box when agents recovered the box, but the precise original location of the "Afganastan" folder at that time is unknown.

[544] FBI Serial 512 1A614; Evidence items 1B04, 1B44.

[545] FBI Serial 512 1A614; Evidence item 1B44.

[546] Biden 10/9/23 Tr. at 43-45. In general, when our report identifies handwriting as Mr. Biden's, it is based on the following factors, which often occur in combination: (1) Mr. Biden identified it as his handwriting or likely his handwriting; (2) others familiar with Mr. Biden's handwriting identified it as his or likely his; (3) Mr. Biden confirmed that he wrote an entire class of documents, such as his notebooks and notecards; (4) the handwriting appears to match known instances of Mr. Biden's handwriting; (5) the document was found at Mr. Biden's home or office and is surrounded by materials attributable to Mr. Biden; and (6) the content and context of the handwriting suggest that it is Mr. Biden's.

130



*"Facts First" folder*[547]



*Garage box in original condition showing "Facts First" folder*[548]

---

[547] 1B004-FACTS_FIRST-000001.
[548] 20221221_ERT_0026; FBI Serial 35 1A42.

131

The "Facts First" folder contained over 200 pages of documents related to the fall 2009 Afghanistan policy review, with a date range from approximately August through October 2009.[549] Among the marked classified documents were the following, which are summarized further in Appendix A:

- McChrystal's assessment, marked "CONFIDENTIAL REL NATO/ISAF" and dated August 30, 2009, in which McChrystal announced the urgent need for additional troops and a comprehensive counterinsurgency campaign in Afghanistan.[550] Mr. Biden marked up this document with extensive handwritten notes, which were highly critical of McChrystal's reasoning and conclusions.[551]

- An August 31, 2009 memorandum from the National Security Adviser to President Obama marked "TOP SECRET/SCI."[552] According to subject-matter experts in the intelligence community, this document contains national defense information in the form of highly sensitive information about the military programs of the United States and a foreign government. The unauthorized disclosure of this information, both today and in 2017 when Mr. Biden was no longer vice president, reasonably could be expected to cause exceptionally grave damage to the national security.

- A September 10, 2009 draft memorandum from Mr. Biden to President Obama.[553] This memo, marked "TOP SECRET," was likely sent from Mr. Biden to President Obama in advance of the first National Security Council meeting of the fall review, held on September 13, 2009.[554] During the meeting, Mr. Biden made lengthy comments that closely tracked the memo.[555] As explained above, after this meeting, Mr. Biden wrote in his journal that his presentation had "punch[ed] a hole" in the logic of his opponents, that the Afghanistan decision would define the administration in history, and that he did not want history to associate him with counterinsurgency strategy.[556]

---

[549] Recovered documents B6-B24.

[550] Recovered document B23.

[551] *Id.*

[552] Recovered document B20.

[553] Recovered document B24.

[554] *Id.*; 12/3/09 e-mail chain between Carney, Blinken, and Klain titled "Proposed Additions to Timeline," SCOH-000234; Evidence item 1B44.

[555] Notebook entry 1B66-0068-69; 12/3/09 e-mail chain between Carney, Blinken, and Klain titled "Proposed Additions to Timeline," SCOH-000234; FBI Serial 525 1A632.

[556] Notebook entry 1B66-0068-69.

- An undated memorandum marked "TOP SECRET//HSC[557]//NOFORN" entitled "Some Facts and Considerations."[558] This memo supported Mr. Biden's views in the Afghanistan debate and offered commentary on the intelligence community's analysis about Afghanistan.[559] According to subject-matter experts in the intelligence community, the memo contains national defense information, including highly sensitive information about intelligence activities, sources, and methods. Unauthorized disclosure of this information in 2017 when Mr. Biden was no longer vice president reasonably could be expected to cause exceptionally grave damage to the national security.

- A September 29, 2009 memorandum with attachments, from the National Security Adviser to the President, marked "TOP SECRET WITH TOP SECRET/NOFORN/CODEWORD ATTACHMENTS."[560] Mr. Biden underlined and marked several passages that relate to the classified attachments to the memo.[561] The memo's attachments include several intelligence products from the Office of the Director of National Intelligence.[562] One such attachment, marked "TOP SECRET//HUMINT/COMINT//ORCON/NOFORN//FISA," appears to contain Mr. Biden's handwriting and underlining.[563] According to subject-matter experts in the intelligence community, portions of this document contain national defense information about sensitive intelligence sources and methods. Unauthorized disclosure of this information, in 2017 when Mr. Biden was no longer vice president, and still today, reasonably could be expected to cause serious damage to the national security.

- A draft handwritten note from Mr. Biden to President Obama, dated October 18, 2009, offering Mr. Biden's advice about Afghanistan, including Mr. Biden's explanation of why he believed the military's proposed counterinsurgency strategy would fail.[564] This note does not appear to have been completed.

---

[557] This is a typographical error. The correct marking is HCS, which stands for HUMINT Control System, and signifies information human intelligence sources.

[558] Recovered document B15.

[559] *Id.*

[560] Recovered documents B6-B13.

[561] Recovered document B6.

[562] Recovered documents B7, B9, B10, B11.

[563] Recovered document B7.

[564] Recovered document B18-1; Klain Class Tr. at 3-4.

## 2.    "Afganastan" folder

The second folder in the box that contained marked classified documents relating to Afghanistan was a manila folder labeled "Afganastan 2009."[565]



*"AFGANASTAN 2009" manila folder*[566]

In his interview with the special counsel, Mr. Biden said the handwritten label on this folder looks like his handwriting,[567] and the distinctive misspelling of "Afganastan" confirms this. Mr. Biden repeatedly used this or a similar misspelling

---

[565] Evidence item 1B04.

[566] 1B004-AFGANASTAN_2009-000001; Evidence item 1B04.

[567] Biden 10/9/23 Tr. at 51-52.

134

in handwritten notes as vice president, and before that in notes he took as a senator dating back to 1980.[568]

The "Afganastan" folder contained almost 100 pages of documents from October and November 2009, including numerous materials Mr. Biden used as reference material when writing the Thanksgiving memo to President Obama.[569] Among the documents were the following, which are summarized further in Appendix A:

- A November 25, 2009 typewritten memorandum from Mr. Biden to President Obama about Afghanistan, marked "TOP SECRET."[570] Mr. Biden made handwritten edits to this memo, some of which were incorporated into the handwritten Thanksgiving memo dated three days later.[571] Entire pages of the handwritten Thanksgiving memo are repeated nearly verbatim from the November 25 memo, making the November 25 memo the original source document.[572]

- Multiple drafts of the handwritten Thanksgiving memo.[573] These include documents with edits, comments, and additions from Mr. Biden's staff, which were delivered to Mr. Biden when he was in Nantucket writing the Thanksgiving memo.[574] Mr. Biden repeated numerous passages from these documents nearly verbatim in the final memo.[575]

- A copy of Mr. Biden's talking points for a National Security Council meeting held on November 11, 2009, and Mr. Biden's follow-up memorandum to the National Security Advisor a few days later, on November 15, 2009, both

---

[568] 6/11/80 Handwritten Notes from June 11, 1980 Meeting with West German Chancellor Helmut Schmidt, 1B017-BIDEN MEETING WITH CHANCELLOR SCHMIDT-000015; Notebook entries 1B67-0011, 0013; 1B68-0033; 1B65-0016; 1B22-0016.

[569] Recovered documents B25-B38; Evidence item 1B04; FBI Serials 35, 512 1A614, 682, 683 1A772.

[570] Evidence item 1B04; Recovered document B25.

[571] Recovered document B25; Handwritten materials 1B66-0003-28; Biden 10/9/23 Tr. at 52-53; Klain Class. Tr. at 8; Evidence item 1B04.

[572] Recovered document B25; Handwritten materials 1B66-0003-28; 11/27/09 e-mail from Blinken, SCOH-000230; Evidence item 1B04.

[573] Recovered document B25-1.

[574] *Id.*

[575] *Id.*; Evidence item 1B04.

marked "Top Secret."[576] The talking points and memo contain numerous points that were later incorporated into the handwritten Thanksgiving memo, including Mr. Biden's "dee[p] concer[n] that adding significantly more resources into Afghanistan is, potentially, a gigantic strategic blunder that plays into Al Qaeda's hands."[577]

In addition to the manila "Afganastan" file folder, the box also contained a blue hanging folder bearing the same misspelling on the handwritten label.[578] The blue hanging "Afganastan" folder contained only a red file folder holding a one-page memo from 2012 unrelated to Afghanistan.[579]



*Blue hanging folder labeled "AFGANASTAN"*[580]

---

[576] Recovered documents B28, B29; Evidence item 1B04.

[577] *Id.*

[578] 20230103_ DSC_0136; Evidence item 1B04.

[579] Evidence item 1B04. The garage box also contained a folder labeled "Foreign Policy: Second Term CLASSIFIED MARCH 2013." This folder contained two marked classified documents—one marked "SECRET/NOFORN," the other marked "TOP SECRET//NOFORN//Pre-decisional"—which outlined, in broad terms, foreign policy goals for the Obama administration's second term. FBI Serials 512 1A614, 683 1A772; Evidence items 1B04, B4, B5. The folder also contained an unmarked memorandum from Mr. Biden to President Obama providing advice about managing the U.S. relationship with a foreign nation (not Afghanistan) in the second term. B4-1.

[580] 20230103_DSC_0034; FBI Serials 35, 195 1A212.

## B.    Other materials in the garage box

In addition to the two folders with marked classified documents about Afghanistan, the garage box contained folders with unclassified material that was of great personal interest to Mr. Biden and that he appears to have personally used and accessed.[581]

Several folders in the garage box contained materials that Mr. Biden appears to have accessed both shortly before and shortly after February 16, 2017, the day Mr. Biden told Zwonitzer he had "just" found classified documents downstairs.[582] For example, in January 2017, less than a month before he told Zwonitzer he had just found the classified documents downstairs, Mr. Biden appears to have accessed documents later found in the box. On January 23, 2017, Mr. Biden wrote a notebook entry about a call scheduled for later that day to finalize a deal with Creative Artists Agency (CAA), a talent agency that went on to represent him in negotiating his book deal for *Promise Me, Dad*.[583] The same entry also referenced Mr. Biden's work with his sister on his "S Corp."[584]

The box found in Mr. Biden's garage contained a corresponding file folder, labeled "Signed Contracts Penn, CAA," which contained the signature page of a final

---

[581] FBI Serial 512 1A614.

[582] FBI Serials 315, 355 1A400, 512 1A614; Evidence item 1B80; Chapter 5.

[583] Notebook entry 1B59-0025; ASSOCIATED PRESS, *Joe and Jill Biden get multi-book deal*, WHYY (Apr. 5, 2017), https://whyy.org/articles/joe-and-jill-biden-get-multi-book-deal/; FBI Serial 77 1A86; FBI Serial 682.

[584] Notebook entry 1B59-0025.

agreement between Mr. Biden and Creative Artists Agency.[585] Mr. Biden signed the agreement, which was dated a few days after the notebook entry, on January 26, 2017.[586] The folder also contained the final agreement between Mr. Biden and the Penn Biden Center—Mr. Biden's primary employer after his vice presidency—which Mr. Biden signed, also on January 26, 2017.[587] And the folder contained a W-9 tax form for Mr. Biden's S corporation, CelticCapri, which Mr. Biden used to receive income from book deals and speeches, among other purposes.[588] The W-9 form listed Mr. Biden as the president of the S corporation and was signed by Mr. Biden and dated January 30, 2017—less than three weeks before Mr. Biden told Zwonitzer he had just found classified documents downstairs.[589]

The folder of signed contracts from late January 2017 was found in the box a few folders away from the "Facts First" folder that contained marked classified documents about Afghanistan, as shown in the image below.[590]

---

[585] 1B004-SIGNED CONTRACTS PENN_CAA-000001 - 1B004-SIGNED CONTRACTS PENN_CAA-000008. Evidence item 1B04.

[586] 1B004-SIGNED CONTRACTS PENN_CAA-000008.

[587] 1B004-SIGNED CONTRACTS PENN_CAA-000004 - 1B004-SIGNED CONTRACTS PENN_CAA-000007; FBI Serial 512 1A614; Evidence item 1B04.

[588] 1B004-SIGNED CONTRACTS PENN_CAA-000002; FBI Serial 512 1A614; Evidence item 1B04; Darla Mercado, *Joe Biden used this strategy to trim his tax bill. You can, too*, CNBC (Aug. 6, 2019), https://www.cnbc.com/2019/08/06/joe-biden-used-this-strategy-to-trim-his-tax-bill-you-can-too.html.

[589] FBI Serial 512 1A614; 1B004-SIGNED CONTRACTS PENN_CAA-000002.

[590] FBI Serial 512 1A614.



*Contents of box recovered from Delaware garage (Dec. 21, 2022)*[591]

---

[591] Evidence item 1B04.

Mr. Biden also appears to have created a folder with the handwritten label "Short Termism" and the handwritten date February 3, 2017—less than two weeks before he told Zwonitzer he had just found classified documents downstairs.[592] This folder, later recovered by the FBI in the same box as the classified Afghanistan documents, appears to be labeled in Mr. Biden's handwriting and contains material about a public policy issue of longstanding interest to Mr. Biden.[593] After creating this folder in or around February 2017, Mr. Biden spoke on a panel addressing "short-termism" at the University of Delaware a few months later in May 2017.[594]

The box also contained a folder labeled "mark Z" and dated 2/16/17.[595] "Mark Z" is a reference to Mr. Biden's ghostwriter, Mark Zwonitzer, and the folder is dated the same day Mr. Biden met with Zwonitzer at the Virginia home and told Zwonitzer he had just found classified documents downstairs.[596]

---

[592] Zwonitzer 7/31/23 Tr. at 82-83; FBI Serial 512 1A614. As explained below, the folder appears to be labeled in Mr. Biden's handwriting, based on comparisons with other known instances of that handwriting.

[593] FBI Serials 35, 512; *see also, e.g.*, Joe Biden, *How Short-Termism Saps the Economy*, WALL ST. J., Sept. 27, 2016; Notebook entries 1B20-0027, 0025, 0041.

[594] Larissa Kubitz, *Biden Institute takes first step with dynamic business panel*, THE REVIEW (May 2, 2017), https://udreview.com/biden-institute-takes-first-step-with-dynamic-business-panel/ (last visited Feb. 1, 2024).

[595] 1B004-MARK Z 2-16-17-000001; FBI Serial 512, 1A614.

[596] 1B004-MARK Z 2-16-17-000001; Biden 10/8/23 Tr. at 132; Zwonitzer 7/31/23 Tr. at 82-83; Evidence item 1B04.



*"MARK Z 2/16/17" blue file folder*[597]

Inside the Mark Z folder was the final book proposal for *Promise Me, Dad*.[598] Mr. Biden used this proposal to shop his book to potential publishers, and this bidding process resulted in a book contract netting Mr. Biden an advance of $8 million.[599] Mr. Biden's assistant identified the handwriting on this folder as Mr. Biden's.[600] The date on the folder indicates that Mr. Biden created it at or around the same time he met with Zwonitzer on February 16, 2017, and said he had just found classified documents. The folder was at some point placed in the same box as the marked classified documents about Afghanistan.

[597] 1B004-MARK Z 2-16-17-000001; FBI Serial 512.
[598] 1B004-MARK Z 2-16-17-000001 through 000005.
[599] Zwonitzer-00001334; Zwonitzer 7/31/23 Tr. at 32-33, 59-66, 78-79, 82, 85-89.
[600] Executive Assistant 9/28/23 Tr. at 84.

Mr. Biden also continued to access materials in the box after he told Zwonitzer on February 16, 2017 that he had found the classified documents. For example, on March 5, 2017, less than three weeks later, Mr. Biden wrote in one of his notebooks that he wanted to get a copy of the contract offered by Washington Speakers Bureau—a group that had made Mr. Biden a lucrative offer to arrange paid speeches—"for my records."[601] The garage box contained a folder with the handwritten label "Washington Speakers Bureau," which contained a copy of that offer.[602] The handwriting is Mr. Biden's.[603] The Washington Speakers Bureau folder was found a few folders away from the "Facts First" folder containing marked classified documents about Afghanistan.

The materials described above, which Mr. Biden appears to have accessed in the weeks before, during, and after he told Zwonitzer about "just" finding classified documents, were all located in folders in front of the "Facts First" folder in the box (to the right of the folder in the image of the box above).

Immediately behind (to the left of) the "Facts First" folder were three more items that contained information of significant personal interest to Mr. Biden:

- A manila envelope containing documents from February and March 2017 relating to Mr. Biden's retirement payments and then-current health-insurance information, along with a copy of the Senate Ethics Manual bearing Mr. Biden's handwriting. Mr. Biden also wrote on the envelope, including the date "4-17," an apparent reference to April 2017.[604] These months—February, March, and April 2017—coincide with and closely

---

[601] Notebook entry 1B59-0027; FBI Serial 77.

[602] 1B004-WASHINGTON – SPEAKERS BUREAU 000001-000007; FBI Serial 512.

[603] Biden 10/9/23 Tr. at 57; Personal Aide 4 Tr. at 119.

[604] 1B004-ENVELOPE ADDRESSED TO JOE BIDEN-000001-000028; FBI Serial 512.

follow the date when Mr. Biden told Zwonitzer he found classified documents, February 16, 2017.

- A white binder labeled "2016" containing detailed financial information about Mr. Biden's income and expenses, including expenses relating to the Virginia home.[605] Mr. Biden described this type of financial binder as the sort of material that he knowingly kept in his files.[606] When interviewed, his sister, Ms. Biden Owens, identified materials in the binder as ones she printed for Mr. Biden at his request.[607]

- A brown/maroon binder labeled "Beau Iowa," which appears to have been compiled in roughly 2014, and which contains, among other things, photographs of Beau Biden campaigning in Iowa.[608]

The box also contained other materials of personal interest to Mr. Biden, some of which go back decades, and some of which extend for years after Mr. Biden told Zwonitzer he had found classified documents.[609] These included:

- The Biden Archives, which compiled ancestry information about the Biden family, and which was addressed to Mr. Biden's parents at their home in Delaware.[610]

- Photos and biographical information of Mr. Biden and other members of his graduating law school class, from 1967.[611]

- A folder labeled "V.P. Image – Press" containing a 2015 newspaper article from the Delaware News Journal. The article's opening sentence reads: "While Vice President Joe Biden has assured himself a place in U.S. history books, his political legacy in tiny Delaware is epic."[612]

---

[605] FBI Serial 512 1A614.

[606] Biden 10/8/23 Tr. at 99-101; FBI Serial 554 1A662.

[607] Biden Owens Tr. at 62-66.

[608] FBI Serial 512 1A614.

[609] FBI Serial 512 1A612.

[610] 1B004-ARCHIVES BIDEN_THE BIDEN ARCHIVES-000001; FBI Serial 512 1A612.

[611] 1B004_MANILA FOLDER WITH DOCUMENTS-000002; FBI Serial 512 1A612.

[612] 1B004_ARCHIVES BIDEN_VP IMAGE – PRES-000006; FBI Serial 512 1A612.

- Polling data related to the 2016 presidential election showing Mr. Biden outperforming Mr. Trump in several swing states that Hillary Clinton lost.[613]

- Documents from the end of the Obama administration. For example, information about Mr. Biden's move out of the Naval Observatory, from November 2016;[614] a folder about the Penn Biden Center with materials from November 2016;[615] moving company information for Mr. Biden and Dr. Jill Biden from December 2016;[616] and a folder relating to the Biden Institute at the University of Delaware, dated January 3, 2017.[617]

- Documents from the first few months after the Obama administration, when Mr. Biden was a private citizen.

- An IRS Form 1099 for tax year 2017 documenting Mr. Biden's lump-sum payment to Zwonitzer for his work ghostwriting *Promise Me, Dad*, and other tax documents dated 2018.[618]

- A binder of briefing materials from the 2020 presidential campaign, dated from 2019 and 2020. Inside the binder are personal photos of Mr. Biden and his family, including his grandchildren.[619]

- Notecards with presidential campaign remarks from 2020.[620]

In sum, the materials surrounding the marked classified documents about Afghanistan were of personal importance to Mr. Biden and were materials he appears to have accessed around the time he told Zwonitzer, while they were in Mr. Biden's Virginia home, that he had "just found all the classified stuff downstairs."

---

[613] FBI Serial 512 1A612; 1B004_POLLING HRC 2016 JRB-000002-000005.

[614] FBI Serial 512 1A612; 1B004_VICE PRESIDENT OF THE US_FURNITURE-000001; 1B004_VICE PRESIDENT OF THE UNITED STATES-000001.

[615] FBI Serial 512 1A612; 1B004_PENN DC-000001.

[616] FBI Serial 512 1A612; 1B004_TRANSITION-000001.

[617] FBI Serial 512 1A612; 1B004_UDEL 1-03-17-000001.

[618] FBI Serial 512 1A612; 1B004-GREEN FOLDER WITH DOCUMENTS-000003.

[619] FBI Serial 512 1A612; 1B004-BOOK 2-000001.

[620] FBI Serial 512 1A612; 1B004-CARDS-REMARKS AND NOTES-000001.

### III. IN JANUARY 2023, THE FBI FOUND THE CLASSIFIED 2009 THANKSGIVING MEMO IN MR. BIDEN'S DELAWARE HOME OFFICE

On January 20, 2023, about a month after FBI agents searched Mr. Biden's Delaware garage and found the box with classified Afghanistan documents, agents returned to search the living areas of Mr. Biden's Delaware home.[621] In Mr. Biden's main office, agents found the notebook he used to chronicle the fall 2009 Afghanistan policy review.[622] The notebook, which was labeled "Af/Pak 1," was found in a drawer along with many of Mr. Biden's other notebooks from the Obama administration.[623]



*Mr. Biden's Delaware home office containing his notebooks (Jan. 20, 2023)*[624]

---

[621] FBI Serials 35, 77.
[622] FBI Serial 77; Notebook 1B66.
[623] FBI Serial 77 1A86.
[624] FBI Serial 77 1A86 20230120_JLH_0173.

145



*Office file cabinet under television containing eight seized notebooks (Jan. 20, 2023)*[625]



*Contents of office file cabinet under television containing eight seized notebooks
(Jan. 20, 2023)*[626]

---

[625] 20230120_FBI_0151; FBI Serial 77 1A87.
[626] 20230120_FBI_0152; FBI Serial 77 1A87.



*Notebook labeled "Af/Pak 1"*[627]

Inside the front cover of the Af/Pak notebook, held together with a binder clip, was Mr. Biden's handwritten 2009 Thanksgiving memo to President Obama, dated November 28, 2009.[628] The handwritten memo contains information that remains classified up to the Secret level. Attached to the memo was a November 2009 State Department cable about Afghanistan that was marked classified as Confidential.[629] The cable shows a declassification date in November 2019, though the State Department has been unable to confirm whether it has been formally declassified.[630]

---

[627] 20230120_FBI_0158; FBI Serial 77 1A86.

[628] Handwritten material 1B66_0001-28; FBI Serial 77 1A86; 682.

[629] FBI Serial 676.

[630] *Id.*



*Interior of "Af/Pak 1" notebook with cover page of Thanksgiving memo*[631]

In Mr. Biden's interview with the special counsel, he initially said he was not aware that he had kept the Thanksgiving memo after his vice presidency.[632] In response to a follow-up question, he said, "I guess I wanted to hang onto it for posterity's sake. I mean, this was my position on Afghanistan. And it later became discussed . . . . It became discussed inside the foreign policy establishment that I was recommending it . . . ."[633]

---

[631] 20230120_FBI_0161; FBI Serial 77 1A86.

[632] Biden 10/9/23 Tr. at 14-21.

[633] *Id.* at 21.

\* \* \*

In December 2022 and January 2023, in Mr. Biden's Delaware garage and home office, FBI agents found classified documents relating to one of the seminal moments of his vice presidency: his opposition to the 2009 troop surge in Afghanistan. The classified documents were physically surrounded by Mr. Biden's private, personal material, including material he accessed around the same time he told his ghostwriter in February 2017, while in his Virginia home, that he "just found all the classified stuff downstairs."

149

## CHAPTER SEVEN

### TRACING THE AFGHANISTAN DOCUMENTS

We were unable to determine how the marked classified Afghanistan documents got from the White House, where Mr. Biden possessed them as vice president in 2009, to his Delaware home, where they were found in 2022. Mr. Biden had at least some of the Afghanistan documents with him in Nantucket during Thanksgiving 2009, when, as described in Chapter Six, he used some or all those documents as reference material in writing his handwritten memo to President Obama. From Nantucket, we have been unable to determine whether the documents next went to Mr. Biden's office in the White House, or to his official residence at the Naval Observatory, or to his personal home in Delaware.

In an attempt to trace the path of the Afghanistan documents and other marked classified documents found in the Delaware home, we reviewed extensive evidence of the movement of Mr. Biden's belongings from the end of the Obama administration. We interviewed numerous people who were in Mr. Biden's Delaware and Virginia homes at relevant times, and reviewed photographs and videos of the spaces as well as records from moving companies, furniture companies, and other sources. Ultimately, we could not determine precisely when the box containing the Afghanistan documents got into the garage, or who put the documents there.

As explained in Chapter Eleven, the strongest case for criminal charges against Mr. Biden relating to the Afghanistan documents would rest on his retention of the documents at the Virginia home in 2017. The February 16, 2017, recorded conversation when Mr. Biden told Zwonitzer he "just found all the classified stuff

downstairs" in the Virginia home is evidence that the Afghanistan documents were there. Other evidence provides some additional clues suggesting that these documents may have been stored in the Virginia home and then moved to the Delaware home, where they were ultimately placed in the box in the garage. As discussed further in Chapter Eleven, we find this evidence to be insufficient to meet the government's burden in a criminal prosecution.

## I.    MR. BIDEN'S MOVES FROM THE NAVAL OBSERVATORY TO VIRGINIA AND THEN TO DELAWARE

As explained below, when Mr. Biden left the vice presidency in January 2017, he moved into a rental home in Virginia. From 2017 to 2019, Mr. Biden split time between the Virginia home and his permanent home in Delaware, which he owned before, during, and after the vice presidency, and still owns today.[634] In July 2019, some of Mr. Biden's belongings in the Virginia home were moved to his home in Delaware.[635]

### A.    2017 move out of the Naval Observatory

On January 7, 2017, the Bidens moved furniture and personal belongings out of the Naval Observatory and into the Virginia home using a private moving

---

[634] Biden 10/8/23 Tr. at 40-47 (describing building the Delaware home while a Senator). *See also* Sections I.A and I.B below.

[635] *See* Section I.D below.

company.[636] The Bidens paid for the move themselves and packed their own belongings, with the help of staff members and naval enlisted aides.[637]

Mr. Biden was personally involved in the move: He selected which pieces of government-owned furniture from the Naval Observatory he bought and moved to Virginia, directed some of the packing, and was personally present for the entirety of the move.[638] One military aide recalled seeing him "packing by himself" and "just him moving his stuff one at a time into the . . . truck" at the Naval Observatory on moving day, and Secret Service agents saw Mr. Biden "moving boxes" at the Virginia house during the weekend of his move into that house.[639]

Mr. Biden stored papers in several places at the Naval Observatory, including desks, safes, and briefcases. As explained above in Chapter Three, Mr. Biden stored classified materials at the Naval Observatory while vice president. We were unable

---

[636] 12/21/16 Invoice from private moving company, Georgetown Moving and Storage, SCOH-000279; 1/7/17 e-mails from Secret Service agents describing status of movers packing up the Naval Observatory, USSS-0000528890 and USSS-0000529043.

[637] 12/21/16 Invoice from private moving company, Georgetown Moving and Storage, SCOH-000279 (indicating "customer to pack all," "carrier to pack none"); Residence Manager Tr. at 37; NEA 5 Tr. at109-114; Ricchetti Tr. at 122, 124; NEA 1 Tr. at 48, 50-51, 55-56; NEA 3 Tr. at 28-30, 34; Personal Aide 3 3/28/23 Tr. at 111-112; Personal Aide 3 10/4/23 Tr. at 14-15, 31; Dr. Biden Personal Aide Tr. at 58-61; Staff Assistant 2 Tr. at 86-87, 91-92.

[638] 10/6/16 Memo from Residence Manager to the Vice President and Dr. Biden, 1B004-Vice President of the US_Furniture at 000002 ("Per our conversation yesterday . . . ."); handwritten notes describing phone call with Residence Manager on 12-19-16, FBI Serial 278, Notebook 1B59; entry in Notebook DAILY 2016 (1B59) describing 12/19/16 call with Residence Manager ("12-19-16, 9:55pm The Lake: Also spent time on phone w/ [Residence Manager] re: furniture + movement of furniture"); NEA 3 Tr. at 28-34; NEA 5 Tr. at 114; NEA 1 Tr. at 48, 50-51, 55-56; Military Aide 7 Tr. at 50; 1/7/17 e-mail from Secret Service agents describing Mr. Biden as present at the Naval Observatory with the movers, USSS-0000528890; 1/7/17 e-mail from Secret Service agents describing Mr. Biden going to Virginia Residence, USSS-0000524214; Personal Aide 3 10/4/23 Tr. at 3-6, 16-18, 20; Residence Manager Tr. at 60;_Ricchetti Tr. at 122, 125

[639] Military Aide 7 Tr. at 50, 53-55; 1/13/17 Secret Service e-mail, USSS-0000406162.

to determine whether any classified documents were inadvertently moved to the Virginia home when Mr. Biden moved out of the Naval Observatory.

During his vice presidency, Mr. Biden used a desk with green leather inserts in the turret of the Naval Observatory's primary bedroom.[640] Private movers moved the green-top desk to the large basement room in the Virginia home that Mr. Biden used as an office.[641] No staffers recalled removing or packing material from the desk before movers removed it from the Naval Observatory.[642]

Antique desk with green leather insets
Purchased by the OVP. 2011





*Green-top desk in Naval Observatory (undated)*[643]      *Green-top desk in Virginia basement office (Sept. 21, 2017)*[644]

---

[640] 10/5/16 e-mail from Residence Manager to then-OVP Associate Director for Finance, SCOH-000225; 10/6/16 Memo from Residence Manager to the Vice President and Dr. Biden, Evidence Item 1B004-Vice President of the US_Furniture at 000002; 12/30/16 e-mail from Executive Assistant to Mr. Biden, forwarding correspondence from OVP Counsel, SCOH-000236; Personal Aide 3 10/4/23 Tr. at 9-11.

[641] Personal Aide 3 10/4/23 Tr. at 9.

[642] *See, e.g.*, Residence Manager Tr. at 37; Personal Aide 3 10/4/23 Tr. at 9-11; Executive Assistant 9/28/23 Tr. at 115; NEA 1 Tr. at 56.

[643] Evidence Item 1B004-Vice President of the US_Furniture at 000007.

[644] 9/21/17 photograph taken at the Virginia Residence, SCOH-000323.

Mr. Biden and his staff kept classified documents in safes at the Naval Observatory, but staff cleared out their contents after the January 7, 2017 move.[645] Mr. Biden was also known to keep documents in his briefcases, which he carried with him when traveling.[646] Mr. Biden's staff did not go into his desk at the Naval Observatory, and it appears staff retrieved documents from his briefcase only rarely, if ever, so we were unable to determine if those locations contained any documents at the end of the administration.[647]

We were also unable to determine whether any of Mr. Biden's papers—classified or not—were in the boxes moved out of the Naval Observatory and to Virginia. No one involved recalled packing or moving papers or files belonging to Mr. Biden.[648] Mr. Biden also stated that he did not "ever remember packing up written material to go anywhere.[649] He explained that, "[i]t doesn't mean it didn't happen, but I just don't remember any of that."[650]

During the investigation, we obtained photographs of the Virginia home from several sources in an attempt to identify photographs showing the classified

---

[645] 1/15/17 e-mail from military aide to Executive Secretary, SCOH-000255; Military Aide 8 Tr. at 17, 33-34; 1/16/17 e-mail correspondence between OVP National Security Affairs and OVP Counsel staff, SCOH-000246; 1/16/17 e-mail correspondence between OVP National Security Affairs and OVP Counsel staff, SCOH-000218; 1/16/17 e-mail, SCOH-000259; Executive Secretary Staffer 2 7/7/23 Tr. at 57; 1/17/17 e-mail, SCOH-000256; Associate Counsel 3/29/23 Tr. at 16, 74; Bakotic 7/19/23 Tr. at 90-92.

[646] Staff Assistant 3 Tr. at 49; Executive Assistant 9/28/23 Tr. at 73-74; Personal Aide 1 4/26/23 Tr. at 58; Personal Aide 2 Tr. at 35; Personal Aide 3 3/28/23 Tr. at 34-35, 56-57; Personal Aide 3 10/4/23 Tr. at 52-53.

[647] Personal Aide 3 3/28/23 Tr. at 85; Personal Aide 3 10/4/23 Tr. at 10; NEA 5 Tr. at 67; Staff Assistant 3 10/4/23 Tr. at 67-68; Military Aide 10 Tr. at 22.

[648] *See, e.g.*, NEA 1 Tr. at 56; NEA 3 Tr. at 30-31.

[649] Biden 10/8/23 Tr. at 67.

[650] *Id.* at 67.

Afghanistan documents or the box in which they were found. We found none. We did identify photographs taken in January 2017, while Mr. Biden was moving into the Virginia home from the Naval Observatory. But the photographs showed only the exterior of moving boxes, not their contents, and we were not able to identify the box in which the Afghanistan documents were found in any of the photos.

## B.    Security at the Virginia home

The Virginia home was not authorized to store classified information in February 2017, when Mr. Biden told Zwonitzer he had "just found all the classified stuff downstairs."

The Virginia home was not set up for secure handling or storage of classified documents. No one we interviewed recalled any safes or other approved facilities for the storage of classified material in the home.[651] The Virginia home had an alarm system.[652] It was also generally locked, although a staff member entered the house through an unlocked door to facilitate the move-out in July 2019.[653]

Although the White House Situation Room delivered a classified book to Mr. Biden at the Virginia home on one occasion near the end of the Obama administration in early January 2017,[654] his National Security Affairs staff later determined that he

---

[651] *See, e.g.*, Secret Service Special Agent 2 Tr. at 80; Virginia house manager Tr. at 45.

[652] Virginia House Manager Tr. at 14-15; 1/30/17 e-mail from U.S. Secret Service agent to Dr. Biden's personal aide, USSS-0000527876; Secret Service Special Agent 1 Tr. at 37-39. *But see* NEA 1 Tr. at 86 ("If there was [an alarm] we didn't use it or it didn't work.").

[653] NEA 1 Tr. at 87; Secret Service Special Agent 1 Tr. at 39; Dr. Biden Staffer 1 Tr. at 63-64.

[654] 1/15/17 e-mail from Military Aide 8 to OVP staff and White House Situation Room, SCOH-000318; 1/14/17 Secret Service e-mail, USSS-0000524184; 1/15/17 e-mails between military aide, OVP staff, and the White House Situation Room, SCOH-000314. That evening,

should not receive classified material there.[655] E-mail correspondence among his staff, military aide, and briefer reflect that Mr. Biden learned of this change in process, as he "requested the [President's Daily Brief] for the drive into the White House"[656] when he started spending the night at the Virginia home,[657] as opposed to his staff's alternative plan of delivering it to the West Wing for him to review after he arrived there.[658]

After the vice presidency, the Virginia home had an intermittent Secret Service presence for six months, ending in July 2017.[659] During those six months, agents were present only when a protected person was there (such as Mr. Biden or Dr. Jill Biden),

the Bidens returned to the Naval Observatory. 1/15/17 Secret Service e-mail, USSS-0000524182.

[655] 1/17/17 e-mail from National Security staffer to Kahl, SCOH-000304; 1/17/17 e-mail from Kahl to National Security Staff, SCOH-000301.

[656] 1/18/17 e-mail from Military Aide 3 to OVP National Security Affairs staff and PDB briefer, SCOH-000271.

[657] Between January 7, 2017, when he moved into the Virginia home, and January 18, 2017, when he began spending the night there, Mr. Biden traveled extensively and continued to stay overnight at the Naval Observatory on the few occasions he was in Washington, D.C. *See, e.g.*, 1/8/17 e-mails between Military Aide 7, OVP staff, and the White House Situation Room, SCOH-000248; 1/7/17 Secret Service e-mail, 1B001_01916050 (indicating Mr. Biden returned to the Naval Observatory at 23:17 on January 7, 2017); 1/8/17 e-mails between military aide and OVP staff, 1B001_01915912 (indicating that briefing books for January 9, 2017 will be delivered to the Vice President in the morning in Los Angeles); 1/10/17 e-mails between military aide, OVP staff, and the White House Situation Room, SCOH-000244, SCOH-000252, SCOH-000265; 1/11/17 e-mail from OVP National Security Affairs staff, SCOH-000261; Secret Service schedule for January 11, 2017, USSS-0000004488; Secret Service schedule for January 12, 2017, USSS-0000004494; 1/11/17 e-mails amongst OVP staff with Mr. Biden's schedule for January 12, 2017, 1B001_01984097; 1/13/17 White House Press Release, SCOH-000222; 1/14/17 Secret Service e-mail, USSS-0000001109 (indicating Mr. Biden arrived at the "Lake House" the evening of January 13, 2017).

[658] 1/18/17 e-mail from Military Aide 3 to OVP National Security Affairs staff and PDB briefer, SCOH-000271; 1/18/17 e-mail from Military Aide 3 to Executive Assistant, OVP National Security Affairs staff, SCOH-000302; 1/18/17 e-mail from OVP National Security Affairs staffer to National Security Affairs staff, SCOH-000272; 1/19/17 e-mails amongst OVP National Security Affairs staff, SCOH-000263.

[659] 7/7/17 Secret Service e-mail, USSS-0000523706; Secret Service Supervisor Tr. at 32; Secret Service Special Agent 1 8/24/23 Tr. at 36.

156

and agents generally had a staffer or protected person give them access to the home.[660] Mr. Biden split his time between the Virginia home, the Delaware home, and his recently purchased beach home in Rehoboth Beach, Delaware.[661] Dr. Biden stayed overnight at the Virginia home when she was teaching.[662]

The Virginia home was frequented by family members, staff, and guests, not all of whom had a security clearance. A Secret Service agent lived intermittently in a basement bedroom from about the summer of 2017 until the summer of 2018, though he was not working on Mr. Biden's security detail at the time.[663] A former naval enlisted aide stayed there from about January 2019 until July 2019.[664] Family members and guests also visited occasionally.[665]

### C. In January 2017, after the end of his vice presidency, Mr. Biden found classified documents at his Virginia home and returned them

Soon after leaving the vice presidency, Mr. Biden apparently recognized that the Virginia home was not a secure location for the storage of classified material. When interviewed, Mr. Biden's personal aide recalled that during the first week after the end of the administration—several weeks before Mr. Biden told Zwonitzer he "just found all the classified stuff downstairs"—Mr. Biden discovered classified material at

---

[660] 1/15/17 e-mail from Secret Service agent to personal aide, SCOH-000223; Secret Service Special Agent 2 Tr. at 79; Virginia house manager Tr. at 15-18; NEA 1 Tr. at 86-87; Dr. Biden Staffer 1 Tr. at 32.

[661] *See, e.g.*, NEA 1 Tr. at 92; Secret Service Special Agent 1 8/24/23 Tr. at 26, 34, 36; Zwonitzer 7/31/23 Tr. at 146-47; Ricchetti Tr. at 140; Personal Aide 3 3/28/23 Tr. at 144, 174. 6/8/17 Schedule, NARA_SCAN_00000300 ("Close on the Beach House"); FBI Serial 3.

[662] NEA 1 Tr. at 66.

[663] Secret Service Special Agent 1 8/24/23 Tr. at 31-32.

[664] NEA 1 Tr. at 65-66.

[665] *Id.* at 66-68; Dr. Biden Personal Aide Tr. at 78-79; Zwonitzer 7/31/23 Tr. at 144-46.

the Virginia home and directed the aide to return it to the White House.[666] According to the aide, he was standing outside the Virginia home when Mr. Biden approached him and handed him a "slim binder[ ]" with a classified coversheet.[667] Mr. Biden said something like, "I just found this. Can you make sure it gets back to the White House?"[668] The aide surmised that the binder contained materials relating to "foreign leader calls" because Mr. Biden participated in many such calls in the last days of the administration.[669]

The aide believed he notified the director of programs for the Office of the Vice President's National Security Affairs team, who had stayed on into the next administration.[670] The aide believed he then gave the classified binder to a Secret Service agent at the Virginia home, who brought it to the Naval Observatory, where a military aide delivered it to Vice President Pence's national security staff at the White House.[671] We reviewed available phone records and interviewed several people serving at the time in the White House, the Secret Service, and the Naval

---

[666] Personal Aide 3 3/28/23 Tr. at 197-212; Personal Aide 3 10/4/23 Tr. at 58 (describing timing of incident as "a week or roughly a week after the Inauguration.")

[667] Personal Aide 3 3/28/23 Tr. at 197-99. The aide did not believe it was one of the "typical" classified coversheets with red, orange, or yellow classification markings; rather, he believed it had the "vice presidential seal" and "some type of classified marking on it." *Id.* at 198-99.

[668] *Id.* at 199-200; *see also id.* at 197.

[669] *Id.* at 204, 211-12. The aide did not believe the binder was one of the Vice President's "traditional briefing book[s]" from his National Security Affairs team. *Id.* at 199.

[670] *Id.* at 201-04. Initially, the aide stated it was possible that he notified a military aide instead. *Id.* at 201. When re-interviewed, however, the aide stated that he believed he contacted the Director of Programs for National Security Affairs, and not a military aide. Personal Aide 3 10/4/23 Tr. at 58-59.

[671] Personal Aide 3 3/28/23 Tr. at 203-04, 208-10.

158

Observatory, and none of them recalled this event.[672] Mr. Biden did not remember it either, although he stated in written responses to questions submitted by the special counsel: "If I had seen any marked classified documents in my home or office between the time when I was serving as Vice President and President, I would have immediately returned them to the U.S. government."[673] During his interview, he also stated that if he found classified documents, "I would have gotten rid of them. I would have gotten them back to their source. . . . I had no purpose for them, and I think it would be inappropriate for me to keep clearly classified documents."[674]

### D.    Move out of Virginia home to Delaware in 2019

On July 18, 2019, private movers packed and moved the Bidens' belongings from the Virginia home to the Delaware home, under a staffer's supervision.[675] Mr. Biden was not present for the packing or move, as he was traveling for his presidential campaign.[676]

---

[672] Director of Programs Tr. at 156-57, 180 (stating that the incident did "not sound familiar"); Secret Service Supervisor Tr. at 29-30 (stating he was unaware of Secret Service agents being given classified information found at the Virginia Residence); Military Aide 1 Tr. at 32-37; Military Aide 2 Tr. at 13-14; Military Aide 3 Tr. at 82-83; Military Aide 8 Tr. at 55-56.

[673] Biden 10/9/23 Tr. at 7-8, 39-40; President Joseph R. Biden, Jr.'s Responses to Written Questions Submitted by the Special Counsel, Dec. 1, 2023, at 1. Mr. Biden caveated his response in his interview by adding that "notes in my book, they're my notes and they're my property, but that document is not my property." Biden 10/9/23 Tr. at 42.

[674] Biden 10/9/23 Tr. at 41.

[675] Moving company invoice, SCOH-000274 (indicating a pack date of 7/16/19, a load date of 7/17/19, and move date of 7/18/19 from Virginia home to Delaware home); Dr. Biden Staffer 1 Tr. at 61-64.

[676] CITY NEWS SERVICE, *Joe Biden visits Crenshaw-district soul food restaurant, hits Trump on 'go back' rhetoric,* LOS ANGELES DAILY NEWS (July 19, 2019), https://www.dailynews.com/2019/07/19/joe-biden-visits-crenshaw-district-soul-food-restaurant-hits-trump-on-go-back-rhetoric/ (last visited Jan. 31, 2024) (Biden returned Thursday [Friday, July 19, 2019]) to Southern California to raise money for his Democratic

159

Our investigation focused on a wooden, two-drawer file cabinet that moved from the Virginia home to the Delaware home, because marked classified documents were later found inside the file cabinet in the Delaware home, and because of the possibility that the classified Afghanistan documents later found in the Delaware garage were at one time stored in the file cabinet.[677]

In the Virginia home, the file cabinet held files and was located near Mr. Biden's green-top desk in his basement office.[678] In July 2019, the file cabinet moved from the Virginia home to the Delaware home.[679] Mr. Biden said in his interview he believed he bought the cabinet for the Virginia home, but was unsure.[680] We were otherwise unable to determine where the cabinet originated, although photographs and records suggest it did not come from the Naval Observatory, and it likely came from the Delaware home or was bought for the Virginia home.[681] Regardless, Mr.

presidential bid[.]"); Heidi Przybyla, *Biden's plan for rural America is the latest Democratic outreach to Trump country*, NBC NEWS (July 18, 2019), https://www.nbcnews.com/politics/2020-election/biden-s-plan-rural-america-latest-democratic-outreach-trump-country-n1031441 (last visited Jan. 31, 2024); Alexandra Jaffe, *Biden plan seeks to boost rural America through investments*, AP NEWS ONLINE, (July 16, 2019), https://apnews.com/united-states-presidential-election-54b68d199fbd46158735b87f8a1518a1 (last visited Jan. 30, 2024) ("We have to ensure we bring along everyone,' the former vice president said in Manning, an Iowa town of about 1,500 residents.").

[677] FBI Serials 43, 44.

[678] Biden 10/8/23 Tr. at 78-79; Personal Aide 3 10/4/23 Tr. at 43-44.

[679] Personal Aide 3 10/4/23 Tr. at 43-44 ("green hanging files"). The desk did not move to Delaware. *See, e.g.*, SCOH-000274; August 2019 Photographs of Virginia home, SCOH-000741; SCOH-000742; SCOH-000743; SCOH-000744; SCOH-000745; SCOH-000746.

[680] Biden 10/8/23 Tr. at 43, 72.

[681] We identified several other sources of furniture and deliveries of items to the Virginia home between January and April 2017. However, none of those deliveries appear to have included the file cabinet. 2/14/17 e-mail from Mr. Biden's Personal Aide to Secret Service, USSS-0000523734; 1/12/17 e-mail from Secret Service agent to Dr. Biden's personal aide, SCOH-000220; 1/13/17 e-mail between Secret Service agents, USSS-0000527855;

160

Biden told us the file cabinet contained his own files and no one else's, and his personal aide recalled filing papers for Mr. Biden in both that cabinet and his green-top desk when those items of furniture were in the Virginia home.[682]

The staffer present for the move out of the Virginia home recalled that furniture such as the cabinet was plastic-wrapped and moved with contents inside, rather than being emptied before moving.[683] No one we interviewed recalled emptying the cabinet and packing its contents for the move to Delaware.[684]

In January 2023, FBI agents recovered two marked classified documents from a notebook found in the same file cabinet in the basement den of Mr. Biden's Delaware home.[685] Both documents were dated from 2013, and one related to American troop levels in Afghanistan, while the other related to Iraq.[686]

---

February 2017 Secret Service Final Survey Report, USSS-0000523800; March 2017 Secret Service e-mails, USSS-0000313361, USSS-0000310321.

[682] Biden 10/8/23 Tr. at 79 ("[T]hey were all my files, I believe, or at least under my control . . . . [I]t wasn't like somebody filed their papers in my file cabinet."); Personal Aide 3 10/4/23 Tr. at 11-14, 43-44.

[683] Dr. Biden Staffer 1 Tr. at 62, 66-67, 70-72.

[684] *Id.*; 7/15/09 text messages between Dr. Biden Staffer 1 and Personal Aide 3, SCOH-000380; Personal Aide 3 10/4/23 Tr. at 54-56.

[685] FBI Serials 44 1A56, 682.

[686] FBI Serial 683 1A772 C1, C2, C3, C4.



*File cabinet in Virginia home's basement office (Sept. 21, 2017)[687]*



*File cabinet in Virginia home's basement office (March 8, 2018)[688]*



*File cabinet in Delaware home's basement den (Jan. 12, 2023)[689]*

---

[687] FBI Serial 89 1A92; 9/21/17 photograph taken in Virginia home, SCOH-000321.

[688] SCOH-000767; FBI Serial 696 1A786.

[689] 1/12/23 photograph taken in Delaware home, FBI Serial 44 1A56 202301112_DSC_0005.

162

## II.    EVIDENCE THAT MR. BIDEN POSSESSED THE CLASSIFIED AFGHANISTAN DOCUMENTS IN THE VIRGINIA HOME

Some evidence suggests the Afghanistan documents were stored in the basement of the Virginia home from 2017 to 2019, moved in July 2019 to the Delaware home, and, at some point either before or after the move, transferred to the garage box, where they were finally found in the Delaware garage in December 2022. But we cannot rule out other explanations, including the possibility that the classified Afghanistan documents were left somewhere in Mr. Biden's Delaware home while he was vice president and forgotten there, until someone put them in the garage box after the 2019 move from the Virginia home to the Delaware home without realizing the documents contained classified information.

### A.    The dates of documents in the garage box suggest they were in the Virginia home

There are clues in the files themselves that suggest the contents of the garage box were moved from Virginia to Delaware. The garage box containing the Afghanistan documents also contained other documents with dates that correspond to dates when Mr. Biden's schedule shows him present at the Virginia home in and around February 2017 and afterward. The coinciding dates suggest that those documents were at the Virginia home with him during that period.[690]

---

[690] FBI Serials 304 1A340, 179, FBI-00001343 (Schedules); 1B004-SHORT TERMISM 2-3-17-000001; 1B004-PLAN FOR YOUR FUTURE VANGUARD-000001; 1B004-MARK Z 2-16-17-000001. The garage box also included Biden's speeches, speaking engagement offers, and financial documents dated between March 2017 and March 2019. 1B004-2016 CAMPAIGN SPEECHES_LABOR-000017; 1B004-CAA - SPEECHES-000003; 1B004-INCOME AND EXPENSES 2016-000005-21; 1B004-GREEN FOLDER WITH DOCUMENTS-000002-28.

### B.    The garage box containing marked classified Afghanistan documents came from the move out of the Virginia home

Based on photographs we obtained, it is likely the garage box that was later found to contain the Afghanistan documents came to the Delaware home during the July 2019 move from Virginia to Delaware.

About a month after the move from Virginia to Delaware, in late August 2019, a photo shows what appears to be the same box as the garage box containing the Afghanistan documents, inside the Delaware home in Mr. Biden's main-floor office, immediately next to his desk.[691] The box is not seen in photographs of that space next to his desk from June 2019 (one month before the move).[692] Two months after the August 2019 photo of the box, in October 2019, another photo shows what appears to be the same box in the same place in Mr. Biden's office.[693] Based on its size and markings, the box next to Mr. Biden's desk in the August and October 2019 photos appears to be of the same type as the boxes that moved from the Virginia home to the Delaware home in late July 2019.[694]

---

[691] 8/26/19 photograph, SCOH-000576; FBI Serial 625 1A720.

[692] 7/3/19 photos, SCOH-000774 and SCOH-000775

[693] SCOH-000768. Our conclusion is based on close inspection of the box's distinctive markings and packing tape.

[694] 7/20/2019 photo, SCOH-000769; FBI Serial 679 1A768.





*Box next to desk in Delaware home's office*
*(Aug. 2019)*[695]

*Box next to desk in Delaware home's office*
*(Oct. 2019)*[696]

The boxes shown above and the timing of the move suggest that the box next to Mr. Biden's desk in Delaware came from the Virginia home.

Upon close inspection of the photographs and the garage box itself recovered by the FBI, we conclude that the box shown above next to Mr. Biden's Delaware office desk in 2019 is the same as the garage box containing the Afghanistan documents found in Mr. Biden's Delaware garage in 2022. The words "Cabinet" and "Desk file" are handwritten on the top flaps of the recovered garage box. A portion of the "Desk file" handwriting can be seen on the box in the above photos from 2019 in Mr. Biden's Delaware office (magnified below):

---

[695] 8/26/19 photograph, SCOH-000576; FBI Serial 625 1A720. Based on our review of the photographs, this cabinet pictured behind Mr. Biden's desk is not the same file cabinet from the basement office of the Virginia home.

[696] SCOH-000768.

165



*Top left: zoomed-in photograph of box from August 2019*[697]
*Top right: zoomed-in photograph of box from October 2019*[698]
*Bottom: photograph of garage box containing marked Afghanistan documents (Jan. 22, 2024)*[699]

One possibility is that the classified Afghanistan documents were stored in the Virginia home, then placed in the box and moved to the Delaware home, where the box (with the Afghanistan documents inside) sat in Mr. Biden's office for several months between August and October 2019. But we cannot rule out other possibilities.

[697] 8/26/19 photograph, SCOH-000576; FBI Serial 625 1A720.
[698] SCOH-000768; FBI Serial 625 1A270.
[699] 1/22/24 photograph, GarageBox-001; Evidence item 1B87

166

The August and October 2019 photographs of Mr. Biden's Delaware office desk do not show the box's contents. When the garage box was recovered by the FBI in December 2022, it contained material dated between December 2019 and September 2020, after Mr. Biden moved out of the Virginia home and when he was living in the Delaware home.[700] This means that at least some of the box's contents were added after the box was stored in Mr. Biden's Delaware home office in 2019. It is also possible that, sometime after the box was photographed in Mr. Biden's Delaware office in October 2019, someone put the classified Afghanistan documents into this box from elsewhere in the Delaware home, reusing the box for this purpose. One witness specifically recalled Mr. Biden reusing old boxes, even when they were damaged.[701] In any case, the box containing the Afghanistan documents was eventually moved out of Mr. Biden's Delaware home office to the Delaware garage, where it was found in 2022.

We interviewed dozens of witnesses about the box and its contents, including Mr. Biden. All denied knowing that the classified Afghanistan documents were in the box, and all denied knowing when or how the box and its contents arrived in the garage, or who put them there. In the intervening years, boxes, furniture, the Corvette, and miscellaneous items were repeatedly moved in, out, and around the

---

[700] 1B004-BOOK 2-000001177 (binder containing memos, schedules, and speeches dated between December 2019 and March 2020); 1B004-LOOSE DOCUMENTS AND PHOTO-000001-13; 1B004-CARDS-REMARKS AND NOTES-000001-73 (campaign speeches, schedules, and an event memo for Justice Ginsburg's memorial service dated between August 2019 to September 2020); Personal Aide 4 Tr. at 86-89. Secret Service e-mails show Mr. Biden also visited his beach house. *See, e.g.*, 6/13/20 e-mail between Secret Service agents, USSS-0000007733.

[701] NEA 1 Tr. at 123.

167

garage.[702] While staffers—and even Mr. Biden—recalled being in the garage and seeing boxes at various points, no one recognized the box containing marked classified documents or recalled moving boxes within the Delaware home to the garage.[703]

## C. Investigation of the file cabinet that was moved from Virginia to Delaware was inconclusive

We also examined connections between the contents of the garage box and the file cabinet that moved from Virginia to Delaware, to investigate the possibility the Afghanistan files were at one time stored in the file cabinet. No witnesses recalled removing files from the cabinet.[704] Ultimately, the investigation was inconclusive.

* * *

Independent of the February 2017 Zwonitzer recording, the dates of the files in the garage box and the way the box was labeled suggest that some or all the files in the garage box, including the classified Afghanistan documents, may have been moved from the Virginia home to the Delaware home in 2019, before they were found in a box in the Delaware garage in 2022. But there are alternative explanations for how the Afghanistan documents got into the garage box that are also consistent with the evidence described above. As discussed in Chapter Eleven, we find the evidence

---

[702] 1/20/23 FBI photographs of garage, 20230120_JLH_0027 and 20230120_JLH_001 8; 12/21/22 FBI photograph, 20221221_ERT_0013; April 2018 through December 2022 Mechanic records, SCOH-000568; Photograph of Delaware residence, SCOH-000575; FBI Serial 625 1A720; Secret Service photographs of Delaware home, USSS-0000366970, USSS-0000262676; Campaign photographs SCOH-000770, SCOH-000771, SCOH-000772, SCOH-000773.

[703] *See, e.g.*, Personal Aide 4 Tr. at 112-113; Director of Oval Office Operations Tr. at 64-70; Dr. Biden Personal Aide Tr. at 113-118.

[704] NEA 1 Tr. at 111-12; Personal Aide 4 Tr. at 147-48 (doesn't remember going through the cabinet); Director of Oval Office Operations Tr. at 115 ("I have never accessed that, no.")

as a whole insufficient to meet the government's burden of proving that Mr. Biden

willfully retained the Afghanistan documents in the Virginia home in 2017.

CHAPTER EIGHT

### MR. BIDEN'S FIRST BOOK, *PROMISES TO KEEP*, AND THE CLASSIFIED SENATE DOCUMENTS IN THE DELAWARE GARAGE

The Afghanistan documents were not the only marked classified documents in Mr. Biden's garage. FBI agents also found boxes containing organized files related to several international trips Mr. Biden took as a young senator in the late 1970s.[705] Like the 2009 debate over the troop surge in Afghanistan, Mr. Biden viewed these trips as seminal episodes in his public life. Indeed, in his 2007 memoir *Promises to Keep: On Life and Politics*, Mr. Biden described these trips as historic and formative experiences that prepared him for the presidency.[706]

As explained below, some of the documents in these files were marked classified, though, because of the passage of time, we do not know whether Mr. Biden willfully retained the classified documents or consulted them when writing the book.

### I.    IN 2023, THE FBI FOUND FILES RELATED TO THE TRIPS CHRONICLED IN *PROMISES TO KEEP* IN MR. BIDEN'S DELAWARE GARAGE

During the January 2023 search of Mr. Biden's Delaware garage, FBI agents recovered boxes labeled "International Travel 1973-1979" and "Foreign Travel."[707] Agents found these boxes in a storage closet, in the same garage where they found the box containing the classified Afghanistan documents, as shown below.[708]

---

[705] Evidence items 1B17, 1B18.

[706] Joseph R. Biden, PROMISES TO KEEP: ON LIFE AND POLITICS (Random House Trade Paperback ed. 2008).

[707] Evidence items 1B17, 1B18.

[708] FBI Serials 35, 77 1A86.



*Garage box and storage closet in Mr. Biden's Delaware garage (Dec. 21, 2022)[709]*



*Interior of Mr. Biden's garage storage closet containing Senate documents (Jan. 20, 2023)[710]*

---

[709] 20221221_ERT_0013; FBI Serial 35 1A42.
[710] 20230120_FBI_0054; 20230120_FBI_0058; FBI Serial 35 1A42.

171

Like the box containing the classified Afghanistan documents, these boxes contained files and documents related to Mr. Biden's foreign policy experience and expertise—namely, organized files documenting his official foreign travel, including trips to the Soviet Union, West Germany, and Yugoslavia that he wrote about in his first book.[711] The files contained handwritten notes, briefing materials, and travel itineraries related to the trips.[712]

## II.   *PROMISES TO KEEP*

In 2007, Mr. Biden published a memoir titled *Promises to Keep: On Life and Politics*. As with his later book, Mr. Biden hired Zwonitzer as a ghostwriter.[713] Written in anticipation of Mr. Biden's run for president in 2008, *Promises to Keep* covered his life and political career from his childhood through his final years in the Senate.

In *Promises to Keep*, Mr. Biden discussed several international trips he took as a young senator in the late 1970s, including a congressional delegation to the Soviet Union where he met with the Soviet Premier, a trip to West Germany where he met with the Chancellor, and a trip to Yugoslavia, where he represented the United States at the state funeral of a Yugoslavian leader.[714]

According to Zwonitzer, he and Mr. Biden included these anecdotes to show how then-Senator Biden gained experience in foreign policy "not just learning by being a staff member but by literally sitting across the table from people like [the

---

[711] Biden, PROMISES TO KEEP 132, 143, 248; Evidence items 1B4, 1B17, 1B18.

[712] Evidence items 1B17, 1B18.

[713] Biden, PROMISES TO KEEP 366; Zwonitzer 7/31/23 Tr. at 31-35.

[714] Biden, PROMISES TO KEEP 132, 142-43, 248-52.

Soviet Minister of Foreign Affairs]."[715] During a recorded interview with Zwonitzer, Mr. Biden explained that during these international trips, he learned the importance of foreign policy experience and that "[i]t matters what kind of personal relationships and rapport you can establish with foreign leaders."[716] Mr. Biden said that when he later considered a presidential run, he "was never worried . . . whether I could sit across [from] [Soviet President Leonid] Brezhnev or sit across from [British Prime Minister Margaret] Thatcher . . . or [that I would] sit there and be intimidated."[717]

*Promises to Keep* put these anecdotes in a similar context. In discussing his decision to run for president in 1988, for example, Mr. Biden wrote that despite his relative youth, he felt he "measured up" to the other candidates in part due to his foreign policy experience:

> I was just forty-two years old, but after a decade on the Senate Foreign Relations Committee and nearly that long on the Senate Select Committee on Intelligence, I knew the world and America's place in it in a way few politicians did. My education in foreign affairs wasn't just the time spent in committee hearings but in traveling the world and meeting leaders.[718]

## III.    FOREIGN TRIPS CHRONICLED IN *PROMISES TO KEEP*

### A.    Mr. Biden's 1979 trip to Yugoslavia

One of the trips Mr. Biden wrote about was his 1979 trip to Yugoslavia to represent the United States at the state funeral of a Yugoslavian political leader. Mr. Biden described the trip as "a strange kind of awakening for me."[719] He made the trip

---

[715] Zwonitzer 7/31/23 Tr. at 46-47.

[716] 1978-race.doc at 18, Zwonitzer-00009492.

[717] 1988.doc at 10, Zwonitzer-00009499.

[718] Biden, PROMISES TO KEEP 143.

[719] *Id.* at 248.

with Averell Harriman, one of America's most distinguished diplomats, who "adopted" Mr. Biden and served as his "own personal tutor."[720] During the trip, Mr. Biden and Harriman had a private meeting with longtime Yugoslavian president and World War II hero Josip Broz Tito.[721] Mr. Biden called the meeting "remarkable," an opportunity to be in the room with "the last two living men who remembered" the Yalta Conference at the end of World War II.[722]

### B.    Mr. Biden's 1979 congressional delegation to the Soviet Union

Elsewhere in the book, Mr. Biden wrote that he observed the benefits of direct engagement with foreign leaders during a congressional delegation he led to the Soviet Union in 1979. The purpose of the trip was to discuss arms control and the SALT II strategic nuclear arms limitations agreement.[723] In *Promises to Keep*, Mr. Biden described how he "gained the grudging respect" of his Russian counterpart during a frank and sometimes tense face-to-face meeting with the Soviet Premier, where Mr. Biden also met President Leonid Brezhnev.[724]

Mr. Biden also sought to put the trip in the larger context of his foreign policy expertise and political ambitions. As the 1988 presidential election approached, Mr. Biden explained, "it was becoming clear that the new Soviet leader, Mikhail Gorbachev, was looking for a partner to write the end to the Cold War. And there

---

[720] Biden, PROMISES TO KEEP 248.

[721] *Id.* at 248, 250-52.

[722] *Id.* at 251.

[723] *Id.* at 143-45.

[724] *Id.*

wasn't anybody lining up to run for the nomination I thought would be a better partner than me."[725]

## IV.    THE FILES RELATED TO THE TRIPS CHRONICLED IN *PROMISES TO KEEP* IN MR. BIDEN'S DELAWARE GARAGE CONTAINED MARKED CLASSIFIED DOCUMENTS

One of the boxes containing organized files about the trips Mr. Biden wrote about in *Promises to Keep* contained marked classified documents from the late 1970s.[726] The box labeled "International Travel 1973-1979" contained materials from Mr. Biden's trips to Asia and Europe, including trips to Yugoslavia and the Soviet Union.[727] The box contained roughly a dozen marked classified documents that are currently classified at the Secret level.[728]



*"International Travel" box containing marked classified documents*[729]

---

[725] Biden, PROMISES TO KEEP 146.
[726] Evidence item 1B18.
[727] *Id.*
[728] *Id.*; Recovered documents D11-19.
[729] 20211221_ERT_0102; FBI Serial 35 1A42.

For example, the "International Travel 1973-1979" box contained files related to the congressional delegation that Mr. Biden led to the Soviet Union in 1979.[730] Inside the files were more than a dozen folders devoted to aspects of the trip, including Mr. Biden's travel itinerary, handwritten notes, letters, and briefing material.[731]

The files also contained documents marked as classified. For example, a folder labeled "Senator Biden" stored several documents, including background information about Soviet officials.[732] These documents were marked "CONFIDENTIAL" and "CONFIDENTIAL NOFORN [not releasable to foreign nationals]."[733] The intelligence community has determined that these documents are currently classified at the Secret level.[734]

The box also contained a file related to Mr. Biden's 1979 trip to Yugoslavia.[735] A note on the front page indicates that the file consists of a "reproduction of the contents of [Mr. Biden's] Yugoslavia file."[736] The file contained documents marked "Classified" and "Confidential" as well as a memo marked "SECRET."[737] The

---

[730] Evidence item 1B18.

[731] *Id.*

[732] *Id.*; Recovered documents D11-D19.

[733] Recovered documents D11-D19.

[734] FBI Serial 676; Recovered documents D11-D19. The reason for the change is that the relevant intelligence agency no longer uses the designation "Confidential." Information that was previously classified as "Confidential" is now classified as "Secret."

[735] Recovered documents D04-D06, folder labeled "Yugoslavia."

[736] Evidence item 1B18.

[737] Recovered documents D04-D06, folder labeled "Yugoslavia."

176

intelligence community has determined that these documents are classified at the Secret level.[738]

\* \* \*

We were limited in our ability to investigate these documents because of the significant passage of time since their creation. Although we cannot prove that Mr. Biden retained these classified documents willfully or used them in writing *Promises to Keep*, he did write about the foreign trips that were the subject of the documents. And like the classified Afghanistan documents, the classified files in Mr. Biden's garage relating to the trips discussed in *Promises To Keep* were part of a larger set of materials in Mr. Biden's home chronicling his experiences and achievements, particularly in foreign policy.

---

[738] FBI Serial 676.

CHAPTER NINE

LEGAL STANDARDS

Our investigation focused on the "possible unauthorized removal and retention of classified documents or other records discovered at the" Penn Biden Center, the University of Delaware, and Mr. Biden's personal residences.[739] The criminal statutory provision that best fits the facts of our investigation is 18 U.S.C. § 793(e), a section of the Espionage Act that proscribes unauthorized retention and disclosure of national defense information. The law governing that crime is discussed below in sections I and II. We discuss other criminal prohibitions, and why they do not apply, in section III.

## I.    UNAUTHORIZED RETENTION OF NATIONAL DEFENSE INFORMATION

To prove unauthorized retention of national defense information under 18 U.S.C. § 793(e) the government must show: (1) the defendant had unauthorized possession of a document, writing, or note; (2) the document, writing, or note related to the national defense; and (3) the defendant willfully retained the document, writing, or note and failed to deliver it to an employee or officer entitled to receive it.[740]

---

[739] Office of the Attorney General, Order No. 5588-2023, Appointment of Robert K. Hur as Special Counsel (January 12, 2023).

[740] *See United States v. Rosen*, 445 F. Supp. 2d 602, 623-26 (E.D. Va. 2006), *amended,* Order, No. 1:05-cr-225, 2006 WL 5049154 (E.D. Va. Aug. 16, 2006); Court's Instruction to the Jury at 19, *United States v. Brown*, No. 21-cr-348 (M.D. Fla. Dec. 12, 2022), ECF No. 304; Government's Proposed Jury Instructions at 18, *United States v. Sterling*, No. 1:10-cr-485 (E.D. Va. Oct. 11, 2011), ECF No. 258; Final Jury Instructions at 44, *United States v. Ford*, No. 05-cr-235 (D. Md.).

## A.    Unauthorized possession

The Espionage Act does not define "unauthorized possession," but courts in recent decades have construed that language and a related phrase in the same statute ("entitled to receive") by referencing the executive order governing the handling of classified information in effect at the time of the conduct.[741] As explained in Chapter One, under that executive order a private citizen's access to classified information is authorized only if he or she receives a favorable eligibility determination, signs an approved non-disclosure agreement, and has a need to know the information or obtains a formal waiver of that requirement.[742] Classified information must also be kept in approved and secure storage containers.[743]

By implication from the exception in § 4.4 of the executive order, the restrictions on access to classified information in the order appear to govern a former

---

[741] *United States v. Morison*, 844 F.2d 1057, 1075 (4th Cir. 1988) (construing governing executive order and holding, "the words 'entitled to receive' in [18 U.S.C. § 793(d) and (e)] can be limited and clarified by the Classification Regulations . . . ."); *Rosen*, 445 F. Supp. 2d at 622 ("the rule regulating who is 'entitled to receive' is the Executive Order setting forth a uniform classification system for national security information"); *see also United States v. Hung*, 629 F.2d 908, 919 n.10 (4th Cir. 1980) ("The trial judge provided adequate content for ['unauthorized possession'] by advising the jury that a person would have authorized possession if he had an appropriate security clearance and if he gained access to the document because it was necessary to the performance of his official duties."). Jury instructions in Espionage Act cases have generally mirrored the executive order's requirements for access to classified information by defining unauthorized possession to mean that the possessor lacks a security clearance, lacks a need to know, or removes the information from its proper storage location. *See* Final Jury Instructions at 45, *Ford*, No. 05-cr-235; Government's Proposed Jury Instructions at 10, *Sterling*, No. 1:10-cr-485, ECF No. 258; Transcript of Jury Instructions at 194, *United States v. Morison* ("An individual has unauthorized possession of documents and writings when he possesses those under circumstances or in a location which is contrary to law or regulation for the conditions of his employment.").

[742] Executive Order 13526 §§ 4.1(a), 4.4.

[743] *Id.* § 4.1(g); *see* 32 C.F.R. §§ 2001.43(b)(1) and (2), 2001.53; Office of the Director of National Intelligence, Intelligence Community Directive 705.

vice president, which Mr. Biden was between January 2017 and January 2021.[744]

Under the executive order's provisions, a former vice president (or former president) may receive a waiver of the need-to-know requirement, but only if a senior official of the agency that originated the classified information "determines in writing that access is consistent with the interest of national security" and "takes appropriate steps to protect classified information from unauthorized disclosure or compromise, and ensures that the information is safeguarded in a manner consistent with this order[.]"[745]

For all of the classified materials recovered during this investigation, after the vice presidency, Mr. Biden did not receive a written waiver of the need-to-know requirement, and no agency official made the findings required by the executive order. Therefore, Mr. Biden's possession of those materials in unsecured spaces in his home after his vice presidency was unauthorized within the meaning of the Espionage Act.[746]

The White House Counsel's Office and Mr. Biden's personal attorneys have argued to us that, despite these requirements, the Presidential Records Act authorizes a former president or vice president to keep classified materials in locations that are not approved for storage of classified information at home, as long as those materials are not defined as presidential records under the Act. Counsel note

---

[744] Executive Order 13526 § 4.4.

[745] *Id.* §§ 4.1, 4.4; *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8.

[746] *See Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8; Superseding Indictment ¶¶ 18-19, *United States v. Trump, et al.*, No. 23-cr-80101 (S.D. Fla. July 27, 2023), ECF No. 85.

180

that the Presidential Records Act excludes personal records (which can include diaries) from government ownership and preexisting White House guidance has interpreted the Act to exclude rough meeting notes from its definition of records. Pointing to Mr. Reagan's treatment of his diaries containing Top Secret/Sensitive Compartmented Information (as discussed in Chapter Ten), counsel contend that a former president or vice president may lawfully retain written national defense information provided it is not a presidential record under the Act and that Mr. Biden's notebooks, like Mr. Reagan's diaries, are not presidential records.

The approach that the Department and courts have taken in Espionage Act cases after passage of the Presidential Records Act cuts against this view.[747] Courts and the Department have determined whether possession of national defense information is authorized principally based on the terms of the executive order. The order specifically addresses and is the primary source of law governing access to such information, in contrast with the Presidential Records Act, which mentions classified material in just one irrelevant provision.[748] The executive order's restrictions on access to classified information also appear to apply to former presidents and vice presidents.[749] We therefore decline to adopt the argument that compliance with the

---

[747] *E.g., Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8; Superseding Indictment ¶¶ 18-19, *United States v. Trump*, No. 23-cr-80101, ECF No. 85.

[748] *See* 44 U.S.C. § 2204(a)(1)(A).

[749] *See* nn.744-46 above.

Presidential Records Act authorizes former presidents and vice presidents to retain national defense information in unsecured and unapproved locations.[750]

As explained in Chapters Ten, Twelve, and Thirteen, we do consider the historical practices of former presidents and vice presidents—including Mr. Reagan's treatment of his diaries—when evaluating whether Mr. Biden acted willfully and when weighing the factors set forth in the Principles of Federal Prosecution.

## B.    Related to the national defense

The Espionage Act, including Section 793(e), is concerned with "information relating to the national defense," which is distinct from but related to the term "classified information."[751] "Classified information" is defined by the executive order as information whose "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security[.]"[752] Information relating to the national defense (often referred to as "national defense information") is not defined in the Espionage Act and so its meaning has been construed by courts. As the Supreme Court held in the seminal case *Gorin v. United States*, "national defense" is a "generic concept of broad connotations, referring to military and naval

---

[750] Additionally, the Presidential Records Act makes no mention of the relevant criminal statutes and there is no conflict between the Act and those criminal laws. *See Carcieri v. Salazar*, 555 U.S. 379, 395 (2009) ("Absent a clearly expressed congressional intention, an implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute.") (cleaned up).

[751] *Compare* 18 U.S.C. § 793 (concerning information "relating to the national defense"), *with* 18 U.S.C. § 1924 (concerning "classified information of the United States," which is statutorily defined as "information originated, owned, or possessed by the United States Government concerning the national defense or foreign relations of the United States that has been determined pursuant to law or Executive order to require protection against unauthorized disclosure in the interests of national security.").

[752] Executive Order 13526 §§ 1.2, 1.4, 6.1(i).

establishments and the related activities of national preparedness."[753] It includes "all matters directly and reasonably connected with the defense of our nation against its enemies."[754]

Information relating to the national defense must be "closely held" and not lawfully "made public" or "available to the general public."[755] But "[t]he mere fact that similar but unofficial information is publicly available does not automatically remove information in closely-held documents from the realm of 'national defense' information."[756]

In determining whether information relates to the national defense under the Espionage Act, the fact that the information is classified is neither sufficient nor necessary, but it is "highly probative" evidence.[757]

---

[753] *Gorin v. United States*, 312 U.S. 19, 28 (1941).

[754] *Id.* at 30; *see United States v. Drummond*, 354 F.2d 132, 151-52 (2d. Cir. 1965) (applying *Gorin* definition to 18 U.S.C. § 794 and finding jury instructions "more than ample" where district court instructed jury to consider documents as well as testimony about their content and significance to determine whether standard was met).

[755] *Morison*, 844 F.2d at 1071-72; *see also Hung*, 629 F.2d at 918 n.9 (publicly available information not national defense information under the Espionage Act); *United States v. Dedeyan*, 548 F.2d 36, 39-40 (4th Cir. 1978) (affirming jury instruction for Section 793(f) stating information did not relate to the national defense if it was "made public [by the government and] . . . is found in sources lawfully available to the general public" or if government "made no effort to guard such information").

[756] *United States v. Squillacote*, 221 F.3d 542, 579 (4th Cir. 2000).

[757] *Rosen*, 445 F. Supp. 2d at 623. Jury instructions follow this principle. *E.g.*, Jury Charge at 22-23, *United States v. Schulte*, No. 17-cr-548 (S.D.N.Y. July 8, 2022), ECF No. 879 ("In determining whether material is 'closely held,' you may consider whether it has been classified by appropriate authorities and whether it remained classified on the date or dates pertinent . . . I caution you that the mere fact that information is classified does not mean that the information qualifies as NDI."); Court's Instructions to the Jury at 20, *Brown*, No. 21-cr-348, ECF No. 304 (same); Government's Proposed Jury Instructions at 44, *Sterling*, No. 1:10-cr-485, ECF No. 258 ("[Y]ou are to determine whether certain information in this case was national defense information. That is not the same as 'classified information.' However, you may consider the fact that information was classified in determining whether the

## C.    Willfully retains

Finally, the government must prove that a defendant willfully retained the material and failed to deliver it to an officer or employee "entitled to receive" the information. The statute does not define who is "entitled to receive" the information, so again, courts have looked to the governing rules concerning the handling of classified materials, primarily the executive order.[758] Generally, those entitled to receive the information are people with the requisite security clearance and the need to know.[759]

Willfulness is a heightened *mens rea*, which as articulated by the Supreme Court in *Bryan v. United States*, requires proof "that the defendant acted with knowledge that his conduct was unlawful."[760] Under the Espionage Act, an act is willful when "it is done voluntarily and intentionally and with the specific intent to do something that the law forbids. That is to say, with a bad purpose either to disobey or to disregard the law."[761] While willfulness requires proving an intent to disobey

___

information at issue was national defense information."); Final Jury Instructions at 46, *Ford*, No. 05-cr-235 ("In determining whether material is 'closely held,' you may consider whether it has been classified by appropriate authorities and whether it remained classified on the date or dates pertinent . . . .").

[758] *Morison*, 844 F.2d at 1075 ("the words 'entitled to receive' in [18 U.S.C. § 793(d) and (e)] can be limited and clarified by the Classification Regulations . . . ."); *Rosen*, 445 F. Supp. 2d at 622 ("the rule regulating who is 'entitled to receive' is the Executive Order setting forth a uniform classification system for national security information").

[759] *Rosen*, 445 F. Supp. 2d at 622-23.

[760] *Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *accord Ratzlaf v. United States*, 510 U.S. 135, 136-37 (1994); *United States v. Bursey*, 416 F.3d 301, 308-09 (4th Cir. 2005).

[761] *Morison*, 844 F.2d at 1071; *accord* Court's Instructions to the Jury at 22, *Brown*, No. 21-cr-348, ECF No. 304; Government's Proposed Jury Instructions at 15, *Sterling*, No. 1:10-cr-485, ECF No. 258; Final Jury Instructions at 19, *Ford*, No. 05-cr-235.

the law, courts have applied *Bryan*'s standard of "simple willfulness" to Section 793(e) and rejected any need for the government to prove an intent to cause harm.[762]

Accordingly, to prove a violation of Section 793(e) we would need to show that Mr. Biden knowingly retained national defense information and failed to deliver it to an appropriate government official, and that he knew this conduct was unlawful. As discussed in more detail below, because of the interrelation between "national defense information" and "classified information," when evaluating a potential Section 793(e) charge, the Department considers whether the information the person possessed was classified and whether the person knew it was classified.

## II.    UNAUTHORIZED DISCLOSURE OF NATIONAL DEFENSE INFORMATION

Section 793(e) also prohibits the willful communication, delivery, or transmission of national defense information to a person not entitled to receive it. The first two elements, unauthorized possession and relating to the national defense, are identical to those addressed above in sections I.A. and I.B. The element of willful disclosure to a person not entitled to receive is addressed below.

---

[762] *United States v. Hitselberger*, 991 F. Supp. 2d 101, 107-08 (D.D.C. Dec. 3, 2013) (applying *Bryan*'s willfulness standard to Section 793(e) and explaining "the core of 'willful' misconduct is to act with the knowledge or intent to disregard the law, not an evil intent to injure the United States"); *United States v. Drake*, 818 F. Supp. 2d 909, 918 (D. Md. 2011) (applying *Bryan*'s willfulness standard to Section 793(e) and noting the definition is consistent with Fourth Circuit precedent predating *Bryan*); *see also United States v. Kim*, 808 F. Supp. 2d 44, 54 (D.D.C. 2011) (applying *Bryan*'s willfulness standard to Section 793(d)).

185

### A.    Willfully communicates, delivers, or transmits to a person not entitled to receive

Just as with retention, disclosure under Section 793(e) requires that the defendant act willfully—that is, with the intent to do something the law forbids.[763] A person is not entitled to receive national defense information if he or she lacks a need to know and an appropriate clearance as required by the executive order.[764]

For an oral disclosure of information (as opposed to the disclosure of a classified document), the government must also prove that "the possessor has reason to believe [the information] could be used to the injury of the United States or to the advantage of any foreign nation."[765] Accordingly, to establish that Mr. Biden violated Section 793(e) when he read information from his notebooks to his ghostwriter, we would need to prove that he acted with an intent to violate the law and had reason to believe the information he disclosed could be used to harm the United States or benefit a foreign nation.

---

[763] *Rosen*, 445 F. Supp. 2d at 625-26 (applying willfulness standard to disclosure under Sections 793(d) and 793(e)).

[764] *See* nn.758-59 above; Chapter One.

[765] 18 U.S.C. § 793(e); *Rosen*, 445 F. Supp. 2d at 625-26 (when disclosure involves intangible information government must prove this "additional and significant scienter requirement" that is analogous to bad faith, but this requirement does not apply in instances where the disclosure is through a tangible medium such as a document); *accord Drake*, 818 F. Supp. 2d at 917 ("Section 793(e) provides for different scienter requirements depending on the character of the national defense item or data that a defendant is charged with possessing. In cases like this one, involving documents, the defendant need only have acted willfully, as a defendant will more readily recognize a document relating to the national defense based on its content, markings or design than it would intangible or oral 'information' that may not share such attributes.").

### III.    OTHER CRIMINAL PROVISIONS

#### A.    Other Espionage Act provisions

The other provisions of the Espionage Act do not fit the facts of this case. Subsections (a), (b), and (c) of Section 793 are facially inapplicable because at no point did we find evidence that Mr. Biden intended or had reason to believe the information would be used to injure the United States or to benefit a foreign nation, which is a requirement of those subsections.[766] Subsection (d) also does not apply, because it requires a failure to deliver materials *on demand*, and when asked to return any classified materials from his vice presidency, Mr. Biden consented to searches and returned all potentially classified materials that were discovered.[767]

Among other reasons, Section 793(f) does not fit because that subsection requires removal of national defense information from "its proper place of custody" by a person who has lawful possession. That is a difficult requirement to apply here because presidents and vice presidents are generally permitted to retain classified information at their residences while in office. Because Section 793(f) can only be violated when Mr. Biden had lawful possession (*i.e.* when he was vice president) any removal of classified information would have occurred while Mr. Biden was still vice president, when that conduct was not proscribed by the executive order issued

---

[766] 18 U.S.C. § 793(a) requires acting "for the purpose of obtaining information respecting the national defense with intent or reason to believe that the information is to be used to the injury of the United States, or to the advantage of any foreign nation." Subsections (b) and (c) incorporate this requirement by reference to "the purpose aforesaid."

[767] 18 U.S.C. § 793(d) criminalizes conduct where the defendant "fails to deliver [the national defense information] on demand to the officer or employee of the United States entitled to receive it."

187

pursuant to the president's authority to control national security information. It is at least arguable that as vice president, Mr. Biden could not have removed national defense information "from its proper place of custody," as the statute requires, because his home and other locations were proper places of custody during his time in office. In any case, interpreting Section 793(f) to apply to a sitting vice president's conduct in that context would raise significant separation of powers concerns.[768] Where such concerns exist, the Supreme Court and the Department of Justice have declined to interpret statutes as applying to the president[769] or vice president[770] absent clear statutory text.

---

[768] *United States v. United States District Court*, 407 U.S. 297, 310 (1972) (President "has the fundamental duty, under Art. II, § 1, of the Constitution, to 'preserve, protect and defend the Constitution of the United States.'"); *Disclosure of Grand Jury Material to the Intelligence Community*, 21 Op. O.L.C. 159, 172 (1997) ("The Constitution vests the President with responsibility over all matters within the executive branch that bear on national defense and foreign affairs, including the collection and dissemination of national security information.").

[769] *See Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (out of respect for separation of powers, "[w]e would require an express statement by Congress" before applying the Administrative Procedure Act to the president); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 178 (1996) ("plain statement rule" is rooted in principles of constitutional avoidance and separation of powers); *Application of Consumer Credit Reporting Reform Act of 1996 to Presidential Nomination and Appointment Process*, 21 Op. O.L.C. 214, 214 (1997) ("It is a well settled principle of law, applied frequently by both the Supreme Court and the executive branch, that statutes that do not expressly apply to the President must be construed as not applying to him if such application would involve a possible conflict with his constitutional prerogatives."); *Application of 28 U.S.C. § 458 to Presidential Appointments of Federal Judges*, 19 Op. O.L.C. 350, 351-53 (1995) (articulating the "well-settled principle that statutes that do not expressly apply to the President must be construed as not applying to the President if such application would involve a possible conflict with the President's constitutional prerogatives").

[770] The Executive power is vested in the president, U.S. CONST. art. II § 1, and the vice president has limited constitutionally enumerated functions, U.S. CONST. art. I § 3, amends. XII, XX, XXV (vice president's constitutional duties include serving as president of the Senate, opening the certified votes from electors for the president and vice president, and duties related to the death, disqualification, or inability of the president). Thus, it could be argued that the separation of powers concerns giving rise to the express statement rule are

188

## B.    Unauthorized removal of classified materials

We also considered the applicability of 18 U.S.C. § 1924, which criminalizes the unauthorized removal of classified material by an officer, employee, contractor, or consultant of the United States. In addition to concerns about the statute's five-year limitations period,[771] the statute's text suggests that it should not apply to the conduct of a sitting president or vice president.

First, the statute requires removal "without authority," and when Mr. Biden was vice president he was authorized to take and keep classified materials at his private residences. Because any act of removal must have occurred when Mr. Biden was vice president, it was arguably done with authority.

Second, the statute does not explicitly apply to a president or vice president, and given the significant separation of powers concerns that would result from the statute's application to a sitting president or vice president, the express statement rule cautions against construing the statute to apply.[772]

---

less applicable to the vice president. *See* Mem. from Laurence H. Silberman, Dep. Att'y Gen., for Richard T. Burress, Office of the President, *Re: Conflict of Interest Problems Arising out of the President's Nomination of Nelson A. Rockefeller to be Vice President under the Twenty-Fifth Amendment to the Constitution*, at 2 (Aug. 28, 1974). Nonetheless, given that the vice president is an elected constitutional officer who is regularly delegated significant executive duties, the Department of Justice has long applied the express statement rule to vice presidents. *Whether the Office of the Vice President is an "Agency" for Purposes of the Freedom of Information Act*, 18 Op. O.L.C. 10, 11 (1994) ("Because the Vice President is also a constitutional officer, the same 'express statement' rule should apply" (citation omitted) in the context of determining whether the Freedom of Information Act applies to the Office of the Vice President.); *Conflict of Interest Problems*, at 5-6 (concluding that a federal conflict-of-interest statute does not apply to either the president or vice president because "[i]t would be strange for Congress to subject the President and the Vice President to possible criminal prosecution without naming them explicitly . . . .").

[771] 18 U.S.C. § 3282.

[772] *See* nn.768-70 above.

Finally, because Section 1924 requires that a defendant "knowingly remove[d]" classified information "without authority and with the intent to retain [it] at an unauthorized location," a prosecution under this statute would face many of the same evidentiary hurdles discussed in Chapters Eleven and Twelve.

## C.    Removing, concealing, or destroying a government record

Title 18 U.S.C. § 2071 criminalizes removing, concealing, or destroying government records. While there is scant case law, most courts that have addressed the statute's elements have required proof that the defendant deprived, or attempted to deprive, the government of its ability to use a given record.[773] We found no evidence that the government was deprived of the use of any of the materials recovered during this investigation or that Mr. Biden acted with the intent to deprive the government of any record. In fact, no one in the government seems to have noticed that any classified materials were missing at any point from the time Mr. Biden left office on January 20, 2017, until marked classified documents were found at the Penn Biden

---

[773] *United States v. Hitselberger*, 991 F. Supp 2d 108, 122-24 (D.D.C. March 5, 2014) (analyzing case law and concluding "the government will need to prove that [the defendant] obliterated information from the public record"); *United States v. Rosner*, 352 F. Supp. 915, 921 (S.D.N.Y. 1972); *United States v. North*, 708 F. Supp. 364, 369 n.3 (D.D.C. 1988); *accord United States v. Poindexter*, 725 F. Supp. 13, 20 (D.D.C. 1989) ("The obvious purpose of the statute is to prohibit the impairment of sensitive government documents . . . ."); *McInerney v. United States*, 143 F. 729, 730-31 (1st Cir. 1906) (Section 2071's predecessor statute was "enacted for the purpose of protecting records, papers, and proceedings of courts of justice, and papers, documents, and records filed or deposited in the public offices of the federal government"); *United States v. De Groat,* 30 F. 764, 765 (E.D. Mich. 1887) (the "essential element" of Section 2071's predecessor statute was "the specific intent to destroy them *as records* of a public office; or in other words, to obliterate or conceal them as evidence of that which constitutes their value as public records, or to destroy or impair their legal effect or usefulness as a record of our governmental affairs . . ."); *but see United States v. Lang*, 364 F.3d 1210, 1221-22 (10th Cir. 2004) (finding that "a copy of a government record itself functions as a record for purposes of § 2071"), *cert. granted, rev'd on other grounds,* 543 U.S. 1108 (2005), and *opinion reinstated in part,* 405 F.3d 1060 (10th Cir. 2005).

Center on November 2, 2022. It is therefore unlikely we could prove deprivation. Section 2071 also requires proof of willfulness, a heightened *mens rea* discussed above in sections I.C, II.A. And so even putting aside the issue of deprivation, any Section 2071 charge would fail for the same reasons discussed in Chapters Eleven and Twelve.

CHAPTER TEN

HISTORICAL BACKGROUND

I.    HISTORICALLY, FORMER PRESIDENTS AND VICE PRESIDENTS TREATED ALL
      RECORDS AS PERSONAL PROPERTY

For most of our nation's history, presidents and vice presidents treated all

records from their respective administrations—including records relating to issues of

national security—as personal property that they took with them upon leaving

office.[774] A congressionally commissioned study found in 1977 that, when leaving

office, past presidents routinely took national security files including "briefing

materials for the President, records of negotiations with foreign governments,

correspondence with foreign heads of state or governments, [and] correspondence

with or directives to agencies within the Executive branch on foreign affairs."[775]

The practice of outgoing presidents and vice presidents retaining their records

was reconsidered in the 1970s, culminating in the passage of the Presidential Records

Act in 1978.[776] The Act provides that all "Presidential records"—documents created

---

[774] *See Nixon v. United States*, 978 F.2d 1269, 1270 (D.C. Cir. 1992) (remarking upon the "long and unbroken history relating to the use, control, and disposition of presidential papers" and concluding "that Mr. Nixon, like every President before him, had a compensable property interest in his presidential papers"); *Title to Presidential Papers—Subpoenas*, 43 Op. Att'y Gen. 11, 11 (1974) (former presidents' ownership of materials from their administration was a matter of "almost unvaried understanding of all three branches of the Government since the beginning of the Republic"); FINAL REPORT OF THE NATIONAL STUDY COMMISSION ON RECORDS AND DOCUMENTS OF FEDERAL OFFICIALS at 16 (March 31, 1977) ("The papers of Vice Presidents of the United States have traditionally been disposed of in the same manner as Presidential papers; that is, Vice Presidents have removed them when they left office.").

[775] FINAL REPORT OF THE NATIONAL STUDY COMMISSION at 14-15.

[776] Before the Presidential Recordings and Materials Preservation Act of 1974, which applied only to former President Nixon, "Presidents exercised complete dominion and control over their presidential papers." *Nixon*, 978 F.2d at 1277. "In 1978, Congress prospectively

or received by the president or his staff to assist or advise him in carrying out his official duties—belong to the government.[777] In contrast, "[p]ersonal records" remain the property of the former officeholder.[778]

The Act defines "personal records" to mean "all documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President."[779] Such personal records include "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business."[780]

While the Presidential Records Act marked a turning point in the treatment of presidential materials, as discussed in Chapter Nine, the Act does not exempt former presidents and vice presidents from specific prohibitions on removing, retaining, losing, or disclosing classified and national defense information.[781]

After the Act's passage, at least one former president, President Reagan, left office with his presidential diaries, which contained classified information, and stored those diaries at his private home. The Department of Justice, the National Archives, and others knew that President Reagan treated his diaries (containing classified

---

abolished presidential ownership of White House materials with the Presidential Records Act." *Id.* at 1277 n.19.

[777] 44 U.S.C. §§ 2201-02.

[778] *Id.* §§ 2201-03; *Nixon*, 978 F.2d at 1277 n.19.

[779] 44 U.S.C. §§ 2201(3).

[780] *Id.*

[781] *See* Executive Order 13526 §§ 4.1 4.4; 18 U.S.C. § 793.

information) as personal property, but no agency took action to recover the classified materials or to investigate or prosecute the former president.

## II.    THE REAGAN DIARIES

The first president subject to the Presidential Records Act, Mr. Reagan kept a diary in which he wrote an entry nearly each day while he served as president.[782] His diaries contained information that was classified up to Top Secret/Sensitive Compartmented Information level, and remained so until 2007 or later, years after Mr. Reagan died. Mr. Reagan took all five volumes of his diaries home with him when he left office, and at that time, it was known to the Department of Justice, the Iran-Contra Independent Counsel, and the National Archives that (1) Mr. Reagan's diaries contained Top Secret classified information, and (2) Mr. Reagan treated his diaries as personal property that was not in the National Archives' possession.[783] The

---

[782] Ronald Reagan, THE REAGAN DIARIES ix (Douglas Brinkley ed., First Harper Perennial Ed. 2009).

[783] Other former presidents kept diaries or journals that they took with them after they left office. For example, President George H. W. Bush regularly kept a dictated diary that was later quoted extensively in published works. Interview by George W. Bush with Jon Meacham, Author, DESTINY AND POWER, (Nov. 8, 2015), https://www.c-span.org/video/?400044-2/destiny-power; JON MEACHAM, DESTINY AND POWER: THE AMERICAN ODYSSEY OF GEORGE HERBERT WALKER BUSH (Kindle ed. 2015); George H. W. Bush & Brent Scowcroft, A WORLD TRANSFORMED (First Vintage Books ed. 1999). President Carter also kept a dictated diary that was typed up by his secretary and that he took with him upon leaving office. Jimmy Carter, WHITE HOUSE DIARY xii-xv (2010). Mr. Carter published excerpts from that diary—keeping the original, full version with him at his home and transferring a copy to his presidential library. *Id.* While there is some reason to think that the Bush and Carter diaries may have also contained classified information, the historical record is clear that Mr. Reagan's diaries did and that relevant government entities knew of Mr. Reagan's possession of that material.

We also examined the practices of other former Presidents predating the Presidential Records Act, but we were unable to glean much from that inquiry. Like the key statutory provision, 18 U.S.C. § 793(e), the modern classification system did not come into being until the mid-20th century. *See* Cong. Research Serv., *The Protection of Classified Information:*

194

Department of Justice also repeatedly described the diaries in public court filings as Mr. Reagan's personal records.[784]

Mr. Reagan's personal possession of his diaries, and the fact that portions of his diaries were classified up to the Top Secret level, was also known to the Congress[785] and the federal courts.[786] In the wake of the Iran-Contra affair, Mr. Reagan produced relevant excerpts from his diaries to various investigative bodies, including congressional committees and the Independent Counsel.[787] During the Independent Counsel's prosecution of former National Security Adviser John

---

*The Legal Framework* 1 (updated Feb. 2, 2023). Two Presidents during this period died in office (Franklin D. Roosevelt and John F. Kennedy), and several appear to have entered agreements while in office expressly contemplating their continued access to classified information in their presidential papers after the end of their terms. *See* Letter for James B. Rhoads and Robben W. Fleming from Gerald R. Ford, annex B, § 5(c)(vii), (d), (g) (Dec. 13, 1976), https://www.fordlibrarymuseum.gov/library/forddeed.asp; Letter for Lawson B. Knott, Jr., from Lyndon B. Johnson, §§ 2(c)(ii) & (e), 5 (Aug. 13, 1965), *reprinted in* 111 Cong. Rec. 21661-62 (1965); Letter for Franklin Floete from Dwight D. Eisenhower, §§ 5, 7(a), 8 (Apr. 13, 1960), *reprinted in The "Public Documents Act": Hearings on H.R. 16902 and Related Legislation Before the Subcomm. on Printing of the H. Comm. on H. Admin.*, 93d Cong., 2d Sess. 134 (1974). Nor were we able to find specific evidence that the Department of Justice was contemporaneously aware of any instances where these earlier Presidents kept classified materials without appropriate safeguards. For these and other reasons, what we have been able to discern about the earlier history sheds little light on the question at hand and our analysis focuses on the Reagan diaries as the most probative historical example.

[784] *See, e.g.*, Memorandum in Support of Motion to Quash Subpoena to Archivist and Statement of Interest by the Department of Justice at 5-6, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG) (D.D.C. Dec. 6, 1989) (DOJ Mot. to Quash in *Poindexter*).

[785] Lawrence Walsh, FINAL REPORT OF THE INDEPENDENT COUNSEL FOR IRAN/CONTRA MATTERS: VOLUME III at 686 n.30 (1993) ("Access to the President's relevant diary entries was provided by the President to the Tower Commission, the Congressional Committees and to the Independent Counsel, who reviewed them in 1987.").

[786] *United States v. Poindexter*, 732 F. Supp. 135, 137-41 (D.D.C. Jan. 30, 1990).

[787] Memorandum of Points and Authorities in Support of Motion by Former President Ronald W. Reagan to Quash Subpoena at 32-33, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG) (D.D.C. Dec. 6, 1989) (Reagan Mot. to Quash in *Poindexter*); David E. Rosenbaum, *Reagan Will Allow Investigators to See Diary Items on Iran Affair*, N.Y. TIMES (Apr. 9, 1987), https://www.nytimes.com/1987/04/09/world/reagan-will-allow-investigators-to-see-diary-items-on-iran-affair.html.

Poindexter, Poindexter sought Mr. Reagan's diary entries for purposes of his criminal defense.[788] In numerous public filings and judicial opinions in 1989 and 1990 after Mr. Reagan left office, the Department of Justice and the U.S. District Court both acknowledged that Mr. Reagan's diaries contained information that was classified, including Top Secret information about sensitive matters.[789]

While this litigation was ongoing, Mr. Reagan was a private citizen living in California, where he kept his diaries at his private home, apparently outside of facilities that were authorized to store Top Secret information.[790] According to the editor of the published versions of Mr. Reagan's diaries, "[f]or several years after their return to California, the Reagans would often sit together in their den after dinner, reading aloud from their diaries and reminiscing about their White House years."[791] While it is unlikely that, after leaving office, Mr. Reagan's den was approved for the storage of Top Secret/Sensitive Compartmented Information, Mr. Reagan retained Secret Service protection at his home for the remainder of his life.[792] Mr. Reagan maintained the ability to receive and handle classified information after leaving the

---

[788] Memorandum in Support of Motion to Quash Subpoena to Archivist and Statement of Interest by the Department of Justice at 5-6, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG) (DOJ Mot. to Quash in *Poindexter*); Lawrence Walsh, *Final Report of the Independent Counsel for Iran/Contra Matters: Volume III* at 686 n.30 (1993).

[789] *E.g.,* DOJ Mot. to Quash at 5-7, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG); *Poindexter*, 732 F. Supp. at 137-41.

[790] *See* Ronald Reagan, THE REAGAN DIARIES x (Douglas Brinkley ed., First Harper Perennial ed. 2009).

[791] *Id.* It is not clear that the Department of Justice knew, at the time of the *Poindexter* litigation, how Mr. Reagan's diaries were stored, or who had access to them.

[792] Act of Sept. 15, 1965, Pub. L. No. 89-186, 79 Stat. 791 (1965) (codified as amended at 18 U.S.C. § 3056); Former Reagan Official Tr. at 51-52 (Mr. Reagan's private residence had Secret Service protection that involved converting portions of the home into Secret Service Space. Former Reagan Official described the home as a "very tight secured 24/7 protected facility.").

White House, as he continued to receive national security briefings at his office space located a few miles from his home, and he consulted with President George H. W. Bush about foreign affairs.[793] Notably, Secret Service agents collected daily intelligence briefing materials after Mr. Reagan had finished with them and ensured that they were properly destroyed.[794]

The wider American public also knew of the existence of Mr. Reagan's diaries. Indeed, the diaries served as sources for at least three publications that Mr. Reagan or his representatives authorized: (1) *An American Life*,[795] Mr. Reagan's autobiography published in 1990; (2) *Dutch*, a biography authored by Edmund Morris and published in 1999;[796] and (3) *The Reagan Diaries*, a collection of the diaries themselves first published in 2007 after Mr. Reagan's death.[797] Notably, *An American Life* was being written during the *Poindexter* litigation[798] and includes dozens of verbatim quotations from Mr. Reagan's diaries.[799] And even as early as 1989, the classified nature of Mr. Reagan's diaries was discernable to any member of the public who read filings and opinions from the *Poindexter* litigation.[800]

---

[793] Former Reagan Official Tr. at 26-41.

[794] *Id.*

[795] Ronald Reagan, AN AMERICAN LIFE (First Threshold trade paperback ed. Jan. 2011).

[796] Edmund Morris, DUTCH (Random House 1999).

[797] Ronald Reagan, THE REAGAN DIARIES (Douglas Brinkley ed., First Harper Perennial ed. 2009).

[798] Robert Lindsey, GHOST SCRIBBLER: SEARCHING FOR REAGAN, BRANDO AND THE KING OF POP, Chapter 37 (2d ed. 2014) (explaining that ghostwriter Robert Lindsey began helping Mr. Reagan write the book after a March 1989 interview).

[799] *E.g.,* Reagan, AN AMERICAN LIFE 445-47.

[800] *E.g.,* DOJ Mot. to Quash at 5-7, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG); *Poindexter*, 732 F. Supp. at 137-41.

197

Mr. Reagan died in 2004.[801] In 2005, Nancy Reagan provided his diaries to the Reagan Library,[802] which is run by the National Archives,[803] so that the diaries could be publicly displayed as part of the collection of Mr. Reagan's personal papers.[804] At that time, the Archives worked with officials at the National Security Council to identify several pages of material that were still classified up to the Top Secret/Sensitive Compartmented Information level. Archives officials removed all pages containing classified information from the diaries so they could be publicly displayed.

Meanwhile, a historian reviewed the unclassified portions of Mr. Reagan's diaries and compiled a collection of them for publication in 2007.[805] *The Reagan Diaries* was a bestseller,[806] and a New York Times article from May 2007 remarked that "readers can get a retroactive sense of being in on some classified information."[807] Today, anyone can view online the full set of Mr. Reagan's presidential diaries,

---

[801] Press Release, The White House, *Announcing the Death of Ronald Reagan* (June 6, 2004), https://georgewbush-whitehouse.archives.gov/news/releases/2004/06/20040606-1.html.

[802] Anna Bakalis, *Library Gets First Look at 'Reagan Diaries'*, VC STAR (May 20, 2007), https://archive.vcstar.com/news/library-gets-first-look-at-reagan-diaries-ep-375630016-352887941.html.

[803] *Ronald Reagan Presidential Library & Museum: About Us*, Ronald Reagan Presidential Library & Museum, https://www.reaganlibrary.gov/about-us (last visited Feb. 2, 2024).

[804] Interview of Michael Duggan & Douglas Brinkley (Apr. 27, 2007), https://www.c-span.org/video/?198343-1/the-reagan-diaries#.

[805] Anna Bakalis, *Library Gets First Look at 'Reagan Diaries'*, VC STAR (May 20, 2007), https://archive.vcstar.com/news/library-gets-first-look-at-reagan-diaries-ep-375630016-352887941.html.

[806] *BEST SELLERS: July 29, 2007*, N.Y. TIMES (July 29, 2007), https://archive.nytimes.com/query.nytimes.com/gst/fullpage-9C05E7DD1431F93AA15754C0A9619C8B63.html.

[807] Motoko Rich, *History Made Intimate Through Reagan's Diaries*, N.Y. TIMES (May 3, 2007), https://www.nytimes.com/2007/05/03/books/03diar.html.

excluding a small number of excerpts that were redacted for personal reasons or national security concerns.[808]

There is no indication that Mr. Reagan acted with any ill intent, attempted to secret away his diaries, or hid their existence or content from appropriate authorities. Quite the opposite, he disclosed the existence of his diaries to several investigative bodies during the Iran-Contra investigations. And during the *Poindexter* litigation, Mr. Reagan's personal attorneys and the Department of Justice repeatedly asserted that the diaries were Mr. Reagan's personal property.[809] But it was apparent his diaries contained classified information. Indeed, some diary entries specifically described information recorded there as "very hush, hush" or "top secret."[810] Some entries were obviously classified at the time he wrote them; some continued to be classified until at least 2007; and some contain national security information that appears to be sensitive to this day.[811]

---

[808] *E.g., White House Diaries, Diary Entry 01/20/1988*, Ronald Reagan Presidential Foundation & Institute, https://www.reaganfoundation.org/ronald-reagan/white-house-diaries/diary-entry-01201988/ (last visited Feb. 2, 2024).

[809] Reagan Mot. to Quash at 1-2, *United States v. Poindexter*, Crim. No. 88-0080-01 (HHG).

[810] 12/1/23 National Security Council production of classified excerpts from Reagan diaries.

[811] We reviewed some of the materials that were deemed to be classified at the Top Secret/Sensitive Compartmented Information level when the National Security Council conducted prepublication review for the *Reagan Diaries*. While we did not submit those unpublished entries for a new classification review, the subject matter appears to us to be sensitive even today. 12/1/23 National Security Council production of classified excerpts from Reagan diaries. Additionally, National Archives officials seem to have inquired about the classification status of the diaries in 2022 and were told that the diaries remained classified at the Top Secret/Sensitive Compartmented Information level. NARA Employee Tr. at 61-63.

CHAPTER ELEVEN

ANALYSIS OF THE EVIDENCE – CLASSIFIED AFGHANISTAN DOCUMENTS

## I.    INTRODUCTION

There is evidence that, after his vice presidency, Mr. Biden willfully retained marked classified documents about Afghanistan and unmarked classified handwritten notes in his notebooks, both of which he stored in unsecured places in his home. He had no legal authority to do so, and his retention of these materials, and disclosure of classified information from his notebooks to his ghostwriter, risked serious damage to America's national security.

But the evidence falls short of proof beyond a reasonable doubt that Mr. Biden retained and disclosed these classified materials willfully. The Department's prior treatment of former presidents and vice presidents who kept national security materials also counsels against prosecution of Mr. Biden, as do the most relevant aggravating and mitigating facts presented here.[812] Therefore, under established Department principles, we decline criminal charges against Mr. Biden relating to the classified Afghanistan documents and his classified notebooks.[813] We would do so even if we were not bound by the Office of Legal Counsel's legal conclusion that a sitting president may not be charged with federal crimes.[814]

In reaching these conclusions, we consider two questions. First, whether the evidence proves beyond a reasonable doubt that a crime occurred; and then, if so,

---

[812] *See* U.S. Dep't of Just., Just. Manual § 9-27.320 (2023).

[813] *See id. at* §§ 9-27.001, 9-27.220, 9-27.230 (2023).

[814] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 260 (2000).

whether criminal charges are warranted. Thus, the Department's Justice Manual requires federal prosecutors to determine whether the person under investigation committed a federal offense and whether "the admissible evidence will probably be sufficient to obtain and sustain a conviction."[815] Next, the Manual directs prosecutors to evaluate relevant aggravating and mitigating facts and to determine whether criminal charges are supported by a "substantial federal interest."[816] A prosecutor should seek criminal charges only after considering each of these questions and making "a policy judgment that the fundamental interests of society *require* the application of federal criminal law to a particular set of circumstances[.]"[817]

We address the first question, the sufficiency of the evidence, for the classified Afghanistan documents immediately below, then for the classified notebooks in Chapter Twelve. We discuss the second question, whether criminal charges are otherwise warranted, for both sets of classified material in Chapter Thirteen.

## II.    THERE IS EVIDENCE THAT MR. BIDEN WILLFULLY RETAINED THE CLASSIFIED AFGHANISTAN DOCUMENTS

In a recorded conversation on February 16, 2017, at Mr. Biden's rental home in Virginia, Mr. Biden told Mark Zwonitzer that Mr. Biden had "just found all the

---

[815] U.S. Dep't of Just., Just. Manual § 9-27.220 (2023).

[816] *See id.* at § 9-27.220 (2023). In determining whether prosecution would serve a substantial federal interest, prosecutors should weigh "all relevant considerations," including: (1) federal law enforcement priorities; (2) the nature and seriousness of the offense; (3) the deterrent effect of prosecution; (4) the person's culpability; (5) the person's criminal history, or its absence; (6) the person's willingness to cooperate in the investigation or prosecution of others; (7) the person's personal circumstances; (8) the interests of any victims; and (9) the probable sentence or other consequences if the person is convicted; and (10) other relevant facts. *Id.* § 9-27.230.

[817] *Id.* § 9-27.001 (emphasis added).

classified stuff downstairs."[818] According to what Mr. Biden told Zwonitzer, "all the classified stuff" related to President Obama's 2009 decision to surge American troops to Afghanistan, and to a pivotal moment when Mr. Biden sent President Obama his handwritten Thanksgiving memo opposing the troop surge.[819] Photos of the Virginia home show that the lowest level "downstairs"—where Mr. Biden told Zwonitzer he had "just found all the classified stuff"—included rooms that Mr. Biden used as work and storage spaces.[820]

Six years later, during this criminal investigation, the FBI recovered marked classified documents relating to the debate over the 2009 Afghanistan troop surge in a box in Mr. Biden's Delaware garage.[821] The classified documents were in folders that also contained drafts of Mr. Biden's Thanksgiving memo, other source documents for that memo, and other memos establishing Mr. Biden's strong contemporaneous opposition to the surge.[822] The folders of classified Afghanistan documents appear to be files of Mr. Biden's creation, labeled in his handwriting, and containing memos and intelligence products he removed from the ordinary flow of paper he received as vice president.[823] Inside Mr. Biden's home office, agents found his "Af/Pak 1" notebook with the classified Thanksgiving memo tucked inside.[824]

---

[818] *See* Chapter Five.
[819] *See* Chapters Five and Six.
[820] *See* Chapter Five.
[821] *See* Chapter Six.
[822] *See id.*
[823] *See id.*
[824] *See id.*

In the same box in the garage where FBI agents found the classified Afghanistan documents, agents also found other documents of great personal importance to Mr. Biden, including photos of his son Beau and documents Mr. Biden filed, accessed, and used in early 2017, during the same time he told Zwonitzer he found the classified documents about Afghanistan in his Virginia home.[825] The evidence suggests that Mr. Biden maintained these files himself.

Mr. Biden had a strong motive to keep the classified Afghanistan documents. He believed President Obama's 2009 troop surge was a mistake on par with Vietnam.[826] He wanted the record to show that he was right about Afghanistan; that his critics were wrong; and that he had opposed President Obama's mistaken decision forcefully when it was made—that his judgment was sound when it mattered most.[827]

This evidence provides grounds to believe that Mr. Biden willfully retained the marked classified documents about Afghanistan. If he was not referring to those documents—later found in his garage—when he told Zwonitzer he had "just found all the classified stuff downstairs," it is not clear what else Mr. Biden could have been referring to.[828]

Nevertheless, for the reasons below, we believe this evidence is not strong enough to establish Mr. Biden's guilt beyond a reasonable doubt.

---

[825] *See* Chapters Five and Six.

[826] *See* Chapter Six.

[827] *See id.*

[828] *See* Chapters Five and Six.

### III. THE EVIDENCE FALLS SHORT OF ESTABLISHING MR. BIDEN'S WILLFUL RETENTION OF THE CLASSIFIED AFGHANISTAN DOCUMENTS BEYOND A REASONABLE DOUBT

In February 2017, when Mr. Biden told Zwonitzer he had "just found all the classified stuff downstairs," Mr. Biden was at his home in Virginia.[829] In December 2022, the FBI recovered the marked classified documents about Afghanistan in the garage of Mr. Biden's home in Delaware, nearly six years later and over one hundred miles away.[830] When the FBI recovered the documents in 2022, Mr. Biden was the sitting president, and he was authorized to have classified documents in his private home. Thus, any criminal charges would most plausibly depend on Mr. Biden's possession of the Afghanistan documents in the Virginia home in 2017, when he was not in office.

There are at least three defenses likely to create reasonable doubt as to such charges. First, Mr. Biden could have found the classified Afghanistan documents at the Virginia home in 2017 and then forgotten about them soon after. This could convince some reasonable jurors that he did not willfully retain them. Second, Mr. Biden might not have retained the classified Afghanistan documents in the Virginia home at all. They could have been stored, without his knowledge, at his Delaware home since the time he was vice president. This would rebut charges that he willfully retained the documents in Virginia. Finally, Mr. Biden could have found only some of the classified Afghanistan documents in the Virginia home in 2017—the ones in the manila "Afganastan" folder found in the garage box—and it is unclear whether

---

[829] *See* Chapter Five.

[830] *See* Chapter Six.

this folder contained national defense information. This too would rebut charges that he willfully retained national defense information, as required by the criminal statute.[831]

We discuss each potential defense in turn.

## A.    Mr. Biden may have found the classified documents in Virginia in February 2017 and then forgotten about them

It is possible that Mr. Biden encountered the classified Afghanistan documents at the Virginia home in February 2017, told Zwonitzer about them, and then, soon after, forgot about them and did not willfully retain them. While such a swift and permanent bout of forgetfulness may seem implausible, several pieces of evidence provide some support for this possibility.

If Mr. Biden discovered classified documents at the Virginia home on February 16, 2017, when he told Zwonitzer he "just found all the classified stuff downstairs," it may not have been something he found memorable. Mr. Biden, after all, had seen classified documents nearly every day for the previous eight years. As vice president, he regularly—and permissibly—kept classified documents in his home.[832] When he spoke to Zwonitzer in February 2017, Mr. Biden had left the White House less than a month earlier. After more than forty years in the highest ranks of government, he was accustomed to having staff members attend to the details of handling, storing, and retrieving classified documents.[833] For a person of his position, the presence of classified documents might not have been noteworthy, and it may have seemed

---

[831] *See* 18 U.S.C. § 793(e).

[832] *See* Chapter Three.

[833] *See id.*

natural that someone else would inevitably take care of it, because, for Mr. Biden, that is how it had nearly always worked.

In response to this defense, the government could note that several weeks before the February 2017 conversation with Zwonitzer, just after leaving the vice presidency, Mr. Biden returned different classified material he found in the Virginia home, giving a slim binder of material possibly relating to foreign leader calls to his personal aide to return to the White House.[834] One explanation is that Mr. Biden returned the binder of foreign leader calls because he did not care about it, whereas he intentionally kept the classified Afghanistan documents because he cared about them a great deal.

But another inference the evidence permits is that Mr. Biden returned the binder of classified material to the personal aide because, after leaving office, Mr. Biden did not intend to retain any marked classified documents. As Mr. Biden said in his interview with our office, if he had found marked classified documents after the vice presidency, "I would have gotten rid of them. I would have gotten them back to their source. . . . I had no purpose for them, and I think it would be inappropriate for me to keep clearly classified documents."[835] Some reasonable jurors may credit this statement and conclude that if Mr. Biden found the classified Afghanistan documents in the Virginia home, he forgot about them rather than willfully retaining them.

Mr. Biden's own words to Zwonitzer provide some support for this conclusion. In the recorded conversation when Mr. Biden told Zwonitzer he had "just found all

---

[834] *See* Chapter Seven.
[835] Biden 10/9/23 Tr. at 41.

the classified stuff downstairs," Mr. Biden's tone was remarkably casual. His sole reference to this discovery of classified documents was this brief aside. Mr. Biden did not sound surprised or concerned by the documents he referenced. While reasonable jurors could draw different conclusions from Mr. Biden's seeming nonchalance, one conclusion is that if Mr. Biden discovered classified documents, it simply was not significant to him and was something he could have quickly forgotten.

After all, the Afghanistan documents and the 2009 troop surge played no role in *Promise Me, Dad*, the book Mr. Biden wrote with Zwonitzer in early 2017.[836] There is no reason to believe Mr. Biden intended to discuss the 2009 Afghanistan troop debate in his book, which, as explained in Chapter Five, covered his experiences in 2014 and 2015. In dozens of hours of recorded conversations with Zwonitzer in 2016 and 2017, when Mr. Biden talked about a vast array of topics, the Afghanistan documents never came up again.[837] This may suggest that after February 16, 2017, the documents were simply not on Mr. Biden's mind.

Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.[838]

---

[836] *See generally* Biden, PROMISE ME, DAD; Chapter Five.

[837] *See generally* FBI Serials 315, 335.

[838] *See generally id.*

In his interview with our office, Mr. Biden's memory was worse. He did not remember when he was vice president, forgetting on the first day of the interview when his term ended ("if it was 2013 – when did I stop being Vice President?"), and forgetting on the second day of the interview when his term began ("in 2009, am I still Vice President?").[839] He did not remember, even within several years, when his son Beau died.[840] And his memory appeared hazy when describing the Afghanistan debate that was once so important to him. Among other things, he mistakenly said he "had a real difference" of opinion with General Karl Eikenberry, when, in fact, Eikenberry was an ally whom Mr. Biden cited approvingly in his Thanksgiving memo to President Obama.[841]

In a case where the government must prove that Mr. Biden knew he had possession of the classified Afghanistan documents after the vice presidency and chose to keep those documents, knowing he was violating the law, we expect that at trial, his attorneys would emphasize these limitations in his recall.

We also expect many jurors to be struck by the place where the Afghanistan documents were ultimately found in Mr. Biden's Delaware home: in a badly damaged box in the garage, near a collapsed dog crate, a dog bed, a Zappos box, an empty bucket, a broken lamp wrapped with duct tape, potting soil, and synthetic firewood.[842]

---

[839] Biden 10/8/23 Tr. at 146; 10/9/23 Tr. at 45.

[840] Biden 10/8/23 Tr. at 82-83.

[841] Biden 10/9/23 Tr. at 17; Recovered document D20.

[842] *See* Chapter Six.



*Garage box with classified Afghanistan documents as encountered by FBI (Dec. 21, 2022)*[843]

A reasonable juror could conclude that this is not where a person intentionally stores what he supposedly considers to be important classified documents, critical to his legacy. Rather, it looks more like a place a person stores classified documents he has forgotten about or is unaware of. We have considered—and investigated—the possibility that the box was intentionally placed in the garage to make it appear to be there by mistake, but the evidence does not support that conclusion.

Finally, Mr. Biden's cooperation with our investigation will likely cause some jurors to conclude that the Afghanistan documents were in his Delaware home by mistake, which is consistent with him forgetting about the documents soon after he

---

[843] *See id.*

discovered them in the Virginia home. Most significantly, Mr. Biden self-reported to the government that the Afghanistan documents were in his Delaware garage and consented to searches of his house to retrieve them and other classified materials. He also consented to searches of other locations, and later in the investigation, he participated in an interview with our office that lasted more than five hours and provided written answers to most of our additional written questions.

Many will conclude that a president who knew he was illegally storing classified documents in his home would not have allowed a search of his home to discover those documents and then answered the government's questions afterwards. While various parts of this argument are debatable, we expect the argument will carry real force for many reasonable jurors. These jurors will conclude that Mr. Biden—a powerful, sophisticated person with access to the best advice in the world— would not have handed the government classified documents from his own home on a silver platter if he had willfully retained those documents for years. Just as a person who destroys evidence and lies often proves his guilt, a person who produces evidence and cooperates will be seen by many to be innocent.

To prove that Mr. Biden willfully retained the Afghanistan documents, the government must establish that he acted "with a bad purpose either to disobey or to disregard the law."[844] Reasonable jurors could conclude that Mr. Biden discovered the

---

[844] *See* Chapter Nine; *Morison*, 844 F.2d at 1071 (emphasis omitted); *accord* Court's Instructions to the Jury at 22, *Brown*, No. 21-cr-348, ECF No. 304; Government's Proposed Jury Instructions at 24, *Sterling*, No. 1:10-cr-485, ECF No. 258; Final Jury Instructions at 19, *Ford*, No. 05-cr-235.

Afghanistan documents in his Virginia home and then forgot about them almost immediately. Such jurors would likely acquit him.

### B.    The classified documents may never have been in the Virginia home

The second potential defense argument is that Mr. Biden may not have retained the classified Afghanistan documents in the Virginia home at all. While there is evidence that he did, most notably his recorded statement with Zwonitzer in February 2017, that evidence is not conclusive.

First, as discussed in Chapter Seven, while the evidence provides clues that the classified Afghanistan documents were stored in the Virginia home, there is no definitive evidence putting them there. Beyond the Zwonitzer recording, no witness, photo, e-mail, text message, or other evidence establishes that the documents were ever stored in Virginia. When considering charges that Mr. Biden willfully retained the classified documents in the Virginia home in February 2017, this absence of additional direct evidence that the documents were in the Virginia home in February 2017 is significant.

Second, the Zwonitzer recording itself is not conclusive. When writing *Promise Me, Dad*, Zwonitzer recorded dozens of hours of conversation with Mr. Biden, and those recordings show that Mr. Biden's statements were often imprecise and his meaning was not always clear.[845] That was particularly true when Mr. Biden spoke elliptically or in asides, as he did when he briefly referenced finding "all the classified stuff downstairs." Given Mr. Biden's tendency towards loose talk with Zwonitzer—

---

[845] *See generally* FBI Serials 315, 335.

and Mr. Biden's limited precision and recall during his interview with our office, discussed above—reasonable jurors may hesitate to place too much evidentiary weight on a single eight-word utterance to Zwonitzer from almost seven years ago, in the absence of other, more direct evidence.

Third, there are alternative explanations for Mr. Biden's statement to Zwonitzer that do not involve the classified Afghanistan documents later found in the Delaware garage. For example, Mr. Biden could have been referring to the collection of handwritten notebooks he kept when he was vice president. As discussed in Chapter Four, Mr. Biden retained more than a dozen such notebooks, which contained his handwritten notes from the President's Daily Brief and White House Situation Room meetings. Some of these notes were themselves classified. One of those notebooks was his Af/Pak 1 notebook, which contained his detailed notes about the 2009 Afghanistan policy review, and a copy of the handwritten Thanksgiving memo.[846]

Mr. Biden explained in his interview with our office that he believed he gathered his notebooks in the Virginia home after moving in, which was at around the same time he met with Zwonitzer in February 2017.[847] And we know from his recorded conversations with Zwonitzer that Mr. Biden planned to, and did, refer to some of his notebooks regularly while writing his book.[848]

---

[846] *See* Chapter Six.

[847] Biden 10/9/23 Tr. at 30, 40-41.

[848] *See* Chapter Five.

Thus, some evidence suggests that when Mr. Biden told Zwonitzer he had "just found all the classified stuff downstairs," he could have been referring to his collection of notebooks, including his Af/Pak 1 notebook, which contained classified information. As explained in Chapter Twelve, we do not believe there are viable criminal charges against Mr. Biden for willfully retaining classified information in the notebooks.[849] This would make the notebook explanation a potentially successful defense.

Another possible explanation is that Mr. Biden could have been referring to the slim binder of classified documents he found at the Virginia home shortly after leaving office and gave to his personal aide to return to the White House.[850] As discussed above, this appears to have happened several weeks before Mr. Biden's recorded statement to Zwonitzer in February 2017.

This explanation seems improbable, as Mr. Biden said he "just" found the classified material, which typically suggests more recency—a matter of hours or days, rather than several weeks. And the personal aide recalled that Mr. Biden handed him a single slim binder or folder of material, which the aide believed related to calls with foreign leaders in the last week of the administration.[851] It is unlikely Mr. Biden was referring to such a small amount of material when he said he just found "*all* the classified stuff," and it would have been a non sequitur during a conversation about his decision-making on Afghanistan in 2009.[852] But our assessment that this

---

[849] *See* Chapter Twelve for an analysis of the evidence pertaining to the classified notebooks.

[850] *See* Chapter Seven.

[851] Personal Aide 3 3/28/23 Tr. at 197-212.

[852] *See* Chapter Five.

explanation seems unlikely does not make it unreasonable, and reasonable jurors could conclude that Mr. Biden's statement to Zwonitzer referred to classified information Mr. Biden had already found and returned.

Mr. Biden could also point to the possibility that the classified Afghanistan documents were never in Virginia but were stored elsewhere without his knowledge: for example, tucked away in his Delaware home since the time he was vice president. We cannot rule out that possibility. As discussed in Chapter Seven, if the documents were somewhere in the Delaware home for many years, someone must have moved them to the garage box after the move from the Virginia home to the Delaware home in July 2019, because that is likely when the garage box arrived in Delaware. But it is possible Mr. Biden or others moved the Afghanistan documents to the garage box without carefully reviewing the files or realizing they contained marked classified documents. As explained in Chapters Fourteen, Fifteen, and Sixteen, our investigation has revealed several other instances of Mr. Biden and others making similar filing mistakes.

Unlike most defendants in classified mishandling cases, Mr. Biden was allowed to have classified documents in his home for eight years as vice president. He also had layers of staff who were responsible for assembling, carrying, storing, and retrieving the types of classified briefing materials found among the Afghanistan documents.[853] Even if Mr. Biden intended to keep the Afghanistan documents for some time while he was vice president—to help him write the 2009 Thanksgiving

_____

[853] *See* Chapter Three.

memo, for example, or as reference material for the Afghanistan policy debates to come in the later years of the Obama administration—it remains possible that Mr. Biden lost track of the documents in the nearly eight years that followed, and that he did not know he still had them after leaving office.

Mr. Biden's house was also filled with paperwork and other materials from almost five decades in government service. He kept boxes of files from nearly every political campaign he ran between 1972 and 2012; files documenting his more than thirty years in the Senate; files from his eight years as vice president; and files relating to his family, his house, his car, and his pets.[854] It is possible the Afghanistan documents, which were in ordinary folders that were not packaged or marked as containing classified information, were needles in the haystack of Mr. Biden's papers.

While it is natural to assume that Mr. Biden put the Afghanistan documents in the box on purpose and that he knew they were there, there is in fact a shortage of evidence on these points. We do not know why, how, or by whom the documents were placed in the box. We do not know whether or when Mr. Biden carefully reviewed the box's contents. We do not know why only some of Mr. Biden's classified Afghanistan memos to President Obama from the fall of 2009 were found in the box, but several other memos he wrote during that time were not.[855] And we do not know why Mr. Biden would have wanted to keep some of the other marked classified documents in

---

[854] *See generally* FBI Serial 512, 1A614, FBI Serial 77, 1A86.

[855] During the fall 2009 Afghanistan review, Mr. Biden wrote President Obama multiple additional classified memos opposing the troop surge. None of these memos were in the garage box with the other classified Afghanistan documents, and none of the memos were recovered during this investigation, though we obtained copies of the memos from the current White House. *See* Classified memos on file with Special Counsel's Office.

215

the box—in particular, a classified document relating to President Obama's second-term foreign policy goals, which was kept in a folder right next to the Afghanistan documents, and which served no particular purpose of Mr. Biden's of which we are aware.[856]

The location of the box containing Afghanistan documents in a seemingly random place in the Delaware garage, and Mr. Biden's cooperation with our investigation—both discussed above—could provide additional reasons for jurors to conclude that the Afghanistan documents were stored in the Delaware home without Mr. Biden's knowledge, and were not in Virginia in 2017.

C.    Mr. Biden may not have found the "Facts First" folder containing national defense information

A reasonable juror could also conclude that, even if Mr. Biden found classified documents about Afghanistan in his Virginia home in February 2017, and even if he remembered he had them after that day, and even if they were the same documents found in his garage six years later and one hundred miles away in Delaware, there is a shortage of evidence that he found *both* the "Afganastan" folder and the "Facts First" folder. This is important because even though the "Afganastan" folder contained documents that were marked classified in 2009, there are serious questions about whether those particular documents remain sensitive today, or when Mr. Biden met with Zwonitzer in 2017. Thus, the "Afganastan" folder alone is not a strong basis upon which to prosecute Mr. Biden for willfully retaining national defense information. And if Mr. Biden saw only the "Afganastan" folder and not the "Facts

---

[856] FBI Serial 512, 1A614; B4, B5.

216

First" folder, which did contain national defense information, he did not willfully retain such national defense information.

This "only one folder" defense is not very strong, but it does find some support in the evidence. Mr. Biden spoke of finding "all the classified stuff downstairs" in the context of telling Zwonitzer about the 2009 handwritten Thanksgiving memo.[857] And the folder most closely associated with that memo is the "Afganastan" folder, which held the raw materials that we know Mr. Biden must have relied on when writing the Thanksgiving memo. The "Afganastan" folder contained previous handwritten and typewritten drafts of the Thanksgiving memo, some of which were incorporated nearly word-for-word into the final document.[858] The folder also held a November 2009 memo from Mr. Biden's communications director, and Mr. Biden incorporated portions of this memo, again nearly word-for-word, into the final Thanksgiving memo.[859] Thus, the evidence establishes that Mr. Biden used the documents in the "Afganastan" folder to write the 2009 Thanksgiving memo to President Obama.

Mr. Biden probably also used the documents in the "Facts First" folder when writing the Thanksgiving memo, but the connection between that folder and the memo is not as strong. The "Facts First" folder contains numerous documents relevant to the memo, but none of them are documents Mr. Biden *must* have used. And most of the materials in the "Facts First" folder were from September 2009, two months before Mr. Biden wrote the Thanksgiving memo.[860]

---

[857] *See* Chapter Five.

[858] *See* Chapter Six.

[859] 11/27/09 e-mail from Blinken to Klain, SCOH-000230.

[860] FBI Serials 35 1A42, 512 1A614, 683 1A772; Recovered documents B6-B24.

Based on this difference between the two folders, some reasonable jurors may conclude that when Mr. Biden told Zwonitzer he "just found all the classified stuff downstairs," he may have been referring only to the "Afganastan" folder, which reminded him of his Thanksgiving memo. The "Afganastan" folder contained roughly a dozen marked classified documents, which could correspond to Mr. Biden's reference to "all the classified stuff" he found. And if Mr. Biden found the "Afganastan" folder, it is possible he did not continue looking through the contents of the separate "Facts First" folder, whose cover had no label or other indication that the materials inside related to Afghanistan.

None of these possibilities are particularly plausible. There is no reason to think, for example, that after identifying the contents of the "Afganastan" folder, Mr. Biden stopped looking through folders that were nearby, including the "Facts First" folder, *and* that he never returned to these materials.

But reasonable jurors who are unwilling to read too much into Mr. Biden's brief aside to Zwonitzer—"I just found all the classified stuff downstairs"—may find a shortage of evidence to establish that Mr. Biden looked through the "Facts First" folder, which is the only folder known to contain national defense information. These jurors would acquit Mr. Biden of willfully retaining national defense information from the "Facts First" folder.

### D.    For other reasons, a jury will be unlikely to unanimously convict Mr. Biden

Several additional facts would make it difficult for the government to present a case that reasonable jurors would unanimously find compelling.

218

First, the Afghanistan documents are now almost fifteen years old. While there is evidence that some contain national defense information, in general, they concern a conflict that is now over, in a country where there are no longer any American troops, about a subject (the 2009 troop surge) that has already been widely discussed in books and media reports. At a trial, we expect the defense would strongly challenge whether the documents still contain sensitive national defense information.

Second, Mr. Biden was allowed to have the Afghanistan documents in his home for eight years as vice president. And when the documents were discovered in his home in December 2022, he was again allowed to have them there as president. To prevail, the government must convince a jury to convict him for having the documents in his home in between, in February 2017, about a month after he left the White House. Because of the possibility that, even if Mr. Biden discovered the Afghanistan documents, he might have forgotten about them soon after, any criminal charges would likely be limited to the days or perhaps weeks surrounding his conversation with Zwonitzer in February 2017. It may be difficult to convince a jury they should care about Mr. Biden's brief illicit possession of documents from 2009, particularly since he was allowed to possess the same documents both before February 2017 (as vice president) and after (as president).

Third, as discussed to some extent above, Mr. Biden will likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory. While he is and must be accountable for his actions—he is, after all, the President of the United States—based on our direct

observations of him, Mr. Biden is someone for whom many jurors will want to search for reasonable doubt. It would be difficult to convince a jury they should convict him— by then a former president who will be at least well into his eighties—of a serious felony that requires a mental state of willfulness.

Finally, while jurors might not find reasonable doubt in any one of the evidentiary shortcomings identified above, some jurors may find reasonable doubt because of the cumulative effect of some or all of these shortcomings.

### E.    There is also insufficient evidence that Mr. Biden willfully retained the handwritten Thanksgiving memo

As explained in Chapter Six, inside the office of Mr. Biden's Delaware home, agents found his Af/Pak 1 notebook, which contained his handwritten notes about the 2009 Afghanistan troop reviews. In the front of the notebook, binder-clipped together, were the pages of the handwritten 2009 Thanksgiving memo in which Mr. Biden made his final argument to President Obama opposing the Afghanistan troop surge. The Thanksgiving memo discussed a November 2009 State Department cable, and the cable itself, which is marked as Confidential, is clipped to the memo.[861] In Mr. Biden's interview with our office, he said he "guess[ed]" he "wanted to hang onto [the Thanksgiving memo] for posterity's sake" because "this was my position on Afghanistan."[862] The handwritten memo, though unmarked, contains information that remains classified up to the Secret level.[863] The State Department cable shows a

[861] FBI Serials 77 1A86, 682, 683 1A772; Evidence item 1B66; Recovered document D20.

[862] Biden 10/9/23 Tr. at 21.

[863] FBI Serial 676.

declassification date of November 2019, but the State Department has been unable to tell us if it has been formally declassified.[864]

Though the handwritten Thanksgiving memo has been determined to be currently classified, we cannot prove that Mr. Biden believed it was classified after leaving office in 2017. The memo was derived from at least one document that was marked as classified in 2009, but during his interview with our office, Mr. Biden said he did not consider the memo classified when he discussed it with his ghostwriter, Zwonitzer, in 2017.[865] The memo concerned deliberations from more than seven years earlier about the Afghanistan troop surge, and in the intervening years those deliberations had been widely discussed in public, so Mr. Biden could have reasonably expected that the memo's contents became less sensitive over time. Because we cannot prove that he knew the memo was classified when he left office, we cannot prove that by retaining the memo, he willfully retained national defense information.

As for the State Department cable, it does not appear to contain national defense information today, and there is no reason to believe it did in 2017. Therefore, the cable cannot be the subject of a willful retention charge under Section 793(e). In addition, Mr. Biden told us in his interview that he does not recognize the marking "Confidential" as a classification marking. To him, the marking means the document should be held in confidence, but not necessarily that it is classified.[866] Although "Confidential" is, in fact, a category of classified information enumerated in the

---

[864] *Id.*

[865] *See* Chapter Six; Biden 10/9/23 Tr. at 31-33, 38 (explaining that the memo "wasn't a Top Secret thing," and was "not confidential in the classification sense").

[866] Biden 10/9/23 Tr. at 24-25.

222

governing executive order, we would likely be unable to refute Mr. Biden's claim that he did not know this.

* * *

We conclude that the evidence is insufficient to meet the government's burden. In accordance with the Justice Manual, because we do not believe the government is likely to obtain a conviction at trial, we decline prosecution.

CHAPTER TWELVE

ANALYSIS OF THE EVIDENCE – CLASSIFIED NOTEBOOKS

There is evidence that when Mr. Biden left office in 2017, he willfully retained his classified notebooks—that is, he knew he kept classified information in notebooks stored in his house and he knew he was not allowed to do so. There is also evidence that Mr. Biden willfully disclosed classified information in his notebooks to his ghostwriter by reading it aloud to him. We conclude that this evidence does not establish Mr. Biden's guilt beyond a reasonable doubt. We therefore decline prosecution of Mr. Biden based on his retention of his notebooks and disclosure of information in them.

## I. WILLFUL INTENT

### A. There is evidence that Mr. Biden retained the classified notebooks, knowing he was not allowed to do so

As with the classified Afghanistan documents, there is evidence that Mr. Biden kept his notebooks after his vice presidency knowing they were classified and he was not allowed to have them.

The evidence shows convincingly that Mr. Biden knew the notebooks, as a whole, contained classified information. For eight years, he wrote in his notebooks about classified information during classified meetings in the White House Situation Room and elsewhere.[867] He was familiar with the notebooks' contents, which included obviously classified information. When reviewing the notebooks with Zwonitzer, Mr. Biden sometimes read aloud classified notes verbatim, but he also sometimes

---

[867] See Chapter Four.

223

appeared to skip over classified information, and he warned Zwonitzer that the material in the notebooks could be classified.[868] Mr. Biden also stored the notebooks in a classified safe in the White House for a time as vice president because the notebooks were classified.[869]

In Mr. Biden's written answers to questions from our office, he called into question whether he knew the information in his notebooks was classified. In those answers, Mr. Biden explained that when he described material in his notebooks to Zwonitzer as "classified" he did not actually mean "classified." According to Mr. Biden, "I may have used the word 'classified' with Mr. Zwonitzer in a generic sense, to refer not to the formal classification of national security information, but to sensitive or private topics to ensure that Mr. Zwonitzer would not write about them."[870] Mr. Biden qualified this answer by explaining, "I do not recall the specific conversations you reference with Mr. Zwonitzer, which took place more than six years ago."[871]

This explanation—that "classified" does not mean "classified"—is not credible. At the time Mr. Biden met with Zwonitzer, Mr. Biden had nearly fifty years of experience dealing with classified information, including as a member of the Senate Select Committee on Intelligence, a member and Chairman of the Senate Committee on the Judiciary, a member and Chairman of the Senate Committee on Foreign

---

[868] Zwonitzer recordings 170424_0091, Carved_000556, Carved_000571.

[869] *See* Chapter Four.

[870] Biden 10/1/23 written responses at 1. Mr. Biden said something similar during our in-person interview of him. Biden 10/9/23 Tr. at 32-33.

[871] Biden 10/1/23 written responses at 1.

224

Relations, and Vice President of the United States.[872] It is not plausible that a person of his knowledge and experience used the term "classified" in this context as a euphemism for "private."

Mr. Biden's explanation is even less credible in light of his actual words to Zwonitzer. As described below, among the times Mr. Biden spoke to Zwonitzer about classified information was when Mr. Biden handed Zwonitzer a notebook entry about a National Security Council meeting in the Situation Room and asked if Zwonitzer could read Mr. Biden's handwriting.[873] Mr. Biden warned Zwonitzer, "Some of this may be classified, so be careful," and added, "I'm not sure. It isn't marked classified, but . . . ."[874]

This is not a reference to merely private material. In this context, when a former official of Mr. Biden's stature and experience warns someone without a security clearance to "be careful" because some information "may be classified," and then refers to "marked classified" material, the former official is talking about classified national security information.[875] The evidence shows that Mr. Biden knew his notebooks contained such information.

There is also evidence that Mr. Biden knew he could not keep classified handwritten notes unsecured at home after his time as vice president.

---

[872] NARA_SCAN_00000904; Biden, Joseph Robinette (Joe), Jr., Biographical Directory of the United States Congress, https://bioguideretro.congress.gov/Home/MemberDetails?memIndex=b000444 (last visited Jan. 30, 2024).
[873] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Evidence item 1B80.
[874] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Evidence item 1B80.
[875] Zwonitzer recording 170424_0091; 170424_0091 Tr. at 13-14; Evidence item 1B80.

### 1.    Mr. Biden knew the purpose of classified handling rules: to prevent unauthorized disclosure of our nation's secrets

The basic principles of the system that protects classified information should be clear to anyone who understands why it is necessary to protect such material in the first place. Information is classified only if its unauthorized disclosure "reasonably could be expected to cause ... damage to the national security."[876] To prevent such disclosure, people who access classified information must store it in authorized, secure places.[877] And if classified information is disclosed, for example to a foreign adversary, it can damage national security whether it is typewritten or handwritten.[878]

These principles are familiar, even obvious, to anyone with experience handling classified information. And they have long been enshrined in the legal and policy regime used to safeguard our nation's secrets. That regime requires classified information to be safeguarded properly whether it is written by hand or typed on a keyboard.[879]

As noted above, when Mr. Biden left office in 2017, he had nearly fifty years of experience with classified information, including eight years in the second-highest position in the Executive Branch. He was deeply familiar with the measures taken to

---

[876] Executive Order 13526 § 1.2.

[877] *Id.* § 4.1(g); 32 C.F.R. §§ 2001.43(b)(1) and (2), 2001.53 (2024); Office of the Director of National Intelligence, Intelligence Community Directive 705 (2010).

[878] Under Executive Order 13526, information is classified only if "its unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security," § 1.4, and "information" refers to "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics." § 6.1(t).

[879] *See id.* §§ 2.1, 6.1(i), 6.1(o), 6.1(p), 6.1(t).

safeguard classified information and the reasons for them. As Ron Klain, one of Mr. Biden's closest aides, explained, Mr. Biden "had traveled the world. He knew the risks that men and women were taking to gather this information and . . . felt a great deal of responsibility about it."[880] And John McGrail, Mr. Biden's top lawyer at the end of the Obama administration, said he would be "surprise[d]" if Mr. Biden intentionally took classified materials home because he well knew, from extensive government experience, that disclosure "can harm sources and methods and the national security interests of the United States."[881]

### 2.   Mr. Biden's public statements show he knew the restrictions on handling classified information after leaving office

Mr. Biden's public statements show he knew classified information must be safeguarded to protect intelligence sources and methods. As Mr. Biden has put it, "People know I take classified documents and classified information seriously."[882] In a September 2022 interview with CBS, Mr. Biden said the following in response to a question about the marked classified documents allegedly found in Mr. Trump's private home:

Reporter:   When you saw the photograph of the top secret documents laid out on the floor at Mar-a-Lago, what did you think to yourself? Looking at that image.

Mr. Biden:   How that could possibly happen. How one—anyone could be that irresponsible. And I thought, what data was in

---

[880] Klain Tr. at 52-53.

[881] McGrail 1/22/24 Tr. at 100-01, 111.

[882] Carol E. Lee, Ken Dilanian, Kristen Welker, and Zoë Richards, *Biden says he was "surprised" to learn government docs were found at his former office,* NBC NEWS (Jan. 10, 2023), https://www.nbcnews.com/politics/white-house/less-dozen-classified-documents-found-biden-office-sources-say-rcna65179 (last visited Feb. 2, 2024).

> there that **may compromise sources and methods?** By
> that I mean names of people who helped or th-- et cetera.
> And it just-- **totally irresponsible**.[883]

Mr. Biden's emphatic and unqualified conclusion that keeping marked classified documents unsecured in one's home is "totally irresponsible" because it "may compromise sources and methods" applies equally to his own decision to keep his notebooks at home in unlocked and unauthorized containers. The notebooks, like the marked documents, contained classified information, the unauthorized disclosure of which could compromise intelligence sources and methods and damage national security.[884] And Mr. Biden's public statements, during his vice presidency and after, demonstrate that he understands "classified information," not merely marked classified documents, is what must be protected.[885] These statements undercut his purported belief that he could lawfully retain the classified information in his notebooks.

---

[883] *President Joe Biden: The 2022 60 Minutes Interview*, CBS NEWS, at 12:09 (Sept. 12, 2022), https://www.youtube.com/watch?v=u1UC89H4Swc (last visited Feb. 2, 2024) (emphasis added).

[884] *See* Chapter Four.

[885] Carol E. Lee, Ken Dilanian, Kristen Welker, and Zoë Richards, *Biden says he was "surprised" to learn government docs were found at his former office,* NBC NEWS (Jan. 10, 2023), https://www.nbcnews.com/politics/white-house/less-dozen-classified-documents-found-biden-office-sources-say-rcna65179 (last visited Jan. 30, 2024); *Transcript And Audio: Vice Presidential Debate*, NPR NEWS (Oct. 11, 2012), https://www.npr.org/2012/10/11/16275 4053/transcript-biden-ryan-vice-presidential-debate (last visited Jan. 30, 2024) (during a vice presidential debate in October 2012, Mr. Biden asserted that he had to be careful about safeguarding classified information when he said, "with regard to the ability of the United States to take action militarily, it is — it is not in my purview to talk about classified information").

228

Mr. Biden has also publicly acknowledged limits on how he may properly handle classified information in his home, even as a sitting president. In August 2022, he told reporters:

Reporter:    Mr. President, in simple terms, is it ever appropriate for a President to take home with them classified and top secret documents?

Mr. Biden:   Depending on the circumstance. For example, I have in my home, a cabined-off space that is completely secure. I'm taking home with me today's PDB. It's locked. I have a person with me—military with me. I read it, I lock it back up, and give it to the military.

Reporter:    Without a specialized area in which you can declassify documents, is it ever appropriate for a president to bring classified and top secret documents home with them?

Mr. Biden:   It depends on the document, and it depends on how secure the room is.[886]

If Mr. Biden thought in 2022 that he was obligated to keep the PDB—the President's Daily Brief—secured in his home as a sitting president, he should have known in 2017 that as a former vice president and a private citizen he was not permitted to keep handwritten notes about the President's Daily Brief and other classified information in unlocked drawers in his home.

---

[886] Remarks by President Biden Before Marine One Departure, The White House (Aug. 26, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/08/26/remarks-by-president-biden-before-marine-one-departure-18/ (last visited Jan. 30, 2024).

### 3.    As vice president, Mr. Biden received advice from staff about the need to secure classified notes properly

Mr. Biden received advice from his staff about the need to secure classified information in the form of notes. In 2011, his first Counsel to the Vice President, Cynthia Hogan, advised him in writing that classified notes generated in the context of discussions with a historian "must be maintained in secure safes" and "stored in a secure facility."[887] And as vice president, Mr. Biden stored his classified notebooks in a safe, at least for a time, in contrast with his decision after leaving office to keep the notebooks at home in unlocked and unauthorized drawers.[888]

### 4.    After his vice presidency, Mr. Biden stored his classified notecards in a SCIF, but kept his classified notebooks in unlocked drawers at home

When Mr. Biden left office, he knew his staff decided to keep his classified *notecards* in a SCIF at the National Archives, and he knew his *notebooks* contained the same type of classified information. As he told his ghostwriter during a recorded interview in October 2016, the same staff who eventually arranged for careful storage of his classified notecards in an Archives SCIF "didn't even know" he also had possession of his notebooks, which he simply took home without informing his staff.[889]

After his vice presidency, Mr. Biden was reminded twice more that his classified notes should be secured in a SCIF: on each of the two days in 2017 when he visited the Archives SCIF to review his notecards in writing his book.[890] The form he

---

[887] 4/28/11 e-mail from Hogan to OVP staff, 1B001_02881349; 4/27/11 Briefing Memo from Hogan, 1B001_02881350.

[888] *See* Chapter Four.

[889] *See id.*

[890] *See id.*

was required to sign at the Archives made clear he was accessing classified information that could not leave the SCIF, and that he had an ongoing obligation to protect this information.[891] And at the end of his first visit, Archives staff asked to see the notes he had taken during his review of the notecards, to ensure he was not removing and mishandling classified information.[892] It should have been clear to Mr. Biden that not only were his classified notecards required to be in a SCIF, he also could not take classified notes about those notecards home with him—and, by extension, he could not keep any classified notes at home at all.

5. **Mr. Biden had strong motivations to ignore proper procedures for safeguarding his classified notebooks**

Finally, Mr. Biden had strong motivations to ignore the proper procedures for safeguarding the classified information in his notebooks. He decided months before leaving office to write a book and began meeting with his ghostwriter while still vice president.[893] After his vice presidency, the notebooks continued to be an invaluable resource that he consulted liberally.[894] During hours of recorded interviews in which he read aloud from his notebooks in his private home, Mr. Biden provided raw material to his ghostwriter detailing meetings and events that would be of interest to prospective readers and buyers of his book.[895] He also likely viewed the notebooks, like the marked classified documents related to Afghanistan recovered from his garage, as an irreplaceable contemporaneous record of some of the most important

---

[891] *See id.*

[892] *See id.*; NARA Archivist 1 Tr. at 56-59, 77-78, 81-82, 93-94, 122-23.

[893] *See* Chapter Five.

[894] *See* Chapter Four.

[895] *See id.*

moments of his vice presidency. This record was valuable to him for many reasons, including to help defend his record and buttress his legacy as a world leader.

**B.    The evidence does not prove beyond a reasonable doubt that Mr. Biden willfully retained the notebooks**

We do not believe this evidence would meet the government's burden at trial to prove Mr. Biden knew his handling of the notebooks broke the law. We expect Mr. Biden's defense would be that he thought his notebooks were his personal property and that he was allowed to take them home after his vice presidency, even if they contained classified information. Enough evidence supports this defense to establish reasonable doubt.

First, we expect Mr. Biden to offer direct evidence that he believed he was entitled to take the notebooks home. During his interview with the Special Counsel's Office, Mr. Biden was emphatic, declaring that his notebooks are "my property," and that "every president before me has done the exact same thing," that is, kept handwritten materials after his term in office, even if they contain classified material.[896] He also specifically cited the diaries President Reagan kept while in office, noting that they included classified information.[897] Mr. Biden repeated this theme in his written answers to our questions, writing that, "[l]ike presidents and vice presidents before me, I understand these notes to be my personal property."[898]

At trial, we expect Mr. Biden to offer similar evidence of his subjective understanding. Such evidence would be admissible as to the element of willfulness,

---

[896] Biden 10/9/23 Tr. at 41-43; Biden 10/8/23 Tr. at 111-12.
[897] Biden 10/8/23 Tr. at 111-12.
[898] Biden 12/1/23 written responses at 1.

which requires proof that Mr. Biden acted with intent to do something the law forbids.[899] And we expect the evidence of Mr. Biden's state of mind to be compelling—clear, forceful testimony that he did, in fact, believe he was allowed to have the notebooks. While the government could question this testimony's veracity as a convenient answer perhaps suggested by his attorneys after the discovery of his classified notebooks, such a suggestion lacks evidentiary support and Mr. Biden's testimony will likely carry significant weight with many jurors.

The government could also question the veracity of Mr. Biden's testimony by introducing evidence that he appears to have come to and acted on the belief that he could take home classified notes entirely on his own, without the advice or knowledge of any of his staff, including the Counsel to the Vice President, John McGrail.[900] Based on the evidence we found, Mr. Biden appears to have consulted no one on this significant question. None of the witnesses we interviewed recalled Mr. Biden mentioning that he intended to take his classified notebooks home or that he believed he was permitted to do so, even during conversations in which McGrail told Mr. Biden that *all* of Mr. Biden's records—including all his notes—would be sent to the National

---

[899] A broad array of defense evidence is admissible at criminal trials for willfulness crimes that would not be admissible for crimes that require a less culpable mental state. *United States v. Lankford*, 955 F.2d 1545, 1550 (11th Cir. 1992) (when willfulness is at issue, a defendant is entitled to "wide latitude in the introduction of evidence tending to show lack of intent") (quoting *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979) (en banc)); *see also Cheek v. United States*, 498 U.S. 192, 203 (1991) (reversible error to instruct the jury to disregard evidence of defendant's belief that he was not required to pay taxes "as incredible as such misunderstandings of and beliefs about the law might be"). Indeed, the Supreme Court has admonished, in the context of a tax crime requiring proof of willfulness, "forbidding the jury to consider evidence that might negate willfulness would raise a serious question under the Sixth Amendment's jury trial provision." *Cheek*, 498 U.S. at 203.

[900] McGrail 1/22/24 Tr. at 84-87, 97-119.

Archives.[901] When interviewed, McGrail recalled that Mr. Biden "understood why his documents were going to [the National Archives.] . . . He understood it and accepted it."[902] McGrail also told us the following:

- Mr. Biden never told McGrail that he was retaining any notes he took while vice president.[903] McGrail said Mr. Biden understood the approach of sending all his records to the National Archives so that archivists could separate presidential records from the rest.[904]

- Mr. Biden never told McGrail that he was retaining any classified notes.[905] McGrail said he would have expected that to be part of the conversation he had with Mr. Biden about the handling of his notes.[906]

- McGrail never advised Mr. Biden that he could bring home classified material of any kind.[907] Indeed, McGrail said he would be surprised to learn that Mr. Biden took classified materials home—even personal notes— knowing they were classified because (1) that would have been "inconsistent with everything that we were killing ourselves trying to accomplish,"[908] (2) he knows his home is not a SCIF,[909] and (3) as former chairman of the Senate Foreign Relations Committee, Mr. Biden knew that classified information cannot be stored outside a secure facility because its disclosure can harm national security and compromise intelligence sources and methods.[910]

- McGrail never spoke to Mr. Biden or anyone else about the Reagan diaries, or historical practices of presidents taking home classified diaries or other materials.[911]

---

[901] *See* Chapter Four.
[902] McGrail 1/22/24 Tr. at 115.
[903] *Id.* at 84, 117.
[904] *Id.* at 86-87, 115.
[905] *Id.* at 98-99.
[906] *Id.* at 117.
[907] *Id.* at 107, 111-12.
[908] *Id.* at 112.
[909] *Id.* at 101.
[910] *Id.* at 100-01, 111.
[911] *Id.* at 73-74, 119.

All that said, we expect Mr. Biden's defense at trial to remain fairly simple. According to McGrail, the only thing he recalls telling Mr. Biden about the disposition of his records was that all his records would go to the National Archives after the administration to separate personal from presidential records.[912] McGrail says he never spoke to Mr. Biden about classified notes or how they should be stored.[913]

From this, Mr. Biden will likely claim that McGrail outlined a cautious arrangement—not a legal requirement—to treat all his records as presidential records until the Archives could sort out what was personal. But, Mr. Biden will likely say, he never believed his notebooks, which he thought of as his personal diaries, fell within that arrangement. He treated the notebooks markedly differently from the rest of his notes and other presidential records throughout his vice presidency, for example, allowing staff to store and review his notecards, but not his notebooks.[914] This treatment, he will argue, and the extremely personal content of some of the notebooks, shows that he considered them to be his personal property. Mr. Biden's notebooks included gut-wrenching passages about his son's death and other highly personal material.[915] His claim that he believed he did not need to send what he considered to be his personal diary to be stored at a government facility will likely appeal to some jurors.[916]

---

[912] *See* Chapter Four.

[913] *See id.*

[914] *See id.*

[915] *E.g.*, Notebook entries 1B57-0051, 54.

[916] The government could respond that many of the notebooks are unlike diaries because they contain work notes, including minutes of meetings of the National Security Council and other classified briefings. *See* Chapter Four. These notebooks do not meet the

We expect Mr. Biden also to contend that the presence of classified information in what he viewed as his diary did not change his thinking. As a member of the exclusive club of former presidents and vice presidents, Mr. Biden will claim that he knew such officials kept diaries, and he knew or expected that those diaries—like Mr. Reagan's—contained classified information.[917] He also understood that former presidents and vice presidents took their diaries home upon leaving office, without being investigated or prosecuted for it. Thus, whatever McGrail now thinks of the matter, Mr. Biden will claim that it did not occur to him to store what he thought of as his personal diaries—which he held close for eight years—at the National Archives, and he certainly did not know that by failing to do so he committed a crime.

Contemporaneous evidence from immediately after the vice presidency supports this defense. In a recorded conversation with Zwonitzer on April 26, 2017, three months after leaving office, Mr. Biden said the following:

| | |
|---|---|
| Mr. Biden: | I'm told by [a personal aide], I guess he checked with you, in order for me to get my, uh, get all those presidential notes I had for lunch, the luncheon meetings, I have to go to McGrail? |
| Assistant: | Yes, McGrail has them. We were supposed to turn it in and that is the last person who had them. |

definition of "personal records" under the Presidential Records Act because they "relate to or have an effect upon the carrying out of" the duties of the vice president, and they are not "of a purely private or nonpublic character." 44 U.S.C. § 2201(3). But Mr. Biden will likely present a compelling case that he viewed the notebooks as his personal diaries or the rough equivalent. Indeed, in a recorded conversation with Zwonitzer, while reviewing a notebook entry about a national security meeting, Mr. Biden twice referred to the passage as a "diary entry." Carved_000556. And, as discussed extensively in Chapter Ten, Mr. Reagan's diaries contained several instances of classified information, the Department of Justice described them as his "personal records," and Mr. Reagan brought them home after his presidency without repercussion.

[917] *See* Chapter Ten.

| Mr. Biden: | OK. Uh. See if you can get me McGrail on the line while I have you now. OK? And stay on okay? |
|---|---|
| Assistant: | Got it sir. Hold on. |
| Zwonitzer: | **This is probably something that goes to the presidential papers.** |
| Mr. Biden: | **I don't think so. It was in between. I didn't want to turn them in.** |
| Zwonitzer: | **Right so, it's the gray area.**[918] |

This exchange concerned Mr. Biden's handwritten notecards, which, like his notebooks, addressed both personal and official matters, and which also contained classified information.[919] The evidence suggests, as explained above, that McGrail decided the classified notecards should be stored at the National Archives after the administration, with Mr. Biden telling Zwonitzer he did not want to do so.[920] But when Zwonitzer suggested that the notecards might be "presidential papers"—that is, presidential records that are required by law to be stored at the National Archives—Mr. Biden disagreed. Mr. Biden explained that he did not think he was required to turn in the notecards and that he had not wanted to do so.

One interpretation of this exchange that the evidence permits is that, while Mr. Biden followed McGrail's advice to store the classified notecards in a SCIF at the Archives, he did not believe he was required to, and he thought that, at most, the notecards fell into an "in between" or "gray area." Indeed, when interviewed, McGrail

---

[918] Zwonitzer recording Carved_000599 (emphasis added); Carved_000599 Tr. at 3-4; FBI Serials 315, 335.

[919] *See* Chapter Four.

[920] *See id.*

237

recalled that he advised Mr. Biden to turn over all his records, "whether personal or not," to the National Archives.[921] McGrail's advice was premised on a desire to avoid taking a constrained view of the Presidential Records Act's requirements, as McGrail believed former vice president Dick Cheney had, and the understanding that archivists would review Mr. Biden's notes and separate presidential records from the rest.[922] McGrail also said he believed that the notes were to be stored in a SCIF at the Archives due to their general sensitivity, not because they were classified.[923]

At trial, Mr. Biden would argue that the 2017 Zwonitzer recording is the best evidence of what he believed after the vice presidency, and it shows he did not believe he was legally required to store his notecards at the Archives, and that he thought the same about his notebooks. In this way, the Zwonitzer recording dovetails with Mr. Biden's expected defense at trial that the Presidential Records Act defined his notebooks as his personal property, and that the Act authorized him to keep these

---

[921] McGrail 1/22/24 Tr. at 83.

[922] *Id.* at 83.

[923] *Id.* at 114. McGrail's recollection on this point is inconsistent with e-mails and other documents that suggest he knew the notecards contained classified information in late 2016 and early 2017. 10/7/16 e-mails between Ratner, Associate Counsel, McGrail, and others, NARAWH-00017698, NARAWH-00017743, NARAWH-00019307; 10/18/16 e-mails between Associate Counsel, McGrail, and others, NARAWH-00017820; 10/20/16 e-mail from Ratner to Ricchetti, McGrail, Kahl et al., 1B001_03798594; 11/14/16 e-mail from McGrail, SCOH-000340; 1/05/17 e-mail from Associate Counsel to McGrail, SCOH-000339; 1/5/17 and 1/6/17 e-mails between Associate Counsel, McGrail, and NARA Archivist 1, SCOH-000326, SCOH-000330, SCOH-000332, SCOH-000334; 1/6/17 Handwritten Note re: VP diary/notecards. It is also at odds with the recollection of the NARA archivist that McGrail told him the notecards contained classified information, NARA Archivist 1 Tr. at 56, 62, and the understanding of the associate counsel who helped McGrail arrange for the notecards to be stored at the Archives. In an interview with our office, she said that "it was the safest decision to have [the notecards] be in a SCIF *since there w[ere] likely classified documents.*" Associate Counsel 8/29/23 Tr. at 9-10, 76 (emphasis added). McGrail's memory of these events could well have faded over the course of more than six years.

238

notebooks in his home, even if they contained classified information. That Mr. Biden was mistaken in his legal judgment is not enough to prove he acted willfully, which requires intent to do something the law forbids.[924]

The defense will buttress these claims by contending that other credible authorities, including at least one former president and the Department of Justice, also have concluded that a former president may keep handwritten notes even if they contain classified information. As discussed in Chapter Ten, the clearest historical example is President Reagan, who left the White House in 1989 with eight years' worth of handwritten diaries, which he kept at his private home in California. The Reagan diaries contained classified information, such as entries recounting National Security Council meetings and referencing highly sensitive intelligence sources and methods, including human sources and signals intelligence.[925] Some entries that addressed sensitive subjects included descriptions such as "top secret" and "very hush hush," and some entries remained classified Top Secret as of 2007, decades after Mr. Reagan wrote them.

As we also describe in Chapter Ten, during the *Poindexter* litigation in 1989 and 1990, after Mr. Reagan's presidency, the Department of Justice took the position in public court filings that the diaries were both "currently classified" and Mr. Reagan's "personal records" that were not in the Archives' possession.[926] In a later

---

[924] *See* Chapter Nine and n.899 above.

[925] *See* Chapter Ten.

[926] Memorandum in Support of Motion to Quash Subpoena to Archivist and Statement of Interest by the Department of Justice at 2-3, 6-7, 17 n.8, 20, *United States v. Poindexter*, Crim No. 88-0080-01 (HHG).

written order, the district court, after conducting an *in camera* review of diary excerpts, described the diaries as containing "classified and highly sensitive information" including an entry about "a certain top-secret and extremely sensitive activity."[927]

After these legal declarations by the Department and the court, the classified diaries remained in Mr. Reagan's private home for another fifteen years, until he died in 2004. And even though the Department of Justice publicly acknowledged that Mr. Reagan treated the diaries as his personal records and they were not in possession of the National Archives, to our knowledge neither the Department nor anyone else sought the diaries' return or initiated a criminal investigation.[928]

In short, there will be evidence at trial that at least one former president did what Mr. Biden now claims it was proper for him to do too: take his diaries home after leaving the White House, even though the diaries contained classified information. As indicated by letters we have received from the White House Counsel's Office and Mr. Biden's personal attorneys, the defense will argue that the Department of Justice blessed this view in Mr. Reagan's case by stating in public filings that the diaries were both classified and Mr. Reagan's personal records and by taking no recovery or enforcement action. Most jurors would likely find this precedent

---

[927] *United States v. Poindexter*, 732 F. Supp. 135, 138 n.5, 141 (D.D.C. Jan. 30, 1990).
[928] *See* Chapter Ten.

240

and Mr. Biden's claimed reliance on it, evidence of which we expect would be admitted at trial,[929] to be compelling evidence that Mr. Biden did not act willfully.

The government could reply that, whatever the reasons for the Department of Justice's inaction in Mr. Reagan's case—including, perhaps, that former presidents have Secret Service protection indefinitely after leaving office, or simply that officials at the Department did not realize Mr. Reagan stored his diaries at home—the relevant executive order and controlling regulations require former presidents and vice presidents to store classified information in a secured location after their time in office.[930]

While we agree with this statement of the law, and we recognize that the Reagan precedent is from a different era with a different legal landscape, we think jurors assessing Mr. Biden's guilt and intent will be persuaded less by what the government says in executive orders and agency regulations, and more by what the government actually has done (or not done) by way of enforcement among the small

---

[929] Admissible evidence concerning a lack of willfulness can include legal materials upon which the defendant claims to have relied in forming the view that his conduct was not forbidden by law, so long as the defendant lays a proper foundation. *United States v. Powell*, 955 F.2d 1206, 1214 (9th Cir. 1991); *see also United States v. Harris*, 942 F.2d 1125, 1132 n.6 (7th Cir. 1991) (noting that, in the context of tax crimes requiring proof of willfulness, defendants can introduce expert testimony about case law "to the extent that the defendant claims actual reliance on that case law"); *United States v. Willie*, 941 F.2d 1384, 1392-98 (10th Cir. 1991) (to show lack of willfulness in a tax case, defendant can introduce evidence to prove his "descriptive" belief that the law *does not* apply to him, but not his "normative" belief that the law *should not* apply to him).

[930] *See* Executive Order 13526 §§ 4.1, 4.4; Superseding Indictment ¶¶ 18-19, *United States v. Trump*, No. 23-CR-80101-AMC, ECF No. 85. It is not clear that the presence of Secret Service agents materially enhances the level of protection afforded to classified materials. Agents we interviewed said they focus on the protection of persons, not documents, and they do not monitor the movement of or access to documents. Secret Service Supervisor Tr. at 12-13; Secret Service Special Agent 1 8/24/23 Tr. at 27-29, 87-88; Secret Service Special Agent 2 Tr. at 31-33.

241

group of former presidents and vice presidents. Many jurors would conclude that, given the Department's treatment of Mr. Reagan, who kept his classified diaries for more than a decade before his death, it would have been plausible for Mr. Biden to believe he could properly keep his classified notebooks. Citing the relevant sources of law likely would not sway such jurors from this conclusion.

We also believe some of the same evidence that supports reasonable doubt for the classified Afghanistan documents also supports reasonable doubt for the notebooks, including Mr. Biden's cooperation with the investigation, his diminished faculties in advancing age, and his sympathetic demeanor. These factors will likely make it difficult for jurors to conclude he had criminal intent.

Finally, the two main sets of evidence summarized above, suggesting that Mr. Biden knew he was not allowed to keep classified notebooks, do not suffice to prove his willfulness beyond a reasonable doubt. The first set of evidence is that Mr. Biden, at his staff's insistence, stored his classified notecards in a SCIF at the Archives, and several months earlier in the fall of 2016 he told Zwonitzer "they didn't even know I have this [notebook]."[931] This could suggest that Mr. Biden concealed his notebooks from staff to avoid restrictions on his access to or use of them.

But the defense will argue that this treatment of the notecards and notebooks is also consistent with an innocent explanation: Mr. Biden may have simply acquiesced to his staff's decision to store his notecards in the Archives SCIF, even though, as he suggested to his ghostwriter on April 26, 2017, he (like Mr. Reagan and

---

[931] *See* Chapter Four.

242

the Department of Justice before him) did not think he was required to do so. If that is what happened, Mr. Biden was not required to inform his staff that their (in his view) unnecessary advice could also apply to his notebooks. His failure to flag the notebooks for what he believed to be his staff's overly cautious treatment is not compelling evidence of willfulness. In the same vein, Mr. Biden could have concluded that the forms he signed about safeguarding classified information in the Archives SCIF were boilerplate paperwork that applied in most cases, but not to the handwritten materials of a former president or vice president, which historically have been treated as the former officeholder's personal property. And he could point to McGrail's current understanding that the notecards were stored in a SCIF simply to keep them secure, not because they were classified.[932]

The second set of evidence concerns the guidance on "best practices" that Counsel Cynthia Hogan gave Mr. Biden in 2010 and 2011 about handling classified information, and his decision after receiving this guidance to store the notebooks in a safe in the White House.[933] This evidence, too, is consistent with innocence. By the time Mr. Biden left the White House in 2017, Hogan's guidance about storage in a safe was six years old, and Mr. Biden had long since stopped following it. The evidence suggests that he did not store his notebooks in a safe for the last several years of his administration, and no one in the White House raised concerns.[934]

---

[932] McGrail 1/22/24 Tr. at 69-70, 113-14, 129-30.

[933] *See* Chapters Three and Four.

[934] *See id.*

While Mr. Biden *may* have recalled Hogan's advice and concluded that it meant he should not bring the notebooks home with him when he left the White House, there is no evidence he did so recall. And there would have been good reason for him not to think this way, especially since Hogan gave her 2010 advice seven years earlier during a meeting scheduled to last ten minutes, and Mr. Biden had long since stopped following her advice, which Hogan told us would have reflected best practices rather than legal requirements.[935]

For these reasons, we do not believe the government could prove beyond a reasonable doubt that Mr. Biden knew it was unlawful to retain his notebooks at his home after the vice presidency.

> **C.    The evidence does not prove beyond a reasonable doubt that Mr. Biden willfully disclosed national defense information in the notebooks to his ghostwriter**

We have also considered whether Mr. Biden willfully disclosed national defense information to Zwonitzer by reading certain passages of his notes, aloud and nearly verbatim, from national security meetings.[936] Mr. Biden should have known that by reading his unfiltered notes about classified meetings in the Situation Room, he risked sharing classified information with his ghostwriter. But we do not believe the evidence supports charges of willful disclosure beyond a reasonable doubt.

At least three times, Mr. Biden read classified notes from national security meetings to Zwonitzer nearly verbatim. The first two incidents involved the same

---

[935] *See id.*

[936] *See* 18 U.S.C. § 793(e) (prohibiting the willful transmission of national defense information).

244

notebook passage.[937] On February 16, 2017, Mr. Biden appeared to explain to Zwonitzer that a notebook entry related to "a long meeting on the Security Council on – it probably was classified."[938] Mr. Biden had skipped over this entry entirely during a recorded conversation with Zwonitzer several months earlier in October 2016.[939] But during the February 16, 2017 recorded conversation, Mr. Biden read aloud to Zwonitzer portions of the notebook entry that contained classified information.[940]

Two months later, on April 10, 2017, during another recorded conversation with Zwonitzer, Mr. Biden turned to the same notebook entry and read additional classified portions aloud, again nearly verbatim.[941] He did so immediately after reviewing aloud highly emotional notebook entries about the death of his son Beau and other personal topics, which appeared on the pages right before the classified entry.[942]

This evidence shows that Mr. Biden disclosed classified information to Zwonitzer, who was not authorized to receive it. But the evidence falls short of proving that Mr. Biden did so willfully—that is, that he knew these notebook passages were classified and that he intended to share classified information with Zwonitzer. During the February 16, 2017 conversation, Mr. Biden appeared to say

---

[937] *See* Chapter Five.

[938] Zwonitzer recording Carved_000556; Carved_000556 Tr. at 4; Notebook entry 1B57-0062-65; FBI Serials 315, 335; Evidence item 1B79; Evidence item 1B81.

[939] *See* Chapter Five.

[940] *See id.*

[941] *See id.*

[942] *See id.*

245

that the meeting his notes summarized—not his notes themselves—"probably" was classified.[943] Though it was foreseeable that Mr. Biden's notes about a classified meeting would themselves be classified (which they were), the evidence does not prove definitively that Mr. Biden actually knew that, or that he intended to share classified information.

And during the April 10, 2017 meeting, jurors could well conclude that Mr. Biden read from the same classified entry without pausing to consider that it was classified, given his discussion of highly emotional topics with Zwonitzer just before he read the classified passage, and the lack of any pause before Mr. Biden launched into reading the classified entry.[944] Though it would require jurors to find that Mr. Biden ignored or missed clear warning signs that he was sharing classified information with Zwonitzer in February and April 2017, we believe some reasonable jurors would likely reach that conclusion.

The third incident happened on April 24, 2017, when Mr. Biden read aloud to Zwonitzer portions of a different entry of classified notes from a National Security Council meeting, also nearly verbatim.[945] When Mr. Biden could not read a particular word in the entry, he showed the entry to Zwonitzer but warned him, "Some of this may be classified, so be careful . . . I'm not sure. It isn't marked classified, but..."[946]

---

[943] *See id.*
[944] *See id.*
[945] *See id.*
[946] *See id.*

246

Mr. Biden nonetheless continued to read aloud and nearly verbatim portions of the same passage of his notes, some of which remain classified at the Secret level.[947]

Mr. Biden's decision to read notes nearly verbatim to Zwonitzer that Mr. Biden had just identified as potentially classified cannot be justified. But the evidence does not prove beyond a reasonable doubt that he intended to share classified information. Mr. Biden told Zwonitzer he was "not sure" the notebook passage he read was classified. That is enough to create reasonable doubt about whether Mr. Biden acted willfully.

There is also evidence that Mr. Biden took some steps to avoid sharing classified information with Zwonitzer. As explained in Chapter Five, Mr. Biden sometimes skipped over notebook passages to avoid reading classified information. And if called as a witness at trial, Zwonitzer would testify that Mr. Biden mentioned the need to be careful "because he was worried that there was a possibility that . . . some of this stuff [handwritten entries in the notebooks] could be classified," and, "there were things he couldn't tell me, lines he couldn't cross."[948]

Given the intelligence and military officials present and the topics discussed at the meetings Mr. Biden recounted for Zwonitzer, Mr. Biden should have realized that his notes did or were likely to contain classified information. But taken as a whole, the evidence will likely leave jurors with reasonable doubts about whether Mr. Biden knew he was sharing classified information with Zwonitzer and intended to do so. For these jurors, Mr. Biden's apparent lapses and failures in February and April

---

[947] *See id.*

[948] Zwonitzer 7/31/23 Tr. at 83.

2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him.[949] Therefore, we conclude that the evidence does not establish that Mr. Biden willfully disclosed national defense information to Zwonitzer.

---

[949] *See* Chapter Eleven.