## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **HERITAGE FOUNDATION**,<br><br>**MIKE HOWELL**,<br><br>         *Plaintiffs,*<br><br>    v.<br><br>**U.S. DEPARTMENT OF JUSTICE**,<br><br>         *Defendant.* | Case No. 1:24-cv-00645-DLF |

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE ADEQUACY OF ITS SEARCH

Pursuant to Federal Rule of Civil Procedure 56, Defendant U.S. Department of Justice ("the Department") hereby moves for partial summary judgment regarding the adequacy of its search, for the reasons set forth in the enclosed Memorandum of Law, Statement of Undisputed Material Facts, and Declaration.

Dated:  July 1, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cameron Silverberg*
CAMERON SILVERBERG
Trial Attorney (D.C. Bar No. 1780628)
United States Department of Justice
Civil Division, Federal Programs Branch
Tel.:    (202) 353-9265
Fax:    (202) 616-8470
Email:  Cameron.D.Silverberg@usdoj.gov

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**HERITAGE FOUNDATION**,

**MIKE HOWELL**,

         *Plaintiffs,*

    v.

**U.S. DEPARTMENT OF JUSTICE**,

         *Defendant*.

Case No. 1:24-cv-00645-DLF

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING THE ADEQUACY OF DEFENDANT'S SEARCH**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.     The Hur Investigation ................................................................................................. 2

II.    Plaintiffs' FOIA Request and the Department's Response ........................................... 3

III.   Procedural Background ............................................................................................. 9

STANDARD OF REVIEW ............................................................................................. 10

ARGUMENT ................................................................................................................... 11

I.     The Department Reasonably Construed Plaintiffs' Request ..................................... 11

II.    The Department Adequately Searched for Potentially Responsive Records ............ 17

      A.    The Department Searched for and Located Documents Specifically
            Referenced in the Cited Passages ................................................................. 17

      B.    Other Referenced Documents Were Considered and Appropriately
            Excluded ..................................................................................................... 19

CONCLUSION ................................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Fed'n of Gov't Emps. Local 2782 v. U.S. Dep't of Commerce,*
  907 F.2d 203 (D.C. Cir. 1990) ................................................. 13

*Am. Immigr. Council v. U.S. Immigr. & Custom Enf't,*
  464 F. Supp. 3d 228 (D.D.C. 2020) ........................................ 12

*Anderson v. U.S. Dep't of Just.,*
  518 F. Supp. 2d 1 (D.D.C. 2007) ............................................ 14

*Assassination Archives & Research Ctr., Inc. v. CIA,*
  720 F. Supp. 217 (D.D.C. 1989) ............................................. 12

*Bigwood v. DOD,*
  132 F. Supp. 3d 124 (D.D.C. 2015) ........................................ 10

*Boehm v. FBI,*
  948 F. Supp. 2d 9 (D.D.C. 2013) ............................................ 10

*Di Viaio v. Kelley,*
  571 F.2d 538 (10th Cir. 1978) ............................................... 14

*Espinoza v. Dep't of Just.,*
  20 F. Supp. 3d 232 (D.D.C. 2014) .......................................... 14

*Evans v. Fed. Bureau of Prisons,*
  951 F.3d 578 (D.C. Cir. 2020) ........................................ 11, 12

*Hodge v. FBI,*
  703 F.3d 575 (D.C. Cir. 2013) ............................................... 17

*Hudgins v. IRS,*
  620 F. Supp. 19 (D.D.C. 1985) .............................................. 12

*Iturralde v. Comptroller of the Currency,*
  315 F.3d 311 (D.C. Cir. 2003) ............................................... 11

*Jud. Watch, Inc. v. Dep't of State,*
  177 F. Supp. 3d 450 (D.D.C. 2016) ........................................ 12

*Lamb v. Internal Rev. Serv.,*
  871 F. Supp. 301 (E.D. Mich. 1994) ...................................... 14

*Leopold v. U.S. Dep't of Just.*,
    301 F. Supp. 3d 13 (D.D.C. 2018) ................................................................. 12, 13

*Meeropol v. Meese*,
    790 F.2d 942 (D.C. Cir. 1986) ...................................................................... 10, 15

*Nat'l Sec. Couns. v. Cent. Intel. Agency*,
    969 F.3d 406 (D.C. Cir. 2020) ........................................................................... 13

*Nat'l Sec. Couns. v. Cent. Intelligence Agency*,
    931 F. Supp. 2d 77 (D.D.C. 2013) ...................................................................... 12

*Oglesby v. U.S. Dep't of the Army*,
    920 F.2d 57 (D.C. Cir. 1990) ............................................................................. 10

*Pinson v. U.S. Dep't of Just.*,
    160 F. Supp. 3d 285 (D.D.C. 2016) .................................................................... 17

*Public Employees for Environmental Responsibility v. EPA*,
    314 F. Supp. 3d 68 (D.D.C. 2018) ................................................................. 14, 15

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) .......................................................................... 11

*Saldana v. Fed. Bureau of Prisons*,
    715 F. Supp. 2d 10 (D.D.C. 2010) ...................................................................... 14

*Schrecker v. DOJ*,
    349 F.3d 657 (D.C. Cir. 2003) ............................................................................ 10

*Steinberg v. DOJ*,
    23 F.3d 548 (D.C. Cir. 1994) ................................................................... 10, 11, 21

**Statutes**

5 U.S.C. § 552 ....................................................................................................... 11, 15

**Regulations**

28 C.F.R. § 600.8 ........................................................................................................ 2

**Other Authorities**

Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the House Comm.
    on the Judiciary (Mar. 12, 2024). ..................................................................... 21

*Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph. R. Biden, Jr.* (Feb. 2024), https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf..............................................................................................................*passim*

**INTRODUCTION**

This case concerns a Freedom of Information Act ("FOIA") request for material relating to Special Counsel Robert Hur's *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph. R. Biden, Jr.* (Feb. 2024) ("Report" or "Hur Report").[1]  Plaintiffs Heritage Foundation and Mike Howell ("Plaintiffs") seek "the records relied upon by Special Counsel Hur in drafting [six] passages in the Report relating to President Joseph R. Biden's memory and mental faculties."  Amended Compl. ¶ 8, ECF No. 6.

To search for potentially responsive documents, Defendant U.S. Department of Justice ("Defendant" or "the Department") analyzed each of the six passages, which were quoted in the request, and each of which either referenced other specific sources, included a footnote to specific sources, or both.  The passages identify four potentially responsive records for the statements at issue: (1) the written transcripts of Mr. Hur's interviews with President Biden ("the Biden-Hur interviews"); (2) the audio from the Biden-Hur interviews; (3) audio recordings from 2016-17 of conversations between Mr. Biden and his biographer, Mark Zwonitzer ("the Biden-Zwonitzer recordings"); and (4) a memorandum that then-Vice President Biden wrote to President Obama regarding Afghanistan policy ("the Afghanistan memo").  That was a reasonable, adequate search in these circumstances, and the Department was not required (as Plaintiffs apparently intend to argue) to take the additional step of interviewing Mr. Hur, who is no longer a Department employee.  The Department is therefore entitled to summary judgment on the adequacy of its search, all that is at issue in this motion.

---

[1] The Report is available at https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-2024.pdf.

## BACKGROUND

### I.    The Hur Investigation

On January 12, 2023, Attorney General Merrick Garland appointed Robert Hur as Special Counsel.  *See Judicial Watch v. Department of Justice*, 24-cv-700, Decl. of Bradley Weinsheimer ("Weinsheimer Decl."), ECF 34-2, ¶ 4.  The Special Counsel's Office ("SCO") was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden.  *See id.*  One document at issue in the investigation was a memo that then-Vice President Biden had written to President Obama in 2009 regarding Afghanistan policy.  Hur Report at 121-22.  The investigation also included an examination of recorded conversations between Mr. Biden and Mr. Zwonitzer in advance of the publication of Mr. Biden's 2017 book, *Promise Me Dad*.  *See, e.g., id.* at 97-102.

As part of the investigation, President Biden voluntarily agreed to an interview with Mr. Hur.  Weinsheimer Decl. ¶ 9.  The interview occurred on October 8 and October 9, 2023, and collectively lasted approximately five hours.  *Id.*  The Special Counsel requested that the interview be audio recorded, and the President voluntarily agreed to that request.  *Id.* ¶ 10.  At the interview, the SCO created audio recordings that documented the interview, *id.* ¶¶ 10, 12, and SCO, with the assistance of a court reporter, later made a written transcript of the interview based on the audio recording, *id.* ¶ 13.

At the conclusion of the investigation, Mr. Hur submitted a confidential report to Attorney General Garland pursuant to Department regulations.  *See* 28 C.F.R. § 600.8(c).  The Report stated that Mr. Hur "conclude[d] that no criminal charges are warranted," Hur Report, at 1, and provided extensive discussion of the investigation and the decisions he reached, *see generally* Hur Report.  The Department later produced a copy of the Hur Report to Congress without any additional redactions or modifications and published it on the Department's public-facing website.  Weinsheimer Decl. ¶ 7.  The Department also produced to Congress, released to FOIA requesters, and published on its public website a redacted copy of the transcript of President Biden's interview.  *Id.* ¶ 17.  These public disclosures were

2

discretionary; the Department did not make all withholdings or apply all redactions available under FOIA. *Id.* ¶ 46. The Department also facilitated Mr. Hur's testimony before Congress concerning his investigation and his decision to decline prosecution. *See id.*

## II.    Plaintiffs' FOIA Request and the Department's Response

On February 9, 2024, Plaintiffs submitted a FOIA request to the Department seeking "the records relied upon by Special Counsel Hur in drafting [certain] passages in the Report relating to President Joseph R. Biden's memory and mental faculties." Amended Compl. ¶ 8. Specifically, the request sought "all records relied upon for the [following] highlighted passages from the Report" (*id.* ¶ 9):

**Passage 1**:

> Given the intelligence and military officials present and the topics discussed at the meetings Mr. Biden recounted for Zwonitzer, Mr. Biden should have realized that his notes did or were likely to contain classified information. But taken as a whole, the evidence will likely leave jurors with reasonable doubts about whether Mr. Biden knew he was sharing classified information with Zwonitzer and intended to do so. For these jurors, Mr. Biden's apparent lapses and failures in February and April
>
> _____
> [947] *See id.*
> [948] Zwonitzer 7/31/23 Tr. at 83.
>
> 247

> 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him.[949] Therefore, we conclude that the evidence does not establish that Mr. Biden willfully disclosed national defense information to Zwonitzer.

**Passage 2:**

Third, as discussed to some extent above, Mr. Biden will likely present himself to the jury, as he did during his interview with our office, as a sympathetic, well-meaning, elderly man with a poor memory. While he is and must be accountable for his actions—he is, after all, the President of the United States—based on our direct

219

observations of him, Mr. Biden is someone for whom many jurors will want to search for reasonable doubt. It would be difficult to convince a jury they should convict him— by then a former president who will be at least well into his eighties—of a serious felony that requires a mental state of willfulness.

4

**Passage 3:**

In his interview with our office, Mr. Biden's memory was worse. He did not remember when he was vice president, forgetting on the first day of the interview when his term ended ("if it was 2013 – when did I stop being Vice President?"), and forgetting on the second day of the interview when his term began ("in 2009, am I still Vice President?").[839] He did not remember, even within several years, when his son Beau died.[840] And his memory appeared hazy when describing the Afghanistan debate that was once so important to him. Among other things, he mistakenly said he "had a real difference" of opinion with General Karl Eikenberry, when, in fact, Eikenberry was an ally whom Mr. Biden cited approvingly in his Thanksgiving memo to President Obama.[841]

In a case where the government must prove that Mr. Biden knew he had possession of the classified Afghanistan documents after the vice presidency and chose to keep those documents, knowing he was violating the law, we expect that at trial, his attorneys would emphasize these limitations in his recall.

We also expect many jurors to be struck by the place where the Afghanistan documents were ultimately found in Mr. Biden's Delaware home: in a badly damaged box in the garage, near a collapsed dog crate, a dog bed, a Zappos box, an empty bucket, a broken lamp wrapped with duct tape, potting soil, and synthetic firewood.[842]

---

[839] Biden 10/8/23 Tr. at 146; 10/9/23 Tr. at 45.
[840] Biden 10/8/23 Tr. at 82-83.
[841] Biden 10/9/23 Tr. at 17; Recovered document D20.
[842] *See* Chapter Six.

208

**Passage 4:**

After all, the Afghanistan documents and the 2009 troop surge played no role in *Promise Me, Dad*, the book Mr. Biden wrote with Zwonitzer in early 2017.[836] There is no reason to believe Mr. Biden intended to discuss the 2009 Afghanistan troop debate in his book, which, as explained in Chapter Five, covered his experiences in 2014 and 2015. In dozens of hours of recorded conversations with Zwonitzer in 2016 and 2017, when Mr. Biden talked about a vast array of topics, the Afghanistan documents never came up again.[837] This may suggest that after February 16, 2017, the documents were simply not on Mr. Biden's mind.

Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.[838]

---

[836] *See generally* Biden, PROMISE ME, DAD; Chapter Five.
[837] *See generally* FBI Serials 315, 335.
[838] *See generally id.*

207

**Passage 5:**

We have also considered that, at trial, Mr. Biden would likely present himself to a jury, as he did during our interview of him, as a sympathetic, well-meaning, elderly man with a poor memory. Based on our direct interactions with and observations of him, he is someone for whom many jurors will want to identify reasonable doubt. It would be difficult to convince a jury that they should convict him—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness.

We conclude the evidence is not sufficient to convict, and we decline to recommend prosecution of Mr. Biden for his retention of the classified Afghanistan documents.

\* \* \*

*Notebooks containing classified information.* FBI agents recovered from unlocked drawers in the office and basement den of Mr. Biden's Delaware home a set

6

**Passage 6:**

Several defenses are likely to create reasonable doubt as to such charges. For example, Mr. Biden could have found the classified Afghanistan documents at his Virginia home in 2017 and then forgotten about them soon after. This could convince some reasonable jurors that he did not retain them willfully. When Mr. Biden told his ghostwriter about finding "all the classified stuff downstairs," his tone was matter-of-fact. For a person who had viewed classified documents nearly every day

4

for eight years as vice president, including regularly in his home, finding classified documents at home less than a month after leaving office could have been an unremarkable and forgettable event. Notably, the classified Afghanistan documents did not come up again in Mr. Biden's dozens of hours of recorded conversations with the ghostwriter, or in his book. And the place where the Afghanistan documents were eventually found in Mr. Biden's Delaware garage—in a badly damaged box surrounded by household detritus—suggests the documents might have been forgotten.

In addition, Mr. Biden's memory was significantly limited, both during his recorded interviews with the ghostwriter in 2017, and in his interview with our office in 2023. And his cooperation with our investigation, including by reporting to the government that the Afghanistan documents were in his Delaware garage, will likely convince some jurors that he made an innocent mistake, rather than acting willfully—that is, with intent to break the law—as the statute requires.

After Plaintiffs filed an application for expedited processing of their request on February 22, 2024, the Department's Office of Information Policy ("OIP") issued a letter on February 29, 2024.  Administrative Letter, ECF No. 6-13.  OIP's letter indicated that it had interpreted Plaintiffs' request as seeking a copy of the transcript of President Biden's interview with Special Counsel Hur.  *Id.* at 1.  Since Plaintiffs had sought the same records in another request, OIP noted that it was "closing the administrative tracking number (FOIA-2024-01098) associated with this request."  *Id.*

### III.     Procedural Background

Plaintiffs filed a Complaint on March 6, 2024.  ECF No. 1.  The Complaint brought a single claim under FOIA, alleging the wrongful denial of expedited processing.  *Id.* at 14-16.  Plaintiffs then filed an Amended Complaint on March 13, 2024.  ECF No. 6.  The Amended Complaint included five claims: (1) "Failure to Conduct Adequate Searches for Response Records," (2) "Wrongful Withholding of Non-Exempt Responsive Records," (3) "Wrongful Denial of Fee Waiver," (4) "Statutory Bar Against Charging Fees," and (5) "Wrongful Denial of Expedited Processing."  *Id.* at 15-20.

As noted in the Status Conference held on June 10, 2024, Defendant conducted a search for records that may be potentially responsive to Plaintiffs' request.  Joint Status Report at 2 (June 16, 2024), ECF No. 14.  That search identified the following four potentially responsive items: (1) the Biden-Hur interview transcripts, (2) the Biden-Hur interview audio, (3) the Biden-Zwonitzer audio recordings, and (4) the Afghanistan memo.  *Id.*  The parties have agreed that only the Biden-Zwonitzer recordings are currently at issue in this case.  Joint Status Report at 2 (June 25, 2024),

9

ECF No. 20. Pursuant to the Court's June 10 and June 22 Minute Orders, Defendant now seeks partial summary judgment on the adequacy of its search.

## STANDARD OF REVIEW

To obtain summary judgment in a FOIA case in which the adequacy of the search is challenged, an agency must show that it "has conducted a search reasonably calculated to uncover all relevant documents." *Steinberg v. DOJ*, 23 F.3d 548, 551 (D.C. Cir. 1994) (citation omitted). An agency's search for responsive records "need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request." *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). "There is no requirement that an agency search every record system"; rather, the agency must only conduct a good-faith, reasonable search of those systems or records likely to possess the requested information. *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Searching for records responsive to a FOIA request is a process that requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," and it is "hardly an area in which the courts should attempt to micro-manage the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (citation omitted).

"To demonstrate that a search for documents was reasonable at the summary judgment phase, a federal agency may submit 'reasonably detailed' affidavits or declarations that describe the search performed." *Bigwood v. DOD*, 132 F. Supp. 3d 124, 135 (D.D.C. 2015) (citation omitted). Agency declarations attesting to a reasonable FOIA search "are afforded a presumption of good faith, and can be rebutted only with evidence that the agency's search was not made in good faith." *Boehm v. FBI*, 948 F. Supp. 2d 9, 19 (D.D.C. 2013) (citations omitted); *accord*

*SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (noting that an agency's FOIA search declaration is entitled to "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents" (internal citation omitted)).  Along with this presumption, the D.C. Circuit has repeatedly held that a reviewing court's focus must be on the search itself, rather than on its fruits (or the lack thereof).  *See, e.g., Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." (citing *Steinberg*, 23 F.3d at 551)).

## ARGUMENT

### I.    The Department Reasonably Construed Plaintiffs' Request

Throughout his Report, Special Counsel Hur referenced and cited authorities and records to support his factual statements and analyses.  That is true for the statements for which Plaintiffs seek records that Special Counsel Hur "relied upon."  In conducting a search, the Department looked for and located those records.  In doing so, it interpreted the request language, "relied upon," to mean particular records cited or referenced by the Special Counsel as support for those passages.  This was reasonable.  Nearly by definition, if these are the records the Special Counsel chose to cite for those statements, they are the records he relied upon for those statements.  The Department understands Plaintiffs disagree and plan to argue that, as a matter of law, the phrase "relied upon" requires something more.  It does not.

FOIA requires that the requester "reasonably describe[]" the records sought.  5 U.S.C. § 552(a)(3)(A).  "A request reasonably describes records if the agency is able to determine precisely what records are being requested."  *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583

(D.C. Cir. 2020) (citation and internal quotation marks omitted).  The responsibility rests firmly on the requester "to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome."  *Assassination Archives & Research Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989); *see also Leopold v. U.S. Dep't of Just.*, 301 F. Supp. 3d 13, 23 (D.D.C. 2018).

The request must also reasonably describe *records*. "FOIA is a mechanism to obtain access to records, not answers to questions." *Jud. Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450, 456 (D.D.C. 2016), *aff'd sub nom. Jud. Watch, Inc. v. United States Dep't of State*, 681 F. App'x 2 (D.C. Cir. 2017); *see also Am. Immigr. Council v. U.S. Immigr. & Custom Enf't*, 464 F. Supp. 3d 228, 245 (D.D.C. 2020) ("FOIA neither requires an agency to answer questions disguised as a FOIA request . . . or to create documents or opinions in response to an individual's request for information." (quoting *Hudgins v. IRS*, 620 F. Supp. 19, 21 (D.D.C. 1985), *aff'd*, 808 F.2d 137 (D.C. Cir. 1987)); *Nat'l Sec. Couns. v. Cent. Intelligence Agency*, 931 F. Supp. 2d 77, 103 (D.D.C. 2013) (accepting the agency's argument that "the FOIA does not oblige [an agency] to create new records or to answer questions about agency records").

Plaintiffs' FOIA request was unusual.  The typical FOIA request identifies a particular record or set of records about a specific subject.  This request did not.  It instead asked for what Mr. Hur "relied upon" when he drafted six passages in the Report that reference other specific records.  The phrase "relied upon" is inherently vague and ambiguous, subject to multiple interpretations.  These interpretations include ones impermissible under the law either because they would require an agency to answer questions about agency records, would sweep in potentially unbounded and undefinable swaths of records, or would be so subjective and uncertain

as to make the standard unworkable for agencies. Based on Plaintiffs' statements to date in this litigation, the Department anticipates they will advance interpretations that cross these lines.

Writers may "rely upon" the entirety of their knowledge whenever they draft a particular passage. But FOIA requesters are not entitled to probe knowledge or experience, or turn potential custodians into witnesses; FOIA requesters can only obtain records. And they submit FOIA requests to the agency (which is responsible for the search), not to a particular individual. Interpreting Plaintiffs' request to require the agency to try to discover the panoply of background facts and records an official subjectively drew on when drafting particular passages plainly exceeds what is required or viable under FOIA. Under such an interpretation, the Department would clearly have been required to deny the request, since it would not have been possible for the agency to craft a reasonable search for responsive records. *See Nat'l Sec. Couns. v. Cent. Intel. Agency*, 969 F.3d 406, 410 (D.C. Cir. 2020) (citing *Am. Fed'n of Gov't Emps. Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203, 209 (D.C. Cir. 1990)).

The Department opposes interpreting Plaintiffs' request in a manner that FOIA does not require. The Department instead, in an effort to resolve this request, acted reasonably and appropriately by reading the request to enable it to conduct a search: it interpreted "relied upon" to mean particular records referenced or cited in the passages themselves. That interpretation was reasonable because the passages provide specific sources that Mr. Hur used to support his statements. The Department accordingly interpreted Plaintiffs' request reasonably and in accordance with FOIA—which it was entitled to do. *See Leopold*, 301 F. Supp. 3d at 23-27 (where a "literal construction of th[e] request" would have been "overly broad, unduly burdensome, and inadequate to describe the records sought," the agency was allowed to adopt a narrower, reasonable interpretation).

Plaintiffs' principal counterargument appears to be that this approach was inadequate as a matter of law under FOIA and that the law instead required the Department to interview Mr. Hur about what he "relied upon." But that counterargument rests on a mistaken assumption: that under the guise of identifying records responsive to a FOIA request, an agency is required to interview decisionmakers about what they relied upon in making their decisions. That is not the law. *See Espinoza v. Dep't of Just.*, 20 F. Supp. 3d 232, 245 (D.D.C. 2014) ("Plaintiff's dispute is based on the faulty premise that the FOIA obligates the government to answer questions apparently about any governmental action."); *see also Anderson v. U.S. Dep't of Just.*, 518 F. Supp. 2d 1, 10 (D.D.C. 2007); *Saldana v. Fed. Bureau of Prisons*, 715 F. Supp. 2d 10, 19 (D.D.C. 2010). To read such a novel requirement into the statute would transform the "reasonable search" standard into an extraordinary, discovery-like mandate that finds no basis in the statute or case law, and which essentially would grant FOIA requestors investigative authority to direct interviews of their chosen witnesses. Nor is the Department obligated to certify, under the guise of designating a record as responsive to a request for all records "relied upon" for an official's statement, what any official was thinking at a given moment. That is, an agency need not "answer questions disguised as a FOIA request." *Lamb v. Internal Rev. Serv.*, 871 F. Supp. 301, 304 (E.D. Mich. 1994) (citing *Di Viaio v. Kelley*, 571 F.2d 538, 542 (10th Cir. 1978)). Put another way, a request phrased as "interview the former Special Counsel about what records he relied upon when making certain statements" would clearly be properly denied. To read such a directive *into* a FOIA request fares no better.

*Public Employees for Environmental Responsibility v. EPA*, 314 F. Supp. 3d 68 (D.D.C. 2018), is not to the contrary. The FOIA request at issue in that case sought records that then-EPA Administrator Scott Pruitt had "relied upon" in making statements about climate change on a news

program. *Id.* at 71-72. The EPA argued that this portion of the FOIA request had not "reasonably describe[d]" the records sought, as required under 5 U.S.C. § 552(a)(3)(A), and that it instead constituted an impermissible interrogatory directed at the Administrator. *Id.* at 75-76. The court rejected this argument, holding that the EPA had erred by interpreting the request as a question and that the agency was obligated to search for "records compiled, prepared, provided, used or reviewed by Administrator Pruitt in connection with" the statements at issue. *Id.* at 75, 78. But in reaching this conclusion, the court made clear that FOIA could *not* be used as a means to pose questions to government officials. *See id.* at 76 n.1 (noting that the "the plaintiff does not dispute EPA's position that the agency is not 'obligated to respond to questions, requests for research . . . [or] to generate explanatory materials,'" and describing that position as an "undisputed legal proposition" (citation omitted)). That "undisputed legal proposition" quashes the notion that the Department was required to treat Plaintiffs' request as a series of questions and get Mr. Hur's responses to them.

To be sure, agencies often identify appropriate custodians or individuals with familiarity with records and, if necessary, consult with them in crafting certain searches under FOIA. And agencies appropriately have discretion under FOIA when doing so. *See, e.g., Meeropol*, 790 F.2d at 956. Here, however, to construct a reasonable search, there was no need to consult with Mr. Hur about what he relied upon in the six passages at issue, since he explained the basis for his reasoning in the passages themselves. There is of course a significant distinction between the *discretion* to speak with decisionmakers and the *obligation* to do so. Nothing in FOIA prohibits the government from consulting with key personnel in the process of responding to a FOIA request, but nothing requires it when it is not necessary. And it cannot be the case that the statute requires

such a consultation when the person sought by the FOIA requester is not even a Department employee.

These distinctions matter—not just in this case, but in many to come.  If Plaintiffs' interpretation of FOIA as an interrogatory device were accepted—despite the clear case law to the contrary—then FOIA requesters would be free to subject current and former officials, even the most senior officials, to interviews about their decisionmaking masked as FOIA requests.  Officials throughout the executive branch would have to direct time and attention away from their responsibilities to respond to "relied upon" requests like the one at issue now, and agencies would be significantly burdened by conducting this new process, once FOIA requestors learn they have a freshly discovered ability to have courts order such interviews.[2]  Indeed, the Department is currently litigating other "relied upon" FOIA requests from Plaintiffs, directed at the Attorney General Merrick Garland and Special Counsel David Weiss.  *See Heritage Found. v. U.S. Dep't of Just.*, No. 1:24-cv-200-RBW (D.D.C.) (Attorney General Garland); *Heritage Found. v. U.S. Dep't of Just.*, No. 1:24-cv-53-MN (D. Del.) (Special Counsel Weiss).  The Department was correct to reject the unsupported and unwarranted notion that FOIA requires the government to interview officials about their decisionmaking, including prosecutors like Mr. Hur.

---

[2] For example, here Plaintiffs have referenced the Department decision to speak with Mr. Hur in a separate FOIA case seeking the audio of the Biden-Hur interviews to suggest that it must do so in this case.  Not so.  First, that was not done to determine what records were responsive to the underlying FOIA request, *see* Weinsheimer Decl. ¶ 2, but in any event the argument reveals the danger or interpreting the law to *require the* Department to speak with Mr. Hur anytime a requester feels doing so is necessary to fulfill their request: There are many FOIA requests and lawsuits related to this matter in which similar demands could, and would, be made.

## II.     The Department Adequately Searched for Potentially Responsive Records

The Department's search was similarly reasonable.  Since the request sought records "relied upon" in six quoted passages in the Hur Report, the Department undertook an examination of each of the passages.  Decl. of Bobak Talebian (July 1, 2024) ("Talebian Decl.") ¶ 7.  That examination was "reasonably calculated to uncover all relevant documents," and thereby constituted an adequate search under FOIA.  *Pinson v. U.S. Dep't of Just.*, 160 F. Supp. 3d 285, 295 (D.D.C. 2016) (quoting *Hodge v. FBI*, 703 F.3d 575, 579 (D.C. Cir. 2013)).

## A.     The Department Searched for and Located Documents Specifically Referenced in the Cited Passages

Three of the passages clearly include the Biden-Hur interviews and the Biden-Zwonitzer recordings as identifiable sources.  *See* Passage 1 ("For these jurors, Mr. Biden's apparent lapses and failures in February and April 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in *Zwonitzer's interview recordings and in our interview of him*." (quoting Hur Report at 247-48) (emphasis added)); Passage 4 ("Mr. Biden's memory also appeared to have significant limitations—*both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office*. Mr. Biden's *recorded conversations with Zwonitzer from 2017* are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries." (quoting Hur Report at 207) (emphasis added)); Passage 6 ("In addition, Mr. Biden's memory was significantly limited, both *during his recorded interviews with the ghostwriter in 2017, and in his interview with our office in 2023*." (quoting Hur Report at 5) (emphasis added)); *see also* Talebian Decl. ¶ 9(a), (d), (f).

Passages 2 and 5 also reference the Biden-Hur interviews but omit mention of the Biden-Zwonitzer recordings.  *See* Passage 2 ("Third, as discussed to some extent above, Mr. Biden will likely present himself to the jury, *as he did during his interview with our office*, as a sympathetic, well-meaning, elderly man with a poor memory. . . . [B]ased on our direct observations of him, Mr. Biden is someone for whom many jurors will want to search for reasonable doubt.  It would be difficult to convince a jury they should convict him—by then a former president who will be at least well into his eighties—of a serious felony that requires a mental state of willfulness." (quoting Hur Report at 219-20) (emphasis added)); Passage 5 ("We have also considered that, at trial, Mr. Biden would likely present himself to a jury, *as he did during our interview of him*, as a sympathetic, well-meaning, elderly man with a poor memory. Based on our direct interactions with and observations of him, he is someone for whom many jurors will want to identify reasonable doubt. It would be difficult to convince a jury that they should convict him—by then a former president well into his eighties—of a serious felony that requires a mental state of willfulness." (quoting Hur Report at 6) (emphasis added)); *see also* Talebian Decl. ¶ 9(b), (e).

Passage 3 again references the Biden-Hur interviews, while also referencing the Afghanistan memo in a manner that supported the Special Counsel's statement:

> *In his interview with our office*, Mr. Biden's memory was worse.  He did not remember when he was vice president, forgetting on the first day of the interview when his term ended ("if it was 2013 – when did I stop being Vice President?"), and forgetting on the second day of the interview when his term began ("in 2009, am I still Vice President?").  He did not remember, even within several years, when his son Beau died.  And his memory appeared hazy when describing the Afghanistan debate that was once so important to him.  *Among other things, he mistakenly said he "had a real difference" of opinion with General Karl Eikenberry, when, in fact, Eikenberry was an ally whom Mr. Biden cited approvingly in his Thanksgiving memo to President Obama.*

> In a case where the government must prove that Mr. Biden knew he had possession of the classified Afghanistan documents after the vice presidency and chose to keep those

> documents, knowing he was violating the law, we expect that at trial, his attorneys would
> emphasize these limitations in his recall.

Report at 208 (first citing Biden 10/8/23 Tr. at 146; then citing Biden 10/9/23 Tr. at 45; then citing
Biden 10/8/23 Tr. at 82-83; then citing Biden 10/9/23 Tr. at 17; and then citing Recovered
Document D20) (emphasis added); *see also* Talebian Decl. ¶ 9(c).

The Department thereby reasonably determined based on the plain text of the six passages
that four sets of records were potentially responsive to the FOIA request: (1) the Biden-Hur
transcripts, (2) the Biden-Hur audio, (3) the Biden-Zwonitzer recordings, and (4) the Afghanistan
memo.

**B.    Other Referenced Documents Were Considered and Appropriately Excluded**

Beyond Passage 1's generalized reference to Chapter 11 of the Report, the passages only
identify three additional sources in footnotes: (1) Recovered Document D20, which is cited in one
of the footnotes accompanying the text of Passage 3; (2) FBI Serials 315 and 335, which appear
to be cited in the footnote accompanying the text of Passage 4;[3] and (3) Mr. Biden's notebook
entries referenced in the text of Passage 4.  The Department reasonably determined that none of
these three sources were potentially responsive to Plaintiffs' request.

The Hur Report describes "Recovered Document D20" as a "State Department cable from
the U.S. Embassy in Kabul" regarding an Afghan province's "views on U.S. troop levels in
Afghanistan."  Report at A-18.  The document is cited in a footnote that accompanies the following
sentence in Passage 3: "Among other things, [Biden] mistakenly said he 'had a real difference' of
opinion with General Karl Eikenberry, when, in fact, Eikenberry was an ally whom Mr. Biden

---

[3] The relevant sentence is accompanied by a "[*s*]*ee generally id.*" footnote.  Report at 207 n.838.
The immediately preceding footnote—which accompanies text that is not part of Passage 4—
provides the following citation: "*See generally* FBI Serials 315, 335."  *Id.* at 207 n.837.

cited approvingly in his Thanksgiving memo to President Obama." Report at 208 (citing Biden 10/9/23 Tr. at 17, in addition to Recovered Document D20). The document may have been cited to further reflect General Eikenberry's views. But it does not appear to bear on the pertinent conclusion in Passage 3, that Mr. Biden's "memory appeared hazy when describing the Afghanistan debate." Report at 208. The identifiable sources for that statement come from the President's "interview with [the Special Counsel's] office," which included a "mistaken[]" statement regarding the Afghanistan memo. Accordingly, the interview and the memo are the sources that are potentially responsive to the request, and the Department reasonably determined that Recovered Document D20 was not responsive. *See* Talebian Decl. ¶ 9(c).

The Department was also reasonable in finding that Serials 315 and 335 were not responsive either. As the Hur Report explained, "[a]n FBI Serial refers to a numbered entry in the FBI's case file . . . . When an FBI agent logs a new report, for example, into the case file, the report is given a serial number corresponding to the order in which the new file was logged." Report at 19 n.23. FBI Serials 315 and 335 are numbered entries in the FBI case file that catalogue the collection of the Biden-Zwonitzer recordings by law enforcement but do not reflect substantive information about their contents. The content of the recordings themselves, not their inventorying by the FBI, are what provide the basis for the conclusions in Passage 4 that "Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries." Report at 207. *See* Talebian Decl. ¶ 9 n. 2. In addition, the Department reasonably found that the notebook entries referenced in that same sentence from Passage 4 would not be responsive. Mr. Hur's statement is about Biden's communication style, not the factual content of the notebooks. *See id.* ¶ 9 n.1.

Accordingly, the Department reasonably identified the four potentially responsive records through its analysis of the six passages.[4]  *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the House Comm. on the Judiciary, at 65, 72 (Mar. 12, 2024).  There is no basis to believe that Mr. Hur relied upon any additional sources in making the six statements yet declined to mention them in the passages themselves.[5]

Indeed, it is unclear what Plaintiffs expect such sources to be.  The only clear example they have provided is the prospect that the passages were "based in part on contemporaneous notes by Special Counsel Hur and his staff as to appearance and demeanor."  Amended Compl. at 12.  But Mr. Hur did not cite any contemporaneous notes in the relevant passages.  Thus, there is no basis to speculate that Mr. Hur relied upon any notes he may have taken—especially where Mr. Hur cited other sources.  And even if he did, it is debatable about whether such notes would be responsive.  Notes may simply *reflect* Mr. Hur's conclusions, in the same way that prior drafts of Mr. Hur's report may have done so.  Material reflecting Mr. Hur's views is not synonymous with material that he *relied upon* to reach those views.  If Plaintiffs want to request notes or other materials, they can do so in a way that reasonably describes what they are looking for.

---

[4] Mr. Hur's testimony before Congress in March 2024 corroborates the conclusion that he relied generally upon the Biden-Hur interviews and the Biden-Zwonitzer recordings in drafting the quoted passages of the Report.  *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the House Comm. on the Judiciary, at 65, 72 (Mar. 12, 2024).

[5] Plaintiffs have indicated that the Department's search may have been overinclusive, by not pinpointing particular segments in the Biden-Hur interviews or Biden-Zwonitzer recordings that may have informed the Special Counsel's statements.  But a search is not rendered unreasonable because it happens to yield larger records than what a requester had envisioned; the standard is instead whether the search is "reasonably calculated to uncover all relevant documents." *Steinberg*, 23 F.3d at 551.  Again, there is no reason to believe that Mr. Hur relied on particular pinpointed segments of the Biden-Hur interviews and Biden-Zwonitzer recordings and omitted that information from the passages at issue.

Since the Department's search was reasonably calculated to uncover potentially responsive documents, it was adequate under FOIA.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant partial summary judgment on the adequacy of its search.

Dated:  July 1, 2024                              Respectfully submitted,

                                                  BRIAN M. BOYNTON
                                                  Principal Deputy Assistant Attorney General

                                                  MARCIA BERMAN
                                                  Assistant Branch Director

                                                  */s/ Cameron Silverberg*
                                                  CAMERON SILVERBERG
                                                  Trial Attorney (D.C. Bar No. 1780628)
                                                  United States Department of Justice
                                                  Civil Division, Federal Programs Branch
                                                  1100 L Street NW
                                                  Washington, DC 20005
                                                  Tel.:    (202) 353-9265
                                                  Fax:     (202) 616-8470
                                                  Email: Cameron.D.Silverberg@usdoj.gov

                                                  *Counsel for Defendant*