IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HERITAGE FOUNDATION**,<br><br>**MIKE HOWELL**,<br><br>   *Plaintiffs,*<br><br>  v.<br><br>**U.S. DEPARTMENT OF JUSTICE**,<br><br>   *Defendant.* | Case No. 1:24-cv-00645-DLF |

**DEFENDANT'S REPLY IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
REGARDING THE ADEQUACY OF ITS SEARCH**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

I.     The Department Conducted a Reasonable and Adequate Search ....................................... 3

        A.     The Department's Search Was Reasonably Calculated to Locate All Responsive Records Based on a Reasonable Interpretation of the Request ........... 3

        B.     The Department Consulted with Individuals Knowledgeable About the SCO Files ................................................................................................................ 7

        C.     Speculation About What Other Records Could Exist Does Not Render the Search Inadequate ................................................................................................... 8

II.    The Department Did Not Waive its Ability to Reasonably Interpret the Request ............ 10

CONCLUSION ............................................................................................................................. 13

# **TABLE OF AUTHORITIES**

**Cases**

*Davis v. Dep't of Just.*,
  460 F.3d 92 (D.C. Cir. 2006) .................................................................................................. 7

*Greenpeace, Inc. v. Dep't of Homeland Sec.*,
  311 F. Supp. 3d 110 (D.D.C. 2018) ........................................................................................ 9

*Leopold v. U.S. Dep't of Just.*,
  301 F. Supp. 3d 13 (D.D.C. 2018) ................................................................................... 11, 12

*Oglesby v. U.S. Dep't of Army*,
  920 F.2d 57 (D.C. Cir. 1990) .................................................................................................. 4

*People for the Am. Way Found. v. Nat'l Park Serv.*,
  503 F. Supp. 2d 284 (D.D.C. 2007) ........................................................................................ 7

*Public Employees for Environmental Responsibility v. EPA*,
  314 F. Supp. 3d 68 (D.D.C. 2018) ........................................................................................ 12

*Truitt v. Dep't of State*,
  897 F.2d 540 (D.C. Cir. 1990) ................................................................................................ 7

**Regulations**

28 C.F.R. § 16.3 ........................................................................................................................... 12

**Other Authorities**

Robert K. Hur, Special Counsel, Report on the Investigation Into Unauthorized Removal,
  Retention and Disclosure of Classified Documents Discovered at Locations Including the
  Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.,
  (Feb. 2024), (Report),
  https://www.justice.gov/storage/report-from-special-counsel-robert-k-hur-february-
  2024.pdf ................................................................................................................................. 9

## INTRODUCTION

The Department of Justice conducted an adequate search for records responsive to Plaintiffs' Freedom of Information Act ("FOIA") request, based on a reasonable interpretation of the request. The request seeks the records that Special Counsel Robert Hur "relied upon" in making certain statements in his Report related to President Biden's memory and mental faculties. The Department reasonably construed that request as seeking the records referenced and cited in the statements themselves. Plaintiffs' principal argument that the Department's search was inadequate is that there may be other records that Mr. Hur relied upon in drafting the statements that were not referenced in the Report. But a search's adequacy does not depend on the possibility that there may be other responsive records; it depends on whether other records are *likely* to exist.

Here, the text of the statements themselves demonstrate Mr. Hur's reliance (they include references to specific other records) according to a common practice for conveying reliance (they include footnotes to and descriptions of sources) in the context of a regulatory regime that required Mr. Hur's report to explain the bases for his decisions (the Report was submitted pursuant to the Department's Special Counsel regulations). There is no basis to conclude that Mr. Hur relied on other specific sources. And Mr. Hur's congressional testimony supports that conclusion. There, while Mr. Hur testified that his overall conclusions were based on "all of the evidence," he offered his Report as an explanation of his decisions and referenced no specific sources other than those identified in Report.

The Department's search met the standard under the law and, indeed, Plaintiffs' own standard. Contrary to Plaintiffs' contentions, the Department did, in fact, consult with individuals familiar with the SCO's files. Plaintiffs indicate that doing so would constitute a "reasonable

1

search." Plaintiffs' Cross Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment Regarding the Adequacy of Defendant's Search at 14, ECF No. 22 ("Opposition"). Plaintiffs also concede that the law did not require the Department to interview Mr. Hur about what else he conceivably may have relied upon. *Id.* Plaintiffs are thus left with only speculation about what additional searches might have turned up. They may "well imagine" that SCO lawyers maintained additional material in a source file on "memory," *id.*, or that a close review of otherwise unresponsive "contemporaneous drafting materials" could reveal other sources, *id.* at 19, but that is insufficient. If Plaintiffs want other materials, such as those they speculate about, FOIA permits them to submit requests for them. FOIA does not require the Department to search every possible repository of files; it requires a reasonable search of those locations likely to contain responsive records, based on the circumstances of the case. And FOIA does not permit Plaintiffs to use capacious request phrasing to probe and shift the FOIA search standard until they are satisfied.

The Department acted reasonably and appropriately in conducting a search based on the FOIA request and the context, and it was not required to deny the request simply because Plaintiffs wanted to litigate a different interpretation. Accordingly, the Court should grant the Department summary judgment on the adequacy of its search.[1]

---

[1] The parties reached an agreement regarding processing portions of the Biden-Zwonitzer recordings, the only records currently at issue in this case. *See* Joint Status Report (June 25, 2024), ECF No. 20.

# ARGUMENT

I. **The Department Conducted a Reasonable and Adequate Search**

As set forth in the Department's opening brief, the guiding principle for an agency in conducting a FOIA search is that it must search those locations where records responsive to the FOIA request are reasonably likely to be found. It is not required to search everywhere that it is merely possible that responsive records may be found. The Department conducted an adequate search here because it interpreted Plaintiffs' request for records relied upon by Mr. Hur in making certain statements in his report that relate to President Biden's memory and mental faculties as seeking the records that the report itself indicates Mr. Hur relied upon, and then located those records. *See* Defendant's Memorandum in Support of Motion for Partial Summary Judgment at 11-21, ECF No. 21 ("Defendant's Opening Brief"). In the particular circumstances of this case, where the portions of the Hur Report highlighted in the FOIA request provided Mr. Hur's basis for them, the Department's interpretation and search were adequate and reasonable.

    A. **The Department's Search Was Reasonably Calculated to Locate All Responsive Records Based on a Reasonable Interpretation of the Request**

Plaintiffs argue that it was unreasonable to assume that the records relied upon for Mr. Hur's specific statements in his Report about President Biden's memory and mental faculties are co-extensive with the records referenced in the Report. In other words, Plaintiffs argue that there could be other records that Mr. Hur relied upon for these statements that were not referenced or cited in the Report, so the Department had to conduct a broader search. But that is not the relevant

standard—the standard is whether it was *likely* that such other records existed. *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). And here, all evidence points to the contrary.[2]

Start with the highlighted statements in the FOIA request themselves, which the Department set out in full in its opening brief, at pages 3-8, and which Plaintiffs essentially ignore in their Opposition. The highlighted sentence in Passage 1 says: "For these jurors, Mr. Biden's apparent lapses and failures in February and April 2017 will likely appear consistent with the diminished faculties and faulty memory he showed in Zwonitzer's interview recordings and in our interview of him." It is clear from this sentence that Mr. Hur was relying upon his office's interview of Biden and the Biden-Zwonitzer recordings. The highlighted statements in Passage 2 again identify the Biden-Hur interview as its source, as well as the Special Counsel's "direct observations of [Biden]," which is of course not a record. The highlighted statements in Passage 3 also reference the Biden-Hur interview, plus the Afghanistan memo. The highlighted sentence in Passage 4 shows that it was based on the Biden-Hur interview and the Biden-Zwonitzer recordings. For the highlighted sentences in Passage 5, it is just the Biden-Hur interview, and the Special Counsel's "direct interactions with and observations of [Biden]"—again, not a record. And the highlighted sentence in Passage 6 identifies the Biden-Hur interview and the Biden-Zwonitzer recordings as its sources. *See* Defendant's Opening Brief at 17-19.

---

[2] The Department did not equate records "relied upon" with "records *cited*," as Plaintiffs argue. Opposition at 13. Rather, the Department reasonably interpreted the request to be seeking material "referenced" in the passages because the passages themselves indicate what they were based on. *See* Decl. of Bobak Talebian (July 1, 2024) ¶ 7. That includes cited material, but it also includes material that is generally mentioned, without a formal citation. For instance, the Department considered the Afghanistan memo to be potentially responsive, even though Passage 3 refers to it without citing to it in a footnote.

4

Plaintiffs contend that Mr. Hur's congressional testimony suggests he relied on other records. That is not the case. In his testimony—much of which Plaintiffs themselves quote in their Opposition—Mr. Hur explained that he generally relied upon his interview with President Biden and the Biden-Zwonitzer recordings in reaching his conclusions about the President's memory in the Report. First, Mr. Hur expanded upon his conclusions in an exchange with Representative Harriet Hageman, who referenced the highlighted sentence in Passage 6. *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the House Comm. on the Judiciary, at 72 (Mar. 12, 2024) ("Hur Testimony"), available at ECF No. 23-4. Representative Hageman asked Mr. Hur if he had "compare[d] President Biden's current memory or condition with his memory or condition when he was in the Senate or when he left the Vice Presidency and took the classified documents subject to your investigation." *Id*. Mr. Hur responded that such a comparison was included in the Report: "One of the things that's in the report is an assessment of the President's memory, *based on recordings from the 2016-2017 timeframe, recordings of conversations between Mr. Biden and his ghostwriter*, and comparing that with the President's memory that he exhibited *during our interview of him in October of 2023*. So there was a comparison there." *Id.* (emphasis added).

Second, Mr. Hur's congressional testimony included the following exchange with House Judiciary Committee Chairman Jim Jordan:

> Mr. HUR: *The totality of the time that I spent with the President during his voluntary interview was something that I certainly considered in framing my assessment and articulating it in the report*. That includes not only the words in the cold record of the transcript of the interview, but also the experience of being there in the room with him, and frankly considering how he would present to a jury in a criminal trial if charges were brought.
>
> Chair JORDAN: I guess I'm asking specifically. I know you [c]ite in the report the dates that he couldn't remember when he was Vice President, when he began, when his term

5

> ended. You cite that in your report. Is there anything else specifically that stands out from that interview with the President?
>
> Mr. HUR: A number of things stand out. Again, I'm aware that the transcript [has] now been made available. I do provide certain examples in my report of significant personally painful experiences about which the President was unable to recall certain information. I also took into account the President's overall demeanor in interacting with me during the five-plus hour voluntary interview. So, it was a wealth of details about being there in the moment with the President, including his inability to recall certain things. I'll also say, as reflected in the transcript, the fact that he was prompted on numerous occasions by the members of the White House Counsel's Office.

*Id.* at 65 (emphasis added). Once again, Mr. Hur was asked under oath about the basis for his statements about the President's memory. And once again, Mr. Hur referred to his interview of the President.

Nothing in Mr. Hur's testimony identified any records he relied on other than those referenced in the Report. Indeed, Mr. Hur underscored that his Report needed to speak for itself:

> The Department's regulations required me to write a confidential report explaining my decision to the Attorney General. I understood that my explanation about this case had to include rigorous, detailed, and thorough analysis. In other words, I needed to show my work, just as I would expect any prosecutor to show his or her work explaining the decision to prosecute or not. The need to show my work was especially strong here. The Attorney General had appointed me to investigate the actions of the Attorney General's boss, the sitting President of the United States. I knew that[,] for my decision to be credible, I could not simply announce that I recommended no criminal charges and leave it at that. I needed to explain why. . . .
>
> I did not sanitize my explanation, nor did I disparage the President unfairly. I explained to the Attorney General my decision and the reasons for it. That's what I was required to do. . . .
>
> [I am] [c]onfident the analysis set forth in Chapters 11-13 of my report provided [a] thorough evaluation and explanation of the evidence[,] and I encourage everyone to read it when forming their opinions of the report.

*Id.* at 7-8.

In light of this context, it is not likely that there were other records that Mr. Hur relied upon for the highlighted statements in the Report that he omitted from the Report or from his

congressional testimony. The adequacy of the agency's search is judged based on those locations where records responsive to the FOIA request at issue are likely to be found, not based on locations where other records might be found. *See, e.g., Davis v. Dep't of Just.*, 460 F.3d 92, 167, 169 (D.C. Cir. 2006) (noting that the adequacy of a search is "dependent upon the circumstances of the case" (citation omitted)); *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (same); *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 293 (D.D.C. 2007) (same). The analysis here is based on the highlighted statements that Plaintiffs themselves included in their FOIA request and does not necessarily extend to even other passages of the Hur Report, let alone other scenarios such as a hypothetical legal brief or how any agency hypothetically prepares an administrative record. *Cf.* Opposition at 13, 18-19.

**B. The Department Consulted with Individuals Knowledgeable About the SCO Files**

Plaintiffs' Opposition indicates Plaintiffs' position that the search may have been reasonable if the Department had consulted with an "individual with knowledge of how files were structured in Special Counsel Hur's Office" or "familiar with the working files and drafting processes" of Mr. Hur's Report. Opposition at 14, 19. Plaintiffs previously indicated that they were demanding more: specifically, that the Department interview a former Special Counsel. *See* Transcript of June 10, 2024 Status Conference at 32 ("If they didn't talk to Special Counsel Hur, I can tell you, we will dispute it."). Accordingly, the Department's initial submissions did not describe how it has consulted with individuals familiar with the SCO files. The Department submits a Supplemental Declaration detailing these steps, which included contact with personnel with knowledge of the Special Counsel's Office's records and recordkeeping, such as the Office's former Records Manager, and former Executive Officer. *See* Supplemental Declaration of Bobak

7

Talebian (July 17, 2024) ¶¶ 7-9.  These steps, in combination with the Department's analysis of the passages, were fully sufficient to effectuate an adequate search in this case.

### C. Speculation About What Other Records Could Exist Does Not Render the Search Inadequate

Since the Department consulted with individuals knowledgeable about SCO records, Plaintiffs are left only with speculation about what else could have been discovered had the Department taken additional steps.  That speculation is insufficient to render the Department's search inadequate.

Plaintiffs apparently (and correctly) have backed away from their earlier insistence that a search that did not include an interview of Mr. Hur would be inadequate.  *Cf.* Transcript of June 10, 2024 Status Conference at 32.  Plaintiffs now argue that an interview is not "the only possible reasonable search."  Opposition at 14.  They suggest that a search would be reasonable if it included consultations with "[o]thers formerly in the Special Counsel's Office."  *Id.*; *see also id.* at 19.  But the Department did consult with others formerly in the Special Counsel's Office in locating responsive records, as discussed above.

Plaintiffs speculate that other systems or records *might* exist that would expand the universe of potentially responsive records.  For example, they suggest the SCO may have used "an official SharePoint." *Id.* at 14.  They "well imagine" that SCO lawyers may have kept "source files for key topics such as the President's 'memory' that featured so centrally in the declination decision." *Id.* And they suggest that a review of "contemporaneous drafting materials—while not *themselves* responsive—could well reveal the records relied upon" beyond those referenced in the Report. *Id.* at 19 (emphasis in original).  But Plaintiffs provide no evidence or argument that searching these locations would be likely to identify records that Mr. Hur relied upon for the specific highlighted

8

statements that the Department has not already identified. It is in fact exceedingly unlikely that such further steps would reveal unreferenced evidence for Mr. Hur's conclusions about the President's memory.

Moreover, Plaintiffs' proposed fishing expedition through the SCO filing system would not only be needless; it would also be significantly burdensome. As the Hur Report indicates, "the investigation collected over seven million documents, including e-mails, text messages, photographs, videos, toll records, and other materials from both classified and unclassified sources." Report at 29. FOIA does not require the Department to sift through this enormous database when the passages themselves have already identified the relevant material. Nor does FOIA require the Department to examine prior "drafting materials" to determine what past versions of the passages may have referenced. *See Greenpeace, Inc. v. Dep't of Homeland Sec.*, 311 F. Supp. 3d 110, 133 (D.D.C. 2018) (noting that FOIA does not require agencies to "conduct research" or to "otherwise dig out all the information that might exist, in whatever form or place it might be found" (citation and internal quotation marks omitted)).

Plaintiffs cite as an example of the alleged deficiency of the search the fact that the Department did not search for any notes taken by Mr. Hur or his team during his interview with President Biden. Opposition at 20. Plaintiffs note that Mr. Hur testified to Congress that he relied upon all available "demeanor evidence" for his conclusions about President Biden's memory, discussing the "totality of the time that I spent with the President during his voluntary interview." *Id.* at 21 (quoting Hur Testimony at 65). According to this testimony, Mr. Hur relied on evidence of President Biden's demeanor during the interview with him, which is not the same thing as saying he relied upon any notes he may have taken during that interview when drafting specific sentences in the Report. A FOIA request for such notes may be proper in its own right, but that is not what

Plaintiffs asked for here. And even if the Department identified any notes that Mr. Hur or his team took during the interview, it would not provide a basis to conclude Mr. Hur "relied on" them for the specific sentences in the Report. Any such notes may simply reflect Mr. Hur's conclusions—in the same way that prior drafts of Mr. Hur's Report may have done so—without being independent sources that he relied upon for those conclusions. Plaintiffs appear to implicitly accept that distinction by recognizing that "contemporaneous drafting materials" are "not themselves responsive" to their request. Opposition at 19 (emphasis omitted).

## II.     The Department Did Not Waive its Ability to Reasonably Interpret the Request.

Plaintiffs also argue that the Department waived any challenge to the propriety of the FOIA request, and cannot therefore apply a reasonable interpretation to it, by not outright denying the request as invalid when it was first made. But the Department has not taken the position that the request is invalid, so it is not a matter of whether it waived that argument. To the contrary, the Department unquestionably responded to the FOIA request, identifying four potentially responsive records and proceeding to the processing stage. The question now is whether its interpretation and search were reasonable and adequate. The Department has only argued that interpreting the request to have required the Department to interview Mr. Hur would have been invalid to demonstrate the reasonableness of its alternative interpretation. But it did not deny the request as invalid and is not seeking to defend such a nonexistent denial now.

Plaintiffs seem to be arguing that the Department was required to deny the request as invalid because it knew that Plaintiffs wanted to litigate the validity of its "relied upon" request. It is not entirely clear what the import of this argument is, but in any event, it is not correct. It is entirely appropriate—and consistent with FOIA's pro-disclosure ethos—for an agency to adopt a

10

reasonable interpretation of a request where a "literal construction" would be "overly broad, unduly burdensome, and inadequate to describe the records sought," regardless of a FOIA requester's litigation objectives. *Leopold v. U.S. Dep't of Just.*, 301 F. Supp. 3d 13, 23 (D.D.C. 2018).

Plaintiffs also accuse the Department of intentionally delaying the litigation by processing their request rather than denying it. That is incorrect as well. Processing the request resulted in a search, the identification of records, and the processing of those records, which most FOIA requesters want. Had the Department instead denied the request, no search would have taken place and no records would be processed until after the Court had resolved the threshold issue of whether Plaintiffs had reasonably described the records they sought. And if Plaintiffs lost at that stage—for example, because they insisted on an interview of Mr. Hur—then they would have received no response at all, despite a reasonable interpretation of the request being available that would have enabled processing of responsive records. The Department was under no obligation to embrace this all-or-nothing approach, as the *Leopold* court made clear when it upheld an agency's reasonable, narrowed interpretation of a request that enabled processing to take place. *See id*. at 22-25.

Plaintiffs argue that *Leopold* is distinguishable because "it did not involve a situation where: (1) Plaintiffs had made clear that if Defendant declined to process the request as written Plaintiff intended to litigate the adequacy of the requests; (2) Defendant represented to both the Court and Plaintiffs—without caveat—that Defendant was processing the Request; and (3) Plaintiffs do not agree that Defendant's construction of the Request is reasonable." Opposition at 15. But the Department did process the request "as written," just not in a manner Plaintiffs insisted on at the time but have now abandoned. And Plaintiffs offer no explanation for why any of these

11

distinctions make a difference. The *Leopold* plaintiffs made virtually the same argument that Plaintiffs make here: that an agency cannot "apply a saving construction of the request without prior notice or permission from the Plaintiffs." *Leopold*, 301 F. Supp. 3d at 25 (citation and internal quotation marks omitted); *see also* Opposition at 10 (arguing that the Department cannot "apply a form of an avoidance cannon and adopt a saving interpretation of the Request" (citation, alteration, and internal quotation marks omitted)). The court rejected that argument, finding that there was no "obligation on agencies to provide notice and/or to confer with a requester before construing an otherwise fatally overbroad request in a manner to which a response may be provided." *Leopold*, 301 F. Supp. 3d at 25. The same reasoning applies here.[3]

Plaintiffs seek to rely on *Public Employees for Environmental Responsibility v. EPA*, 314 F. Supp. 3d 68 (D.D.C. 2018) ("*PEER*"), for their waiver argument, but the Department's course of action here is consistent with what the court ordered in *PEER*. *PEER* held that the Environmental Protection Agency incorrectly *denied* a request seeking records "relied upon" by then-Administrator Scott Pruitt in making specific statements about climate change in a television interview. *Id.* at 76-78. The court then directed the agency to conduct a search for "records compiled, prepared, provided, used, or reviewed by Administrator Pruitt in connection with his public statements" in the interview—a construction of the request that essentially enacted the agency's prior offer "to search for any briefing materials that were prepared by Administrator Pruitt or certain members of his staff, in the days leading up to the interview." *Id.* at 73, 78 (citation

---

[3] *Leopold* also rebuts Plaintiffs' argument that the Department may have been required to confer with Plaintiffs under 28 C.F.R. § 16.3(b), which directs the Department to consult with a requester if the request "does not reasonably describe the records sought." That regulation has no applicability here, since Plaintiffs' request "provided a reasonable description of the records sought and allowed the [Department] to limit the scope of the request to a reasonably manageable search, avoiding the need to trigger any conferral obligation." *Leopold*, 301 F. Supp. 3d at 25.

omitted). Here, the Department did not, unlike EPA, deny the request but rather reasonably interpreted it and conducted an adequate search, based on the fact that the Hur Report itself contained the answer to what Mr. Hur relied upon for the highlighted statements.

## CONCLUSION

For the foregoing reasons and the reasons set forth in the Department's opening brief, the Court should grant the Department partial summary judgment on the adequacy of its search.

Dated: July 17, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cameron Silverberg*
CAMERON SILVERBERG
Trial Attorney (D.C. Bar No. 1780628)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel.:    (202) 353-9265
Fax:    (202) 616-8470
Email: Cameron.D.Silverberg@usdoj.gov

*Counsel for Defendant*