```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   HERITAGE FOUNDATION, et al.,    .
                                     .  Case Number 24-cv-645
 4             Plaintiffs,           .
                                     .
 5        vs.                        .
                                     .  Washington, D.C.
 6   U.S. DEPARTMENT OF JUSTICE,     .  June 18, 2024
                                     .  2:18 p.m.
 7             Defendant.            .
     - - - - - - - - - - - - - - - -
 8

 9                 TRANSCRIPT OF STATUS CONFERENCE
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the Plaintiffs:        SAMUEL DEWEY, ESQ.
                                Chambers of Samuel Everett Dewey, LLC
13                              2200 12th Court North
                                Apartment 609
14                              Arlington, VA 22201

15                              DANIEL MAULER, ESQ.
                                Heritage Action for America
16                              214 Massachusetts Avenue Northeast
                                Washington, D.C. 20002
17
                                KYLE BROSNAN, ESQ.
18                              495 Eleanor Lane
                                Arnold, MD 21012
19
     For the Defendant:         CAMERON SILVERBERG, ESQ.
20                              JOSHUA ABBUHL, ESQ.
                                U.S. Department of Justice
21                              1100 L Street Northwest
                                Washington, D.C. 20005
22

23   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                333 Constitution Avenue Northwest
24                              Room 4704-B
                                Washington, D.C. 20001
25                              202-354-3284
```

```
 1                    P R O C E E D I N G S

 2        (Call to order of the court.)

 3             COURTROOM DEPUTY:  Your Honor, we are in Civil Action

 4   24-645, Heritage Foundation, et al., versus the U.S. Department

 5   of Justice.

 6        If I can have counsel please approach the podium and state

 7   your names for the record, starting with counsel for the

 8   plaintiff.

 9             MR. DEWEY:  Good afternoon, Your Honor.  Samuel Dewey

10   for the plaintiff, and with me are Dan Mauler and Kyle Brosnan.

11             THE COURT:  Good afternoon to all of you.

12             MR. SILVERBERG:  Good afternoon, Your Honor.  Cameron

13   Silverberg for the Department of Justice.  Also with me is Marcy

14   Berman, assistant director for the Federal Programs Branch at

15   DOJ, and Joshua Abbuhl.

16        For the record, Mr. Abbuhl is counsel of record in Judicial

17   Watch v. DOJ, 24-cv-700.  That is the case before Judge Kelly

18   that we discussed at the last status conference involving the

19   audio material between President Biden and the special counsel.

20             THE COURT:  Okay.  Thank you.

21        All right.  Thank you for being available on short notice.

22   I had hoped that you all would be able to confer and narrow some

23   issues, but your joint status report raised more questions than

24   answered questions.  So I just thought it more efficient to

25   bring you back in and go through some of these questions that I
```

 1    have.

 2         So let me talk to you first, Mr. Dewey.

 3              MR. DEWEY:  Absolutely, Your Honor.

 4              THE COURT:  Tell me what -- I understand you object to

 5    DOJ's proposal to narrow the tapes from 70 hours to 17.  Is that

 6    because you basically don't know what you don't know?  Is that

 7    the argument?

 8              MR. DEWEY:  No disagreement that it would make sense

 9    to prioritize those, but I don't know what I don't know.  I

10    don't even know if those 17 are, you know, actually in issue,

11    given the search deficiencies that plaintiffs submit exist in

12    this case.

13         So I would like to be more helpful to the Court, and I

14    would like to compromise, Your Honor.  I just don't know what I

15    don't know.  I can consent to prioritization.  I can even enter

16    into an agreement to, you know, hold in abeyance other cases we

17    have if it's a resource issue.  But I can't comment on what I

18    don't know.

19         And as far as we can tell, Your Honor, this is a very

20    unusual case in that -- and my friends can correct me if I'm

21    wrong.  Because the Special Counsel's Office no longer exists,

22    no one who actually would have worked with this set of records

23    has been consulted, as I understand it.  No one from that team,

24    certainly -- I know they've stated on the record that Mr. Hur

25    was not consulted, and the government has said they will not ask

1    Mr. Hur.  But I don't even know if anybody else on his team was

2    consulted.

3         I'm just in a complete vacuum here.  And I apologize I

4    can't be more helpful.

5              THE COURT:  Okay.  Well, I know there's frustration on

6    your part on the way in which the department is objecting now,

7    in a way, to the way in which the request was phrased.

8         Do you understand why they focus on 2017 in light of your

9    request?

10              MR. DEWEY:  I do, Your Honor.  I don't dispute that

11   that is a rational way to proceed.  I just -- based on the

12   information I know, it seems eminently rational to prioritize

13   those 17 hours.  I just don't know what I don't know in the

14   other 17 hours, and I don't know what I don't know about what is

15   actually in those 17 hours.

16        There are, as the government now admits, notes, transcripts

17   of these Special Counsel's Office had access to.  They surely --

18   I mean, there is no question in my mind, Your Honor, that

19   Mr. Hur and Mr. Krickbaum are the type of lawyers who would have

20   listened to every second of these tapes.

21        So I should think some sort of a rubric exists within the

22   department.  And I'm not asking to see that.  I'm just asking

23   for some steer here, Your Honor.

24        And on the search question, we really were blindsided.  The

25   government didn't even assert the stock defense in its answer

1    that the request was improper.  So we had no idea that this

2    issue was going to present this way.  The government refused,

3    and I get it's their right, Your Honor, but they did refuse our

4    repeated entrees to discuss the search.  And that's kind of

5    where we are.

6        So our position is we're fine with prioritizing that.

7    We're fine with doing whatever we can to move this along.  We

8    just don't know what we don't know.

9            THE COURT:  Right.  Well, tell me why you've expressed

10   the specific interest, according to the department, in the

11   February 16th interview.

12           MR. DEWEY:  So, Your Honor, if I may --

13           THE COURT:  And that's 2017; correct?

14           MR. DEWEY:  That is correct, Your Honor.  And I

15   apologize that I'm reaching for a binder.  I just want to be as

16   precise as I can, Your Honor.

17       As I understand it, the passages that are in our complaint,

18   Your Honor, that are the gamut of the suit, which is documents

19   relied upon for various passages in the complaint, as I

20   understand it, what the department has done is looked at the

21   time period of some of those discussions and concluded that the

22   time period aligns.

23       And I don't dispute that logic.  That's logical to me.

24   Were I looking at this in a vacuum, I don't mean to beat a

25   horse, Your Honor, but again, I just come back to this seems

1  about as inefficient as humanly possible, considering there are

2  eminently competent and qualified lawyers who will know where

3  this stuff is.

4      THE COURT:  All right.  Okay.  So you have, am I

5  correct, six different cases pending in the court related to

6  President Biden and Special Counsel Hur and --

7      MR. DEWEY:  Yes, Your Honor.  The full list is in

8  front of Your Honor at ECF Number 13, I believe, my letter to

9  the Court clarifying that issue.

10      THE COURT:  All right.  I mean, obviously, at some

11  point, there are resource issues.  So can you prioritize for my

12  benefit where this stacks up relative to those other cases in

13  terms of importance?

14      MR. DEWEY:  Your Honor, we view this as essential,

15  because it goes directly to Special Counsel Hur's conclusions

16  regarding charging decisions, how the president would present to

17  a jury, which relates to the memory issues, and that's a public

18  controversy which the White House has only fanned with denials.

19      THE COURT:  But isn't the Kelly case more important to

20  you?

21      MR. DEWEY:  If I had to rank them, I would concede

22  that, Your Honor.  I think this certainly ranks above some of

23  the Hur cases.

24      And, Your Honor, to be clear, we are not pressing for an

25  accelerated schedule in all of those cases.  In the case

1    involving the images, I have been conferring with Mr. Myers, who

2    is representing the department in that case, and we have not

3    pressed.  We are working that out.  The fingerprints case was

4    filed later.

5        And we don't have an objection if Your Honor felt it was

6    appropriate to prioritize even within those cases.  We just

7    viewed this set of cases as particularly important.

8        THE COURT:  Well, I don't have control over all of

9    those cases.  I'm just curious where it stacks up.

10       MR. DEWEY:  I would probably rank this second, Your

11   Honor, in terms of the cases we filed.  And again, I suppose I

12   do have control, and I can't speak to ranking within the Hur

13   cases or one or two Hunter Biden cases that are related to the

14   broader impeachment electoral issues in our submission, but I

15   can say -- I can and I'm authorized to state as to other cases,

16   we will consent to a stay or a delayed production.  We did that

17   in another matter in front of Your Honor last year, and we would

18   be happy to do that again if the department came to us with a

19   specific resource constraint.  We just don't have any basis to

20   even negotiate on that, Your Honor.

21       Again, I've reiterated in the JSR, my clients were

22   certainly willing to concede issues that we don't think are

23   worth litigating.  We're not even going to challenge an

24   exemption 1 claim, if that's made.  We could, but we're not.

25       THE COURT:  When you say you're willing to consent to

1    a stay, you mean in what case?

2         MR. DEWEY:  There are other cases against the

3    department, Your Honor, that --

4         THE COURT:  That you're involved in that is not this

5    set of cases?

6         MR. DEWEY:  That is not this set that we're happy, if

7    there is a resource issue and there's a concrete proposal and

8    the Court feels that an accommodation is necessary in terms of

9    accelerating here, you need to pull resources from somewhere,

10   yes.  And we did that, Your Honor, last summer in another case.

11        And I'm offering that up just to show and I've been

12   authorized to offer that up just to show we are trying -- we

13   understand that there are limits, even for the department.  We

14   are trying to move this forward.

15        Again, that's part of my frustration here is I don't even

16   know what's in the 17 hours.  It may be that really we only need

17   an hour and a half, and if someone picked up the phone and

18   asked -- it doesn't even have to be Mr. Hur.  Ask Mr. Krickbaum.

19   He might say, in 30 minutes of reading the complaint, well,

20   yeah, go get that file, what you need is here, here, and here.

21        It kind of is encompassed in the search issue, Your Honor,

22   and I am beating a horse, and I apologize.  But I would like to

23   be more helpful, and I've tried to be -- we have tried to be as

24   helpful as we can on all these issues.

25        THE COURT:  Does your offer to stay include the Hunter

1    Biden cases?

2         MR. DEWEY:  I would have to take that back to my

3    client.  I think we view them as --

4         THE COURT:  Okay.  I'm just checking, because that's

5    the only one on my docket.

6         MR. DEWEY:  We view those as in parallel.  I think

7    Your Honor may have -- I don't think Your Honor has any other

8    cases against DOJ.

9         THE COURT:  You're keeping a lot of judges busy, as

10    well as the department.

11      All right.  Let me ask you about Mr. Zwonitzer's notes.

12    You agree those aren't subject to FOIA unless the special

13    counsel relied on them; right?

14         MR. DEWEY:  100 percent agree, Your Honor.  All we are

15    saying there is that we have 72 hours and we don't know what's

16    in them, but we know there are notes and we know that there are

17    transcripts that could give some sort of topical guidance.

18      So all I was asking was that the department consult those

19    and then potentially use those for the normal give and take.  Do

20    you really want tape X which is an hour and 15 minutes and is

21    literally the president discussing the impact of his son's death

22    on him and his wife?  The answer is going to be obviously not.

23         THE COURT:  Okay.  Tell me why you're not agreeing to

24    just not pursue rather than stay the issue with respect to the

25    Hur tapes?  I mean, that's before Kelly; right?

1          MR. DEWEY:  Correct.

2          THE COURT:  And you're going to be estopped from

3   coming before me and trying to get a different decision on that.

4   Why is that just not Judge Kelly's case now and this is just

5   this case involving the biographer's tapes?  What are you hoping

6   to achieve by staying that?

7          MR. DEWEY:  We had thought that was just the most

8   efficient resolution.

9          THE COURT:  Okay.  Does it --

10         MR. DEWEY:  Procedurally, if Your Honor disagreed with

11  us and would prefer a different procedure, I can certainly

12  confer with the department.

13         THE COURT:  I was just kind of confused by that.

14         MR. DEWEY:  Your Honor, the thought there was, can you

15  dismiss a case as to a specific record because that record,

16  although responsive, would be litigated in another court?  It

17  just seemed easier to us, from the plaintiff's side -- I can't

18  speak for my friends except for that proposal.  It seemed

19  easiest to us to simply stay it.

20      And then to your point, you know, I suppose the

21  government -- no, it would be the same district.  So I don't

22  even think the government could not acquiesce.  That would be a

23  nice federal courts point that I don't think Your Honor would

24  need to get into.  But the thought was that the judgment would

25  flow from Kelly, and that's easier than trying to figure out how

1  do you --

2         THE COURT:  Okay.  It's not a big deal.  It's not

3  critical.  I was just confused.

4      All right.  So I may have more questions for you,

5  Mr. Dewey.  Let me hear from the department.

6      Is it Mr. Dewey or -- I mean Mr. Silverberg?

7         MR. SILVERBERG:  Thank you, Your Honor.

8      So just to address a point at the outset, the Court's order

9  directed the parties to discuss the rate of production and the

10  extent to which the rate of production of audiotapes can be

11  compared to that of pages of documents.

12         THE COURT:  Uh-huh.

13         MR. SILVERBERG:  And we'll certainly get into the rate

14  of processing, but we just wanted to clarify a point, that we

15  don't intend in this case to issue any productions, because we

16  have determined that the audio that we're discussing will be

17  withheld in full --

18         THE COURT:  Okay.  And I understand that.  Help me

19  understand the basis for the categorical withholding.  Is this

20  executive privilege?  What is -- what's the basis to withhold in

21  full when, as I understand it, the report contains quotes from

22  parts of the audio?  And if that's in fact true, why can you

23  withhold in full?

24         MR. SILVERBERG:  Your Honor, two points there.  First,

25  the basis for the withholding is at least under the privacy

exemptions 6 and 7(c). This was a set of audio recordings of in 2017 a private individual with another private individual discussing personal matters. The audio was never disclosed to anyone.

THE COURT: Well, I mean for a president.

MR. SILVERBERG: Your Honor, on the second point, which goes to waiver, these audio recordings were never disclosed to the public. They were -- the only reason that they came into the possession of the FBI was for a criminal investigation for two individuals who are not charged.

And so we think that this is just a clear case where privacy would apply.

THE COURT: So President Biden's privacy interests will exceed the public's interest in understanding why Hur made the decision he did? That's the department's position?

MR. SILVERBERG: Absolutely. The only cognizable public interest that seems to be raised on the other side is that this would illuminate the special counsel's reasoning. And the special counsel has explained his reasoning at length in both his report and the particular passages that are cited in the complaint and in his testimony to Congress. He listened to the relevant audio and made a determination that is included in these particular passages.

THE COURT: But maybe the American public disagrees with that conclusion. I mean, why is it still not -- why does

1    it stop with his conclusion?  Why is there not a public interest

2    in hearing what he heard?

3              MR. SILVERBERG:  Well, Your Honor, I would say that

4    the -- it's an exceedingly high bar to try to establish that the

5    special counsel, who is, you know, afforded the presumptions of

6    good faith in making a determination about whether to prosecute,

7    that there is a compelling public interest on the side of

8    questioning the special counsel's determination that he laid out

9    at length in a 380-page report and that we do not see that as

10   coming remotely close to outweighing the private interests,

11   which are enormous in the case of a privately recorded set of

12   conversations between two individuals who at that time, at the

13   time we're discussing, were private citizens discussing

14   extremely intimate details.

15        The book itself is called "Promise Me, Dad," which is an

16   illusion to a statement that Beau Biden made to Joe Biden

17   assuring that Joe Biden would be okay, whatever happened, as he

18   was facing terminal cancer.  So these were private

19   conversations.  They have never been released.

20        We think that it's crystal clear that --

21              THE COURT:  But with an eye to the substance of them

22   being released in a book; right?

23              MR. SILVERBERG:  Well, certainly, that's possible, but

24   at the time, these were --

25              THE COURT:  Did then -- well, now President Biden, did

he have the right to object to any comments that he said being

used?

MR. SILVERBERG:  I'm sorry, Your Honor.  You mean in

the book?

THE COURT:  Did they have some sort of agreement where

President Biden could veto anything that was said in the

interview that the biographer wanted to include in the book?

MR. SILVERBERG:  Your Honor, my understanding is that

these interviews were a long series of conversations detailing

events in the lead-up to writing the book itself and were about

all of the different events that the book covered, which is the

time stamp between November 2014 and January 2016.  And

obviously, prominent among that is Beau Biden's death and how it

affected his work.

And so my understanding is that these were private

conversations in advance of a book.  The audio of those

conversations has never been publicly released, and we think

that this comes into the heartland of what would be private.

These really are only a FOIA issue because of an FBI

investigation.

THE COURT:  No, I understand.  I'm not saying you

can't make the argument.  All I'm saying is we're going to do it

all at once.  That's all.

MR. SILVERBERG:  Absolutely, Your Honor.  And to that

point, the reason why we bring all this up is we think it would

1    be far more efficient and would be the -- would bring about the

2    fastest resolution of all this if, instead of going through the

3    enormous undertaking and processing for every particular

4    exemption, we instead pursue the bifurcation proposal in which

5    we litigate specifically the privacy issues which we think we

6    have strong arguments for.

7         THE COURT:  But let's just say hypothetically you lose

8    that.  Let's just say.  Then what?  I mean, time is of the

9    essence here.

10        MR. SILVERBERG:  Your Honor, so if we were to have to

11   process all -- so 70 hours of audio, then we're talking about a

12   very extensive process that we detailed in our joint status

13   report, which would have to begin with the classification review

14   for the underlying material, which would be an extremely

15   intensive process --

16        THE COURT:  And there's been no classification review

17   at all done of this to this point for any purpose?

18        MR. SILVERBERG:  Your Honor, what I can say is -- what

19   I know is just the full body of 70 hours has not gone through a

20   classification --

21        THE COURT:  Has any portion gone through a

22   classification review?

23        MR. SILVERBERG:  Your Honor, sitting here or standing

24   here, I don't have the specifics about whether individual

25   snippets of the --

1          THE COURT:  Because with respect to that, those

2     snippets, like, why do we need to delay the release of all of it

3     in order to --

4          MS. BERMAN:  I just want to clarify, Your Honor, we

5     did get confirmation that none of the audio in question has

6     underwent a classification review.

7          THE COURT:  None of it?

8          MS. BERMAN:  None of it.

9          THE COURT:  Okay.

10          MR. SILVERBERG:  So, Your Honor, we would have to go

11     through the classification review.  Then we would have to

12     process the underlying audio itself, which as we detailed in our

13     joint status report is an extremely time intensive process.  To

14     give Your Honor some context about the FBI's typical

15     processing -- and let me step back for a moment.

16        The Office of Information Policy at DOJ really has no

17     experience processing records remotely close to this level of

18     volume for audio.

19        But the FBI, which we've been consulting with, has informed

20     us that their standard processing rate for audio is 30 minutes

21     per month.  And that's a reflection of just how difficult it is

22     to go line by line.  It often requires a listener to listen to

23     multiple -- to sentences repeatedly to determine who exactly is

24     talking, to apply applicable redactions.

25        We don't have -- unlike the case of the special counsel and

1   his interviews with the president, we don't have some transcript

2   that's been created by the special counsel that we can attest to

3   its accuracy.  So we don't have the kind of transcript that

4   would enable a faster processing.

5        So just to put it in context and to clarify how this would

6   look under the FBI's rate, their typical processing rate for

7   written material is 500 pages a month.

8        So in effect, every hour of audio equates to a thousand

9   pages of written material per month.  And so without getting any

10  sense of narrowing from the other side, we're talking about

11  effectively 70,000 pages of material that the other side has

12  told us needs to be processed as soon as humanly possible.  And

13  that's just the processing.  That's not the consultations.

14       THE COURT:  So what about -- I just want to loop back

15  with Ms. Berman.  Even the portions of the interview -- you

16  don't have to get up.  You can answer it there, if you would

17  like.  Even the portions of the interview that were -- correct

18  me if I'm wrong, but I understand them to be quoted in the Hur

19  report.  There was no classification review as to those

20  statements before they went into a report to Congress?

21       MS. BERMAN:  My understanding is there was some level

22  of classification review of the information in the audio but not

23  the audio itself and certainly not the entirety of the audio.

24       THE COURT:  But what --

25       MS. BERMAN:  And -- I'm sorry.  And it was not like an

1    actual formal classification review.

2            THE COURT:  Okay.  But what else are we talking about

3    besides the content with the national security review?  I mean,

4    the information itself, that's what's reviewed; right?

5            MS. BERMAN:  Well, I mean, I think that what was

6    reviewed was, for instance, Biden reading from his notebooks,

7    and certain information in the notebooks that was read on the

8    audio would have been determined to be classified.

9        But that's a very different type of review than the

10    entirety of the -- the audiotape itself.

11            THE COURT:  No, no, no.  I'm just talking about the

12    portions of the audio that were, I understand, quoted in the

13    report.  That's all I'm talking about.  When you say there's

14    been no classification review of any kind, you mean that even

15    with respect to those quotes that are in the Hur report?

16            MS. BERMAN:  So, for instance, three of the notebooks

17    from which Biden was reading verbatim did contain classified

18    information.  Pages from those notebooks were sent for

19    classification review and determined to be classified.

20        Based on the pages in the notebooks being classified, the

21    investigation team made the logical assumption that those

22    conversations would also be classified, but they did not send

23    any audio for classification review.

24            THE COURT:  Okay.  But again, the information -- the

25    quotes that are in the Hur report presumably were not deemed to

1    be classified, or they wouldn't have been in the report, or no?

2    Is that not correct?

3              MS. BERMAN:  Well, yes, that's correct.

4              THE COURT:  Okay.  So, I mean, as a start, why can't

5    we start with those portions of the tape?

6              MS. BERMAN:  Which portions?

7              THE COURT:  That are quoted in the Hur report.

8              MS. BERMAN:  And just process the quotes?

9              THE COURT:  Uh-huh.  I mean, why would that be

10   problematic, from the department's standpoint?

11             MS. BERMAN:  So first of all -- it might be helpful

12   for me to approach.  Thank you, Your Honor.

13       So I think a distinction that I understand is not exactly

14   crystal clear, but there's a clear distinction between what's in

15   the Hur report, what's reported in the Hur report and the

16   audiotape itself.

17             THE COURT:  They're not identical?

18             MS. BERMAN:  They're not identical.

19             THE COURT:  Oh, I thought they were literal quotes.

20             MS. BERMAN:  But the distinction is between the Hur

21   report putting in writing that Mr. Biden said the quote and the

22   audio itself that has Mr. Biden's intonation and voice on it and

23   all of the things on an audio that are not transparent on the

24   written page.

25             THE COURT:  Right.  But that's not national security.

          MS. BERMAN:  Well, I'm sorry.  The point I was trying

to make is they're separate records.  So there's no waiver.

Just because a report says somebody said something on an

audiotape is not the same as the audiotape itself.

     As I think Your Honor is familiar with, in the D.C.

Circuit, the waiver doctrine is very strict.  There has to be --

it has to be the same information.  It has to basically be the

same record.

          THE COURT:  But let's say this is the same -- well, it

doesn't have to be the same information.  It can be different

documents that contains the same information; right?

          MS. BERMAN:  Yes, but here, it's different

information.

          THE COURT:  Why?

          MS. BERMAN:  It's his voice.

          THE COURT:  All right.  But if it's quotes and the

quotes accurately line up with his voice -- and maybe they

don't.  That's another issue.  But let's assume for a moment,

you know, "dog chases cat" is what he said and it's in quotes.

     Why is that not identical for purposes of --

          MS. BERMAN:  So our position, and this is the position

we took in the case before Judge Kelly that's now being briefed,

there is a quantitative difference between something that is on

the page in writing and an audiotape of someone's voice saying

it.

1          THE COURT:  And you're saying it's the privacy grounds

2     is what protects it, not any other exemption, just his own

3     privacy?

4          MS. BERMAN:  Right now, as Mr. Silverberg reported, we

5     can say we are withholding it in full on the privacy -- under

6     the privacy exemptions 6 and 7(c).

7          The reason why we have not issued a final response yet to

8     that effect is because we may assert other exemptions for the

9     withholding in full.

10          THE COURT:  Understood.

11          MS. BERMAN:  But we know for sure now 6 and 7(c), and

12     we're ready to enter into a briefing schedule.  And at the time

13     that we file our opening brief, we would certainly assert other

14     exemptions for any withholding in full.

15          THE COURT:  Okay.  Well, let me -- if I can have you

16     all sit down for a moment, and let me hear from Mr. Dewey.

17          Mr. Dewey, it seems to me that it's unrealistic for you to

18     expect to get any of this material in the time frame you want it

19     without significantly narrowing your request.

20          So I'm wondering, can the request be narrowed to just the

21     quotes that are in the Hur report?  I mean, that seems like that

22     would be achievable potentially in terms of a decision by this

23     court and maybe an appeal.

24          MR. DEWEY:  I understand, Your Honor.  I'm thinking on

25     my feet here.  So I apologize, Your Honor, if I'm imprecise.

1    And I would have to take that back to my client.

2        The concern that I know my client has with any position

3    like that is we are completely behind the veil, Your Honor, and

4    we have profound --

5            THE COURT:  Obviously, but you've put yourself in the

6    time box.  We are where we are, and --

7            MR. DEWEY:  I don't disagree, Your Honor.  I'm

8    saying -- I will certainly take that back to my client, and we

9    have no objection to substantially narrowing.

10       There are some other points that I would make, which is --

11   and again, I'm sorry to come back to the search point, Your

12   Honor, but it seems like we're operating in -- everyone is

13   operating in a environment in which things are uncertain, and

14   none of that would be the case if --

15           THE COURT:  Right.  But I don't know -- it seems to

16   me, based on the case law I've reviewed, that it's reasonable

17   for them to ask the person if this is what you relied on.  They

18   refuse to do it.  The search is struck down.  That's just

19   further delay.

20           MR. DEWEY:  I understand what Your Honor is saying

21   there, and I can take that back to my client and will take that

22   back to my client.  I flag that by way of --

23           THE COURT:  Yeah, I don't think I can force them to

24   ask.  I think that they can litigate this and perhaps lose.

25           MR. DEWEY:  Well, I hesitate.  I'm again thinking on

my feet.  This Court is sitting in equity.  The Court certainly
has the power and the authority to ask.  This Court in equity
would have power and authority to ask Mr. Hur directly or
Mr. Krickbaum.

I just want to emphasize --

THE COURT:  I have the power to ask Mr. Hur?

MR. DEWEY:  I think you would, Your Honor.

THE COURT:  I don't know about that.  He's not a party
here.

MR. DEWEY:  I think Your Honor would in a court of
equity.  And where I'm operating at a high level here, I'm just
trying to illustrate why I'm not immediately accepting
narrowing, Your Honor, and I would have to think about it,
because I don't know if there are other highly significant
passages.

If I can, Your Honor, I don't follow the 70,000 pages.
Just briefly on the timing issue, the only authority that we
could find is the Texas case that we put in front of Your Honor
where Judge Kacsmaryk said try to reduce it to a page count, and
we did that as best we could with the existing transcript we
have since it has time stamps.  And we put that in front of Your
Honor this morning, and the department has it as well.  That's
the best we can get to, and it's nowhere close to the 70,000
pages.  But I get that this is certainly an imprecise science.

But when we looked at the transcript, the average was

1    significantly under two minutes a page.  This was ECF 17.  We

2    did the math on the transcript the department produced.  Looking

3    at Mr. Biden's speaking rate for the first tape, which is 48

4    pages of transcript, he averaged a minute 16 seconds of audio

5    per page of transcript.

6       So I would argue the government's 70,000 pages is probably

7    not accurate.  It's quite inflated.  But I get it's an imprecise

8    science.  I apologize we can't give you any more clarity on

9    that.

10           THE COURT:  What is your total estimate?

11           MR. DEWEY:  I would extrapolate, Your Honor, looking

12   at this tape and it's an hour and it's 48, call it 50

13   conservatively, pages of transcript.  So 50 times 17 would be --

14           THE COURT:  No, I can do it.

15           MR. DEWEY:  I'd have to get a calculator, Your Honor,

16   one of the many reasons I'm a lawyer.  850 and maybe quadruple

17   that, multiply it by a factor of 5, even 6, and you're well

18   below the 70,000.  I strongly disagree that if you just process

19   the 17 hours, it would go to that.

20       If I can, Your Honor, as to -- unless Your Honor has a

21   question on that point, I did want to respond to my friends on

22   the issue of classification and the current determination.

23       Your Honor, we want the case to move quickly.  I agree with

24   Your Honor.  I would just say, our position is we don't

25   understand how one can withhold in full without knowing what's

1    in the tapes.  The government takes the position it hasn't

2    listened to the tapes.

3          THE COURT:  They're taking the position that the voice

4    itself is entitled to privacy protection.

5          MR. DEWEY:  Correct, Your Honor.  I'm just saying, to

6    make that determination, someone -- I think it's pretty clear

7    under the D.C. Circuit law, someone would have to listen to the

8    tapes, and the government is maintaining that has not been done.

9          THE COURT:  Well, you can listen to the beginning and

10   listen to the end.  His voice is all over it.  Is it labeled a

11   tape of his interview?  You're not contesting that his voice

12   isn't on these tapes, are you?

13         MR. DEWEY:  No, Your Honor, we are not contesting that

14   at all.  What we are contesting is that --

15         THE COURT:  That no one's listened to it?

16         MR. DEWEY:  No one's listened to it, and you can't

17   make even a categorical balancing determination without

18   listening to it.

19        If I can on that, because that goes to the classification

20   issue as well, the D.C. Circuit en banc in NASA said when you're

21   dealing with audio you have the lexical and the nonlexical, and

22   they do move independently.  I agree with the government on

23   that.

24        But the government has to sustain its burden over each

25   component separately.  And when you consider that, you do look

to, when you're considering the nonlexical, what is in the lexical.

So the question is, what is in the audio, taking into account that the information is either quoted in the Hur report, was used to write the book, what in the lexical -- I mean the nonlexical itself triggers the exemption.

And I think Your Honor was exactly correct that when you ask that question under exemption 1 for classification, Your Honor, we don't see how it could possibly be the case that the intonation would be classified. The classification would turn on the words, not the intonation.

And on that classification issue, we just fundamentally don't understand it, Your Honor, because the government should have a road map. The necessary implication of what they are saying is that Special Counsel Hur does not know what portions of the tape would trigger a classification concern.

And we would submit that's just not plausible that an attorney of his stature tasked to investigate this would not have exhaustively analyzed those 70 hours. The portions of those 70 hours that implicated classified material like the block quote that appears on page 106 of the Hur report, those are going to be flagged by Mr. Hur. Those are going to be flagged by Mr. Krickbaum, and they are going to be exhaustively examined.

We just don't see how the government can square that

1    position, Your Honor, that the entire tape, they have no idea,

2    and let's go through a full classification review, and yet,

3    Special Counsel Hur obviously did an exhaustive review of this

4    material.

5              THE COURT:  And that's why I'm asking you, if you

6    narrow your request to the portions that are in the report, it

7    seems like that would expedite matters.

8        But you're just saying you find it not credible that

9    there's a delay with the rest of it as well.

10             MR. DEWEY:  Correct, Your Honor.  I illustrate that in

11   terms of our consideration of Your Honor's suggestion and how

12   we're thinking about that, and I just wanted to say, I think

13   Your Honor asked the correct questions on the public interest

14   under the CREW line of cases.

15       And I would add, Your Honor, that it's not only the public

16   evaluating Mr. Hur's report.  The White House says he was wrong

17   on these passages.  President Biden stood up on the bully pulpit

18   and said he was wrong.  President Biden made statements about

19   the report which Special Counsel Hur testified were not

20   accurate.  To this day, the White House is attacking Special

21   Counsel Hur on these points.

22       If you watched the contempt debate in Congress, there were

23   fairly vicious attacks on Special Counsel Hur as to these exact

24   points, how the jury would perceive President Biden and his

25   memory.

1    It's not just allowing the American people to evaluate the

2    report.  It's allowing the American people to evaluate the

3    debate that the government itself is perpetuating.

4        THE COURT:  And again, I just circle back to my

5    original question to you, which is, if this report was written

6    by someone who is evaluating his credibility, why would you not

7    just be content with those portions of the tapes?

8        I mean, realistically, it's hard to see how you're going to

9    get the level of review and the speed at which you want it

10   otherwise.

11       MR. DEWEY:  I understand, Your Honor, and I can take

12   that back and look at how are we going to narrow -- how can we

13   narrow, how can we look to those issues, and I appreciate Your

14   Honor's point.  I just wanted to respond --

15       THE COURT:  Yeah, I hear you.  I just have no way of

16   second-guessing what is being represented in terms of the amount

17   of review that national security would require, not as to -- I

18   agree with you on the portions that are in the Hur report.  But

19   as to the whole 70 hours, it certainly would take some time, I

20   would think.

21       MR. DEWEY:  I think it would take some time.  I think

22   certainly there is a road map, because Special Counsel Hur would

23   have flagged anything that he thought was classified on the

24   tapes.  And again, that's what I can't square.

25       But I'm happy to take Your Honor's proposal back.

```
 1              THE COURT:  It's not my proposal.  I'm just asking --

 2              MR. DEWEY:  I apologize, Your Honor.  I didn't mean it

 3      that way.  I think it's a thoughtful --

 4              THE COURT:  You're not happy with their attempt to

 5      narrow things, in part because of the time but in part because

 6      you think it's underinclusive, and you're not ever going to be

 7      happy unless you get the whole shebang or they sit down and say

 8      do you want this, do you want this, do you want this.  And

 9      they're not going to do that.

10          I can set a schedule that they have to try to make, but I

11      don't think I can insist that they must.  I can insist that you

12      all sit down and confer, but I'm not going to tell them how to

13      do that.

14              MR. DEWEY:  But I actually think the result here is

15      massively overinclusive, Your Honor.  I just don't know how to

16      narrow it because the government refuses to ask any custodian.

17      We are not aware of any authority, and I don't mean to

18      predetermine the search question that I know the government is

19      briefing, but it is very hard to narrow when the government

20      refuses to ask anyone who worked on the matter how to narrow it,

21      Your Honor.

22          I think this is massively overinclusive.  I make no bones

23      about it.  And that was the point I raised in our briefing, Your

24      Honor, that it may be that the only relevant stuff here is an

25      hour and a half of tape, the quoted portions and some stuff
```

1    around it.

2        And I've implored the government, if you don't want to set

3    the precedent of asking Mr. Hur, ask anybody in the office.  I

4    understand you may not want to ask the top man, and

5    Mr. Krickbaum is a former United States Attorney, Your Honor.

6    He is about his business, if he's doing anything.  I mean, he

7    could certainly -- it's just incredibly hard for my client in

8    that position to narrow when we're not getting anything in

9    return.

10        THE COURT:  I don't know that they have to help you

11    narrow.

12        MR. DEWEY:  Your Honor, technically, I think a lot of

13    this is not responsive to the search because of the way they run

14    the search as to the audio itself.  So I think it's less a

15    question of narrowing and more it all turns on the search

16    dispute.  But I fully get Your Honor's points.

17        And to be frank, as I said the other day, Your Honor, I was

18    very surprised when I got the morning of the hearing the e-mail

19    saying that all 70 hours were being deemed responsive.

20        I understand they're under no obligation to narrow.  I'm

21    not asserting that point.  But the point I am asserting is I

22    don't even know if half this stuff is responsive.  If that goes

23    with the search question, so be it.  We're happy to narrow.  But

24    we feel like we're being forced to narrow now because if the

25    government had stated its position, quite frankly, in other

```
 1    matters as to how these searches are being running in December,

 2    we were hours away from clicking file on the ECF, Your Honor,

 3    and we would have litigated that issue.

 4              THE COURT:  Lesson learned.

 5              MR. DEWEY:  I'm beating a dead horse, Your Honor.  I'm

 6    just indicating --

 7              THE COURT:  Well, you were trigger happy on a lot of

 8    cases.  So I'm not surprised -- I mean, I am surprised you held

 9    on this one.

10              MR. DEWEY:  Trying to work it out, Your Honor.  That's

11    why I need to go back and consult, and I will stop beating a

12    dead horse on that.  I just want to emphasize, I'm not trying to

13    be difficult or not take Your Honor's proposal seriously.

14    Again, I apologize.  It's not your proposal.  Your thought.

15              THE COURT:  But, you know, the briefing on that motion

16    is going to be ripe July 15th.  If the Court addressed it

17    promptly and did agree with you -- and I'm not saying that I

18    would, but if I did, there's time there, but there's not a lot

19    of time.

20              MR. DEWEY:  Correct, Your Honor.

21              THE COURT:  You're in the box you're in.

22              MR. DEWEY:  We are, Your Honor.  I think -- I wonder

23    around, Your Honor -- aloud, Your Honor, if there would be a way

24    to confer with my friends and find a way to conditionally

25    narrow, depending upon Your Honor's determination on the search.
```

1    Perhaps there's a way to say we will narrow it to the portions

2    Your Honor has identified, conditioned on the understanding that

3    if Your Honor were to rule the search were invalid and say yes,

4    obviously you should ask Mr. Hur and if Mr. Hur came back --

5              THE COURT:  Then you wouldn't be bound by that, yeah.

6              MR. DEWEY:  That we wouldn't be bound by that.

7    Whereas, if Your Honor agreed with them, we would say okay,

8    that's fine.  I think that would probably be agreeable to my

9    client.  I would need to confer.  I would think the

10   government -- I can't ask their position.  I'm happy to consult

11   with them, Your Honor, and I'm happy, if Your Honor wants to go

12   into a conference room right now with them and talk with them

13   and come back, I take Your Honor's point that, you know, we need

14   to work this out and be reasonable in what we're asking.

15             THE COURT:  Uh-huh.  Okay.  All right.

16       Mr. Silverberg?  So the way in which you've construed their

17   request that seeks records relied upon, I know we addressed this

18   a little bit last time, but tell me how you can be sure that you

19   have that universe of records just by looking at the report

20   itself.

21             MR. SILVERBERG:  Your Honor, so we will, of course,

22   detail this in further detail with the search briefing itself.

23   But broadly speaking, we looked at the six passages that were

24   cited in the complaint and did a close read of the passages,

25   which are clear in referencing audio from 2017 and among other

sources that we identified at our status conference.  And we think that was corroborated by the special counsel's testimony to Congress in which he referenced the tapes themselves.

So broadly speaking, as Ms. Berman mentioned at the last status conference, it's not a traditional type of FOIA case with a traditional type of FOIA search because it's not a traditional request.  We're looking at what was relied upon --

THE COURT:  I know.  But you've accepted this.  I mean, you could have challenged it, but you didn't.  So you've accepted it.

MR. SILVERBERG:  Correct, Your Honor.

THE COURT:  It just does seem like you can't accept it and not do your due diligence to try to do a thorough search based on the request.

MR. SILVERBERG:  No, Your Honor, and we think the statements are clear in the particular passages of the report. The special counsel was referring to interviews conducted in 2017.  And so we're looking at the interviews that were done in 2017.

THE COURT:  Right.  But how do you know, for example, he didn't look at the notes of the biographer?

MR. SILVERBERG:  Well, there's no reference to the notes in any of the passages.  There's no reference in the special counsel -- that I'm aware of in the special counsel's testimony to Congress regarding the notes.  And the notes would

1    be a reflection of the underlying recordings, which are what is

2    mentioned specifically in the passages that are included in the

3    report.

4            THE COURT:  Yeah, I'm just, you know, thinking aloud

5    here.  And obviously, you will be briefing all of this in the

6    forthcoming motions.  But in cases in which, you know, just

7    generic FOIA requests are made and a e-mail pops up with a

8    personal e-mail -- or let's say it's a request for a personal

9    e-mail search of a former department employee, say, for example,

10    there are instances where you actually do consult with that

11    person, are there any other e-mails we should be looking for,

12    et cetera.

13        So I'm just wondering why this is different.

14            MR. SILVERBERG:  Your Honor, we do consult with

15    custodians.  But to the extent that these -- this FOIA request

16    is construed as a question posed to the special counsel saying

17    please tell us where exactly in these interviews you were

18    relying, like give us a pincite, please explain the basis.  We

19    can cite several different cases.  I'll read you a quote from

20    one.  "To the extent that plaintiffs' FOIA requests are

21    questions or requests for explanations of policies or

22    procedures, these are not proper FOIA requests."

23            THE COURT:  Understood.  But you all didn't take that

24    position.  You could have.  You could have said this is an

25    improper request, like rejected it, but you didn't.

1          MR. SILVERBERG:  Of course, Your Honor.  We reasonably

2     construed --

3          THE COURT:  But is that reasonable, to not even ask

4     the person is there anything else you relied upon, simply

5     because the report says he relied upon the tapes?

6          MR. SILVERBERG:  We think we have a case here where

7     the special counsel himself has stated what he relied upon, and

8     so there was no need to go to the special counsel.

9          THE COURT:  And it's just one question, are we missing

10    anything.  Like, I don't understand.  It's hard to reach a

11    conclusion other than you don't want to know what you might not

12    know, and if you're wrong, it's okay, it just delays things.

13         Like, that just seems like a very -- I'm not expecting you

14    to go through 70 hours of tapes to get the answer to that

15    question.  It's asking a single question of one person.

16         MR. SILVERBERG:  Your Honor, understood, and just two

17    points on that.

18         The first is just we again reiterate that we don't think it

19    was needed in this case because of the facts, because the

20    particular passages reference what was relied upon.

21         But the second, the underlying case law that I just

22    mentioned really builds on the premise that FOIA is not an

23    interrogatory device.  If it was established, the principle that

24    plaintiffs, people can just ask the Secretary of State, any

25    agency, can you please explain what the basis was for this or

when you wrote that in a report can you please provide us the

specific citation for X, Y, Z, that would break FOIA.  That

would turn it into a device --

THE COURT:  Agreed; agreed.  But you didn't make that

argument at the outset.  You said we're going to comply with

this request.  Some judges, Judge Howell has upheld a similar

request; relied upon was okay.  So you didn't want to litigate

that.

And now you have the request, and you want to know what was

relied upon by Hur.  It seems like a very natural way to find

that out is to ask Hur.

MR. SILVERBERG:  Your Honor, so we interpreted the

request in a way that would be proper.  So we did not construe

it in a way so as to reject it.  Reasonable minds might disagree

on exactly the sequence --

THE COURT:  And I might, and if I do, then you will go

back and ask, and there will be further delay in the case.

MR. SILVERBERG:  And, Your Honor, you know, we think

that interpreting it in a way that we are we think is reasonable

based on the passages and does not lead to further delay.

THE COURT:  How?  How does it not lead to further

delay if you've missed something?

MR. SILVERBERG:  Well, Your Honor, in a sense that if

we had just rejected it at the outset, that would have caused

more delay because the plaintiffs would then presumably --

1          THE COURT:  No, I mean now where we are now, how would

2    it not cause further delay if you are incorrect with your

3    assumption here?

4          MR. SILVERBERG:  Your Honor, we won't dispute that if

5    there is an issue, if Your Honor believes that there's an issue

6    with the search, that it would cause further delay.

7          THE COURT:  Okay.  Go ahead.

8          MR. SILVERBERG:  If I may, I just do want to reiterate

9    a point we made, which is that we think the fastest resolution

10   is through bifurcation.  We have serious concerns that an

11   extended protracted period of potential narrowing will lead to

12   another cycle --

13         THE COURT:  Maybe not.  What if they call back and say

14   we just want the sections of the tape of the ten instances which

15   Hur quoted?  Would that not be welcomed from the department, I

16   would think?  That would be a significant narrowing; correct?

17         MR. SILVERBERG:  We're absolutely looking for a

18   narrowing proposal, but --

19         THE COURT:  I would think that could be produced

20   pretty quickly -- not produced, withheld with exemptions very

21   quickly, right, and we could start that briefing quite quickly?

22         MR. SILVERBERG:  Your Honor, I don't know at this

23   particular moment exactly the capabilities of identifying within

24   the audio, what level of consultations would be necessary.  I

25   think still the most efficient process would be the bifurcation.

1      I will just also mention the point that if there is no

2  further narrowing in this case and really just the working with

3  audio and the enormous constraints and level of difficulty it

4  takes when working with audio, I do want to mention that the

5  folks processing these requests are human beings.  We are doing

6  our best to process, as Your Honor mentioned, an array of FOIA

7  requests from these same plaintiffs.  And I did want to be sure

8  to mention that this processing is not done by computers; it's

9  done by human beings.

10      THE COURT:  Okay.  And what do you have to say about

11  the way in which they estimated the volume and the time?  I know

12  you say the department says it's 30 minutes a month.

13      MR. SILVERBERG:  Your Honor, what they appear to be

14  doing is looking at the amount of time it would take to listen

15  to a particular recording, and that is just not the time it

16  takes to process the particular recording.

17      For all applicable FOIA exemptions, which appears to be

18  what my friends on the other side are asking for, the process

19  of -- and that's just one listen, Your Honor.  It's not the

20  process -- when applying particular exemptions to new audio, it

21  will involve frequent pausing, frequent discussions of who

22  exactly is talking.  If there's a particular word that's

23  inaudible, it may require several times to go back to understand

24  exactly what's being said to make sure that the applicable

25  exemptions apply.

1          It's an extremely time-intensive process.  It is not akin

2     to just listening to a tape.

3          THE COURT:  Okay.  All right.

4          Anything else, Mr. Dewey?

5          MR. DEWEY:  I have one very quick thing, Your Honor.

6          As to the -- on the audio estimation, that's why we're

7     saying multiply by five, multiply by ten.  We get it's not just

8     the time to listen.  And it's still under.

9          I just wanted to highlight, Your Honor, as I understand

10    what my friends were saying, they've kind of looked at the

11    report and pulled data from footnotes in the report.  But I'm

12    looking at 106 in the report, which is a quote from the

13    interview with Mr. Zwonitzer that discussed classified

14    information.  And it's got -- this is footnote 441.  It says

15    "Zwonitzer recording," and then it's got an evidentiary Bates

16    170424-0091, which I would presume is a specific recording, and

17    then it's got a semicolon, 170424-0091, transcript abbreviation,

18    at 13 through 14, and then it --

19          THE COURT:  That's a transcript of the tapes?

20          MR. DEWEY:  That's how I read it, Your Honor.  That

21    just goes to my point of we will narrow.  We will -- I'm

22    confident that my client --

23          THE COURT:  The department's told me there is no

24    transcript.  Do you all have a response to that citation?

25          MR. DEWEY:  I mean, there are multiple citations to

1    that effect, Your Honor, where there is a transcript

2    specifically quoted to a recording Bates.

3        I just pulled this example because it aligns with that.

4    I'm happy to put it on the ELMO --

5            THE COURT:  No, I believe you.  That leads you to

6    believe that there's a transcript of these 70 hours.

7            MR. DEWEY:  It would be logical that for the pertinent

8    tapes Special Counsel Hur had them transcribed to conduct a

9    classification review.  Because as Your Honor indicated,

10   classification, even under the NASA distinction, is only going

11   to occur on the lexical.  The nonlexical, it's practically

12   impossible to conceive of that being classified.  I would fully

13   expect -- that's how I would do it.

14           THE COURT:  So you're not seeing the transcript here,

15   but you're saying the transcript would significantly expedite

16   the review of the tapes?

17           MR. DEWEY:  Precisely, Your Honor.  And I would think,

18   to Your Honor's point about a simple question, I would think

19   anybody in the Special Counsel's Office could translate that

20   citation.

21       There are other citations, FBI serial --

22           THE COURT:  All right.  Well, again, Mr. Dewey, I

23   think it's in Heritage's interest to significantly narrow its

24   request because of the time constraints.

25       I also think it's in the department's interest to continue

1    to meet and confer with Heritage.  Also, correct if there's been

2    a misstatement made with respect to the transcript, because that

3    will alter the review process, the Court believes,

4    significantly.

5        I don't understand why the department can't ask Hur a

6    couple of quick questions, particularly if we think there's a

7    transcript floating out there of the tapes that he knows exists.

8        MR. SILVERBERG:  So, Your Honor, just to clarify, the

9    transcript being cited, I think we would just need to go back

10   and look into exactly what transcripts that is referring to,

11   because the -- there were transcripts of the interview that the

12   special counsel did with Mr. Zwonitzer.

13        THE COURT:  Okay.  So it might not be that at all.

14   But you would agree with me that you need to know the answer to

15   that as you're making representations to the Court.

16        MR. SILVERBERG:  No, of course, Your Honor.  And I

17   just want to clarify what I meant about the references to the

18   transcripts.  We're talking about the six passages in the

19   complaint, and there's just no basis for the particular passages

20   to be -- as we're reading them, to be referencing the

21   transcripts or notes that might exist for Mr. Zwonitzer.

22        So I just wanted to be clear on that point and what we were

23   relaying.

24        THE COURT:  I'm not following what you're saying.

25        MR. SILVERBERG:  So, Your Honor, in describing the

1    search that we did, we looked at the six particular passages

2    that were included in the complaint.  We did a deep, close

3    reading of the particular passages.  And we saw no basis or

4    citation in those particular passages --

5              THE COURT:  To a transcript.

6              MR. SILVERBERG:  -- to any sort of transcript.

7              THE COURT:  I see.

8              MR. SILVERBERG:  So I wanted to clarify that.

9              THE COURT:  Okay.  So, Mr. Dewey, that does seem to

10   suggest that the transcript is some other transcript.

11             MR. DEWEY:  Your Honor, if I may, the transcript of

12   the special counsel's interviews are always indicated by

13   "Zwonitzer 73123," the date of the interview.  And that's been

14   consistent for any custodian Mr. Hur interviewed.

15        I'm referring to a Bates that goes to a transcript in

16   footnote 441.  I'm not trying to be difficult.  I'm just raising

17   the issue of --

18             THE COURT:  It would help to speak to Mr. Hur, yeah.

19             MR. DEWEY:  Or I can -- I'm on my complaint, amended

20   complaint, ECF Number 6.  The passage at 207 cites to FBI

21   serials 315 and 335.  I don't know if that's a 302.  I don't

22   know if that's a -- everything is serialized, Your Honor.  I

23   don't know what that is.

24             THE COURT:  Okay.  All right.  Was there something

25   more you wanted to add, because I think your colleague wants to

```
 1    say something?

 2              MR. SILVERBERG:  I will let my colleague say

 3    something.

 4              THE COURT:  All right.

 5              MR. SILVERBERG:  Thank you, Your Honor.

 6              MS. BERMAN:  Thank you, Your Honor.

 7         I just want to be sure I understand your proposal, because

 8    the conferral process, I think as you can tell, has not been

 9    easy in this case.

10         So is your proposal that --

11              THE COURT:  Again, this is not my proposal.  I'm

12    asking Heritage --

13              MS. BERMAN:  Yeah, to consider this idea.

14              THE COURT:  This idea that if something has gone

15    through national security review and is in this public report,

16    then maybe that is sufficient for what they want in terms of the

17    tape.

18              MS. BERMAN:  Right.  So that's why I'm standing up,

19    because I think that's different from what you said before.

20         What I heard you say was whether it could be narrowed --

21    whether their request could be narrowed to just quotes in the

22    report.

23              THE COURT:  Well, what's the difference?  What's the

24    one you just said a moment ago?  Quotes versus --

25              MS. BERMAN:  Versus I think you just said something
```

1    that's been before national security review.

2            THE COURT:  Well, I thought that you told me nothing

3    had been through national security review.

4            MS. BERMAN:  The audio has not been through a

5    classification review at all.

6        But I'm just trying to get --

7            THE COURT:  Okay.  But there are portions of the

8    report that quote from the audio; correct?

9            MS. BERMAN:  Yes.

10           THE COURT:  And those portions of the report that

11   quote from the audio went through national security review?

12           MS. BERMAN:  Presumably, yes.

13           THE COURT:  Okay.  And you're saying there's some

14   other layer of national security review that includes the voice?

15   I don't understand.

16           MS. BERMAN:  No, no, no.  Sorry.  The only thing I'm

17   trying to clarify, because I want to make sure when we confer --

18           THE COURT:  I don't even know if they're going to take

19   this bait of narrowing.  But I'm just -- I don't have any end

20   game here.  I just am listening to you and saying there are a

21   lot of steps to go through this whole report, and there are a

22   lot of hours, and if there's certain sections of the report or

23   certain quotes from the report or certain, I don't know --

24           MS. BERMAN:  Can I just ask my question?

25           THE COURT:  Yeah.

1          MS. BERMAN:  Sorry.

2          THE COURT:  The reason I'm dodging is I'm not familiar

3    enough with all of the specifics of the report to intelligently

4    state on how you might narrow this.  I was just initially

5    starting with quotes, because that seemed to be the least

6    problematic.

7          MS. BERMAN:  I totally agree with that, and I

8    appreciate that.

9      Here's my question:  Are we just talking about -- are we

10   talking about any quotes from the audio that are in the report

11   or quotes from the audio that are in the report that support a

12   characterization about Biden's memory?

13     Because that's what the complaint is about, and that's what

14   the six passages in the report -- in the complaint and the FOIA

15   request are about.  And I just want to make sure that we're not

16   broadening that to any quotes from the audio that are in the

17   report.

18     Does that make sense?

19         THE COURT:  I guess.  But then again, their request

20   was, you know, information they relied upon, and that was --

21         MS. BERMAN:  For those conclusions about Biden's

22   memory specifically.

23         THE COURT:  Right; right.

24         MS. BERMAN:  Not everything he relied upon for the

25   whole report.

1          THE COURT:  Let me hear from Mr. Dewey.

2          MS. BERMAN:  Thank you so much.

3          MR. DEWEY:  Your Honor, I'm quite confused, because

4     the government said all 70 hours are responsive.  And under

5     that, I was pointing out the transcript passages, because I

6     think it illustrated how aggressive an argument the government

7     was making.

8          I take my friend's point to indicate why the search -- why

9     to Your Honor's thought that it does make sense to ask someone

10    in the Special Counsel's Office.  I don't understand how the

11    government can say that we're broadening the request by talking

12    about a quote that may not relate to the specific passage when

13    they've designated all 70 as responsive.

14          THE COURT:  I do think it's fair to assume that

15    perhaps not every single nugget of the interview that led the

16    special counsel to reach the conclusion he reached was not

17    itemized in the report.  I mean, I think that that's possible,

18    that those were illustrations of instances that showed that he

19    reached the conclusion he did with regard to credibility.  But I

20    don't know that that means that that's the sum total.  We don't

21    know, because we don't know what Hur would say.

22          So I think that's a fair point.  I'm not going to resolve

23    this.  I'm just telling both of you that you both have a lot to

24    lose in not resolving this, because the Court will put out an

25    order, and the department will have to try to comply with it.

1    And the plaintiffs may never get what they want in the time

2    frame that they want to get it.  And that will be your decision.

3        I'm trying to accommodate -- I think the department has

4    some legitimate concerns.  You've hit them in umpteen different

5    areas.  And I'm not saying that this is not of importance.  It

6    certainly is to the American public.  So I'm not diminishing the

7    case.  But you have filed a lot of cases.  I have another one

8    relating to Hunter Biden.  I mean, the department has to do

9    something else besides respond to Heritage FOIA requests.

10   They've got a lot of other important cases to handle.  And there

11   are resource problems.

12       I think that the government does have to realign resources

13   on occasion, and I appreciate that.  But you have to be

14   realistic.  You can't get everything you want in all of these

15   cases in time -- in the time limit that you want.

16       So you all sit down and reach the best decision you can,

17   and if you can't reach one, then the Court is going to impose a

18   briefing schedule and a document production -- by "document

19   production," I mean portions of the tape -- that may be really

20   tough for the department, and it might not get you what you want

21   in time.  But it will all be kind of a waste at that point,

22   because neither one of you will benefit from that kind of order.

23       But I do believe that I need to move this case along.

24           MR. DEWEY:  I understand, Your Honor, and that's why

25   we offered to stay other proceedings.  And I think, you know, in

1    principle, processing the quoted passages subject to Your

2    Honor's search ruling is agreeable to my client.  I conferred

3    with them.  I think we would be fine with that.

4         But I just understood Ms. Berman now to change the

5    government's position to the 70 hours is not responsive.  So I

6    don't know where to go.

7         THE COURT:  And I just want to make sure that I

8    understand what she's saying.

9         You're saying there are a lot of quotes of the president in

10   the report.  Some of those quotes, in your view, form the basis

11   of the decision Mr. Hur made in terms of the president's

12   credibility or --

13        MS. BERMAN:  Memory.

14        THE COURT:  Yeah.  Well, again, I can't -- I don't

15   know, because I don't know whether these were illustrative or

16   whether this was the sum total of instances and he put every

17   single one in there.  I can't answer that.  Only he can answer

18   that.  And I don't think you can answer it either.

19        If there are a bunch of quotes from Biden in the report,

20   presumably all those were cleared, and why you can't litigate

21   those pretty expeditiously, I don't understand.

22        MS. BERMAN:  Okay.  So even if we're just talking

23   about the broader proposal, not the proposal idea, of narrowing

24   to all quotes from the audio that are in the report, I again

25   want to be very clear.  We're just talking about quotes, actual

1    things in quotation marks?

2    THE COURT:  That's up to him, but that's what I was

3    saying would be the most -- the cleanest way to resolve this

4    issue, is to focus on things that had to have been cleared.

5    But, Mr. Dewey, you're more familiar with the report than I

6    am.

7    MR. DEWEY:  My client is willing to make that

8    concession, subject again to if Your Honor rules the search is

9    inefficient, you have to talk to Mr. Hur, preserving that.

10    MS. BERMAN:  We certainly have to take this back and

11    find out what the implications of this are.  So I certainly

12    cannot commit to it now.

13    THE COURT:  No, and I don't expect you to.

14    MR. DEWEY:  I just want to be clear.  If there are

15    other cases that do not involve the Hur report or matters

16    related to the impeachment that Ms. Berman thinks are sucking up

17    resources that would cause a problem, we will -- I'm happy to

18    consider staying briefing schedules, staying production.

19    THE COURT:  You all talk that through.  Can you all

20    get back to me by Thursday or Friday?  How much time do you

21    need?

22    MS. BERMAN:  Your Honor, tomorrow is a holiday.  Every

23    time we've filed a JSR in this case, it has been extremely

24    time-consuming and quite exhausting.  And we now have a brief

25    due on Monday in the search declaration.

1    So we need more time.  We cannot do all this.  I have many

2    other responsibilities.  Mr. Silverberg has many other

3    responsibilities.  And our clients do, too.

4        THE COURT:  Okay.  What about -- I think it's more

5    critical that you all reach an agreement than the time limit on

6    this.  I think it is important to push on this, but I would

7    rather, from my perspective, give the department more time to

8    file their opening brief and see if you all can't reach an

9    agreement on this issue.

10    It will delay the decision on the search a few days, but I

11    think this is really important.  I think if I gave them -- if

12    you all try to reach an agreement by Friday, and if you can't, I

13    will put out an order on Friday, but I would give the department

14    an additional three days, and I would -- if you want to shorten

15    the time for your opposition, we can stay on the same track.

16        MR. DEWEY:  That's agreeable to us, Your Honor.

17        THE COURT:  To stay on the same track but give them

18    three additional days?

19        MR. DEWEY:  Yes.

20        MS. BERMAN:  Your Honor, could we have an extra week

21    on the search?  We need more time.

22        THE COURT:  You were going to file by the 24th.  So if

23    you filed by July 1, the opposition would be due the 8th.  That

24    would give you a week.  Or I could give you a little bit more

25    time and shorten their time for reply.

1      Why don't you all talk about this as well.  Okay?  I would

2  be happy to give them another week.  I think that that's

3  reasonable.  I think you all would need to tighten the briefing

4  schedule on you in order to get what you want here in terms of

5  an agreement.

6          MR. DEWEY:  That's fine.

7          THE COURT:  One way to probably obviate any issue with

8  the search is just to have a conversation with Hur, and then you

9  don't have to file any brief at all.

10          MS. BERMAN:  Your Honor, I very much appreciate that

11  perspective.  We are concerned we'd have to do that in every

12  FOIA case.

13          THE COURT:  Understood.  But this is a unique --

14          MS. BERMAN:  This is not a unique request by Heritage

15  Foundation.

16          THE COURT:  True.

17          MS. BERMAN:  They have at least two other cases that

18  we are currently litigating --

19          THE COURT:  That they will use against you, right.

20          MS. BERMAN:  -- with this "relied upon" language.  So

21  we are --

22          THE COURT:  In the future, maybe you should just

23  reject them outright.  I don't think you've forfeited that for

24  all time.

25          MS. BERMAN:  Your Honor, I have to stand up for that

1    decision.  We were trying to be both reasonable, which I know

2    the courts always expect us to be, and we were trying not to

3    delay.

4              THE COURT:  But if you're going to find -- if you

5    can't win, then just play by the rules and just say this doesn't

6    meet it and litigate it.

7              MS. BERMAN:  Again, we thought -- we were trying to do

8    a reasonable interpretation and a reasonable search, and that's

9    all that FOIA requires.  It does not require an exhaustive

10   search of turning over every rock.

11             THE COURT:  And there's a presumption of good faith

12   and all that.  So I hear you.

13       So again, it's in both sides' interests to reach some

14   agreement.  And, Mr. Dewey, you have to appreciate when you file

15   all these cases, that you've got to give some, because when you

16   all don't play well together -- and I'm not pointing fingers

17   here, but when things escalate, everything has to be a status

18   report, you're taking time away from these cases moving forward.

19       So I don't know who is at fault here.  It's unfortunate

20   that we have to have two status hearings to try to get to this

21   point.

22             MS. BERMAN:  I agree.  So if we could have relief of

23   our June 24th date, that would be very helpful.

24             THE COURT:  So I am giving you until the 27th, and I

25   think it's appropriate for you all to give them until July 1st.

1    But I'm going to leave that up to you all and your negotiations.

2    Okay?

3         For now, you're not expected to file anything until

4    June 27th, and I hope you all push it back even farther and

5    shorten their schedule.

6              MS. BERMAN:  And you're expecting a JSR by Friday?

7              THE COURT:  Yes.  I mean, if you all tell me look,

8    we're close but we want to file it on Monday, just file a

9    two-sentence joint saying give us a little bit more time.  I

10   don't want to force anyone into saying no because you can't get

11   the appropriate clearance.  But time is of the essence.  So

12   Friday, and if you both ask for more time until Monday, fine.

13             MS. BERMAN:  Thank you, Your Honor.

14             THE COURT:  All right.  Anything else?

15             MR. DEWEY:  No, Your Honor.  Thank you.

16             THE COURT:  All right.  Thank you.

17        (Proceedings adjourned at 3:33 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


    I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



/s/ Sara A. Wick                    June 27, 2024

SIGNATURE OF COURT REPORTER         DATE