## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HERITAGE FOUNDATION**,

**MIKE HOWELL**,

               *Plaintiffs,*

      v.

**U.S. DEPARTMENT OF JUSTICE**,

           *Defendant.*

Case No. 1:24-cv-00645-DLF

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.     The Hur Investigation ................................................................................................ 2

II.    Plaintiffs' FOIA Request and Procedural Background ........................................... 4

STANDARD OF REVIEW .................................................................................................. 5

ARGUMENT ....................................................................................................................... 6

I.    The Transcripts Were Properly Withheld In Part and the Audio Was Properly Withheld In Full Under Exemptions 6 and 7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy ................................................................ 6

    A.    Release of the Redacted Portions of the Transcripts Would Result In An Unwarranted Invasion of Privacy .................................................. 8

    B.    Release of the Audio Recordings Would Result In An Unwarranted Invasion of Privacy ................................................................ 16

II.    The Transcripts Were Properly Withheld In Part Under Exemption 5 Because They Are Attorney Work Product Not "Routinely" Available in Civil Litigation .......... 20

III.   Disclosure of the Audio Recordings or of the Redacted Portions of the Transcripts Would Foreseeably Harm Interests Protected by FOIA Exemptions ............................ 23

IV.   There Is No Reasonably Segregable, Non-Exempt Information ..................................... 24

CONCLUSION ..................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Cases**

*Am. Oversight v. U.S. Dep't of Just.*,
  45 F.4th 579 (2d Cir. 2022) ............................................................................. 21

*Associated Press v. U.S. Dep't of Def.*,
  554 F.3d 274 (2d Cir. 2009) ............................................................................. 13

*August v. FBI*,
  328 F.3d 697 (D.C. Cir. 2003) ........................................................................... 5

*Bast v. U.S. Dep't of Just.*,
  665 F.2d 1251 (D.C. Cir. 1981) ....................................................................... 10

*Boyd v. Crim. Div. of U.S. Dep't of Just.*,
  475 F.3d 381 (D.C. Cir. 2007) .................................................................. 12, 13

*Brayton v. Off. of the U.S. Trade Rep.*,
  641 F.3d 521 (D.C. Cir. 2011) ........................................................................... 5

*Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*,
  331 F.3d 918 (D.C. Cir. 2003) ........................................................................... 5

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ............................................................. 7, 12, 19

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  854 F.3d 675 (D.C. Cir. 2017) ......................................................................... 10

*Cook v. Nat'l Archives & Recs. Admin.*,
  758 F.3d 168 (2d Cir. 2014) ...................................................................... 11, 12

*Dep't of Air Force v. Rose*,
  425 U.S. 352 (1976) ........................................................................................... 6

*Detroit Free Press Inc. v. U.S. Dep't of Just.*,
  829 F.3d 478 (6th Cir. 2016) ........................................................................... 18

*Dunkelberger v. U.S. Dep't of Just.*,
  906 F.2d 779 (D.C. Cir. 1990) .................................................................. 15, 19

*Ecological Rts. Found. v. EPA*,
  541 F. Supp. 3d 34 (D.D.C. 2021) ................................................................... 24

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
  18 F.4th 712 (D.C. Cir. 2021) ................................................................ *passim*

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019) ........................................................................................... 5

*Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*,
  524 F.3d 1021 (9th Cir. 2008) ......................................................................... 13

*FTC v. Grolier Inc.*,
    462 U.S. 19 (1983) ............................................................................................ 20

*Fund for Const. Gov't v. Nat'l Archives & Recs. Admin.*,
    656 F.2d 856 (D.C. Cir. 1981) ................................................................... *passim*

*Gilliam v. U.S. Dep't of Just.*,
    128 F. Supp. 3d 134 (D.D.C. 2015) ............................................................... 5

*In re Sealed Case*,
    146 F.3d 881 (D.C. Cir. 1998) ...................................................................... 21

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) .......................................................................................... 5

*Jud. Watch, Inc. v. U.S. Dep't of Def.*,
    715 F.3d 937 (D.C. Cir. 2013) ........................................................................ 6

*Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
    926 F. Supp. 2d 121 (D.D.C. 2013) ............................................................. 20

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    391 F. Supp. 3d 43 (D.D.C. 2019) ............................................................... 22

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    432 F.3d 366 (D.C. Cir. 2005) ...................................................................... 24

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
    806 F. App'x 5 (D.C. Cir. 2020) ................................................................... 22

*Jud. Watch, Inc. v.  Nat'l Archives & Recs. Admin.*,
    876 F.3d 346 (D.C. Cir. 2017) ................................................................... *passim*

*Leopold v. U.S. Dep't of Just.*,
    487 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 22

*Light v. U.S. Dep't of Just.*,
    968 F. Supp. 2d 11 (D.D.C. 2013) ................................................................. 5

*Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*,
    819 F.2d 1181 (D.C. Cir. 1987) ....................................................... 20, 21, 22

*Mil. Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) ........................................................................ 6

*Nat'l Archives & Recs. Admin. v. Favish*,
    541 U.S. 157 (2004) ................................................................................ 7, 9, 12

*Nat'l Ass'n of Retired Fed. Emps. v. Horner*,
    879 F.2d 873 (D.C. Cir. 1989) ...................................................................... 19

*N.Y. Times Co. v. NASA*,
    782 F. Supp. 628 (D.D.C. 1991) ............................................................. 17, 18

*N.Y. Times Co. v. NASA*,
    920 F.2d 1002 (D.C. Cir. 1990) ........................................................................ 17

*Nova Oculus Partners, LLC v. SEC*,
    486 F. Supp. 3d 280 (D.D.C. 2020) ..................................................................... 7

*Off. of the Cap. Collateral Couns. v. U.S. Dep't of Just.*,
    331 F.3d 799 (11th Cir. 2003) ............................................................................ 13

*Pike v. U.S. Dep't of Just.*,
    306 F. Supp. 3d. 400 (D.D.C. 2016) .................................................................. 17

*Pike v. U.S. Dep't of Just.*,
    No. 16-5303, 2017 WL 2859559 (D.C. Cir. June 23, 2017) ................................ 18

*Prison Legal News v. Samuels*,
    787 F.3d 1142 (D.C. Cir. 2015) ......................................................................... 10

*Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*,
    No. 22-cv-3381, 2024 WL 1213324 (D.D.C. Mar. 19, 2024)............................... 15

*Reps. Comm. for Freedom of the Press v. FBI*,
    3 F.4th 350 (D.C. Cir. 2021) ............................................................................. 23

*Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*,
    567 F. Supp. 3d 97 (D.D.C. 2021) ..................................................................... 23

*Schoenman v. FBI*,
    575 F. Supp. 2d 166 (D.D.C. 2008) ..................................................................... 7

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ........................................................................... 20

*U.S. Dep't of Def. v. FLRA*,
    510 U.S. 487 (1994) ...................................................................................... 7, 12

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) .................................................................................. *passim*

*N.Y. Times, Co.  v. U.S. Dep't of Just.*,
    138 F. Supp. 3d 462 (S.D.N.Y. 2015) ................................................................ 21

*Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Just.*,
    844 F.3d 246 (D.C. Cir. 2016) .......................................................................... 24

*U.S. Dep't of State v. Ray*,
    502 U.S. 164 (1991) .................................................................................... 13, 14

*U.S. Dep't of State v. Wash. Post Co.*,
    456 U.S. 595 (1982) ...................................................................................... 6, 7

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    592 U.S. 261 (2021) ........................................................................................ 23

*United States v. Clemens*,
  793 F. Supp. 2d 236 (D.D.C. 2011) ........................................................................ 22

*United States v. Deloitte LLP*,
  610 F.3d 129 (D.C. Cir. 2010) .............................................................................. 21

*Williams & Connolly v. SEC*,
  662 F.3d 1240 (D.C. Cir. 2011) ...................................................................... 20, 21

**Statutes**

5 U.S.C. § 552(a)(3) .................................................................................................. 5

5 U.S.C. § 552(a)(4)(B) ............................................................................................. 5

5 U.S.C. § 552(a)(8)(A) ........................................................................................... 23

5 U.S.C. § 552(b) ..................................................................................................... 24

5 U.S.C. § 552(b)(5) ................................................................................................ 20

5 U.S.C. § 552(b)(6) ............................................................................................. 6, 10

5 U.S.C. § 552(b)(7)(C) ......................................................................................... 7, 10

44 U.S.C. § 2201(3)(A) ............................................................................................ 12

**Rules**

Federal Rule of Civil Procedure 56 .......................................................................... 5

Federal Rule of Civil Procedure 26(b)(3)(A) ....................................................... 20, 21

**Regulations**

28 C.F.R. § 600.8(c) .................................................................................................. 3

**Other Authorities**

Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on the
  Judiciary, 118th Cong. (2024), available at https://www.congress.gov/event/118th-con-
  gress/house-event/116942/text ........................................................................ 14

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal,
  Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn
  Biden Center & the Delaware Private Residence of President Joseph R. Biden, Jr.*
  (Feb. 5, 2024) .............................................................................................. *passim*

## INTRODUCTION

In this Freedom of Information Act ("FOIA") case, Plaintiffs seek written transcripts and audio recordings of private conversations between President Biden and Mark Zwonitzer, the President's writing assistant. These conversations took place in President Biden's homes in 2016 and 2017, as part of the writing process for a memoir about a painful period of President Biden's life: a span of fourteen months, from November 2014 to January 2016, during which Mr. Biden dealt with the illness and death of his son Beau—and the challenge of serving as vice-president and deciding whether to run for the presidency amid immense grief. These discussions—recorded by Mr. Zwonitzer for reference in drafting Mr. Biden's memoir—were analogous to entries in a personal diary. The only reason that these recordings became government records is because they were collected by the Special Counsel's Office ("SCO"), as part of an investigation that yielded no charges.

The Department of Justice has disclosed redacted versions of partial transcripts of these recordings, but any additional disclosure of either the transcripts or the audio recordings is unwarranted. The withheld audio recordings and portions of the transcripts are protected by FOIA's Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest. Privacy interests implicated by disclosure of law enforcement records are at their zenith when the disclosure involves nonpublic information about an uncharged individual. These privacy harms are acute in this context, where the nonpublic information involves sensitive and personal home recordings. Under FOIA, only a substantial public interest in disclosure could overcome such significant privacy concerns—and there is no such interest here. The Department has already released ample information that explains the basis for the Special Counsel's conclusions, including his assessment

of the Biden-Zwonitzer recordings. As a result, any marginal increase in the public's understanding of how Special Counsel Hur carried out his investigation (the only public interest cognizable under FOIA) is insufficient to overcome the significant privacy interests at stake.

Moreover, the written transcripts are also subject to Exemption 5, as disclosure of the redacted material would reveal attorney work product. The transcripts were created by a court-reporter service at the SCO's direction, in order to capture the specific sections of dozens of hours of recorded conversations between President Biden and Mr. Zwonitzer that the SCO team deemed most significant. The transcripts were accordingly created because of the prospect of criminal litigation. This work product reveals the impressions of the SCO attorneys, and it is subject to withholding without any balancing of interests.

Since the Department properly asserted FOIA Exemptions 5, 6, and 7(C), it is entitled to summary judgment.

## BACKGROUND

### I.    The Hur Investigation

On January 12, 2023, Attorney General Merrick Garland appointed Robert Hur as Special Counsel. Decl. of Bradley Weinsheimer ("Weinsheimer Decl.") ¶ 5. The SCO was authorized to investigate the possible unauthorized removal and retention of classified documents at various locations associated with President Biden. *See id.* During the investigation, agents from the Federal Bureau of Investigation ("FBI") contacted Mr. Zwonitzer regarding his work on memoirs that President Biden had published. *See* Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 335 (Feb. 5, 2024) ("Hur Report"), available at

https://www.justice.gov/sco-hur.  Mr. Zwonitzer provided investigators with the electronic devices he had used to create dozens of hours of recorded conversations with Mr. Biden in advance of the publication of Mr. Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*.  *Id.* at 106, 335.  The conversations took place between the spring of 2016 and the summer of 2017, at Mr. Biden's residences.  *Id.* at 100.  They covered "a vast array of topics" related to the memoir, which "recounts a 14-month period of Mr. Biden's vice presidency from Thanksgiving to January 2016, during which he dealt with the illness and eventual death of his elder son, Beau, who died in May 2015."  *Id.* at 97, 207.  "The book discusses the toll that loss took on Mr. Biden, the foreign policy issues in Ukraine, Central America, and Iraq he addressed during that time, and the role his son's death played in Mr. Biden's decision not to run for president in 2016."  *Id.* at 97-98.

In a voluntary interview with the SCO, Mr. Zwonitzer relayed that he had deleted the audio recordings of these conversations with Mr. Biden.  *Id.* at 335.  Investigators recovered the deleted files from the external hard drive that Mr. Zwonitzer provided, using a digital forensic process known as "file carving," in which a storage device is comprehensively scanned.  *Id.* at 335 & n.1350.  The SCO listened to the recovered recordings as part of its investigation.  Weinsheimer Decl. ¶ 14.  A small subset of these recordings were of particular investigative interest, and the SCO accordingly engaged a court-reporter service to transcribe those portions of the recordings designated as such by the SCO.  *Id.* ¶ 15.

At the conclusion of the investigation, Mr. Hur submitted a confidential report to Attorney General Garland pursuant to Department regulations.  *See* 28 C.F.R. § 600.8(c).  The Report stated that Mr. Hur "conclude[d] that no criminal charges are warranted," Hur Report at 1, and provided extensive discussion of the investigation and the decisions he reached, *see generally* Hur Report.

The Department later produced a copy of the Hur Report to Congress without any additional redactions or modifications and published it on the Department's public-facing website. Weinsheimer Decl. ¶ 8.  The Department also produced redacted copies of the transcripts of interviews that the SCO had conducted with President Biden and Mr. Zwonitzer as part of its investigation.  *Id.* ¶ 25.  In addition, the Department facilitated Mr. Hur's testimony before Congress concerning his investigation and his decision to decline prosecution.  *Id*.

## II.    **Plaintiffs' FOIA Requests and Procedural Background**

On February 9, 2024, Plaintiffs submitted a FOIA request to the Department seeking "the records relied upon by Special Counsel Hur in drafting [certain] passages in the Report relating to President Joseph R. Biden's memory and mental faculties."  Am. Compl. ¶ 8, ECF No. 6.  Plaintiffs filed a Complaint on March 6, 2024 and an Amended Complaint on March 13, 2024.  *See* ECF Nos. 1, 6.

Plaintiffs do not challenge the adequacy of the Department's search.  Joint Status Report at 2 (Aug. 28, 2024), ECF No. 28.  By agreement of the parties, Plaintiffs only seek (1) the portions of audio recordings from 2016-17 of conversations between President Biden and his writing assistant, Mark Zwonitzer ("the Biden-Zwonitzer recordings") that are quoted directly in the Hur Report, and (2) the transcripts of a portion of the Biden-Zwonitzer recordings that SCO created via a court-reporter service.  The Department withheld the audio in full on the basis of Exemptions 6 and 7(C).  The Department withheld the transcripts in part on the basis of Exemptions 1, 3, 5, 6, and 7(C).  Plaintiffs informed the Department that they do not challenge the Department's withholdings on the basis of Exemptions 1 and 3, but Plaintiffs otherwise challenge all withholdings made regarding the audio and transcripts on the basis of Exemptions 5, 6, and 7(C). The Department now seeks summary judgment.

## STANDARD OF REVIEW

Under FOIA, federal agencies must make agency records available to the public upon request unless the records fall within one or more statutory exemptions.  5 U.S.C. § 552(a)(3), (b)(1)-(9).  The statute reflects a "balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential," *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 925 (D.C. Cir. 2003), given the "'legitimate governmental and private interests' that might be 'harmed by release of certain types of information,'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)).  "FOIA expressly recognizes that important interests are served by its exemptions, and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement."  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (cleaned up).  The Department bears the burden of justifying its withholdings of materials responsive to a FOIA request, and this Court reviews the Department's response to that request *de novo*.  *See* 5 U.S.C. § 552(a)(4)(B).

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. U.S. Dep't of Just.*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Off. of the U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011)).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The defendant in a FOIA case must show . . . that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. U.S. Dep't of Just.*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

A court may award summary judgment in a FOIA action on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (citations omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (cleaned up).

## ARGUMENT

### I. The Transcripts Were Properly Withheld In Part and the Audio Was Properly Withheld In Full Under Exemptions 6 and 7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy

The release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest. The Department thus properly withheld the transcripts in part and the audio recordings in full under Exemptions 6 and 7(C).

Exemption 6 exempts from disclosure information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For the exemption to apply, the information at issue must be maintained in a government file and apply to a particular individual. *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Once that threshold requirement is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public's interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976).

Similarly, Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). And for Exemption 7(C) to apply, the records at issue must have been compiled for law enforcement purposes. *Schoenman v. FBI*, 575 F. Supp. 2d 166, 174 (D.D.C. 2008). If that threshold requirement is met, Exemption 7(C)—like Exemption 6— requires individual privacy rights to be balanced against the public interest in disclosure. *See, e.g.*, *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 762 (1989). In the balancing process, however, Exemption 7(C) "is more protective of privacy than Exemption 6." *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 496 n.6 (1994); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004). Accordingly, "[w]hen an agency invokes both exemptions, courts 'focus' on Exemption 7(C) because it 'establishes a lower bar for withholding material.'" *Nova Oculus Partners, LLC v. SEC*, 486 F. Supp. 3d 280, 288 (D.D.C. 2020) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1091 n.2 (D.C. Cir. 2014) ("CREW")).

The recordings and transcripts satisfy the threshold requirements of both Exemption 6 and Exemption 7(C). They qualify as "similar files" under Exemption 6 because the protected information applies to a particular individual and is contained in government records. *Wash. Post*, 456 U.S. at 602. And they were "compiled for law enforcement purposes" under Exemption 7(C) since the underlying audio was collected from Mr. Zwonitzer's hard-drive using forensic techniques as part of evidence-gathering efforts in a law enforcement investigation, and then partially transcribed at the SCO's direction. Weinsheimer Decl. ¶¶ 11, 14-15, 17. Because the

privacy interests at stake in the transcripts and audio far outweigh the potential public interest in disclosure, the Department's assertions of Exemptions 6 and 7(C) should be upheld.

### A. Release of the Redacted Portions of the Transcripts Would Result In An Unwarranted Invasion of Privacy

Controlling precedent strongly supports the Department's determination that the transcripts should be withheld in part under Exemptions 6 and 7(C).  That precedent demonstrates that uncharged individuals—including high-ranking public officials—have a strong privacy interest in the contents of a law enforcement file.  This point applies in spades to the unredacted transcripts, as they reflect the contents of private, sensitive home recordings gathered by the government as part of a law enforcement investigation.  In order to overcome this strong privacy interest, Plaintiffs have to identify a public interest in the transcripts that is direct and substantial—and one that concerns the *agency* behind the investigation, not the target.  But there is no such interest here. The public already has access to a wide array of information about the SCO's investigation.  The Department has released the Hur Report, which describes the basis of Mr. Hur's conclusions in detail, including his assessment of Mr. Biden's conversations with Mr. Zwonitzer.   The Department has also produced a transcript of Special Counsel Hur's interview of President Biden, with limited redactions, and a redacted version of the Special Counsel's interview of Mr. Zwonitzer.  And Mr. Hur provided more than five hours of congressional testimony regarding his investigation.  With a breadth of information already available, there is minimal public interest in the transcripts, as Plaintiffs cannot show that they would directly and substantially shed additional light on the SCO's conclusions.  The privacy interest clearly outweighs any marginal public interest here.

### 1.    The Privacy Interests in the Transcripts are Substantial

Privacy interests are at their apex for individuals when prosecutors have decided not to charge them.  As the D.C. Circuit has emphasized, "'where individuals have been investigated but not charged with a crime,' disclosure of material properly exempt under Exemption 7(C) 'represents a severe intrusion on the privacy interests of the individual[] in question.'"  *Jud. Watch v. Nat'l Archives and Records Administration*, 876 F.3d 346, 349 (D.C. Cir. 2017) (quoting *Fund for Const. Gov't v. NARA*, 656 F.2d 856, 866 (D.C. Cir. 1981)); *see also Fund for Const. Gov't*, 656 F.2d at 861 (highlighting the privacy interest in "information which would reflect investigations of allegations of possible wrongdoing by individuals who were neither indicted nor prosecuted").  This principle extends to high profile cases involving public figures.  *See, e.g.*, *Jud. Watch*, 876 F.3d at 350 (holding that former Secretary of State Hillary Clinton's "significant privacy interest in the contents of the Independent Counsel's investigative files 'should yield only where exceptional interests militate in favor of disclosure'" (quoting *Fund for Const. Gov't*, 656 F.2d at 866)).

This heightened privacy interest remains even if it is known that a particular individual has been subject to an investigation.  "'[T]he *fact* that [an individual] was under investigation' is distinct from the privacy interest in the *contents* of the investigative files," which entails "avoiding disclosure of the details of the investigation."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 719 (D.C. Cir. 2021) ("*EPIC*") (citations and internal quotation marks omitted); *see also Jud. Watch*, 876 F.3d at 349 (finding a "distinct" privacy interest in contents of the Independent Counsel's investigation files even though the existence of the investigation and the investigation's subject were both public knowledge); *Favish*, 541 U.S. at 171 (holding that "the fact that other

pictures had been made public [does not] detract[] from the weighty privacy interests" in remaining pictures).

These holdings are grounded in the fundamental policy choice Congress made in Exemption 7(C): the recognition that the release of information about individuals contained in *law enforcement files* raises particularly acute threats to personal privacy. The relationship between Exemption 6 and Exemption 7(C) reflects those heightened privacy concerns, in that FOIA sets a "lower bar" for the government to withhold information contained in law enforcement files under Exemption 7(C). *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (citation omitted). While Exemption 6 protects information contained in non-law enforcement files only when disclosure "would constitute a *clearly* unwarranted invasion of personal privacy," Exemption 7(C) protects information in law enforcement files when disclosure "could reasonably be expected" to result in "an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6), (7)(C) (emphasis added). Exemption 7(C) thus "affords broader privacy rights to suspects, witnesses, and investigators." *Bast v. U.S. Dep't of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981). That protection "makes sense because disclosure of [the contents of the investigative files] could reveal new information about a person's conduct, going beyond the facts in the public record," which "could expose the individual to the very reputational and stigmatizing harms against which we have found Exemption 7(C) protects." *EPIC*, 18 F.4th at 719 (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 854 F.3d 675, 682 (D.C. Cir. 2017)).

The unredacted transcripts would include an array of new information about individuals who were never indicted. And this information reflects intimate details that are in the heartland of what Exemption 7(C) protects from disclosure—including the impact of Beau Biden's death on President Biden's assessment of whether to run for President, foreign policy issues occurring

during the period preceding and following Beau's death, the well-being of family and others, and President Biden's candid reflections on his relationships with leaders in the United States and abroad and his decision on whether to enter the 2016 election. *See* Weinsheimer Decl. ¶ 16. The transcripts reflect home recordings that are analogous to diary entries and that only happen to be in the government's possession because they were swept up as evidence in an investigation yielding no charges. *See id.* ¶ 22. Releasing the unredacted version of the transcripts would be like releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone—despite no charges having ever been brought, let alone charges relating to that private content. The privacy interests here are undoubtedly enormous.[1]

That privacy interest does not somehow lessen because the recordings were made with a book in mind. The conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing. *See* Hur Report at 100. More generally, there is a substantial difference between private brainstorming and what a person might decide to communicate later in a more public setting. The very foundation of privacy is the choice of what aspects of a brainstorming session become public and what stays in the room. *See Reps. Comm.*, 489 U.S. at 763 (defining privacy as "the individual's control of information concerning his or her person").

That foundational tenet applies to former presidents and vice presidents, who have "compelling" privacy interests in "what they were thinking, considering, and planning as they transitioned back to private life after their years of service to the country." *Cook v. Nat'l Archives*

---

[1] In addition to President Biden and Mr. Zwonitzer, the unredacted transcripts reflect private conversations involving other individuals. *See* Weinsheimer Decl. ¶ 16. Mr. Zwonitzer and these other individuals have their own privacy interests implicated by the disclosure of these transcripts, as unindicted individuals referenced in material included in a law enforcement file.

*& Records Admin.*, 758 F.3d 168, 176 (2d Cir. 2014).  These "former officials have a significant interest in developing their ideas privately, free from unwanted public scrutiny."  *Id.*  Indeed, Congress has specifically sought to protect the privacy of presidential and vice-presidential diaries, deliberately excluding materials that serve as the "functional equivalent of a diary or journal" from the Presidential Records Act's preservation and disclosure requirements.  *See* 44 U.S.C. § 2201(3)(A).

### 2.  Any Cognizable Public Interest in the Transcripts is Exceedingly Limited and Outweighed by the Privacy Interest

On the other side of the balance, to overcome a privacy interest under Exemption 7(C), "a FOIA requester must (1) 'show that the public interest sought to be advanced [by disclosure] is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'"  *Boyd v. Crim. Div. of U.S. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007) (quoting *Favish*, 541 U.S. at 172).  Where there is a "significant privacy interest in the contents of the . . . investigative files," disclosure is warranted "only where exceptional interests militate in favor of disclosure."  *Judicial Watch*, 876 F.3d at 350 (quoting *Fund for Const. Gov't*, 656 F.2d at 866).

Critically, only certain public interests are cognizable here: "the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'"  *CREW*, 746 F.3d at 1093 (cleaned up) (quoting *FLRA*, 510 U.S. at 497).  D.C. Circuit precedent thereby requires that any public interest in disclosure be grounded in an explanation of how release of the audio recordings and transcripts would inform the public about the activities of *Special Counsel Hur*, not about the conduct or characteristics of President Biden or Mr. Zwonitzer.  *See id.* ("[T]he relevant public interest is *not* to find out what [House

Majority Leader] DeLay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct."); *EPIC*, 18 F.4th at 720-21 (noting that this principle "follow[s] decades of United States Supreme Court precedent," and applying it to a FOIA case involving the report of Special Counsel Robert Mueller).

And because a plaintiff must show that disclosure "is likely to advance" a cognizable public interest, *see Boyd*, 475 F.3d at 387, an important consideration in the Exemption 7(C) analysis is whether the public already has access to substantial information about the topic.  If substantial information is already available, then there is little public interest in further disclosure that only marginally increases public understanding.  For example, in *Judicial Watch*, the D.C. Circuit held that the public interest in a draft indictment of former Secretary of State Clinton was "greatly reduced" given "the voluminous information already in the public domain about the Independent Counsel's investigation," including a final report by the Independent Counsel, a staff summary of the evidence, and information released by congressional committees.  876 F.3d at 350.  "In these circumstances," disclosure was inappropriate because "the incremental public interest in learning how the Independent Counsel carried out his investigation . . . by disclosure of a draft indictment appears slight."[2]  *Id.*; *see also U.S. Dep't of State v. Ray*, 502 U.S. 164, 178 (1991) (allowing

---

[2] Courts outside of this Circuit apply a similar analysis.  *See, e.g.*, *Forest Serv. Emps. for Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1028 (9th Cir. 2008) ("As a result of the substantial information already in the public domain, we must conclude that the release of the identities of the employees who participated in the Forest Service's response to the Cramer Fire would not appreciably further the public's important interest in monitoring the agency's performance[.]"); *Off. of the Cap. Collateral Couns. v. U.S. Dep't of Justice*, 331 F.3d 799, 804 (11th Cir. 2003) (finding that substantial public information was available about an attorney's misconduct and that any "public interest in knowing how DOJ responded to [the attorney's] misconduct can be satisfied by this other public information"); *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 293 (2d Cir. 2009) ("We conclude that the public interest in evaluating whether DOD properly followed-up on the detainees' claims of mistaken identity have been adequately served by the disclosure of the redacted information[.]").

withholding of unredacted summaries of agency interviews because the public interest had been "adequately served" by earlier release of redacted summaries of the interviews).

Here, any public interest in the unredacted transcripts would be exceedingly minimal. The public already has access to voluminous information about the SCO investigation, beginning with the Hur Report itself. The Hur Report specifically and meticulously lays out the basis for the SCO's conclusions, in a comprehensive account that spans 345 pages of main text, more than 1,300 footnotes, and three appendices. It includes substantial discussion of the legal framework governing the handling of classified information, the investigatory steps undertaken, the evidence uncovered, and the reasons why SCO concluded that charges against President Biden and Mr. Zwonitzer were not warranted. As part of this analysis, the Hur Report includes a detailed examination of the Biden-Zwonitzer recordings and how they were relevant to Mr. Hur's decision not to seek charges. *See, e.g.*, Hur Report at 3-14. In addition, Special Counsel Hur publicly testified before Congress for more than five hours concerning his investigation and his decision to decline to recommend charges. *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on the Judiciary, 118th Cong. (2024), available at https://www.congress.gov/event/118th-congress/house-event/116942/text. And the Department has already produced a written transcript of Special Counsel Hur's interview with President Biden himself and has produced redacted transcripts of the SCO's interviews with Mr. Zwonitzer.[3] So any public interest in the transcripts "is greatly reduced . . . because . . . the voluminous information already in the public domain about the [Special] Counsel's investigation" already lets "the public

---

[3] The Department applied a small number of redactions to the Biden interview transcript to withhold specific information that is exempt under FOIA.

at large" "readily assess" SCO's conduct. *Jud. Watch*, 876 F.3d at 350, 351; *see also Ray*, 502 U.S. at 178.

To the extent that Plaintiffs may argue that the transcripts shed additional light regarding the Special Counsel's conclusions about the President's memory, such an argument is sheer speculation. The Hur Report already explains the Special Counsel's assessment of the President's memory and the ways in which it influenced the SCO's decision-making. *See, e.g.*, Hur Report at 5-6. The Hur Report also discusses the role that the Biden-Zwonitzer recordings played in that assessment. *See, e.g., id.* at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."). It is unclear how the unredacted transcripts would shed additional light on this conclusion, which is already spelled out. Speculation about what may be included in the unredacted transcripts does not amount to a substantial public interest. *See Dunkelberger v. U.S. Dep't of Just.*, 906 F.2d 779, 781 (D.C. Cir. 1990) (noting that public interest "must be defined with sufficient specificity" to enable balancing).

All told, given the extensive amount of evidence collected and analyzed by Special Counsel Hur and the substantial amount of other information about Special Counsel Hur's declination decision already available to the public, release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions. *Jud. Watch*, 876 F.3d at 350; *see also Project on Gov't Oversight, Inc. v. U.S. Off. of Special Couns.*, No. 22-cv-3381, 2024 WL 1213324, at *4 (D.D.C. Mar. 19, 2024) (upholding Exemption 7(C) assertion after noting that

"'general public curiosity' about the conduct of government employees who have been cleared of wrongdoing cannot outrun those employees' 'legitimate and substantial privacy interests,' even when those employees are 'high level government . . . officials'" (quoting *Fund for Const. Gov't*, 656 F.2d at 866, 864)).

When the privacy interests are high and the public interests are minimal given public information, the balance decisively tips in favor of exemption.  That is the case here.  The privacy interest in transcripts of sensitive home recordings is exceedingly significant.  Any potential cognizable public interest in the transcripts is minimal, as the public already has access to a wealth of material that explains how the recordings were evaluated in the SCO investigation.  The Department properly withheld the redacted material under Exemptions 6 and 7(C).

### B. Release of the Audio Recordings Would Result In An Unwarranted Invasion of Privacy

The principles supporting the Department's decision to redact the transcripts similarly support the withholding of the audio recordings under Exemptions 6 and 7(C).  Controlling precedent makes clear that individuals have a distinct privacy interest in an audio recording of their voice, even where a transcript is available of the words they have spoken.  That distinct privacy interest is notable here, given that the audio is of sensitive home recordings that are solely in the government's possession because of a criminal investigation that yielded no charges.  No substantial public interest counterbalances those privacy concerns.

#### 1.    The Audio Implicates Distinct Privacy Interests

The medium of audio recordings creates additional and distinct privacy concerns.   The audio recordings of a private conversation reflect the individual's oral responses, including any pauses, hesitations, mannerisms, and intonations.  For that reason, the *en banc* D.C. Circuit has recognized that audio recordings "can contain personal information" distinct from the information

contained in a written transcript. *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990) ("*NASA I*"). In *NASA I*, the government refused to release through FOIA the audio recording of astronauts aboard the *Challenger* shortly before the space shuttle exploded. *See id.* at 1003. The Court held that "[t]he information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves." *Id.* at 1006. Because "voice inflections can contain personal information," the audio recording at issue in *NASA I* could be withheld *even though the transcript had already been released*. *Id.* at 1005; *see also id.* at 1005–07. Indeed, on remand the district court found that the government properly withheld the audio recording on privacy grounds because the sound of a person's voice constituted "intimate details" over which a person possesses a "substantial" privacy interest. *N.Y. Times Co. v. NASA*, 782 F. Supp. 628, 631-32 (D.D.C. 1991) ("*NASA II*").

Underlying these holdings is the common-sense understanding that "information is not conveyed by words alone." *NASA I*, 920 F.2d at 1007. The sound of a person's voice is far more intimate, expressive, and revealing than words captured on a page. That is why the release of a private recording is a far greater intrusion into someone's privacy than the release of only their words.

That precedent and principle squarely applies to the audio recordings here. The "information recorded" in the audio recording of the Biden-Zwonitzer conversations is "distinct and in addition to the information contained" in a transcript of those conversations. *Id.* at 1006; *see also Pike v. U.S. Dep't of Just.*, 306 F. Supp. 3d 400, 412 (D.D.C. 2016) (Brown Jackson, J.) ("Under binding precedent, written transcripts of recordings do not contain information that is identical to the audio recorded version." (citing *NASA I*, 920 F.2d at 1006) (emphasis removed)), *aff'd*, No. 16-5303, 2017 WL 2859559 (D.C. Cir. June 23, 2017) (per curiam). As noted above,

this new information would come from a law enforcement file regarding individuals who were never charged—a context in which the D.C. Circuit has recognized a heightened privacy interest. *EPIC*, 18 F.4th at 719; *see also Fund for Const. Gov't*, 656 F.2d at 861. And while the content of the specific audio recordings at issue does not involve particularly sensitive subjects—dealing instead with document retention and foreign policy issues[4]—the context in which the conversations were recorded was undoubtedly sensitive. The recordings were made for a book about how Mr. Biden coped with the loss of his son, and how he managed his responsibilities in that year while struggling with enormous personal grief. They were recorded in private and were not meant for wider distribution. *See* Weinsheimer Decl. ¶ 22. The sound of a person's voice conveys "intimate details" in such a context. *NASA II*, 782 F. Supp. at 631.

If released to the public, these private conversations—and all the "intimate details" they contain—would likely be broadcast to the world and become universally available on the Internet. *See* Weinsheimer Decl. ¶ 23. This would be akin to the global dissemination of someone's private audio diaries, which only happened to be in the government's possession because those diaries had been swept up in an investigation that yielded no charges. *See id.* ¶ 22. Such a disclosure implicates obvious and significant privacy interests. *See, e.g.*, *Judicial Watch*, 876 F.3d at 349; *Detroit Free Press Inc. v. U.S. Dep't of Just.*, 829 F.3d 478, 482 (6th Cir. 2016) ("[M]odern technology only heightens the consequences of disclosure . . . .").

---

[4] The audio corresponds to quoted material featured in the Hur Report on pages 64-65, 75-77, 106, 110, 225, and 236-37. *See* Weinsheimer Decl. ¶ 19 (providing the quoted material). The Department also identified two partial quotations on page 173 of the Hur Report for which no corresponding audio was located. *See id.* These quotations involve brief reflections from President Biden regarding relationships with world leaders, and the Department understands that these quotes are attributed to documents collected during the SCO's investigation. *See id.*

2.      **Any Cognizable Public Interest in the Audio is Clearly Outweighed By the Privacy Interest**

On the other side of the balance, disclosure of the recordings would do little to advance the public's understanding of the Special Counsel's investigation.  The sound of Mr. Biden and Mr. Zwonitzer's voices sheds little light on "how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct."  *CREW*, 746 F.3d at 1093.  As indicated above, voluminous information is available that lets the public know how the SCO reached its conclusions, including a nearly 400-page report.  That report spells out how the recordings affected the Special Counsel's determination regarding the President's memory.  And the Special Counsel's decision not to recommend charges was based on a huge collection of evidence, including additional portions of the Biden-Zwonitzer recordings and interviews with President Biden, Mr. Zwonitzer, and dozens of other individuals. *See, e.g.*, Hur Report at 29.  In such a context, it is exceedingly speculative to envision how these recordings would shed any light on SCO's role. *See Dunkelberger*, 906 F.2d at 781 (noting that the public interest "must be defined with sufficient specificity").  Such a release "would tell us nothing directly about the character of the [SCO's] behavior." *Reps. Comm.*, 489 U.S. at 774; *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (holding that there is no public interest "unless the public would learn something directly about the workings of the *Government*" via disclosure).  It certainly does not justify divulging the audio of what amounts to the conversational equivalent of Mr. Biden's diary entries.

Under these facts, the Department has satisfied its burden to show that the audio recordings—like the redacted portions of the transcripts—"logically" and "plausibly" fall within the protection of Exemptions 6 and 7(C).

19

## II.    The Transcripts Were Properly Withheld In Part Under Exemption 5 Because They Are Attorney Work Product Not "Routinely" Available in Civil Litigation

Exemption 5 exempts documents that are privileged in civil discovery. *See Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1185-87 (D.C. Cir. 1987).  This includes any material that cannot ordinarily be obtained through civil discovery.  *See id.*  Accordingly, information that is subject to a "qualified" privilege remains unqualifiedly exempt under FOIA even if the privilege could be overcome in specific civil litigation.  *See FTC v. Grolier Inc*., 462 U.S. 19, 27 (1983).  For instance, "[a]lthough work product protection may be overcome for cause in civil cases, any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA."  *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011) (citation omitted).  So unlike in the civil litigation context, the Court does not engage in any balancing here; qualified privileges are categorical under Exemption 5.  *See, e.g.*, *id.*

The transcripts at issue here are quintessential attorney work product.  They were created by SCO during and in furtherance of a law enforcement investigation, and they reveal the impressions of what SCO deemed to be important parts of the Biden-Zwonitzer recordings for investigative and prosecutorial purposes.  The redacted portions of the transcripts are thereby protected by Exemption 5.

"The work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'"  *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  The doctrine covers "the mental impressions, conclusions, opinions, or legal theories of an attorney," often called opinion work product, and "factual materials prepared in anticipation of litigation," often called fact work product.  *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997).  Importantly, and as the Second Circuit has explained, Federal Rule of Civil Procedure 26(b)(3)(A) "sweeps

broadly," and "effectively . . . rejects the conclusion reached by some district courts that witness statements—particularly verbatim statements—are work product only to the extent 'they reveal an attorney's strategic impressions and mental processes,' not when they merely record the witnesses' factual observations." *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 590 & n.13 (2d Cir. 2022) (quoting *N.Y. Times, Co.  v. U.S. Dep't of Just.*, 138 F. Supp. 3d 462, 471-72 (S.D.N.Y. 2015)). "[B]oth are work product." *Id.* at 590 n.13.  In civil litigation, fact work product is more easily discoverable upon a showing of good cause.  But under FOIA, "any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA." *Williams & Connolly*, 662 F.3d at 1243.

The D.C. Circuit "appl[ies] a 'because of' test" to determine whether a record is work product, "asking 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).  This "because of" test governs "regardless of [a document's] status as 'factual' or 'deliberative'" material.  *Martin*, 819 F.2d at 1187.  So even factual documents memorializing verbatim witness testimony, such as "eleven signed witness statements," constitute work product if they were prepared because of litigation.  *See id.* at 1183, 1187; *see also Am. Oversight*, 45 F.4th at 590 n.13.

Applying this test here, the transcripts are plainly work product, as they were prepared because of the prospect of litigation.  The Special Counsel was authorized to investigate potential federal crimes and to bring prosecutions arising from his investigation.   As part of this investigation, the SCO examined "dozens of hours of recorded conversations" between Biden and Zwonitzer in 2016 and 2017, which covered "a vast array of topics."  Hur Report at 207.  The SCO

determined that a small subset of these recordings were of particular investigative interest, and it had these portions of the recordings transcribed by a court-reporter service, to facilitate SCO's consideration of evidence that would be considered in determining whether to pursue any charges. *See* Weinsheimer Decl. ¶ 15.

Since the transcripts were culled from a wider array of material, they constitute opinion work product, which garners the highest level of protection in civil discovery. The act of paring down key items of evidence from a much larger pool of material "necessarily reflect[s] a focus chosen by the lawyer." *United States v. Clemens*, 793 F. Supp. 2d 236, 252 (D.D.C. 2011) (citation omitted). Here, the transcripts reveal the assessment of what the SCO deemed to be the most significant material for prosecutorial purposes among the dozens of hours of the Biden-Zwonitzer recordings.

And even if the SCO had undertaken no winnowing at all, it would make no difference, since factual material prepared because of litigation is also protected by the work product doctrine. *Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 11-12 (D.D.C. 2020); *see also Jud. Watch, Inc. v. U.S. Dep't of Just.*, 391 F. Supp. 3d 43, 50 (D.D.C. 2019) ("Exemption 5 extends the same protections to both kinds of work product [*i.e.*, fact and opinion work product]."), *aff'd*, 806 F. App'x 5 (D.C. Cir. 2020). By engaging a court-reporter service to create transcripts of conversations containing relevant evidence, to assist the SCO in determining whether the evidence warranted a recommendation of criminal charges, the SCO was creating material because of the prospect of litigation. That material's status as work product does not hinge on whether it was a full transcript or a partial one, or whether it featured verbatim statements or summaries of them. *See Martin*, 819 F.2d at 1183, 1187 (finding that "eleven signed witness statements"—which necessarily contained the verbatim testimony of those witnesses—were work product). The

redacted portions of the transcripts are accordingly exempt under Exemption 5. *See U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 263 (2021).

### III.    Disclosure of the Audio Recordings or of the Redacted Portions of the Transcripts Would Foreseeably Harm Interests Protected by FOIA Exemptions

In order to justify the withholding of a responsive record, the FOIA Improvement Act of 2016 requires the government to show that "the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) [of FOIA]," or that "disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i); *see also Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021). To satisfy the foreseeable harm requirement, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." *Reps. Comm.*, 3 F.4th at 369 (quoting H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016)).[5]

Disclosure of the audio recordings or the redacted portions of the transcripts would foreseeably harm interests protected by each of the FOIA exemptions asserted here. Disclosure of either the audio recordings or the redacted transcript portions would harm interests protected by Exemptions 6 and 7(C) because releasing the records would result in unwarranted harm to privacy interests that an individual maintains in preventing the dissemination of a private recordings that were collected in the course of an investigation that yielded no criminal charges. *See* Weinsheimer Decl. ¶ 34; *see also Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 65 (D.D.C. 2021) ("[W]hen

---

[5] This burden is more stringent when an agency asserts the deliberative process privilege, which is the specific privilege that Congress sought to address by adding the foreseeable harm standard. *See Reps. Comm. for Freedom of the Press v. United States Customs & Border Prot.*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021). By contrast, "an agency's burden under the foreseeable harm requirement may be more easily met when invoking other privileges and exemptions for which the risk of harm through disclosure is more self-evident and the potential for agency overuse is attenuated." *Id.*

invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to establish foreseeable harm.").    Further, disclosure would harm the interests protected by Exemption 5 (via work product): release of the recordings or transcripts would impermissibly reveal federal prosecutors' interview strategies and factual material gathered in anticipation of litigation.  *See* Weinsheimer Decl. ¶ 34.  Disclosure would also eliminate the Department's ability to assert a viable discovery privilege over the transcripts in future potential civil litigation.  *See id.*

## IV.    There Is No Reasonably Segregable, Non-Exempt Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Here, the Department has properly withheld the audio recordings in full and the written transcripts in part under multiple exemptions.  Because their release would unjustifiably infringe privacy interests related to the law enforcement interview of an uncharged individual, the entirety of the audio recordings and the redacted portions of the transcripts are properly withheld under Exemptions 6 and 7(C), and no portions are further segregable.  *See* Weinsheimer Decl. ¶ 35. Further, because the transcripts were created in anticipation of litigation, the redacted portions of the transcripts are work product subject to Exemption 5—an exemption that is not subject to segregability requirements.  *See, e.g., Jud. Watch, Inc. v. U.S. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005).  Accordingly, all information has been appropriately withheld, and no further segregation is possible.  *See, e.g.*, *Nat'l Ass'n of Crim. Def. Lawyers v. U.S. Dep't of Just.*, 844 F.3d 246, 256 (D.C. Cir. 2016) (noting that when an exemption applies to an entire record, "there are no non-exempt portions left to segregate").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant's motion for summary judgment.


Dated:  November 13, 2024          Respectfully submitted,


                                   BRIAN M. BOYNTON
                                   Principal Deputy Assistant Attorney General

                                   MARCIA BERMAN
                                   Assistant Branch Director

                                   */s/ Cameron Silverberg*
                                   CAMERON SILVERBERG (D.C. Bar No. 1780628)
                                   JOSHUA C. ABBUHL (D.C. Bar No. 1044782)
                                   Trial Attorneys
                                   United States Department of Justice
                                   Civil Division, Federal Programs Branch
                                   1100 L Street NW
                                   Washington, DC 20005
                                   Tel.:   (202) 353-9265
                                   Fax:    (202) 616-8470
                                   Email: Cameron.D.Silverberg@usdoj.gov

                                   *Counsel for Defendant*