## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HERITAGE FOUNDATION**,

**MIKE HOWELL,**

*Plaintiffs,*

v.

**U.S. DEPARTMENT OF JUSTICE,**

*Defendant.*

Case No. 1:24-cv-00645-DLF

## DEFENDANT'S COMBINED OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.    The Transcripts Were Properly Withheld In Part Under Exemptions 6 and 7(C)
      Because Disclosure Would Cause An Unwarranted Invasion of Privacy ......................... 3

      A.    The Privacy Interests in the Transcripts are Substantial ......................................... 3

      B.    Any Cognizable Public Interest in the Transcripts is Exceedingly Limited and
            Outweighed by the Privacy Interest ........................................................................ 6

II.   The Audio Recordings Were Properly Withheld In Part Under Exemptions 6 and
      7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy ............... 10

      A.    The Privacy Interests in the Audio are Distinct and Significant ............................ 11

      B.    Any Public Interests in the Audio Recordings are Exceedingly Minimal and
            Outweighed by the Privacy Interest ...................................................................... 14

III.  The Transcripts Were Properly Withheld In Part Under Exemption 5 Because They
      Are Attorney Work Product Not Routinely Available in Civil Litigation ..................... 17

      CONCLUSION ............................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Abila v. Funk*,
  No. CIV 14-1002, 2016 WL 5376323 (D.N.M. Sept. 20, 2016) ............................................ 19

*Beck v. Dep't of Just.*,
  997 F.2d 1489 (D.C. Cir. 1993) ....................................................................................... 12

*Boyd v. Crim. Div. of U.S. Dep't of Just.*,
  475 F.3d 381 (D.C. Cir. 2007) ........................................................................................ 14

*Carrasco v. Campagna*,
  No. C-03-4727, 2007 WL 81909 (N.D. Cal. Jan. 9, 2007) ....................................... 20

*Chaney v. Keego Harbor Police Dep't*,
  Case No. 21-11662, 2023 WL 113043 (E.D. Mich. Jan. 5, 2023) ........................... 20

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ................................................................................ 8, 13

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  822 F. Supp. 2d 12 (D.D.C. 2011) ................................................................................ 12

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ...................................................................................... 18

*Dunkelberger v. Dep't of Just.*,
  906 F.2d 779 (D.C. Cir. 1990) ...................................................................... 7, 8, 15, 16

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
  18 F.4th 712 (D.C. Cir. 2021) ................................................................................... 4, 11

*Enron Corp. Sav. Plan v. Hewitt Assocs., LLC*,
  258 F.R.D. 149 (S.D. Tex. 2009) .................................................................................. 20

*Gargano v. Metro-North*,
  222 F.R.D. 38 (D. Conn. 2004) ..................................................................................... 20

*In re Subpoenas Duces Tecum*,
  738 F.2d 1367 (D.C. Cir. 1984) .................................................................................... 18

*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*,
  876 F.3d 346 (D.C. Cir. 2017) .............................................................................. 4, 11, 14

*Kimberlin v. Dep't of Just.*,
  139 F.3d 944 (D.C. Cir. 1998) ................................................................................... 4, 13

*Leopold v. U.S. Dep't of Just.*,
 487 F. Supp. 3d 1 (D.D.C. 2020) ................................................................. 19

*Lopez v. Exec. Off. for U.S. Att'ys*,
 598 F. Supp. 2d 83 (D.D.C. 2009) ................................................................. 7

*Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*,
 819 F.2d 1181 (D.C. Cir. 1987) ............................................................. 19, 20

*Moyle v. Liberty Mutual Retirement Benefit Plan*,
 No. 10cv2179, 2012 WL 4486269 (S.D. Cal. Sept. 27, 2012).......................... 20

*N.Y. Times Co. v. NASA*,
 920 F.2d 1002 (D.C. Cir. 1990) ...................................................... 10, 11, 12

*Nat'l Archives & Recs. Admin. v. Favish*,
 541 U.S. 157 (2004) ....................................................................................... 7

*Nat'l Ass'n of Home Builders v. Norton*,
 309 F.3d 26 (D.C. Cir. 2002) ....................................................................... 12

*Pike v. U.S. Dep't of Just.*,
 306 F. Supp. 3d 400 (D.D.C. 2016), *aff'd*, 2017 WL 2859559 (D.C. Cir. June 23, 2017)....... 11

*Sea-Roy Corp. v. Sunbelt Equip. & Rentals, Inc.*,
 172 F.R.D. 179 (M.D.N.C. 1997) ................................................................. 20

*Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*,
 502 F. Supp. 2d 50 (D.D.C. 2007) ................................................................. 7

*Tax Analysts v. IRS*,
 117 F.3d 607 (D.C. Cir. 1997) ..................................................................... 19

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
 489 U.S. 749 (1989) ............................................................................... 5, 12

*United States v. AT&T*,
 642 F.2d 1285 (D.C. Cir. 1980) ................................................................... 18

*United States v. Thompson*,
 562 F.3d 387 (D.C. Cir. 2009) ..................................................................... 18

*Wiedeman v. Canal Ins. Co.*,
 No. 1:15-cv-4182, 2016 WL 6080908 (N.D. Ga. Oct. 18, 2016) ........................... 21

*Wolf v. CIA*,
 473 F.3d 370 (D.C. Cir. 2007) ............................................................... 16, 17

**RULES**

Fed. R. Civ. P. 26 ................................................................................................................. 17

**OTHER AUTHORITIES**

Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on
    the Judiciary, 118th Cong. (2024),
    https://perma.cc/MBG6-CQCA ................................................................................................ 7

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal,*
    *Retention, & Disclosure of Classified Documents Discovered at Locations Including the*
    *Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.*
    (Feb. 5, 2024),
    https://perma.cc/LU98-MMVT ........................................................................................ *passim*

## INTRODUCTION

The Court should not require disclosure under the Freedom of Information Act ("FOIA") of transcripts and audio recordings of private conversations between President Biden and Mark Zwonitzer, the President's writing assistant.  The conversations were undisputedly recorded at President Biden's homes in 2016 and 2017, to provide source material for a memoir about the period of his vice-presidency in which he dealt with the illness and death of his son Beau.  These private and personal home recordings only became government records because they were collected by the Special Counsel's Office ("SCO"), as part of an investigation that yielded no charges.  The unredacted transcripts and the audio recordings are protected by Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest.  The transcripts are also protected by Exemption 5, since they were created by the SCO in anticipation of criminal litigation, and disclosure of the redacted material would reveal attorney work product.  The Department was accordingly correct to withhold the transcripts in part and the audio recordings in full.

Plaintiffs fail to rebut the applicability of these exemptions.  Regarding Exemptions 6 and 7(C), Plaintiffs assert that the privacy interests are diminished because the relevant facts are known.  But this assertion disregards the array of new, private material that would be disclosed by releasing the unredacted transcripts, including President Biden's candid reflections on a range of sensitive issues.  It also disregards binding precedent that makes clear that President Biden and Mr. Zwonitzer have a distinct privacy interest in recordings of their voices, even where the corresponding text has already been released.  Instead, Plaintiffs appear to predicate nearly their entire case on an asserted public interest in resolving perceived disputes between President Biden and Special Counsel Hur regarding whether Mr. Biden disclosed classified information to Mr.

Zwonitzer and whether SCO's conclusions regarding the President's memory were accurate. But the Department has already provided a high volume of information that explains Mr. Hur's conclusions about these points in detail, including a meticulous report that spans nearly 400 pages.[1] Plaintiffs fail to distinguish binding precedent that highlights the limited public interest present when the public already has access to voluminous information about a prosecutorial declination. Indeed, they fail to even show how these unredacted transcripts or the audio recordings would meaningfully shed further light on these two issues at all.

Regarding Exemption 5, Plaintiffs appear to concede that the transcripts constitute opinion work product, given that the SCO selected a portion of the recordings for transcription to capture relevant material as it considered criminal litigation. Plaintiffs nonetheless argue that work product protection was waived when the Hur Report disclosed that the transcripts had evidentiary value. But the Hur Report only disclosed a small fraction of the content in the transcripts, and it is well-established that waiver via disclosure requires an exact match of the disclosed content. And, in any event, the transcripts' status as opinion work product makes no difference in this case, as they undoubtedly qualify as at least fact work product. Plaintiffs' arguments to the contrary are undermined by both case law and common sense.

Since the Department properly asserted FOIA Exemptions 5, 6, and 7(C), it is entitled to summary judgment.

---

[1] For the full report, see Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024), at 4, 103-08, 244-48 ("Hur Report"), https://perma.cc/LU98-MMVT.

**ARGUMENT**

**I.    The Transcripts Were Properly Withheld In Part Under Exemptions 6 and 7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy**

The Department properly withheld the transcripts in part under Exemptions 6 and 7(C).  As demonstrated in Defendant's opening brief, uncharged individuals—including high-ranking public officials—have a heightened privacy interest in the previously undisclosed contents of a law enforcement file.  This privacy interest is particularly strong here, given that the transcripts reflect the contents of private, sensitive home recordings of individuals who were never charged in the underlying law enforcement investigation.  To overcome this strong privacy interest, Plaintiffs have to identify a public interest in the transcripts that is direct and substantial.  But there is no such interest here.  The public already has access to a wide array of information about the SCO's investigation, including the Hur Report, Mr. Hur's congressional testimony, a minimally redacted transcript of Mr. Hur's interview of President Biden, and a redacted transcript of the SCO's interview of Mr. Zwonitzer.  With a high volume of information already available, there is minimal public interest in the transcripts, as Plaintiffs cannot show that they would directly and substantially shed additional light on the SCO's conclusions.  The privacy interest clearly outweighs any marginal public interest in releasing the transcripts.  *See* Def.'s Mem. of Law in Supp. of Mot. for Summ. J., at 8-16, ECF No. 33-1 ("Def.'s Mem.").

**A.  The Privacy Interests in the Transcripts are Substantial**

Plaintiffs attempt to discount the privacy interests implicated by the transcripts, but their arguments are disconnected from the relevant facts and law.  While acknowledging that President Biden and Mr. Zwonitzer have a heightened privacy interest in the contents of a law enforcement file, given that neither of them were charged with a crime, Plaintiffs contend that the privacy interests are "vastly diminished" because the "operative facts" are known.  Pls.' Cross-Mot. or

Partial Summ. J. & Opp'n to Def's Mot. for Partial Summ. J. on Withholdings, at 32, ECF No. 34-1 ("Pls.' Opp'n").  But that is plainly incorrect.  The Hur Report addressed only discrete portions of the transcripts; it did not disclose most of the content included in the 117 pages of transcribed material at issue, nor did it release any of the underlying audio.  *See* Decl. of Bradley Weinsheimer ¶ 22, ECF No. 33-2 ("Weinsheimer Decl.").  Disclosure here would reveal new content from a law enforcement file regarding individuals who were never charged, thereby implicating the strong privacy interests in such content that the D.C. Circuit has repeatedly recognized.  *See e.g., Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 349 (D.C. Cir. 2017) (highlighting the substantial privacy interests that former Secretary of State Hillary Clinton had in the release of further disclosures from Independent Counsel Kenneth Starr's investigation, given that she was not charged with a crime, and finding that Exemption 7(C) applied to a draft indictment from that investigation); *see also Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 719 (D.C. Cir. 2021) ("*EPIC*"). [2]

This content would not only be new; much of it would also be sensitive and personal.  The withheld portions of the transcripts include details such as the impact of Beau Biden's death on President Biden's assessment of whether to run for President, foreign policy issues occurring

---

[2] Plaintiffs include cursory citations to cases that purportedly support their argument that the privacy interests are "vastly diminished" here.  But these cases provide no such support. They simply acknowledge that an uncharged individual's privacy interest in the contents of a law enforcement investigation is even higher when that individual has not been publicly linked to the investigation—while also acknowledging that there is a distinct interest in the contents of the investigation. *See, e.g., Kimberlin v. Dep't of Just.*, 139 F.3d 944, 949 (D.C. Cir. 1998) (finding that information regarding an investigation were properly withheld under Exemption 7(C), even where the public was aware of the investigation's target, since the target still had a privacy interest in further disclosures).  These cases were then followed by further D.C. Circuit precedent that emphasized the distinct and heightened privacy interests in further disclosures from high-profile and widely publicized prosecutorial declinations. *See Jud. Watch*, 876 F.3d at 350; *EPIC*, 18 F.4th at 722.

during the period preceding and following Beau's death, the well-being of family and others, and President Biden's candid reflections on his relationships with leaders in the United States and abroad. *See* Weinsheimer Decl. ¶ 16. Plaintiffs hardly address these details, instead inaccurately claiming that the transcripts would offer only "carefully targeted details about already public content." Pls.' Opp'n at 32. Nor is there any apparent recognition or response concerning the privacy interests held by third parties who appear at certain segments of the transcripts, such as a portion that includes conversations between Mr. Zwonitzer and an unidentified individual regarding Beau Biden's illness. *See* Weinsheimer Decl. ¶ 15.

Plaintiffs appear to assume that the transcripts consist only of material "relevant to potential serious criminal conduct—not President Biden's otherwise private affairs." Pls.' Opp'n at 19. But Plaintiffs are mistaken to presume that the SCO's winnowing of material meant that the transcripts *only* include items that SCO ultimately determined were material to the investigation. To the contrary, as indicated above, the transcripts include a range of sensitive material that did not concern the retention of classified documents.

Plaintiffs also argue that these privacy interests are insignificant because the underlying conversations helped facilitate a book. But that mistakenly conflates private source material with a public final product. Private brainstorming or drafting does not transform into public material simply because the finalized piece of writing is eventually released. To the contrary, a clear marker of a privacy interest is an individual's choice of what content to release and what to leave out—as well as how to phrase the content that winds up in the final publication. *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989) (defining privacy as "the individual's control of information concerning his or her person"). Private conversations that

inform the drafting process of a memoir are no more public than diary entries that inform that process.

Nor does it matter that President Biden was compensated for the book. Plaintiffs assert that there is a distinction between writing a diary and "sell[ing] previously private intricate details." Pls.' Opp'n at 18. But that distinction makes no difference. Earning income from a book has no bearing on the privacy interest that individuals have in source materials that are independent of the book itself and are not included in that book. For instance, if Mr. Zwonitzer surreptitiously leaked the recordings to a tabloid, the invasion of privacy would be no less salient because of the presence of a book contract. Plaintiffs provide no support for their suggestion that compensation for a book somehow lessens the privacy interest in independent source material that is not publicly disseminated. The privacy interests in the transcripts are unquestionably substantial, and Plaintiffs provide no basis to find otherwise.

## B. Any Cognizable Public Interest in the Transcripts is Exceedingly Limited and Outweighed by the Privacy Interest

Having given short-shrift to the privacy interests, Plaintiffs quickly turn to the asserted public interest in disclosure, but these arguments fare no better. First, Plaintiffs argue that the transcripts must be disclosed because they would address "whether there was a case to answer against President Biden in part because he disclosed classified information to Zwonitzer." Pls.' Opp'n at 32. But this point was analyzed at length in the Hur Report, including the classification status of the information shared with Mr. Zwonitzer and the reasons why charges were unwarranted. *See* Hur Report at 4, 103-08, 244-48. Even if this were a cognizable public interest, Plaintiffs fail to explain how that interest is not substantially diminished by these prior disclosures, or how further disclosure of the transcripts would shed further light on the analysis that Mr. Hur provided in his report.

Plaintiffs highlight that the transcripts were created in order to capture a small subset of the dozens of hours of Biden-Zwonitzer recordings that "contained information that was potentially relevant to the SCO's evaluation of whether to recommend criminal charges." Weinsheimer Decl. ¶ 15. But Plaintiffs mistakenly conflate material that reveals initial attorney impressions (and is thereby opinion work product) with material cited as the basis for a charging decision. For instance, law enforcement may interview dozens of witnesses in an investigation, compile reports that reveal attorney impressions about what was said in those interviews, and then arrive at a charging decision that turns on a far smaller set of details from the interviews. Here, the bases for the charging decision were detailed at length in the Hur Report.[3]

All Plaintiffs do offer are repeated and generalized references to the public's ability "to judge the matter for themselves." Pls.' Opp'n at 33. Yet they concede that it is unclear how the transcripts would actually aid the public in such a judgment. *See id.* (stating that "no one knows what the public will draw from the transcripts in determining whether President Biden or Special

---

[3] To the extent that Plaintiffs may suggest that Mr. Hur failed to address a material issue in his report, Plaintiffs would have to make a heightened evidentiary showing. *See Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174-75 (2004) (noting that FOIA requesters who argue for disclosures based upon alleged government malfeasance or negligence "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred"). No such evidence exists here. To the contrary, Mr. Hur was exceedingly thorough in addressing relevant facts and law in his nearly 400-page report. And he further emphasized the importance of being thorough in his testimony before Congress. *See* Hearing on the Report of Special Counsel Robert K. Hur: Hearing Before the H. Comm. on the Judiciary, 118th Cong. (2024) at 7-8, https://perma.cc/MBG6-CQCA (highlighting Mr. Hur's commitment to including a "rigorous, detailed, and thorough analysis" in his report, and noting that he "had to include a discussion" of "issues [that] were important to [his] ultimate decision" in the report). This absence of evidence would also foreclose arguments in favor of disclosure regardless of the applicability of the heightened evidentiary requirement under *Favish*, since it means that Plaintiffs cannot establish that disclosure would actually advance the asserted public interest. *See Dunkelberger v. Dep't of Just.*, 906 F.2d 779, 781 (D.C. Cir. 1990); *see also Lopez v. Exec. Off. for U.S. Att'ys*, 598 F. Supp. 2d 83, 89 (D.D.C. 2009); *Seized Prop. Recovery, Corp. v. U.S. Customs & Border Prot.*, 502 F. Supp. 2d 50, 59 (D.D.C. 2007).

Counsel Hur is correct," that "[s]ome may find the transcripts informative; some not so," and that "FOIA presupposes many known unknowns"). This is plainly insufficient to establish the kind of substantial and direct public interest needed to overcome the significant privacy interests here, given the range of material already available and the hazy nature of Plaintiffs' asserted public interest. *See Dunkelberger*, 906 F.2d at 781 (noting that a public interest "must be defined with sufficient specificity" to enable balancing).

Second, Plaintiffs argue that the transcripts are needed in order to shed light on the Special Counsel's determinations regarding President Biden's memory. But the Special Counsel explained the basis for these determinations in detail in the Hur Report. *See e.g.,* Hur Report at 207 ("Mr. Biden's memory also appeared to have significant limitations—both at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations, and today, as evidenced by his recorded interview with our office. Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."). Plaintiffs again fail to explain how any remaining public interest in this issue can outweigh the well-established privacy interests in non-public information in law enforcement files about uncharged parties.[4]

---

[4] To the extent that Plaintiffs frame this asserted public interest as being about the President's memory in and of itself, rather than the SCO's conclusions, it is not cognizable. A public interest is cognizable in the balancing analysis only if it involves "shed[ding] light on an agency's performance of its statutory duties or otherwise let[ting] citizens know what their government is up to." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1093 (D.C. Cir. 2014) ("CREW"). D.C. Circuit precedent thereby requires that any asserted public interest be grounded in how disclosure would inform the public about agency conduct regarding an investigation, not the target of the investigation—even if the target happens to be a government official. *See id.* (highlighting that "the relevant public interest is *not* to find out what [House Majority Leader] DeLay himself was 'up to' but rather how the FBI and the DOJ carried out their respective statutory duties to investigate and prosecute criminal conduct" (citation omitted)).

Even further afield is the Plaintiffs' repeated suggestion that the material in the Biden-Zwonitzer recordings could reveal whether "Vice President Harris and other senior Administration officials cover[ed] for President Biden when they viciously attacked Special Counsel Hur" for his conclusions regarding the President's memory. Pls.' Opp'n at 27. The transcripts (and underlying recordings) are of conversations that took place more than seven years ago—well before President Biden was inaugurated and assembled his administration. There is no evidence to suggest that Vice-President Harris or other senior officials in the administration took part in these recorded conversations, listened to the recordings, or read the transcripts. The link between the Biden-Zwonitzer recordings and this presumed public interest is entirely unexplained.

In making these arguments, Plaintiffs repeatedly imply that the public interest is somehow heightened by the fact that President Biden disputed certain aspects of Mr. Hur's analysis. But Plaintiffs provide no authority that supports the notion that the public interest increases if an uncharged individual challenges a finding in a law enforcement report. Such a rule runs contrary to fundamental norms of the criminal justice system—including that individuals are presumed innocent of crimes for which they were never charged or convicted and are free to defend themselves, and that law enforcement agencies do not typically disclose information from investigations regarding uncharged individuals. *See* Weinsheimer Decl. ¶ 21 (noting that "[i]t is a bedrock principle of the U.S. justice system that individuals are entitled to a presumption of innocence," and that "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to that core tenet").

Plaintiffs' arguments are ultimately foreclosed by D.C. Circuit precedent, which emphasizes the limited nature of the public interest when voluminous information is available. Plaintiffs attempt to distinguish one of these cases, *Judicial Watch*, by noting how that case only

involved an asserted interest in the generalized "operations" of the Independent Counsel's Office that had investigated former Secretary of State Hillary Clinton. But while Plaintiffs' asserted interests may be somewhat more specific, the manner in which disclosure would serve the asserted interests is just as hazy. Indeed, the most salient distinction between *Judicial Watch* and this case is one that weighs in the Department's favor: a draft indictment is far more probative of a prosecutor's decision-making than the material at issue in this case, and the D.C. Circuit still held that the public interest was satisfied by the voluminous material released. That logic and holding squarely apply here.

## II.     The Audio Recordings Were Properly Withheld In Part Under Exemptions 6 and 7(C) Because Disclosure Would Cause An Unwarranted Invasion of Privacy

The same reasoning that supports the Department's decision to redact the transcripts also supports the withholding of the audio in full under Exemptions 6 and 7(C). As emphasized above and in Defendant's opening brief, the D.C. Circuit has held that uncharged individuals have a heightened privacy interest in new information being disclosed from a law enforcement file. And the D.C. Circuit has further recognized that individuals have a distinct privacy interest in their voice, even if a corresponding transcript has been released. *See N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1005 (D.C. Cir. 1990). That precedent underscores that President Biden and Mr. Zwonitzer have clear privacy interests in previously undisclosed home recordings that only happen to be in the government's possession because they were collected in a criminal investigation that yielded no charges. These privacy interests outweigh any asserted public interest in the audio. The public's ability to evaluate the SCO's work in general, and its analysis of the audio in particular, is met by the range of material already available—including the nearly 400-page Hur Report, which quotes and analyzes the specific recordings at issue. The Department has therefore

demonstrated that the balance decisively favors withholding.  Def.'s Mem. at 16-19.   Plaintiffs

offer no basis to tip the scales in the other direction.

### A.  The Privacy Interests in the Audio are Distinct and Significant

To start, Plaintiffs fail to distinguish binding precedent that emphasizes the significant

privacy interests that uncharged individuals have in previously undisclosed records from law

enforcement files—including when those individuals were high-profile public figures subject to

widely publicized investigations.  *See Jud. Watch*, 876 F.3d at 349; *see also EPIC*, 18 F.4th at 715-

16, 720-22 (highlighting the substantial privacy interests held by President Trump's family

members, associates, and other government officials in previously undisclosed material from

Special Counsel Robert Mueller's report, and finding that Exemption 7(C) applied to material

about those individuals that divulged "new private information" beyond what had already been

publicly released).

Instead, Plaintiffs argue that privacy interests are minimal given that the "content of the

audio in question" has already been released, since the Hur Report quoted the underlying audio.

Pls.' Opp'n at 21.  The assumption behind this argument is that the transcribed content in the Hur

Report and the audio recordings are interchangeable, and that disclosure of the audio recordings is

therefore not "new content" from a law enforcement file.  But that assumption is foreclosed by

controlling precedent that makes clear that transcripts and audio are *not* interchangeable.  *See*

*NASA*, 920 F.2d at 1005-06 (holding that the audio recording of the astronauts aboard the

Challenger could be withheld, even though a transcript had been released, since "[t]he information

recorded through the capture of a person's voice is distinct and in addition to the information

contained in the words themselves"); *see also Pike v. U.S. Dep't of Just.*, 306 F. Supp. 3d 400, 412

(D.D.C. 2016) (Brown Jackson, J.) ("Under binding precedent, written transcripts of recordings

do not contain information that is identical to the audio recorded version." (citing *NASA*, 920 F.2d at 1006) (emphasis omitted)), *aff'd*, 2017 WL 2859559 (D.C. Cir. June 23, 2017) (per curiam).[5]

Plaintiffs note that the circumstances of *NASA* were different than the circumstances here. Pls.' Opp'n at 22-23. That is obviously correct. But *NASA* is not confined to its particularly morbid facts: its basic principle is that the sound of someone's voice and the manner in which they speak can implicate privacy interests that go beyond a written transcript. 920 F.2d at 1004-05. That principle extends to the home recordings at issue here, which were recorded in private while drafting an intensely personal memoir.

It is immaterial that the particular snippets of audio at issue concern only document retention and foreign policy issues, as opposed to more sensitive subjects. Privacy interests turn on what individuals intend to disclose about themselves. *See Reps. Comm. for Freedom of the Press*, 489 U.S. at 763. This analysis does not differ based on a post-hoc determination by others about which subjects are fit for disclosure. *See Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (finding that "Exemption 6 is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature" (citation omitted)); *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 822 F. Supp. 2d 12, 19 n.6, 21 (D.D.C. 2011) (collecting cases for this point, and noting that the notion of privacy is construed even more broadly in the context of Exemption 7(C)). For instance, if law enforcement were to release select

---

[5] Plaintiffs' argument is also self-defeating. If Plaintiffs were correct that disclosure of the audio recording revealed no new information beyond what had been disclosed by the Department's release of the Hur Report, then there would be no cognizable public interest in the release of this law enforcement record, and the Department's Exemption 7(C) withholding would undoubtedly be correct. *See Beck v. Dep't of Just.*, 997 F.2d 1489, 1494 (D.C. Cir. 1993) ("Where we find that the request implicates no public interest at all, we need not linger over the balance; something outweighs nothing every time." (cleaned up)).

portions of an uncharged individual's private diary, that would clearly implicate the individual's privacy interests, regardless of the particular subjects covered in the entries.[6]

The same reasoning further refutes Plaintiffs' suggestion that President Biden and Mr. Zwonitzer have limited privacy interests because the public is already familiar with how President Biden speaks and because online content exists of Mr. Zwonitzer speaking in public. This publicly available content is distinct from home recordings that were made in private and not meant to be disseminated to the world.

Plaintiffs also suggest that the fact that the Executive Branch disclosed the relevant quotes through its release of the Hur Report somehow "vitiates" any privacy interest, since the President heads the Executive Branch and "privacy interests do not operate as a sword and shield." Pls.' Opp'n at 21. But the cases that Plaintiffs cite do not support their argument. Rather, they make clear that when an individual discloses some information about their involvement with a law enforcement investigation, they nonetheless retain a privacy interest in the confidentiality of other, nondisclosed information. *See, e.g., CREW*, 746 F.3d at 1092; *Kimberlin*, 139 F.3d at 949. If the opposite were true, and disclosure of some information relating to an individual's involvement with a law enforcement investigation broadly waived any privacy rights as to other materials in the investigative file concerning that individual, there would be strong incentives to never disclose any such information, contrary to FOIA's pro-disclosure purpose.[7]

---

[6] As detailed above, there is no merit to the argument that these conversations were somehow rendered less private because they were part of the process of writing a book, or that President Biden relinquished his privacy interest in them by disagreeing with aspects of the Special Counsel's report.

[7] In addition, Plaintiffs' arguments about the Executive Branch's disclosures do not suggest that Mr. Zwonitzer was involved in the decision to disclose the quotes and do not, therefore, impact his privacy interests.

**B.  Any Public Interests in the Audio Recordings are Exceedingly Minimal and Outweighed by the Privacy Interest**

With privacy interests identified, only a significant, cognizable, and counterbalancing public interest can justify disclosure.  *See Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 387 (D.C. Cir. 2007).  In conducting this analysis, controlling precedent recognizes that even if there is a cognizable public interest, the significance of that interest depends on how much other information is already available about the relevant topic.  *See, e.g.*, *Jud. Watch*, 876 F.3d at 350.  And just as in *Judicial Watch*, that information here is voluminous, including a nearly 400-page report that comprehensively explains the details of the investigation and the reasons to decline prosecution, an hours-long congressional hearing at which Mr. Hur provided testimony on the subject, and a minimally redacted transcript of President Biden's interview with Mr. Hur.  Given these materials, the public can readily assess the basis for Mr. Hur's decisions, and the public interest in further disclosures is minimal.

In arguing otherwise, Plaintiffs insist that the audio recordings are necessary to allow the public to evaluate "demeanor evidence" that factored into the Special Counsel's conclusions regarding President Biden's memory.  Pls.' Opp'n at 29.  Even if this were a cognizable public interest, the Special Counsel explained the basis for his conclusions regarding the President's memory in the Hur Report.  *See, e.g.,* Hur Report at 5, 207-08, 247-48.  The report's extensive analysis already provides the information that would enable the public to assess these conclusions.  Plaintiffs appear to presume that the public is entitled not only to this analysis, but also to "any piece of evidence of significance" that underpins it.  Pls.' Opp'n at 30.  This assertion is wholly unsupported, and it would eviscerate the well-established principle that the privacy rights of uncharged individuals are among the most protected under FOIA.  *See, e.g., Jud. Watch*, 876 F.3d at 349.

Plaintiffs also fail to clarify how the recordings at issue would actually advance the asserted interest of evaluating the SCO's conclusions about the President's memory. The audio at issue constitutes approximately six and a half minutes of the Biden-Zwonitzer recordings—a tiny portion of the dozens of hours of audio that the SCO obtained from Zwonitzer.[8] It is unclear why or how these snippets of audio would "resolve" a purported "dispute" about a prosecutor's subjective assessment regarding how a witness would present at trial. *See Dunkelberger*, 906 F.2d at 781. To the extent that there is an interest in determining how President Biden spoke over seven years ago, in the 2016-17 timeframe, the public already has access to an array of his interviews, speeches, and public appearances from that period.

Plaintiffs similarly fail to clarify how the audio recordings would serve any remaining and cognizable public interest regarding "whether classified information was disclosed to Zwonitzer." Pls.' Opp'n at 30. They simply assert that "[a] cold transcript is no substitute for live testimony when evaluating a witness's demeanor," and that "many members of the public may well find the audio significant to *their* view of the matter." *Id.* But the SCO's determinations about these issues are already detailed in the Hur Report. *See* Hur Report at 4, 103-08, 244-48. Plaintiffs provide no clear explanation for what further light the recordings would shed on these determinations. The

---

[8] In turn, this assessment was only one aspect of several defenses that independently justified declining charges. *See* Hur Report at 4 ("[W]e do not believe this evidence is sufficient, as jurors would likely find reasonable doubt for one or more of several reasons."); *id.* ("Several defenses are likely to create reasonable doubt as to such charges."); *id.* at 5 ("[H]is cooperation with our investigation . . . will likely convince some jurors that he made an innocent mistake, rather than acting willfully . . . as the statute requires."); *id.* ("Another viable defense is that Mr. Biden might not have retained the classified Afghanistan documents in his Virginia home at all. . . . This would rebut charges that he willfully retained the documents in Virginia."); *id.* at 6 ("In addition to this shortage of evidence, there are other innocent explanations for the documents that we cannot refute."); *id.* at 1 ("Prosecution of Mr. Biden is also unwarranted based on our consideration of the aggravating and mitigating factors set forth in the Department of Justice's Principles of Federal Prosecution.").

same point applies to Plaintiffs' unsupported, nonsensical suggestion that the recordings could somehow reveal something about Vice-President Harris or other senior officials—despite them not being part of the recordings, and despite no evidence that they ever listened to them. Sheer speculation does not amount to a substantial public interest. *See Dunkelberger*, 906 F.2d at 781.

In a final bit of speculation, Plaintiffs presume that disclosure would bring clarity to what President Biden said in half of a sentence included in the recordings. The Hur Report provides the following quote for the exchange: "Mr. Biden appeared to tell Zwonitzer this notebook entry related to 'a long meeting on the Security Council on—it probably was classified.'" Hur Report at 104. The report further states in a footnote that "Mr. Biden's precise words are difficult to discern. This quotation is our best attempt to do so." *Id.* at n.431. From this footnote, Plaintiffs pronounce that disclosing the audio would "allow the American People to judge the matter for themselves and would allow experts to explore audio enhancement to provide clarity on this issue." Pls.' Opp'n at 26. No further explanation is provided for why undisclosed experts would be better able to determine the wording than the SCO's investigative team, or how this would advance any of Plaintiffs' asserted public interests. Nor do Plaintiffs reconcile this suggestion—that the audio recordings may reveal material that was not disclosed in the Hur Report—with the remainder of their argument, which presumes that President Biden and Mr. Zwonitzer have little privacy interest in the recordings because the relevant content has already been disclosed.[9]

---

[9] This quote is partially redacted in the transcripts because of the official acknowledgement doctrine, which requires that the requested information must exactly match the disclosed information for the disclosure to waive applicable FOIA exemptions, *Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007), and it does not "cast[] doubt on all redactions," Pls.' Opp'n at 35 (capitalization omitted).

**III.    The Transcripts Were Properly Withheld In Part Under Exemption 5 Because They Are Attorney Work Product Not Routinely Available in Civil Litigation**

The Department also properly withheld the redacted portions of the transcripts as attorney work product under Exemption 5. The transcripts were plainly "prepared in anticipation of litigation," Fed. R. Civ. P. 26(b)(3)(A); *see also* Weinsheimer Decl. ¶¶ 29-32—a point that Plaintiffs do not dispute. They constitute opinion work product—the category of work product afforded the most protection in the civil discovery context—because they captured a small subset of the Biden-Zwonitzer recordings, thereby reflecting which segments of the recordings were of particular investigative interest. And even if no such winnowing had taken place, the transcripts would still constitute factual work product, as factual materials prepared because of the prospect of criminal litigation. *See* Def.'s Mem. at 16-20.

Plaintiffs appear to concede that the transcripts constitute opinion work product. Pls.' Opp'n at 36. They instead make the extraordinary argument that the Hur Report and Mr. Hur's congressional testimony waived work product protection by generally revealing "the factual areas the Special Counsel thought important to his charging decision." *Id.* In other words, Plaintiffs presume that attorney impressions about the audio's potential significance can be distilled into an exceedingly generalized statement—something akin to "some portions of audio may be important"—and that the Hur Report then waived work product protection by impliedly revealing this statement, even for the dozens of pages of transcripts that were not disclosed in the report. Plaintiffs provide no case law that supports construing attorney impressions this generically and then waiving protection over work product this broadly. This baseless assertion runs headfirst into an array of contrary precedent, including that waiver via official disclosures require an exact match of the records. *See, e.g., Wolf*, 473 F.3d at 378 (listing the criteria that Plaintiffs must establish in

order to demonstrate waiver by an official acknowledgment, including that the "information requested must match the information previously disclosed" (citation omitted)).

Even assuming that this precedent did not settle the issue, and that a separate waiver analysis was necessary, such an analysis would unequivocally support the Department's position. The D.C. Circuit looks to "[t]hree main factors [to] determine whether work-product protection has been waived," namely whether:

> (1) the party claiming the privilege seeks to use it in a way that is not consistent with the purpose of the privilege;
>
> (2) the party had no reasonable basis for believing that the disclosed materials would be kept confidential by the [receiving party]; and
>
> (3) waiver of the privilege in these circumstances would not trench on any policy elements now inherent in this privilege.

*United States v. Thompson*, 562 F.3d 387, 394 (D.C. Cir. 2009) (quoting *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C. Cir. 1984)).

Applied here, each of these factors underscore that work product protection has not been waived. First, the Department's decision to have portions of the recordings transcribed was perfectly consistent with the purpose of work-product doctrine, which is to "protect the adversary trial process itself." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980). This decision did not somehow enable unfairness toward a litigation adversary; it instead was "consistent with the promotion of trial preparation within the adversary system." *United States v. AT&T*, 642 F.2d 1285, 1300 (D.C. Cir. 1980). Second, the Department never disclosed the unredacted transcripts beyond the Executive Branch following their creation by a court-reporter service. Weinsheimer Decl. ¶ 18. And third, transcribing evidence that may be relevant to a criminal investigation—while keeping that evidence confidential, particularly given that none of the individuals in the transcripts were charged with a crime—does not trench on any policy elements inherent in the work-product doctrine. To the contrary, confidentiality gives SCO

investigators the space needed to examine all kinds of evidentiary leads, even if they wind up not being material in the final analysis. *See Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020) (upholding the assertion of the work product doctrine over FD-302 forms created during Special Counsel Mueller's investigation, and noting that disclosure of such work product would "inhibit the flexibility with which future special counsels might structure and pursue investigations" (citation omitted)).

And even if one disregards the question about the transcripts as opinion work product, they nonetheless receive protection as factual work product. Plaintiffs assert that "[v]erbatim transcripts are not fact work product," and that "the Government cites no cases for the contrary proposition." Pls.' Opp'n at 38. That is incorrect. In its opening brief, the Department cited D.C. Circuit precedent that makes clear that verbatim witness statements created during an investigation are protected by the work product doctrine. *See Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1185-87 (D.C. Cir. 1987) (agreeing with the agency's assessment that witness statements were "classic examples of work product" (citation omitted)).

Plaintiffs cite two cases from outside this Circuit in support of their argument that verbatim transcripts are not work product, but both are plainly distinguishable. In *Abila v. Funk*, the court held that deposition transcripts were not work product because deposition testimony would not reveal an "attorney's strategies and legal impressions." No. CIV 14-1002, 2016 WL 5376323, at *6 (D.N.M. Sept. 20, 2016) (citation omitted). But the D.C. Circuit has made clear that the work product doctrine protects factual material as well as material that would reveal an attorneys' impressions. *See Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997); *see also Leopold*, 487 F. Supp 3d at 12 (finding that FD-302 forms were still work product, even if they "exclude[d] prosecutors' impressions, opinions[,] or analyses," since "factual recitations of what occurred

during the interview . . . are also protected by the attorney work product privilege" (citations omitted)). And in *Moyle v. Liberty Mutual Retirement Benefit Plan*, the court held that "transcripts of telephone calls between Plaintiff Moyle and a claims representative" were not work product—a holding that was not explained, but that appears to be based on the premise that the transcripts were not created in anticipation of litigation. *See* No. 10cv2179, 2012 WL 4486269, at *4 (S.D. Cal. Sept. 27, 2012) (finding that the remaining items on the privilege log at issue—aside from the transcripts of the calls—were "initiated for the purposes of litigation" and therefore "need not be disclosed"). By contrast, the transcripts at issue here were created by the SCO in anticipation of criminal litigation. *See* Weinsheimer Decl. ¶¶ 29-32.

To the extent that these two cases can be read for the sweeping proposition that verbatim transcripts are never work product, they are out of step with both D.C. Circuit precedent and an array of other cases across a range of other circuits. *See, e.g., Martin*, 819 F.2d at 1185-87 (recognizing that witness statements constitute work product); *Enron Corp. Sav. Plan v. Hewitt Assocs., LLC*, 258 F.R.D. 149, 161 n.8 (S.D. Tex. 2009) ("Ordinary work-product generally consists of 'primary information, such as verbatim witness testimony . . . .'" (citation omitted)); *Gargano v. Metro-North*, 222 F.R.D. 38, 39-40 (D. Conn. 2004) (finding "transcripts of audio taped statements" of witnesses to be work product); *Sea-Roy Corp. v. Sunbelt Equip. & Rentals, Inc.*, 172 F.R.D. 179, 185 n.7 (M.D.N.C. 1997) ("Rule 26(b)(3) . . . provides taped conversations with work product protection . . . ."); *Chaney v. Keego Harbor Police Dep't*, Case No. 21-11662, 2023 WL 113043, at *1, *3 (E.D. Mich. Jan. 5, 2023) (finding that a witness's "audio recorded statements" are "material prepared in anticipation of trial and [are] work product"); *Carrasco v. Campagna*, No. C-03-4727, 2007 WL 81909, at *3 (N.D. Cal. Jan. 9, 2007) ("[T]he recordings or transcripts at issue in the case meet the requirements of work product under Rule 26(b)(3). . . .");

*Wiedeman v. Canal Ins. Co.*, No. 1:15-cv-4182, 2016 WL 6080908, at *2 (N.D. Ga. Oct. 18, 2016) ("The recordings are plainly fact work product.").

That case law accords with common sense.  The transcripts at issue here were created by the SCO team—not President Biden or Mr. Zwonitzer—as part of SCO's consideration of potential charges.  *See* Weinsheimer Decl. ¶ 29.  This material would not exist but for the prospect of litigation.  It is at least factual work product, and it was properly withheld under Exemption 5.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendant's opening brief, the Court should grant Defendant's motion for summary judgment and deny Plaintiffs' motion for summary judgment.

21

Dated: December 12, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Cameron Silverberg*
CAMERON SILVERBERG (D.C. Bar No. 1780628)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel.:    (202) 353-9265
Fax:    (202) 616-8470
Email: Cameron.D.Silverberg@usdoj.gov

*Counsel for Defendant*