**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, <br><br> MIKE HOWELL, <br><br>     *Plaintiffs*, <br><br>     v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br>     *Defendant*, <br><br>     and <br><br> JOSEPH R. BIDEN, JR., <br><br>     *Proposed Defendant-Intervenor*. | No. 24-cv-645 (DLF) |

**<u>MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO INTERVENE BY JOSEPH R. BIDEN, JR.</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ....................................................................................................................... 4

LEGAL STANDARD................................................................................................................ 8

ARGUMENT ........................................................................................................................... 9

    I.       President Biden Has a Right to Intervene Pursuant to Rule 24(a)(2) ............................... 9

          A.       President Biden's Motion to Intervene Is Timely ............................................ 10

          B.       President Biden Has a Legally Protected Interest in This Action ...................... 16

          C.       This Action Threatens to Impair President Biden's Legally Protected Interest ...................................................................................................... 17

          D.       The Existing Parties Will Not Adequately Protect President Biden's Legally Protected Interest................................................................................... 19

    II.      In the Alternative, President Biden Should Be Permitted to Intervene Pursuant to Rule 24(b)(1)(B) ................................................................................... 19

    III.    President Biden Has Article III Standing ......................................................... 21

    IV.    At a Minimum, the Court Should Permit President Biden to Intervene for the Limited Purpose of Defending Against the Heritage Plaintiffs' FOIA Claims............... 22

CONCLUSION.......................................................................................................................... 24

## TABLE OF AUTHORITIES

**CASES**

\* *100Reporters LLC v. U.S. Dep't of Just.*,
  307 F.R.D. 269 (D.D.C. 2014)................................................................... 9, 17, 20, 21, 22

*Appleton v. FDA*,
  310 F. Supp. 2d 194 (D.D.C. 2004) ............................................................................ 9, 17

*In re Brewer*,
  863 F.3d 861 (D.C. Cir. 2017) ....................................................................................... 12

\* *Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
  595 U.S. 267 (2022).................................................................................... 11, 12, 13, 15

*Convertino v. U.S. Dep't of Just.*,
  674 F. Supp. 2d 97 (D.D.C. 2009) ................................................................................. 12

*Davis v. FEC*,
  554 U.S. 724 (2008)....................................................................................................... 22

*Defs. of Wildlife v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir. 2013) ..................................................................................... 10

*Dunn v. Austin*,
  No. 25 Civ. 1844, 2026 WL 865836 (D.D.C. Mar. 30, 2026) ........................................ 10

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*,
  146 F.3d 1042 (D.C. Cir. 1998) ..................................................................................... 20

*Fund for Animals, Inc. v. Norton*,
  322 F.3d 728 (D.C. Cir. 2003) ................................................................................. 19, 21

*Gov't Accountability Project v. FDA*,
  181 F. Supp. 3d 94 (D.D.C. 2015) ................................................................................. 14

*Hardin v. Jackson*,
  600 F. Supp. 2d 13 (D.D.C. 2009) ................................................................................. 14

*Hodgson v. United Mine Workers of Am.*,
  473 F.2d 118 (D.C. Cir. 1972) ......................................................................................... 9

*Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*,
  No. 16 Civ. 720, 2021 WL 4739036 (D.D.C. Oct. 12, 2021)....................................... 8, 9

*Institutional S'holder Servs., Inc. v. SEC*,
    142 F.4th 757 (D.C. Cir. 2025) ................................................................................. 10, 19

*Jones v. Prince George's County*,
    348 F.3d 1014 (D.C. Cir. 2003) ...................................................................................... 21

*Jud. Watch v. U.S. Dep't of Just.*,
    No. 24 Civ. 700 (D.D.C. 2025) ........................................................................................ 7

*Karsner v. Lothian*,
    532 F.3d 876 (D.C. Cir. 2008) ....................................................................................... 10

*Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*,
    No. 23 Civ. 3570, 2024 WL 4239936 (D.D.C. Sept. 19, 2024) ..................................... 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020) ....................................................................................................... 10

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................................... 21

*Malvitz v. Fincantieri Marine Grp., LLC*,
    No. 24 Civ. 238, 2025 WL 1663077 (D.D.C. June 12, 2025) ......................................... 16

*Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*,
    66 F.4th 282 (D.C. Cir. 2023) ........................................................................................ 19

*Nat. Res. Def. Council v. Costle*,
    561 F.2d 904 (D.C. Cir. 1977) ................................................................................. 14, 17

*Nat'l Fair Hous. All. v. Carson*,
    330 F. Supp. 3d 14 (D.D.C. 2018) .................................................................................. 19

*Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*,
    205 F.R.D. 1 (D.D.C. 2000) ........................................................................................... 12

*Pescatore v. Palmera Pineda*,
    No. 08 Civ. 2245, 2019 WL 2173835 (D.D.C. May 20, 2019) ....................................... 11

*Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*,
    316 F. Supp. 3d 1 (D.D.C. 2018) ..................................................................................... 9

* *Roane v. Leonhart*,
    741 F.3d 147 (D.C. Cir. 2014) ................................................................... 10, 12, 13, 14

*Roeder v. Islamic Republic of Iran*,
    333 F.3d 228 (D.C. Cir. 2003) ....................................................................................... 21

*SEC v. Prudential Sec. Inc.*,
  136 F.3d 153 (D.C. Cir. 1998) .................................................................................... 10

*Shapiro v. U.S. Dep't of Just.*,
  No. 16 Civ. 1959 (D.D.C. 2018) ................................................................................. 14

*Smoke v. Norton*,
  252 F.3d 468 (D.C. Cir. 2001) .............................................................................. 10, 12

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ..................................................................................................... 10

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..................................................................................................... 22

*Trbovich v. United Mine Workers of Am.*,
  404 U.S. 528 (1972) ..................................................................................................... 19

*United Airlines, Inc. v. McDonald*,
  432 U.S. 385 (1977) ..................................................................................................... 11

*United Mexican States v. Lion Mexico Consol. L.P.*,
  172 F.4th 1 (D.C. Cir. 2026) ....................................................................................... 20

*United States v. Am. Tel. & Tel. Co.*,
  642 F.2d 1285 (D.C. Cir. 1980) ................................................................................... 19

*Ute Indian Tribe of Uintah & Ouray Indian Rsrv. v. U.S. Dep't of the Interior*,
  No. 18 Civ. 547, 2020 WL 1465886 (D.D.C. Feb. 5, 2020) ....................................... 10

*Wildearth Guardians v. Salazar*,
  272 F.R.D. 4 (D.D.C. 2010) .................................................................................... 21, 23

*Yocha Dehe v. U.S. Dep't of the Interior*,
  3 F.4th 427 (D.C. Cir. 2021) ....................................................................................... 10

**FEDERAL STATUTES**

5 U.S.C. § 706 ........................................................................................................................ 23

28 U.S.C. § 1331 .................................................................................................................... 20

**FEDERAL RULES**

Fed. R. Civ. P. 24 ............................................................................................................ *passim*

**OTHER AUTHORITIES**

FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y,
 https://www.justice.gov/oip/available-documents-oip ....................................................... 7

*\* Authorities upon which we chiefly rely are marked with asterisks.*

**INTRODUCTION**

Every American, including a sitting or former Vice President, has a right to privacy in the personal conversations he has within his own home.  And when the U.S. Department of Justice (the "Department") obtains that private information through a criminal investigation, the Department bears a particular responsibility to protect it from disclosure.  The Department previously defended those fundamental principles in this lawsuit, describing the materials sought in this action as "analogous to entries in a personal diary" and withholding them from disclosure under Freedom of Information Act ("FOIA") Exemptions 5, 6, and 7(C).  Under President Trump, however, the Department has reversed that position, and it now plans to release audio recordings and transcripts of President Biden's private, sensitive conversations from 2016 and 2017 both to Heritage Foundation and Mike Howell (collectively, "Plaintiffs" or the "Heritage Plaintiffs") and to Congress.  As a result, President Biden is forced to seek intervention to protect his privacy interests and to advocate for the faithful application of the law, given that the Department has abandoned its duty to do so in this matter.

The Heritage Plaintiffs sued the Department in 2024, seeking recordings and transcripts of President Biden's private conversations with his writing partner, Mark Zwonitzer, that took place in President Biden's home in 2016 and 2017.  The conversations were part of the writing process for President Biden's 2017 memoir, *Promise Me, Dad: A Year of Hope, Hardship, and Purpose*, in which he recounted the politically consequential and personally painful year of his life that began on Thanksgiving in 2014.  That year, President Biden navigated a range of foreign and domestic policy challenges as Vice President.  He also weighed a run for the Presidency in 2016.  All the while, President Biden's eldest son, Beau, fought brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.  The public and private dimensions of President Biden's life have always been intertwined, but perhaps never more so than during that difficult year.

President Biden and Zwonitzer recorded their conversations for use in writing *Promise Me, Dad*, and they both understood that they were speaking privately.

The Department obtained these recordings in 2023 in connection with the investigation of Special Counsel Robert K. Hur into President Biden's handling of classified records. President Biden cooperated fully in that investigation. Ultimately, the Special Counsel concluded that criminal charges were unwarranted, and no charges were brought against President Biden or anyone else.

The Heritage Plaintiffs have no legal right to the recordings or transcripts of President Biden and Zwonitzer's private conversations, which the Department obtained in the context of law enforcement proceedings. The Department itself has explained as much, in no uncertain terms. In the Department's own words, release of President Biden's sensitive, private conversations "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." ECF No. 33-1 ("Def.'s Mem.") at 1. Such release would also inhibit law enforcement in the future, thereby threatening public safety. The Department's highest-ranking career official explained that "the Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties," ECF No. 33-2 ("Weinsheimer Decl.") ¶ 28, and that "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice," *id.* ¶ 21.

The Department is now abandoning the core tenets of American justice and forsaking its duty to protect law enforcement files. The law has not changed, but nonetheless, the Department has reversed course. It plans to release the recordings and transcripts at issue to Plaintiffs and to Congress on June 15, 2026, absent a court order barring release. ECF No. 50 ("JSR (May 8,

2

2026)") at 1.  The Department has yet to offer any formal explanation for its decision.  That may well be because the decision is nakedly political, lacking any basis in the law.  Indeed, faced with the striking weaknesses of its new legal position in this action, the Department took a new tack and secured a pretextual "request" for the records at issue from the House Committee on the Judiciary (the "Committee").  The Department informed President Biden of this supposed request on March 19, but the written document is dated four days later—March 23, 2026.

President Biden now is forced to seek intervention to defend his interests against the Heritage Plaintiffs' meritless legal claims.  The Department does not oppose intervention, and President Biden meets all of the requirements for intervention as of right.  *See* Fed. R. Civ. P. 24(a)(2).  This motion—filed one week after the Department made a final decision to reverse its prior position—is timely.  President Biden has a legally protected interest in preventing the Heritage Plaintiffs from obtaining private conversations recorded in his own home for purely personal use, and this interest would be irrevocably harmed if Plaintiffs prevailed in this action.  It is clear that the existing parties will not adequately protect President Biden's privacy interests or the Department's own institutional and law enforcement interests; indeed, the Department has stated in a court filing that it will disclose the materials at issue on June 15, 2026, unless a court prohibits the Department from doing so.  In the alternative, the Court should grant permissive intervention.  *See* Fed. R. Civ. P. 24(b)(1).  The Court has subject matter jurisdiction over the Heritage Plaintiffs' FOIA claims and over President Biden's proposed cross-claims; President Biden has filed a timely motion; and President Biden's defense and cross-claims share common questions of law or fact with the underlying action.  Permitting President Biden to intervene will not unduly delay or prejudice the adjudication of Plaintiffs' or the Department's rights.  For

3

substantially the same reasons that President Biden has a legally protected interest sufficient to support intervention as of right, he also has Article III standing.

## BACKGROUND

Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad*.  ¶ 7.[1]  In these private conversations—which took place in President Biden's home— President Biden recounted one of the most politically consequential and personally painful years of his life, beginning on Thanksgiving in 2014.  ¶¶ 7-10.  That year, President Biden served the final year of his term as Vice President and considered a run for the Presidency in 2016.  ¶ 9. Meanwhile, President Biden's eldest son, Beau, battled brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.  *Id.*  Pressing decisions that President Biden faced about his political future were inextricably intertwined with Beau.  ¶ 38.  Candidly reflecting on this difficult and consequential time in his life, President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision.  ¶ 10.

Zwonitzer recorded these conversations for his personal use in working with President Biden on *Promise Me, Dad*.  ¶ 8.  Both men understood that they were speaking privately, and the recordings were never intended to be released to the public.  *Id.*

---

[1] Unless otherwise indicated, citations to "¶ __" are to paragraphs of Proposed Defendant-Intervenor's cross-claims.  *See* Proposed Def.-Intervenor's Answer to Am. Compl. & Cross-Claims ("Answer & Cross-Claims") at 13-31.

Years later, in 2020, President Biden ran for and was elected President. ¶ 11.  In 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden.  ¶ 13. President Biden cooperated fully with the Special Counsel's investigation, and Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted and that "the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt." ¶ 19.

In the course of Special Counsel Hur's investigation, the Department obtained materials related to Zwonitzer's conversations with President Biden in 2016 and 2017. ¶ 14.  In a 345-page report to Attorney General Garland, which the Department later published on its website, Special Counsel Hur cited limited excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records related to official business as Vice President. ¶¶ 21-22.[2]  The Department obtained these materials subject to an agreement between the White House Counsel's Office and Special Counsel Hur, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." ¶ 15; Decl. of Amy Jeffress in Supp. of Mot. to Intervene by Joseph R. Biden, Jr. ("Jeffress Decl.") ¶ 8; Answer & Cross-Claims Ex. A ("Agreement") ¶ 1.  The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in

---

[2] *See* Robert K. Hur, Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center & the Delaware Private Residence of President Joseph R. Biden, Jr. 65, 75-77, 106, 110-11, 236-37 (Feb. 5, 2024).

response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." ¶ 16; Jeffress Decl. ¶ 9; Agreement ¶ 5.

On February 9, 2024, Plaintiff Mike Howell submitted a FOIA request to the Department for certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." ECF No. 6-3 (the "FOIA Request"). On March 6, 2024, the Heritage Plaintiffs filed this action against the Department, alleging violations of FOIA. ECF No. 1. On October 16, 2024, the Department issued a final response to the FOIA Request and released 117 redacted pages of transcripts of conversations between President Biden and Zwonitzer that occurred between October 10, 2016, and April 26, 2017. ¶ 27; Weinsheimer Decl. Ex. B. In November 2024, the parties filed cross-motions for summary judgment on the validity of the Department's withholdings pursuant to FOIA. ECF Nos. 33-34. Those motions have been fully briefed since December 23, 2024. *See* ECF No. 38.

In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content." Def.'s Mem. at 11. Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions." *Id.* at 15. Unsurprisingly, the Department concluded that disclosure of the audio recordings and transcripts

would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." *Id.* at 1.

On May 19, 2025, the Department released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur. *See* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip. On September 23, 2025, the Court entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records." Min. Order (Sept. 23, 2025). In the joint status report that followed, the parties explained that the Department had not made additional releases of records and was reviewing its withholdings. ECF No. 42.

On September 27, 2025, the Court stayed this action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues." Min. Order (Sept. 27, 2025). This action remains stayed, and the only substantive activity in the case since September 27, 2025, has been the filing of joint status reports and minute orders extending the stay to allow the parties to continue their discussions. ECF Nos. 42-50.

On February 25, 2026, pursuant to the Agreement, the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with

only very limited redactions.  Jeffress Decl. ¶¶ 11, 14.  Since then, counsel for President Biden engaged continually with the Department, in an effort to resolve this matter without litigation.  *See id.* ¶¶ 13-29.  Meanwhile, on March 19, 2026, the Department reported to counsel for President Biden that it intended to comply with a request from Congress for the very same materials the Department intended to produce to Plaintiffs.  *Id.* ¶ 20.  Counsel for President Biden asked for a copy of the written request.  *Id.* ¶ 21.  On March 23, 2026, the Department shared the congressional request that it had purportedly described the previous week, stating that it was "received from House Judiciary today."  *Id.* ¶ 22.  The request was dated March 23, 2026, four days after the Department described it to President Biden's counsel and three days after counsel requested the written document.  *Id.* ¶ 23.

On May 5, 2026, the Department informed President Biden it had made a final decision to release the recordings and transcripts at issue—with only minimal redactions that are wholly inadequate to protect the privacy interests of President Biden and of third parties—on June 15, 2026, unless President Biden obtains a court order blocking release by that date.  *Id.* ¶¶ 25-29.  President Biden now seeks intervention to protect his interests, including his fundamental privacy interests in the recordings and transcripts of his private conversations from 2016 and 2017.

## LEGAL STANDARD

Federal Rule of Civil Procedure 24(a)(2) provides for intervention of right when, among other things, a person claims an interest relating to the property or transaction at issue and the existing parties do not adequately represent that interest.  Fed. R. Civ. P. 24(a)(2).  Alternatively, the Court may grant permissive intervention where the person "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  "[C]ourts routinely grant motions to intervene for the purpose of preventing disclosure of information under FOIA."  *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, No. 16 Civ. 720, 2021 WL 4739036, at

8

*4 (D.D.C. Oct. 12, 2021); *see, e.g.*, *Physicians Comm. for Responsible Med. v. U.S. Dep't of Agric.*, 316 F. Supp. 3d 1, 3 (D.D.C. 2018); *100Reporters LLC v. U.S. Dep't of Just.*, 307 F.R.D. 269, 274 (D.D.C. 2014); *Appleton v. FDA*, 310 F. Supp. 2d 194, 195-198 (D.D.C. 2004).  Indeed, such requests are "commonplace and straightforward."  *Humane Soc'y Int'l*, 2021 WL 4739036, at *4.

## ARGUMENT

The Court should grant President Biden's motion to intervene to protect the "undoubtedly enormous" privacy interests that this matter implicates.  Def.'s Mem. at 11.  President Biden is entitled to intervene as of right because his motion is timely, he has a legally protected interest in the action, the Department's proposed release threatens to impair his interest, and neither of the existing parties adequately represents that interest.  In the alternative, the Court should grant permissive intervention because the claims and defense at issue involve common questions of law and fact.

## I.    President Biden Has a Right to Intervene Pursuant to Rule 24(a)(2)

Because the Department recently abandoned its longstanding litigation position and is no longer protecting President Biden's interests, President Biden is entitled to intervene under Rule 24(a)(2).  Rule 24(a)(2) provides that, "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Fed. R. Civ. P. 24(a)(2).  This Rule "implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard."  *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130

9

(D.C. Cir. 1972). Indeed, the Department does not oppose President Biden's intervention. ECF No. 50 ("JSR (May 8, 2026)") at 1.

President Biden meets all of the requirements to intervene under Rule 24(a)(2). The D.C. Circuit "ha[s] identified four prerequisites to intervene as of right: '(1) the application to intervene must be timely; (2) the applicant must demonstrate a legally protected interest in the action; (3) the action must threaten to impair that interest; and (4) no party to the action can be an adequate representative of the applicant's interests.'" *Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008) (quoting *SEC v. Prudential Sec. Inc.*, 136 F.3d 153, 156 (D.C. Cir. 1998)). Additionally, in this Circuit, "to intervene under Rule 24(a), the movant must demonstrate that [he] has standing under Article III of the U.S. Constitution," at least when the movant seeks relief that is distinct from that sought by an existing party. *Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 430 (D.C. Cir. 2021); *see also Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (citing *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020)).[3]

### A.    President Biden's Motion to Intervene Is Timely

This motion, filed just one week after the Department informed President Biden of its final decision to disclose the private conversations at issue, is timely. "The timeliness of a motion to intervene is 'to be judged in consideration of all the circumstances.'" *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014) (quoting *Smoke v. Norton,* 252 F.3d 468, 471 (D.C. Cir. 2001)). Where, as here, "the would-be intervenor may be seriously harmed if intervention is denied, courts should be reluctant to dismiss such a request for intervention as untimely." *Ute Indian Tribe of Uintah &*

---

[3] It is "an open question in this [C]ircuit whether Article III standing is required for permissive intervention." *Dunn v. Austin*, No. 25 Civ. 1844, 2026 WL 865836, at *5 (D.D.C. Mar. 30, 2026) (quoting *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013)). Because President Biden has standing, *see infra* Section III, the Court need not reach that question here.

*Ouray Indian Rsrv. v. U.S. Dep't of the Interior*, No. 18 Civ. 547, 2020 WL 1465886, at \*1 (D.D.C. Feb. 5, 2020) (citing 7C Charles Alan Wright & Arthur R. Miller, et al., *Federal Practice and Procedure* § 1916 (3d ed. 2019)); *accord Pescatore v. Palmera Pineda*, No. 08 Civ. 2245, 2019 WL 2173835, at \*2 (D.D.C. May 20, 2019); *see infra* Sections I.B-C, III (addressing harm to President Biden absent intervention).

The timeliness of an intervention motion is assessed not in relation to the filing of an action, but rather "in relation to th[e] point in time" when "'it became clear' that the [movant's] interests 'would no longer be protected' by the parties in the case." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022) (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977)). Here, as explained, President Biden is seeking intervention just one week after it became clear that the Department would no longer protect his privacy interests. The Heritage Plaintiffs filed this action in March 2024; the Department vigorously defended President Biden's interests in summary judgment briefing; the Court stayed the case in September 2025; and the parties filed a series of joint status reports between September 2025 and April 2026. Until the most recent joint status report, filed on May 8, 2026, nothing in these filings revised or rescinded the Department's litigation position that the requested materials were "analogous to entries in a personal diary," that "any additional disclosure of either the transcripts or the audio recordings is unwarranted," and that the withheld audio recordings and transcript portions are protected by FOIA Exemptions 5, 6, and 7(C). Def.'s Mem. at 1-2. Indeed, the Department did not notify President Biden of any planned disclosure—which it was required by the Agreement to do—until February 25, 2026. Jeffress Decl. ¶¶ 9, 11. Immediately upon receiving this notice, counsel for President Biden engaged with the Department in an effort to protect his interests and avoid the need for intervention, including by seeking to negotiate agreed-upon redactions and conditions for

11

any disclosure to Congress, such as making the recordings and transcripts available to the Committee's members and staff in a closed reading room. *Id.* ¶¶ 13-29.[4]    These discussions continued until May 5, when the Department informed President Biden of its final decision and announced that it would disclose the recordings to Plaintiffs and the Committee unless President Biden intervened by May 12. *Id.* ¶ 29.

Considering "all the circumstances," *Roane*, 741 F.3d at 151 (quoting *Smoke*, 252 F.3d at 471), President Biden's motion is timely.   After learning of the Department's final decision on May 5, President Biden promptly prepared his intervention papers and an answer with cross-claims, and he is filing those papers by the Department's requested deadline of May 12. *See* JSR (May 8, 2026) at 1.   By any reading of the case law, this motion—filed just seven calendar days and five business days after it "became clear" that the Department would no longer protect his interests—is timely. *Cameron*, 595 U.S. at 280; *see In re Brewer*, 863 F.3d 861, 872 (D.C. Cir. 2017) ("A nonparty must timely move for intervention once it becomes clear that failure to intervene would jeopardize her interest in the action.").   Courts have granted intervention after far longer periods elapsed. *See, e.g.*, *Convertino v. U.S. Dep't of Just.*, 674 F. Supp. 2d 97, 109 (D.D.C. 2009) (granting intervention motion filed several months after movant learned of his interest in the lawsuit); *Nationwide Mut. Ins. Co. v. Nat'l REO Mgmt., Inc.*, 205 F.R.D. 1, 6 (D.D.C. 2000) (granting in part intervention motion filed four months after movant learned of the lawsuit).

---

[4] For avoidance of doubt, President Biden's position (which is consistent with the Department's litigation position until its recent reversal) is that all of the materials withheld in the Department's final response to Plaintiff Mike Howell's FOIA request, *see* ECF No. 33-2, are exempt from disclosure pursuant to FOIA.   Nevertheless, after learning of the Department's change in position, President Biden engaged with the Department in an effort to resolve this matter without litigation, including by attempting to negotiate mutually acceptable redactions and discussing possible conditions for any disclosure to Congress.   Jeffress Decl. ¶¶ 13-29.   The Department refused to implement redactions or conditions necessary to protect the fundamental privacy rights of President Biden and of third parties. *Id.* ¶¶ 25-29.

The Heritage Plaintiffs contend in the May 8, 2026 joint status report that President Biden's motion is untimely, *see* JSR (May 8, 2026) at 2, 4, but their reasoning is at odds with controlling Supreme Court precedent.  Rather than considering timeliness "in relation to th[e] point in time" when "'it became clear' that the [movant's] interests 'would no longer be protected' by the parties in the case," *Cameron*, 595 U.S. at 280, Plaintiffs suggest that the clock for intervention began to run at the moment that President Trump was inaugurated.  *See* JSR (May 8, 2026) at 4 ("President Biden was well aware of both this action and the potential for divergence in interests with the Department on January 20, 2025 at 12:01 p.m.  Yet he waited well over a year to seek to intervene despite open filings in the public docket of this case indicating that negotiations between Plaintiffs and the Department have been ongoing.").  As explained, however, the Department was bound by an agreement to inform President Biden if it intended to disclose the recordings, and it did not do so until February 25, 2026.  Jeffress Decl. ¶¶ 9, 11.  In the weeks that followed, between February 25 and May 5, President Biden was actively discussing the matter with the Department and had reason to believe that a negotiated resolution might be possible.  *Id.* ¶¶ 13-29.  In any case, Plaintiffs offer no explanation for why the events of January 20, 2025, would affect the *legal* analysis, as none of the relevant FOIA exemptions have changed, and the facts militating against disclosure are even stronger now that President Biden has returned to life as a private citizen.

Importantly, President Biden's motion will not unfairly prejudice any existing party or unduly disturb the litigation—and, indeed, the Department does not oppose the motion.  Courts "do not require timeliness for its own sake"; rather, "the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Roane*, 741 F.3d at 151.  Here, the action has been stayed since September 27, 2025, and the existing parties remained in this posture for more than seven months,

13

filing periodic joint status reports explaining that the Department was reviewing its withholdings and the parties were conferring. *See* ECF Nos. 42-45, 47-48. Neither side sought to lift the stay or filed any request for relief with the Court. *See id.* In light of these facts, it would have made no difference to the course of the litigation if President Biden had moved for intervention earlier. Pursuant to the Court's September 27, 2025 minute order, the Department still would have needed to review its withholdings, and the Department and Plaintiffs still would have needed to confer as directed by the Court.

It is also significant, if not dispositive, that the Court has not yet ruled on the merits of the Heritage Plaintiffs' claims. As this Court has explained, "[a] Rule 24(a)(2) motion is timely when it occurs before a court has ruled on the merits of the case." Mem. Op. & Order at 2, *Shapiro v. U.S. Dep't of Just.*, No. 16 Civ. 1959 (D.D.C. Aug. 10, 2018), ECF No. 28 (concluding intervention motion was timely but denying without prejudice on other grounds); *see also, e.g.*, *Gov't Accountability Project v. FDA*, 181 F. Supp. 3d 94, 95 (D.D.C. 2015) (granting intervention motion where the Court had not yet issued any decisions on the merits of the plaintiff's claims); *Hardin v. Jackson*, 600 F. Supp. 2d 13, 16 (D.D.C. 2009) (same). That is because any "risk of prejudice to existing parties" is "minimal" where, as here, "the putative intervenor d[oes] not seek to upset prior decisions in the case." *Roane*, 741 F.3d at 152 (citing *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 907-08 (D.C. Cir. 1977)).

The Heritage Plaintiffs complain vociferously about the situation, *see* JSR (May 8, 2026), but contrary to their characterizations in the May 8 joint status report, these circumstances are not of President Biden's making. Indeed, Plaintiffs' position statement reflects serious misunderstandings and makes repeated misstatements regarding the timeline of events and other key facts. *Compare id.* at 2-5 *with* Jeffress Decl. ¶¶ 11-29. For example, it is the Department, not

14

President Biden, that recently "changed position," and it is the Department that has set a unilateral deadline of June 15, 2026 for the release, thereby "necessitat[ing] emergency litigation." *Cf.* JSR (May 8, 2026) at 2. These late-breaking decisions by the Department, in turn, created a sudden need for President Biden to protect his interests through litigation.

There are several paths forward, and intervention in this litigation—both to defend against Plaintiffs' claims and to assert cross-claims against the Department—is the least disruptive and most efficient of those paths. If President Biden were to file a separate action, for example, it would merely fragment the procedural questions across two actions, and Plaintiffs' own representations make clear that it would not eliminate the need for briefing on intervention, consolidation, and related issues. *See id.* at 4 (representing that Plaintiffs will seek consolidation if President Biden files a separate action).

In short, Plaintiffs' claimed prejudice has no connection to the timeliness of President Biden's intervention motion. While the Heritage Plaintiffs may have "hoped" that the Department would reverse its longstanding litigation position and release the material without objection from President Biden, Plaintiffs "had no legally cognizable expectation" in that outcome, and "[t]he loss of this sort of claimed expectation does not amount to unfair prejudice in the sense relevant here." *Cameron*, 595 U.S. at 282. President Biden now seeks to do "what the [Department] would have done" in the ordinary course (and was doing until very recently)—namely, to defend against Plaintiffs' meritless claims against the Department—and so his intervention will "d[o] nothing to delay the suit's normal progress." *Id.* at 292 (Kagan, J., concurring in the judgment). To the extent this matter may have unfolded differently if the Department had notified President Biden of the possibility of release before February 25, 2026, or provided its final decision before May 5, or

15

taken any number of other steps to advance the timeline and avoid emergency litigation, Plaintiffs' quarrel is with the Department, not with President Biden.

Far from delaying these proceedings, granting President Biden's motion will expedite and streamline the necessary litigation by allowing the parties to litigate these issues in a single action and to proceed immediately to further briefing once the Court has decided intervention. President Biden is prepared to move forward with all due speed. With respect to the Heritage Plaintiffs' existing FOIA claims, President Biden is prepared to participate in renewed summary judgment briefing on an expedited basis. With respect to the proposed cross-claims, President Biden intends to seek emergency relief against the Department to prevent the planned disclosures on June 15 and is prepared to brief the relevant issues on an expedited schedule. *See infra* Section IV. President Biden respectfully proposes that, as part of any order granting intervention, the Court direct the parties to meet and confer and, within three days of that order, submit a joint status report setting forth their joint or competing proposals on further proceedings in this matter.

**B.      President Biden Has a Legally Protected Interest in This Action**

President Biden has a legally protected interest in this action in light of the severe and imminent risk of harm to his privacy that will result if the Heritage Plaintiffs obtain his personal, sensitive conversations. Plaintiffs seek—and the Department now intends to immediately release, absent President Biden's intervention, *see* JSR (May 8, 2026) at 1—audio recordings and transcripts of private conversations between President Biden and his writing partner that took place in President Biden's home and were never intended for public dissemination. These conversations include President Biden's intimate reflections on sensitive topics, including the passing of his eldest son, Beau, and his decision whether to run for the Presidency in 2016.

There is no serious question that the Department's public disclosure of these records would severely harm President Biden's legally protected interest in his privacy. *See Malvitz v.*

16

*Fincantieri Marine Grp., LLC*, No. 24 Civ. 238, 2025 WL 1663077, at *9 (D.D.C. June 12, 2025) (recognizing "privacy" as a "legally protected interest"); *Keown v. Int'l Ass'n of Sheet Metal Air Rail Transp. Workers*, No. 23 Civ. 3570, 2024 WL 4239936, at *11 (D.D.C. Sept. 19, 2024) (same).  Indeed, "preventing the disclosure of . . . confidential information is a well-established interest sufficient to justify intervention under Rule 24(a)."  *100Reporters*, 307 F.R.D. at 275.

**C.      This Action Threatens to Impair President Biden's Legally Protected Interest**

The Department's disclosure of the materials at issue in this action, which reflect President Biden's private conversations and were obtained by the Department as part of a criminal investigation, would impair President Biden's legally protected interest in his personal privacy.  In assessing impairment, the Court must consider the "practical consequences" that President Biden may suffer if intervention is denied. *Costle*, 561 F.2d at 909.  If the Heritage Plaintiffs prevailed in their FOIA claims in this action, the Department would be required to release President Biden's private conversations.  Such disclosure would irreparably harm President Biden's privacy interests. *See 100Reporters LLC*, 307 F.R.D. at 279 ("[I]mpairment appears especially obvious in FOIA litigation because if the plaintiff succeeds, the public release of the requested materials is both imminent and irreversible."); *Appleton*, 310 F. Supp. 2d at 197 ("[D]isclosures resulting from the disposition of this action could impair [the intervenor's] ability to protect [its] . . .confidential information.").

The Court need not take President Biden's word for it.  As the Department has explained in this litigation, including in sworn declarations:

- "These discussions—recorded by Mr. Zwonitzer for reference in drafting Mr. Biden's memoir—were analogous to entries in a personal diary."  Def.'s Mem. at 1; *see also id.* at 11 ("Releasing the unredacted version of the transcripts would be like releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone—despite no charges having ever been brought, let alone charges relating to that private content."); *id.* at 19 (describing "the audio of what amounts to the conversational equivalent of Mr. Biden's diary entries"); Weinsheimer Decl. ¶ 22

17

("[C]onversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary."); ECF No. 37 ("Def.'s Reply") at 5-6 ("Private conversations that inform the drafting process of a memoir are no more public than diary entries that inform that process."); *id.* at 12-13 ("[I]f law enforcement were to release select portions of an uncharged individual's private diary, that would clearly implicate the individual's privacy interests, regardless of the particular subjects covered in the entries.").

- "The privacy interests here are undoubtedly enormous."  Def.'s Mem. at 11.

- "The recordings were made for a book about how Mr. Biden coped with the loss of his son, and how he managed his responsibilities in that year while struggling with enormous personal grief.  They were recorded in private and were not meant for wider distribution."  *Id.* at 18 (citing Weinsheimer Decl. ¶ 22).

- "[I]t is exceedingly speculative to envision how these recordings would shed any light on SCO's role."  *Id.* at 19.

- "The release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest."  *Id.* at 6.

- "It is a bedrock principle of the U.S. justice system that individuals are entitled to a presumption of innocence.  Release of law enforcement records that reveal non-public private conduct poses substantial threats to that core tenet of American justice."  Weinsheimer Decl. ¶ 21.

- "[T]he Department takes great care to protect its law enforcement files, consistent with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties."  *Id.* ¶ 24.

- "How Mr. Biden's voice sounded throughout [his] conversations [with Zwonitzer] implicates substantial privacy rights.  If the audio recording is released, it could be played on national television or made universally available on the internet, amplifying the harm to privacy."  *Id.* ¶ 23.

- "The unredacted transcripts and the audio recordings are protected by Exemptions 6 and 7(C), as their disclosure would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  Def.'s Reply at 1.

- "[B]inding precedent . . . makes clear that President Biden and Mr. Zwonitzer have a distinct privacy interest in recordings of their voices, even where the corresponding text has already been released."  *Id.*

- "[Plaintiffs'] assertion . . . would eviscerate the well-established principle that the privacy rights of uncharged individuals are among the most protected under FOIA."  *Id.* at 14 (citation omitted).

18

- "To the extent that there is an interest in determining how President Biden spoke over seven years ago, in the 2016-17 timeframe, the public already has access to an array of his interviews, speeches, and public appearances from that period." *Id.* at 15.

These statements remain true today, and the Court should credit them in concluding that disclosure would impair President Biden's legally protected interest.

### D.    The Existing Parties Will Not Adequately Protect President Biden's Legally Protected Interest

It is also beyond dispute that the existing parties will not adequately protect President Biden's legally protected interest in preventing the release of intimate, private conversations. "The movant's burden of showing inadequate representation is 'minimal.'" *Mandan, Hidatsa & Arikara Nation v. U.S. Dep't of the Interior*, 66 F.4th 282, 285 (D.C. Cir. 2023) (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Thus, a putative intervenor "ordinarily should be allowed to intervene unless it is clear that [a] party will provide adequate representation for the absentee." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1293 (D.C. Cir. 1980)), *called into question on other grounds by Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025). Here, the opposite is clear: While the Department once faithfully adhered to the law and defended against Plaintiffs' baseless FOIA claims, it has now reversed course and will no longer defend President Biden's interests. Nor, to state the obvious, are the Heritage Plaintiffs adequate representatives of President Biden. *See* JSR (May 8, 2026) at 2-5.

### II.    In the Alternative, President Biden Should Be Permitted to Intervene Pursuant to Rule 24(b)(1)(B)

"If a movant does not meet the requirements to intervene as a matter of right, intervention may nonetheless be allowed, pursuant to Rule 24(b)." *Nat'l Fair Hous. All. v. Carson*, 330 F. Supp. 3d 14, 64 (D.D.C. 2018). "A court 'may' allow intervention under Rule 24(b)(1) if the would-be intervenor presents '(1) an independent ground for subject matter jurisdiction; (2) a

19

timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.'" *United Mexican States v. Lion Mexico Consol. L.P.*, 172 F.4th 1, 11 (D.C. Cir. 2026) (quoting *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998)).  The Court also "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).  "[P]ermissive intervention is an inherently discretionary enterprise," and district courts are afforded "wide latitude" in determining whether a third party should be permitted to intervene. *Nat'l Children's Ctr.*, 146 F.3d at 1046.

President Biden satisfies all three requirements for permissive intervention.  *First*, the Court has subject matter jurisdiction over Heritage's FOIA claims and over President Biden's proposed cross-claims pursuant to 28 U.S.C. § 1331.  *See also infra* Section III (addressing President Biden's Article III standing).  *Second*, President Biden has filed a timely motion, just one week after learning that the Department made a final decision to release material in which President Biden has compelling privacy interests. *See supra* Section I.A.  *Third*, President Biden's defense and cross-claims share common questions of law or fact with the underlying action between the Heritage Plaintiffs and the Department.  With respect to Plaintiffs' FOIA claims, President Biden stands in the shoes of the Department before its change in position: he will argue that the recordings and transcripts that Plaintiffs seek in this action, which were obtained through a criminal investigation, are exempt from disclosure pursuant to FOIA.  *See* Def.'s Mem. at 1-2; *100Reporters LLC*, 307 F.R.D. at 286 (finding that "similarities between the issues presented" by the intervenors and the Department of Justice showed a common question of law or fact).  With respect to President Biden's cross-claims, the claims are brought against the same party (the Department), involve the proposed disclosure of the same materials, and involve overlapping questions related to the Department's motivations and legal basis for disclosure.

20

Further, permitting President Biden to intervene in this case will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). President Biden's motion is timely, and his intervention will not prejudice any existing party. *See supra* Section I.A.

In sum, in the event the Court denies intervention as of right pursuant to Rule 24(a)(2), the Court should grant President Biden permissive intervention pursuant to Rule 24(b)(1)(B).

## III.     President Biden Has Article III Standing

A proposed intervenor seeking to intervene under Rule 24(a) generally must establish Article III standing. *See Jones v. Prince George's County*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *Fund for Animals*, 322 F.3d at 731-32. To establish Article III standing, an intervenor must show: (1) injury-in-fact, (2) causation, and (3) redressability. *See Fund for Animals*, 322 F.3d at 732-33 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Whether an intervenor has standing is "equivalent" to the question of whether "the intervenor has a 'legally protected' interest under Rule 24(a)." *100Reporters LLC*, 307 F.R.D. at 276; *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("[A]ny person who satisfies Rule 24(a) will also meet Article III's standing requirement."); *Wildearth Guardians v. Salazar*, 272 F.R.D. 4, 13, n.5 (D.D.C. 2010) ("[G]enerally speaking, when a putative intervenor has a 'legally protected' interest under Rule 24(a), it will also meet constitutional standing requirements, and *vice versa*."); *Fund for Animals*, 322 F.3d at 735 (explaining that the inquiries are coextensive).

President Biden has Article III standing for substantially the same reason he has a legally protected interest in this action: because the materials that Plaintiffs seek—namely, recordings and transcripts of private conversations between President Biden and his writing partner in President Biden's home, in the context of writing a highly personal memoir focused substantially on the death of President Biden's son—squarely implicate President Biden's privacy interests. *See supra*

21

Section I.B.  Invasion of personal privacy is a paradigmatic injury for purposes of Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (recognizing privacy harms as traditional, "concrete" harms); *Davis v. FEC*, 554 U.S. 724, 733 (2008) (recognizing disclosure of individual's private information as sufficient to grant individual standing).  "When, as here, it is clear that the FOIA requestor seeks the release of documents that are likely to contain the intervenor's [private] information, the intervenor's injury is both particularized and sufficiently imminent" to establish standing.  *100Reporters LLC*, 307 F.R.D. at 283; *see also id.* at 2884 ("[The] imminent and concrete risk of a proposed intervenor's [private] materials being released through a successful FOIA action is obvious.").  This injury is directly traceable to the Department's decision to disclose these records.  And the injury would be redressed by the relief President Biden seeks in his defense and cross-claims, namely, a decision that the materials at issue are exempt from release pursuant to FOIA and an injunction preventing the Department from publicly releasing them.  *See* Answer & Cross-Claims (answering Plaintiffs' FOIA claims, bringing cross-claims against the Department, and seeking a permanent injunction barring disclosure to Plaintiffs and to the Committee).

**IV.    At a Minimum, the Court Should Permit President Biden to Intervene for the Limited Purpose of Defending Against the Heritage Plaintiffs' FOIA Claims**

For the reasons explained above, at a minimum, President Biden satisfies the requirements for intervention to defend against the Heritage Plaintiffs' FOIA claims in this action.  Because the Department will no longer do so, intervention is necessary to protect President Biden's private, sensitive conversations from disclosure.

As noted, the Department has informed President Biden that it will disclose the conversations to Plaintiffs and to Congress on June 15, 2026, absent a court order barring release.  Accordingly, President Biden also seeks intervention to bring cross-claims against the Department

22

to enjoin release of the materials at issue on the grounds that the Department's final decision to release them to Plaintiffs and the Committee is arbitrary and capricious, an abuse of discretion, and contrary to law.  5 U.S.C. § 706(2)(A); *see* Answer & Cross-Claims at 13-31.  In light of the substantial factual and legal commonalities between Plaintiffs' claims and President Biden's proposed cross-claims, it would serve judicial economy to decide President Biden's cross-claims in the context of this action.  For similar reasons, it is in the existing parties' interest for the Court to adjudicate these claims and defenses together.  Indeed, Plaintiffs have represented that they will seek consolidation if President Biden files a separate action regarding the materials at issue here. *See* JSR (May 8, 2026) at 4.  As explained above, President Biden is prepared to participate in expedited summary judgment briefing on Plaintiffs' FOIA claims.  In light of the Department's planned disclosure on June 15, President Biden also intends to seek emergency relief with respect to his proposed cross-claims and to brief the relevant issues on an expedited schedule.  *See supra* Section I.A.

In the event the Court disagrees, however, President Biden alternatively seeks intervention for the limited purpose of defending against the Heritage Plaintiffs' claims, and he is prepared to assert his cross-claims in a separate action.  *See, e.g.*, Fed. R. Civ. P. 24(a) advisory committee's note to 1966 amendment ("An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings."); *Wildearth Guardians*, 272 F.R.D. at 20 ("[D]istrict courts may impose appropriate conditions or restrictions upon the intervenor's participation in the action.").

* * *

23

For the foregoing reasons, President Biden has a right to intervene in this action pursuant to Rule 24(a)(2). In the alternative, the Court should grant President Biden permissive intervention pursuant to Rule 24(b)(1)(B). In the interest of judicial economy, the Court should grant President Biden leave to intervene for purposes of defending against Plaintiffs' FOIA claims and asserting cross-claims against the Department, in light of the significant factual and legal overlap among the parties' claims and defenses. In the alternative, the Court should grant intervention for the limited purpose of defending against Plaintiffs' FOIA claims, leaving President Biden to assert his affirmative claims in a separate action.

## CONCLUSION

For the foregoing reasons, President Biden respectfully requests that the Court grant the motion to intervene and order the parties to file a joint status report within three days of any such order, setting forth their joint or competing proposals for further proceedings.

Dated: May 12, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883s
ajeffress@heckerfink.com
kkonkel@heckerfink.com
tgoodnature@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Proposed Defendant-Intervenor Joseph R. Biden, Jr.*

*Application for *pro hac vice* admission forthcoming

24