**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**HERITAGE FOUNDATION**, &
**MIKE HOWELL**,

*Plaintiffs,*

v.

**U.S. DEPARTMENT OF JUSTICE**,

*Defendant*.

</td><td>

Case No. 1:24-cv-00645 (DLF)

</td></tr>
</table>

**OPPOSITION TO PRESIDENT JOSEPH R. BIDEN'S MOTION TO INTERVENE AND
CROSS MOTION FOR EVIDENTIARY HEARING**

(Oral Argument Requested)

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT................................................................................................................ 6

   I.  TIMELINESS IS JUDGED BY WHEN PRESIDENT BIDEN KNEW OR SHOULD HAVE KNOWN HIS INTERESTS MAY WELL DIVERGE FROM DOJ'S. ................. 6

   II.  THE TIMELINE MAKES CLEAR THE MOTION IS UNTIMELY............................... 8

     A.  PRESIDENT BIDEN SEEKS TO BAR ANY FURTHER DISCLOSURE AT ALL. 8

     B.  THE TIMELINE. ................................................................................................... 8

   III.  THERE IS SEVERE PREJUDICE FROM INTERVENTION ON THE EVE OF SETTLEMENT OF THE MERITS OF THIS CASE. ...................................................... 13

   IV.  PLAINTIFFS ARE CONDITIONALLY ENTITLED TO AN EVIDENTIARY HEARING................................................................................................................... 15

CONCLUSION.......................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Amador Cty., Cal. v. Dep't of Interior*, 772 F.3d 901 (D.C. Cir. 2014) ................................... 7, 14

*Associated Builders and Contractors, Inc. v. Herman*, 166 F.3d 1248 (D.C. Cir. 1999).............. 6

*Cameron v. EMW Women's Ctr.*, 595 U.S. 267 (2022).......................................................... 6, 9

*Friend of Earth v. Haaland, No. 21-cv-2317 (RC), 2022 WL 126763 (D.D.C. Jan. 15, 2022)......* 8

*In re Brewer*, 863 F.3d 861 (D.C. Cir. 2017)................................................................... 6

*Judicial Watch v. DHS*, 895 F.3d 770 (D.C. Cir. 2018) ...................................................... 14

*Mannings v. School Bd. of Hillsborough Cty., Fla*, 149 F.R.D. 237 (M.D. Fla. 1993)................ 15

*Nat. Ass'n for Adv. for Colored People v. New York*, 413 U.S. 345 (1973)................................... 6

*Paisley v. CIA*, 724 F.2d 201 (D.C. Cir. 1984) .................................................................. 7

*Payne Enter., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988)....................................... 14

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228 (D.C. Cir. 2003)........................................ 7

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971).............................................................. 14

*Stewart v. Rubin*, 124 F.3d 1390 (D.C. Cir. 1997) (Table)................................................... 14

*Stewart v. Rubin*, 948 F.Supp. 1077 (D.D.C. 1996) .................................................... 12, 14

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977) ..................................................... 6

*United States v. BATAS, Ltd.*, 437 F.3d 1235, 1237 (D.C. Cir. 2006)........................................ 7

*United States v. Google LLC*, No. 25-5016, 2025 WL 880552 (D.C. Cir. Mar. 21, 2025)............ 6

*Wash. Post v. Dep't of State*, 685 F.2d 698 (D.C. Cir. 1982)................................................. 15

**Other Authorities**

Doris Keans Goodwin, TEAM OF RIVALS: THE POLITICAL GENIUS OF ABRAHAM LINCOLN (2005) .................................................................................................................. 3

Jake Tapper & Alex Thompson, ORIGINAL SIN (2025) ......................................................... 4

Martin Pengelly, *Biden Asserts Executive Privilege to Block Release of Special Counsel Interviews*, The Guardian (May 16, 2024) ................................................................................ 9

President Donald J. Trump, *Memorandum for the Att'y Gen., Review Certain Presidential Actions* (June 4, 2025) ............................................................................................... 4, 5

Press Release, *Oversight Committee Releases Report on the Biden Autopen Presidency* (Oct. 28, 2025) ............................................................................................................................ 5

Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024) ................................................................................................................... 3, 4, 10, 15

Steven Richards & John Solomon, *Bombshell Memos: Biden Aides Believed He Should Sign Pardons By Hand*, JUST THE NEWS (Sept. 4, 2025) ................................................................ 5

*The Autopen Presidency Part I: Pardons and Commutations*, THE OVERSIGHT PROJECT (Apr. 30, 2025) ............................................................................................................................ 4

*The Autopen Presidency Part II: Executive Orders*, THE OVERSIGHT PROJECT (Apr. 30, 2025) ... 4

*The Autopen Presidency Part III: Autopen Clemency While President Biden was in D.C.*, THE OVERSIGHT PROJECT (Jun. 3, 2025) ............................................................................. 4

*The Autopen Presidency Part IV: Comprehensive Summary of Autopen Use*, THE OVERSIGHT PROJECT (Oct. 27, 2025) ............................................................................................ 4

## INTRODUCTION

This FOIA case has been pending since ***March, 6 2024***.  This Court stayed the action on September 27, 2025 to give the Parties the opportunity to engage in efforts "to settle this case or narrow the remaining legal issues."  Minute Order (Sept. 27, 2026).  The Parties talked, worked together cooperatively, and the case has (effectively) been settled as to the merits of the withholdings.  Defendant will produce records on June 15, 2026 and that will be the end of the merits.  But at the last possible second, former President Joseph R. Biden seeks to halt this settlement, objecting to disclosure.  *See* Motion to Intervene by Joseph R. Biden, Jr. (ECF No. 51) ("Motion" or "Mot.").

President Biden's Motion is untimely under any measure.  Timeliness is a threshold question to any form of intervention.  And President Biden's objection comes many months after it was apparent that his interests had sharply diverged from those of the Trump Administration's Department of Justice.  Indeed, a simple timeline shows President Biden's only argument for timeliness is based on misconstruing the applicable law twice over.

***First***, President Biden asserts that he acted not only timely (but with dispatch) because it was not until May 5, 2026 that the Department stated it was ***disclosing*** the records at issue in this case over President Biden's objection when the Department made a "final decision."  Mot. at 3.  But that is not the test of timeliness.  Timeliness is analyzed from when it became reasonably apparent that interests diverged—not from when adverse action was ***finally*** taken.  Moreover, President Biden's lawyers are taking the further erroneous position that they must receive some kind of writing from the Department before they could conclude they were at risk of a change in position by DOJ.  Not so.  By any measure, divergence of interests occurred when the Department represented it was reconsidering its position in this case, which occurred  no later than ***September 27, 2025***.

***Second***, the Trump Department of Justice ***had already*** taken action directly adverse to Biden by abandoning or reversing many of the same arguments Biden's Department of Justice had relied upon to withhold documents here. This occurred (1) in two highly related cases as of ***May***

*19, 2025* when tapes of President Biden's interview with Special Counsel Robert K. Hur were released (*see* Mot. at 7); and, again, (2) as of *July 7, 2025*, when a large number of redactions were lifted by DOJ as to Special Counsel Hur's interview with Mark Zwonitzer (President Biden's ghostwriter).

There also is real prejudice to allowing intervention at this stage. The parties have worked together since this Court's September 27, 2025 Minute Order and have engaged in a series of mutual accommodations. The merits stage of this case is scheduled to end with DOJ's announced June 15, 2026 document release. President Biden's intervention would disrupt all of that and set the clock back over seven months, undoing much good work.

Before setting out the reasons why these records have public importance, we pause to note that the privacy claims made on behalf of President Biden are (at the highest level) absurd, despite the prior Administration's analogy (by former Biden Department official Bradley Weinsheimer) of the Zwonitzer materials to a personal diary. *See* Mot. at 1. But the Zwonitzer materials are: (1) not protected by any form of privilege; (2) not a conversation between Joe Biden and one or more family members that exclude any members of the public or individuals outside the family; (3) not a Biden session with a therapist or a spiritual advisor; and (4) not an internal memoir book designed to be kept private within the Biden family such as a scrapbook. The relevant materials were instead generated to create a public book to both make money and to promote Joe Biden's political career. *See* ECF No. 34-1 at 16 (record reflects $8 million dollar commercial and political purposes of book). The analogy to protecting a private diary falls flat and the privacy claims make a mockery of true privacy interests. If President Biden wanted privacy, he did not need to hire a ghost writer to write an $8 million for-profit public memoir he later used to undergird his 2020 Presidential campaign. Tellingly, the Motion omits all of these facts and common-sense points.[1]

---

[1] To the extent Biden seeks to pre-litigate the merits of any specific privacy submission, that is manifestly inappropriate. And in any event, President Biden's submission are badly flawed. To take one example, (Mot. at 18) it strains credulity to suggest that President Biden has a privacy

Moreover, overwhelming public importance is present here (as opposed to merely historical salience) for these reasons.

*First*, Special Counsel Hur relied upon these records to conclude:  (1) there was a case Biden had to answer for serious felonies, in part because he disclosed classified information to his ghostwriter Mark Zwonitzer; and (2) prosecution of President Biden was not appropriate in large part because of his "diminished faculties and faulty memory."  *See* Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, & Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* at 4, 103–08, 108, 248 (Feb. 5, 2024) ("Hur Report"), https://www.justice.gov/sco-hur.  President Biden and his proxies vigorously disputed both these points.  *See* ECF No. 34-1 at 3–12.  There is still great public controversy on this point; and the American People have a right to judge that controversy for themselves on the contemporaneous evidence.[2]

*Second*, while President Biden may have retired, this Court knows well that others such as Vice President Kamala Harris have not.  The records at issue go directly to the question of whether those officials knew contemporaneously that President Biden was cognitively impaired while in

---

interest in the non-lexical sound of his voice as concerns *phrases quoted in the Hur Report* that relate to the disclosure of classified material.  The public knows full well how President Biden speaks; he was a politician for decades.  *See* ECF NO. 34-1 at 22–23.  To take another, it is a bridge to far to claim that "[p]ressing decisions that President Biden faced about his political future were inextricably intertwined with Beau" and therefore release here would somehow justify that interest.  Mot. at 4.  Plaintiffs have worked with Defendant's and are confident that Defendant is capable redacted any truly private information concerning Beau Biden—information in which Plaintiffs have always disclaimed interest.

[2]  The notion that the "facts militating against disclosure are even stronger now that President Biden has returned to life as a private citizen" (Mot. at 13) completely ignores an immutable fact.  President Biden *chose* to run for President, take the oath, and serve as the "the President of the United States, clothed with immense power."  Doris Keans Goodwin, TEAM OF RIVALS:  THE POLITICAL GENIUS OF ABRAHAM LINCOLN 687 (2005).  That choice—which President Biden coveted—carries with it the consequence that retirement does not somehow restore a cloak of privacy.  Doubly so when dealing with decisions made by President Biden that have on-going application and in the considered judgement of the sitting President inflicted great, on-going damage to the Nation.

3

Office and whether they shirked their duty to take action or make the American People aware.  For starters, the disclosures we seek serve as direct evidence that seven years ago  President "Biden's memory also appeared to have significant limitations . . . as evidenced by their recorded conversations."    Special Counsel Hur specifically recounted that, "Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries."  Hur Report at 207.  Additionally, and more critically, Special Counsel Hur "testified he also relied upon President Biden's and Zwonitzer's conversations from February and April of 2017 (at issue here) as a critical comparative reference point for assessing President Biden's "diminished faculties and faulty memory."  ECF No. 34-1 at 8 (quoting Hur Report at 248); *see also id.* at 12–13.

*Third*, even many of President Biden's allies admitted in private to journalists Jake Tapper and Alex Thompson that President Biden clearly was in cognitive decline over his Term and in particular in 2024.  *See generally* Jake Tapper & Alex Thompson, ORIGINAL SIN (2025).  That decline in turn manifested itself in what many believe is an alarming situation where there is no documentation that President Biden actually authorized memorialization by signature of non-delegable Presidential decisions.[3]

President Trump has deemed this issue "one of the most dangerous and concerning scandals in American history."  President Donald J. Trump, *Memorandum for the Att'y Gen., Review Certain Presidential Actions* (June 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/reviewing-certain-presidential-actions/. ("Trump Memo")  Indeed, President Biden's  many own senior staff testified to a complete lack of such documentation and

---

[3]  *See, e.g.*, *The Autopen Presidency Part IV: Comprehensive Summary of Autopen Use*, THE OVERSIGHT PROJECT (Oct. 27, 2025), https://itsyourgov.org/investigation/the-autopen-presidency-part-iv-comprehensive-summary-of-autopen-use/; *The Autopen Presidency Part III: Autopen Clemency While President Biden was in D.C.*, THE OVERSIGHT PROJECT (Jun. 3, 2025), https://itsyourgov.org/the-autopen-presidency-part-iii-autopen-clemency-while-president-biden-was-in-dc/; *The Autopen Presidency Part II: Executive Orders*, THE OVERSIGHT PROJECT (Apr. 30, 2025); https://itsyourgov.org/investigation/the-autopen-presidency-part-ii-executive-orders/; *The Autopen Presidency Part I: Pardons and Commutations*, THE OVERSIGHT PROJECT (Apr. 30, 2025); https://itsyourgov.org/investigation/bidens-autopen-presidency-part-i/.).

authorization for use of the autopen on official documents cloaked by a game of three-card monte. *See* Press Release, *Oversight Committee Releases Report on the Biden Autopen Presidency* (Oct. 28, 2025), https://oversight.house.gov/release/oversight-committee-releases-report-on-the-biden-autopen-presidency/. Steven Richards & John Solomon, *Bombshell Memos: Biden Aides Believed He Should Sign Pardons By Hand*, JUST THE NEWS (Sept. 4, 2025), https://justthenews.com/sites/default/files/2025-09/Biden%20White%20House%20autopen%20%26%20clemency%20memos.pdf. And the considered judgement of the current President is remarkably damming.[4] In evaluating how such an unprecedented situation should be approached, the American People deserve as much information as possible as to the timeline and depth of President Biden's cognitive decline

**Fourth**, it is clear that many of these interests will have direct impact and salience in the upcoming mid-term elections. Whether prominent figures in the Democratic party covered up for President Biden, whether official actions perceived as having a negative effect were properly authorized, whether the current Administration is correct in arguing its actions are justified as a response to weaponization under the Biden Administration are all examples of points at issue in the up-coming Mid-Term Elections. One could very well think that the Motion seems less about the merits of the withholdings and more about forcing delay through the Mid-terms.

---

[4] *See* Trump Memo § 1 ("The American public was purposefully shielded from discovering who wielded the executive power, all while Biden's signature was deployed across thousands of documents to effect radical policy shifts."); *id.* For years, Biden suffered from serious cognitive decline. The Department of Justice, for example, concluded that, despite clear evidence that Biden had broken the law, he should not stand trial owing to his incompetent mental state. Biden's cognitive issues and apparent mental decline during his Presidency were even "worse" in private, and those closest to him "tried to hide it" from the public. To do so, Biden's advisors during his years in office severely restricted his news conferences and media appearances, and they scripted his conversations with lawmakers, government officials, and donors, all to cover up his inability to discharge his duties."); *id.* ("Given clear indications that President Biden lacked the capacity to exercise his Presidential authority, if his advisors secretly used the mechanical signature pen to conceal this incapacity, while taking radical executive actions all in his name, that would constitute an unconstitutional wielding of the power of the Presidency, a circumstance that would have implications for the legality and validity of numerous executive actions undertaken in Biden's name.").

**ARGUMENT**

**I.    TIMELINESS IS JUDGED BY WHEN PRESIDENT BIDEN KNEW OR SHOULD HAVE KNOWN HIS INTERESTS MAY WELL DIVERGE FROM DOJ'S.**

"If it is untimely, intervention must be denied." *Nat. Ass'n for Adv. for Colored People v. New York*, 413 U.S. 345, 365 (1973). Thus, "[i]f the motion was not timely, there is no need for the court to address the other factors that enter into an intervention analysis." *Associated Builders and Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999).

President Biden submits that his intervention was timely because "President Biden is seeking intervention just one week after it became clear that the Department would no longer protect his privacy interests." Mot. at 11. He asserts that is so because it was not until May 5, 2026 that "the Department informed President Biden of its final decision and announced that it would disclose the recordings to Plaintiffs and the Committee unless President Biden intervened by May 12." *Id.*

This construct is wrong because it relies on the wrong standard. Timeliness of intervention is judged not from when an action is taken that ***actually prejudices*** a party, but (as even President Biden himself tacitly admits (Mot. at 11)) from when "it became clear" that the [movant's] interests "would no longer be protected" by the parties in the case." *Cameron v. EMW Women's Ctr.*, 595 U.S. 267, 280 (2022) (quoting *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 384 (1977)); *accord United Airlines*, 432 U.S. at 394 ("In short, as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests."). That standard looks to when the proposed intervenor knew or should have known his ***interests*** diverged (here from the Department's)—not when actual prejudice to those interests occurred via some "final decision" (Mot. at 12). *See, e.g.*, *United States v. Google LLC*, No. 25-5016, 2025 WL 880552, at *1 (D.C. Cir. Mar. 21, 2025) (analyzing case from when it became "clear that Google ***would no longer*** protect Apple's interests" as opposed to actual prejudice (emphasis added)); *In re Brewer*, 863 F.3d 861, 872 (D.C. Cir. 2017) ("A nonparty must timely move for intervention once it becomes

6

clear that failure to intervene ***would jeopardize her interest in the action***" (emphasis added))[5]; *Paisley v. CIA*, 724 F.2d 201, 203 (D.C. Cir. 1984) (finding intervention untimely, but permitting intervention because of prior liberality in FOIA precedents, because "On February 22, 1983, when the government filed its supplemental brief . . . *some* divergence between the government's position and the position that the Committee may have held became evident." (emphasis added)).

Accordingly, the D.C. Circuit "measure[s] elapsed time from when the 'potential inadequacy of representation [comes] into existence.'" *Amador Cty., Cal. v. Dep't of Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (quoting *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (internal quotation marks and citation omitted) (second alteration in original)); *id.* ("The record demonstrates that the Tribe knew in 2005 as well that the United States ***might not*** adequately represent the Tribe's interest.  Therefore, the district court did not abuse its discretion in using 2005 as the relevant date in its elapsed time analysis." (emphasis added)); *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003) ("Timeliness is measured from when the prospective intervenor "knew or should have known that any of its rights would be directly affected by the litigation." (cleaned up)).

*United States v. BATAS* provides a useful example of the proper application of this rule. There, the privilege holder delayed intervening until the eve of trial arguing intervention was timely because the privilege holder "could not have objected on privilege grounds until Gulson's testimony occurred either at deposition or trial and therefore need not have intervened earlier." *United States v. BATAS, Ltd.*, 437 F.3d 1235, 1237, 1238 (D.C. Cir. 2006).  The D.C. Circuit rejected that argument out of hand because "[t]he issue, though, is not the timeliness of potential ***objections*** but the timeliness of its ***intervention***."  *Id.*  As the panel explained, the timeliness of intervention stemmed not from the actual injury—the attempt to elicit privilege testimony at trial—but rather "multiple early warnings of danger to its privilege," such as knowledge of what "privileged information might be disclosed." *Id.* at 1239. *See also, e.g., Friend*

---

[5]  Surprisingly, Biden concedes the applicability of this standard, even citing the quoted portion of *Brewer*.  Mot. at 12.

*of Earth v. Haaland*, No. 21-cv-2317 (RC), 2022 WL 126763, at \*1, \*3 (D.D.C. Jan. 15, 2022) (Chevron's putative intervention in challenge to an oil lease sale was untimely where Chevron only intervened after being the "apparent high bidder" because Chevron was aware of a challenge to lease sale and thus "[a]lthough Chevron did not yet know it would be a high bidder, it surely knew at least somewhat in advance that it intended to participate in Lease Sale 257 and that its interests could be affected by the outcome of this litigation."). In this case, Biden's lawyers sat on their hands for at least two-plus months knowing their ultra-thin privacy claims to cloak disclosure of for-profit book disclosure were in danger and could be affected by the outcome of this FOIA litigation, as we next turn to unpacking.

## II.    THE TIMELINE MAKES CLEAR THE MOTION IS UNTIMELY.

### A.    PRESIDENT BIDEN SEEKS TO BAR ANY FURTHER DISCLOSURE AT ALL.

To start, President Biden attempts to obscure what his actual interest is in this case. While to be sure, President Biden's lawyers engaged in some form of negotiations over additional redactions to the Government's June 15, 2026 production (Mot. at 8, 11–12), President Biden's position is that no further disclosure should occur in this case beyond the highly limited disclosure made by the Biden DOJ; indeed, Biden expressly seeks a permanent injunction against *any* further disclosure in his proposed pleading in intervention. *See* Mot. at 12 n.4 ("For avoidance of doubt, President Biden's position (which is consistent with the Department's litigation position until its recent reversal) is that all of the materials withheld in the Department's final response to Plaintiff Mike Howell's FOIA request, *see* ECF No. 33-2, are exempt from disclosure pursuant to FOIA"); Proposed Cross-Claim, Relief at (e) ("Permanently enjoin the Department and its officers, agents, and employees from disclosing the Materials").

### B.    THE TIMELINE.

*January 20, 2025 at 12:01 p.m.* On this date, the Trump 47 Administration takes office. It is known that prior to re-taking office as the 47th President, President Trump (rightly) faulted the Biden Administration for its lack of transparency in Hur-related matters. *See, e.g.*, Martin

Pengelly, *Biden Asserts Executive Privilege to Block Release of Special Counsel Interviews*, The Guardian (May 16, 2024) ("Trump's campaign spokesperson, Steven Cheung, said Biden 'and his feeble administration have irretrievably politicised the key constitutional tenet of executive privilege, denying it to their political opponents while aggressively trying to use it to run political cover for Crooked Joe'"), https://www.theguardian.com/us-news/article/2024/may/16/biden-executive-privilege-special-counsel-interview-release.    At that time President Biden knew or should have known that there was a realistic prospect that President Trump's DOJ would revisit the litigating position that his DOJ took in this matter.  Biden now retorts this is not that case because "the Department was bound by an agreement to inform President Biden if it intended to disclose the recordings, and it did not do so until February 25, 2026." Mot. at 13.  This fails out of the gate because the agreement in question (*see* ECF No. 51-4) did not textually bind the Department as a whole but only Hur and his Office.[6]  And again, the Biden argument misstates the standard.  To be sure, there was no statement by DOJ that it was ***actually changing*** positions, but President Biden's interests in this litigation had already clearly diverged from DOJ.  Moreover, the situation is not comparable to *Cameron* where a candidate ran on a general policy position with ***potential*** application to the matter in issue.  *See Cameron*, 595 U.S. at 280 (discussing in-coming Governor's general pro-abortion views and general policy of declining to defend abortion

---

[6]  *See, e.g.*, ECF No. 51-4 at 2 ("***The Special Counsel's Office*** may not use the information in the grand jury or in court applications without first providing the President with advance notice and a sufficient opportunity to challenge that use in court."(emphasis added)); *id.* ("Other than as specified above, **the Special Counsel's Office** will not share any of the information, in any form, outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public without providing the President with advance notice and a sufficient opportunity to challenge such a disclosure." (emphasis added)). The Hur Special Counsel's Office is dissolved and we would resist any argument that its actions were anything other than independent of the Department during the Biden era, since the need for the independent operation of any Special Counsel has long been a dogmatic point for Democratic Party Administrations.

restrictions while Attorney General); *contra* Mot. at 13.    Here, President Trump promised transparency as to the Hur Report.

*May 19, 2025.*  "On May 19, 2025, the Department released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur." Mot. at 7.  (No. 24-cv-700). Not only did President Trump expressly reverse President Biden's formal claim of Executive Privilege, but DOJ also necessarily reversed many of the same litigation positions advanced in this case.[7]  That DOJ abandoned these litigating positions and released the audio makes clear that President Biden already knew his ***interests*** in this matter had diverged from DOJ's.  Moreover, on its face, the agreement between President Biden and Special Counsel Hur applied to these disclosures.  *See* ECF No. 51-4.  On information and belief, there was notification to President Biden of this release prior to May 19, 2025 and there may well have been discussions regarding the Department reversing legal positions that are applicable in this case insofar as President Biden's interest as he now asserts it lies in there being ***no additional disclosure***.  On May 14, 2026, Plaintiffs' Counsel wrote to Biden's Counsel to request that the record be supplemented with any such conversations.  *See* Exhibit 1 to the Declaration of Samuel Everett Dewey (May 15, 2025). President Biden's Counsel flatly refused to do so.  *Id.*  In light of this, Plaintiffs conditionally request an evidentiary hearing to explore what President Biden knew or should have known as of this date because on information and belief there were relevant discussions with the Department that are material and should be disclosed in all candor.

*July 7, 2025.*    The Department lifted a number of redactions from transcripts of Zwonitzer's interview with Special Counsel Hur.  Again, production of the relevant records in that

---

[7] *Compare* e.g., ECF Nos. 34 & 37 *with* Defendant's Memorandum of Law in Support of Motion for Summary Judgment, *Jud. Watch, Inc. v. DOJ*, 24-cv-700 (TJK) (May 31, 2024) (ECF No. 34-1 at 26–27) (arguing disclosure of audio recording of Special Counsel Hur's interview with President Biden would do little to advance public's understanding of Hur's declination decision given release of official report and written transcript of interview); *id.* at 19–24 (arguing even high-profile individuals investigated but not charged with a crime maintain substantial privacy interests in the contents of investigatory files); *id.* at 19–24 (arguing audio recordings implicate distinct privacy interests); *id.* at 24–27) (arguing balance of privacy interest and public interests weighs in favor of privacy).

case shows the Department reversing many of the same Biden-era Department's arguments made in this case.[8]  And again, on information and belief, there ***was notice*** to President Biden prior to release.

***September 26, 2025.***   The Department indicates in a Joint Status Report that it is considering its position in this matter.  That the Department was "reviewing the withholdings in this case" as opposed to litigating the fully briefed Biden Administration position makes clear that President Biden's interests had diverged from those of the Department as presently constituted. ECF No. 42 at 3.  The Department was not only considering abandoning the Biden Administration position in this case, it ***had already done so*** in two cases concerning related aspects of Special Counsel Hur's investigation in which the legal arguments substantially overlapped.  There is no question that President Biden knew or should have known at that time that additional productions were likely to occur in this case.  Had President Biden wished to continue to litigate the position his Administration took, intervention at that time would have allowed the case to proceed seamlessly.  In that hypothetical world, intervention would have occurred without objection and the parties and the Court would have had over seven months to deal briefing, argument, and decision on the merits of the proper span of FOIA disclosure.[9]

---

[8]  *Compare* ECF Nos. 34 & 37 *with* Defendant's Memorandum of Law in Support of Motion for Summary Judgment, *Heritage Found. v. DOJ*, 24-cv-952 (ACR) (Aug. 8, 2024) (ECF No. 17-1 at 25–27) (arguing disclosure of unredacted transcripts and audio recordings of President Biden biographer Mark Zwonitzer's interviews with Special Counsel Hur unlikely to advance public understanding given release of redacted transcripts of interviews); *id.* at 23–24 (arguing individuals investigated but not charged with a crime maintain substantial privacy interests in the contents of investigatory files); *id.* at 33–36 (arguing audio recordings implicate distinct privacy interests); *id.* at 30–33) (arguing balance of privacy interest and public interests weighs in favor of privacy).

[9]  Thus, President Biden is dead wrong when he submits that "[i]n light of these facts, it would have made no difference to the course of the litigation if President Biden had moved for intervention earlier.  Pursuant to the Court's September 27, 2025 Minute Order, the Department still would have needed to review its withholdings, and the Department and Plaintiffs still would have needed to confer as directed by the Court."  Mot at 14.  Again, the matters now pressed by President Biden would have been litigated with over a seven months runway and that could of course occur in parallel to review by the Department, saving all parties, Preisdent Biden, and this Court a considerable amount of time and efforts.

**December 8, 2025.**  A Joint Status Report is filed stating that "Defendant is still reviewing the withholdings in this case," but adds that "While Defendants' review is not yet complete, the parties still believe that they may be able to narrow the issues in dispute," and thus the Parties request leave to file a joint status report "setting forth whether they have been able to settle the case or narrow the issues in dispute."  ECF No. 43 at 1.  Given that Biden's interests were in no additional disclosures and that Plaintiffs had made clear their position that they would not drop the case without additional disclosures, the fact that the Parties believed they could possibly resolve the case or narrow it, combined with all of the foregoing, clearly put President Biden on notice that his interest in no further disclosure was well out of alignment with the interests of the Department.

**February 25, 2025.**  "[T]he Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with only very limited redactions."  Mot. at 7–8.  Thus, as of that date President Biden was certainly on notice that the Department intended to make an additional production that was directly at adds with his interest in no additional productions.  President Biden all but admits that his interests had manifestly diverged from the Department at this time when his counsel write "[s]ince then, counsel for President Biden engaged continually with the Department, in an effort to resolve this matter without litigation."  Mot. at 8; *see also id.* at 11–12 ("Immediately upon receiving this notice, counsel for President Biden engaged with the Department in an effort to protect his interests and avoid the need for intervention, including by seeking to negotiate agreed-upon redactions and conditions for any disclosure to Congress, such as making the recordings and transcripts available to the Committee's members and staff in a closed reading room.").  By operation of the English language, if one is in negotiations to resolve a matter *without litigation*, then it ineluctably follows that one has already reached a state of divergent *interests*, even if the divergence of interest has not yet been finalized by adverse action.  *See, e.g.*, *Stewart v. Rubin*, 948 F.Supp. 1077, 1104 (D.D.C. 1996) (finding

12

untimeliness because "the Putative Intervenors were so concerned at this time that they thought about bringing their own lawsuit to challenge the settlement agreement.").

**March 3, 2026.** President Biden's lead counsel is informed that "***the Department had reversed its position on withholding*** and intended to release 117 pages of transcript and the corresponding audio recordings by March 6, the deadline for the next joint status report in this case." Declaration of Amy Jeffress. at ¶ 13 (May 12, 2026) (emphasis added) ("Jeffress Decl."). Again, President Biden's professed interest was in preventing ***any*** further disclosure. And at this point, it was indisputable clear that the Department "***had already***"—not simply "might in future"—reverse its position. One struggles to imagines facts that could make it any clearer that the Department-vs.-Biden interests were divergent.

On this record, it is crystal clear that President Biden sat on his rights for months, if not more than a year, despite having access to a great number of skilled attorneys and advisors (note how many Hecker firm lawyers are appearing by *pro hac vice*). By her own admission, President Biden's lead counsel did not intervene for months while she negotiated "in the hope of resolving this matter without resort to litigation." Jeffress Decl. at ¶ 15. That course of conduct is very the definition of being untimely, judged against the correct legal standard of divergent interests. The standard that opposing counsel, in essence, proposes for this Court here is that it is acceptable for a lawyer for a person resisting disclosure to "hope against all hope" that the disclosing authority will change its professed and demonstrated course and that until all glimmer of hope is totally dispelled in that regard, intervention need not occur. But that is manifestly not the law.

## III.    THERE IS SEVERE PREJUDICE FROM INTERVENTION ON THE EVE OF SETTLEMENT OF THE MERITS OF THIS CASE.

President Biden submits that there is no prejudice here because this action has been stayed for more than seven months since September 27, 2025 and therefore President Biden's intervention will not affect the posture of the case or the parties' positions. *See* Mot. at 13-14. But that ignores the record. The case was stayed precisely "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow

13

the remaining legal issues." Minute Order (Sept. 27, 2025). The Parties did just that and the merits of the case were effectively settled. And that settlement will be consummated when the Defendant makes its June 15, 2026 production. This process took considerable time and effort. *See* ECF Nos. 43–47 (detailing length of time required). ***All*** of that effort will be for naught if intervention is permitted and this case effectively re-wound to its pre-September 26, 2025 state. Indeed, allowing that insensible outcome would incentivize a potential intervenor to sit on the sidelines for far too long, watching and waiting, allowing it to pounce by moving for intervention just before the FOIA documents are set to be released. That provides a clear roadmap to delay. That is clear prejudice. *See, e.g.*, *Stewart v. Rubin*, 124 F.3d 1390 (D.C. Cir. 1997) (Table) ("Intervention would cause substantial prejudice to the African-American BATF agents and Treasury Department officials by jeopardizing a settlement agreement reached after lengthy and difficult negotiations"); *Rubin*, 948 F.Supp. at 1104. [10]

Moreover, both Plaintiffs and the Government will be prejudiced because production will—yet again—be delayed. Note that FOIA mandates not only production of records, but the ***prompt*** production of records. *See, e.g.*, *Judicial Watch v. DHS*, 895 F.3d 770, 774 (D.C. Cir. 2018) ("federal agencies, 'upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records *promptly available*.'" (quoting 5 U.S.C. § 552(a)(3)(A) (emphasis added)); *Payne Enter., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value"). Indeed, that is why FOIA statutorily eliminates normal barriers to equitable relief. *Soucie v. David*, 448 F.2d 1067, 1076 (D.C. Cir. 1971) ("Congress clearly has the power to eliminate ordinary discretionary

---

[10] Thus, Biden's submission that "It is also significant, if not dispositive, that the Court has not yet ruled on the merits of the Heritage Plaintiffs' claims" is yet more subterfuge Mot. at 14. That ignores that fact that the D.C. Circuit treats settlement as equivalent to judicial resolution. (A holding that is logically unassailable). *See, e.g.*, *Amador*, 772 F.2d at 905–06 (noting "We have previously concluded that the delay caused by a potential intervenor was sufficient to constitute prejudice where a decision on the merits was pending" and citing *Stewart* to support that proposition). Thus, Biden ***does*** "seek to upset prior decisions in the case"—namely the Parties decision to settle. Mot. at 14 (cleaned up).

barriers to injunctive relief, and we believe that Congress intended to do so here."); *accord Wash. Post v. Dep't of State*, 685 F.2d 698, 704 (D.C. Cir. 1982), *vacated as moot*, 464 U.S. 979 (1983) (mem.). To accept President Biden's position is to accept the loss of over seven months of time and to inflict prejudice on the public from once again delaying release.

## IV.    PLAINTIFFS ARE CONDITIONALLY ENTITLED TO AN EVIDENTIARY HEARING.

As detailed above, Plaintiffs believe, on information and belief, that President Biden was notified of releases of Hur Report related materials in 24-cv-700 & 24-cv-952. Necessarily, that information would be solely in the possession of Biden and the Government. That information may well show that the Motion is untimely. If the Court does not deny the Motion on the papers, it should order an evidentiary hearing to probe this point. This could be accomplished briefly and in conjunction with oral submissions on this Motion. This Court has discretion to take evidence on a motion to intervene. *See, e.g.*, *Mannings v. School Bd. of Hillsborough Cty., Fla*, 149 F.R.D. 237, 238 (M.D. Fla. 1993) (ordering evidentiary hearing).[11]

## CONCLUSION

For the foregoing reasons, the Court should order an evidentiary hearing (if necessary) and deny the Motion putting an end to the merits of this case.

---

[11] Defendant and President take no position on this conditional cross-motion.

Dated:  May 15, 2026

Respectfully submitted,

/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

JEFFREY B. CLARK
(No. 455315)
THE OVERSIGHT PROJECT
211 N. Union Street
Alexandria, VA 22314
202-279-1396
Email:  Jeff@itsyourgov.org

DANIEL D. MAULER
(No. 977757)
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

KYLE BROSNAN
(No. 90021475)
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
845-674-5589
Email:  Kyle@ItsYourGov.org

ERIC NEAL CORNETT
(No. 1660201)
THE OVERSIGHT PROJECT
211 North Union Street
Alexandria, VA 22314
845-674-5589
Email:  Neal@ItsYourGov.org

*Counsel for Plaintiffs*

16