**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION, |  |
| MIKE HOWELL, |  |
| *Plaintiffs*, |  |
| v. |  |
| U.S. DEPARTMENT OF JUSTICE, | No. 24-cv-645 (DLF) |
| *Defendant*, |  |
| and |  |
| JOSEPH R. BIDEN, JR., |  |
| *Defendant-Intervenor*. |  |

<u>**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION BY JOSEPH R. BIDEN, JR.**</u>

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ........................................................................................................................ 3

    I.    The Records at Issue and the Special Counsel's Investigation........................................... 3

    II.    Developments in This Litigation and the Department's About-Face ................................ 5

    III.    The Purposes of the Disclosure........................................................................................ 9

LEGAL STANDARD................................................................................................................ 11

ARGUMENT ............................................................................................................................ 11

    I.    President Biden Is Likely to Succeed on the Merits of His Cross-Claims Challenging the Department's Proposed Disclosure of His Private Information to the Heritage Plaintiffs ........................................................................................................................ 12

        A.    The Department's Decision Is a Final Agency Action Subject to Immediate Review ................................................................................................................. 12

        B.    President Biden's Private Conversations Are Exempt From Disclosure and Properly Withheld Pursuant to FOIA Exemptions 6 and 7(C) ............................ 13

        C.    The Department's Contrary Determination Is Arbitrary, Capricious, and an Abuse of Discretion ........................................................................................... 19

        D.    Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act .................. 26

    II.    President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction............. 32

    III.    The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief......................................................................................... 34

    IV.    The Bond Requirement Should Be Waived or Set to a Nominal Amount ....................... 36

CONCLUSION.......................................................................................................................... 37

# TABLE OF AUTHORITIES

**CASES**

*AAR Airlift Grp., Inc. v. U.S. Transp. Command*,
  161 F. Supp. 3d 37 (D.D.C. 2015) ................................................................................ 25

*\*AFL-CIO v. Dep't of Lab.*,
  No. 25 Civ. 339, 2026 WL 879518 (D.D.C. Mar. 31, 2026) ......................................... 26

*AFL-CIO v. Dep't of Lab.*,
  No. 25 Civ. 339, 2025 WL 1783899 (D.D.C. June 27, 2025) .................................... 33, 34

*AFL-CIO v. FEC*,
  177 F. Supp. 2d 48 (D.D.C. 2001) ................................................................................ 18

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
  663 F.3d 476 (D.C. Cir. 2011) ...................................................................................... 31

*All. for Retired Ams. v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025) ........................................................................ 8, 33, 34

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) .................................................................................... 21

*Ames v. U.S. Dep't of Homeland Sec.*,
  861 F.3d 238 (D.C. Cir. 2017) ................................................................................. 27, 29

*Armstrong v. Geithner*,
  608 F.3d 854 (D.C. Cir. 2010) ...................................................................................... 32

*Bartko v. U.S. Dep't of Just.*,
  898 F.3d 51 (D.C. Cir. 2018) ........................................................................................ 14

*Bast v. U.S. Dep't of Just.*,
  665 F.2d 1251 (D.C. Cir. 1981) .................................................................................... 16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................................... 12

*Brennan Ctr. for Just. v. U.S. Dep't of Just.*,
  697 F.3d 184 (2d Cir. 2012) ......................................................................................... 23

*Brunotte v. Johnson*,
  892 F. Supp. 2d 199 (D.D.C. 2012) .............................................................................. 27

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)...................................................................................................... 20

*Canadian Com. Corp. v. Dep't of the Air Force*,
514 F.3d 37 (D.C. Cir. 2008) ....................................................................................... 19

*Canning v. U.S. Dep't of Just.*,
919 F. Supp. 451 (D.D.C. 1994) ................................................................................... 17

*CASA, Inc. v. Trump*,
793 F. Supp. 3d 687 (D. Md. 2025) .............................................................................. 37

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)..................................................................................... 32

*Chichakli v. Tillerson*,
882 F.3d 229 (D.C. Cir. 2018)............................................................................... 27, 29

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)...................................................................................................... 11

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
746 F.3d 1082 (D.C. Cir. 2014) ................................................................................... 16

*CNA Fin. Corp. v. Donovan*,
830 F.2d 1132 (D.C. Cir. 1987)................................................................................... 19

*Conserve Sw. Utah v. U.S. Dep't of the Interior*,
No. 26 Civ. 317, 2026 WL 569034 (D.D.C. Mar. 1, 2026)............................................ 20

*Council on Am.-Islamic Rels. v. Gaubatz*,
667 F. Supp. 2d 67 (D.D.C. 2009) .......................................................................... 34, 37

*Creed v. Nat'l Transp. Safety Bd.*,
758 F. Supp. 2d 1 (D.D.C. 2010) ............................................................................ 12, 13

*Ctr. for Taxpayer Rts. v. IRS*,
815 F. Supp. 3d 1 (D.D.C. 2025)...................................................................... 33, 34, 35

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)...................................................................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020).......................................................................................................... 25

*Doe v. Hill*,
141 F.4th 291 (D.C. Cir. 2025)..................................................................................... 27

*DSE, Inc. v. United States*,
    169 F.3d 21 (D.C. Cir. 1999) .................................................................................. 37

*Eagle Broad. Grp., Ltd. v. FCC*,
    563 F.3d 543 (D.C. Cir. 2009) ................................................................................ 19

*Elec. Priv. Info. Ctr. v. Dep't of Just.*,
    15 F. Supp. 3d 32 (D.D.C. 2014) ........................................................................... 36

*ERG Transit Sys. (USA), Inc. v. Wash. Metro. Area Transit Auth.*,
    593 F. Supp. 2d 249 (D.D.C. 2009) ........................................................................ 19

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
    811 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................... 37

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................... 20, 21, 24, 25

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ............................................................................... 15

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ........................................................................ 24

*Groenendal v. Exec. Off. for U.S. Att'ys*,
    No. 20 Civ. 1030, 2024 WL 1299333 (D.D.C. Mar. 27, 2024) ................................. 16

*Hand v. U.S. Dep't of Just.*,
    No. 20 Civ. 3690, 2023 WL 2707878 (D.D.C. Mar. 29, 2023) ................................. 18

*Harrison v. Fed. Bureau of Prisons*,
    611 F. Supp. 2d 54 (D.D.C. 2009) .......................................................................... 18

*Henke v. U.S. Dep't of Com.*,
    83 F.3d 1453 (D.C. Cir. 1996) ............................................................................... 31

*Heritage Found. v. EPA*,
    No. 23 Civ. 748, 2023 WL 2954418 (D.D.C. Apr. 14, 2023) .................................. 36

*Hill v. U.S. Dep't of the Interior*,
    151 F.4th 420 (D.C. Cir. 2025) .............................................................................. 12

*Hosp. Staffing Sols., LLC v. Reyes*,
    736 F. Supp. 2d 192 (D.D.C. 2010) ........................................................................ 34

*Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*,
  394 F. Supp. 3d 67 (D.D.C. 2019) ................................................................................. 18

*\*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*,
  876 F.3d 346 (D.C. Cir. 2017) ........................................................................... 25, 32, 36

*Jud. Watch, Inc. v. U.S. Dep't of Just.*,
  No. 23 Civ. 1485, 2024 WL 4039924 (D.D.C. Sept. 4, 2024) ........................................ 22

*Jurewicz v. U.S. Dep't of Agric.*,
  891 F. Supp. 2d 147 (D.D.C. 2012) ................................................................................ 25

*\*League of United Latin Am. Citizens v. Exec. Off. of the President*,
  818 F. Supp. 3d 34 (D.D.C. 2026) .................................................................................. 26

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................................................... 11, 35

*Lepelletier v. FDIC*,
  164 F.3d 37 (D.C. Cir. 1999) ......................................................................................... 14

*Londrigan v. FBI*,
  670 F.2d 1164 (D.C. Cir. 1981) ..................................................................................... 26

*Martin v. Dep't of Just.*,
  488 F.3d 446 (D.C. Cir. 2007) ....................................................................................... 15

*Maydak v. United States*,
  630 F.3d 166 (D.C. Cir. 2010) ................................................................................. 30, 31

*McCready v. Nicholson*,
  465 F.3d 1 (D.C. Cir. 2006) ........................................................................................... 30

*Mennonite Church USA v. U.S. Dep't of Homeland Sec.*,
  778 F. Supp. 3d 1 (D.D.C. 2025) ................................................................................... 11

*Milton v. U.S. Dep't of Just.*,
  596 F. Supp. 2d 63 (D.D.C. 2009) .................................................................................. 18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................................................ 20

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
  783 F. Supp. 3d 290 (D.D.C. 2025) ................................................................................ 37

*\*Nat'l Archives & Recs. Admin. v. Favish*,
  541 U.S. 157 (2004) ................................................................................ 14, 18, 21, 22, 23

*Nat'l Bus. Aviation Ass'n, Inc. v. FAA*,
 686 F. Supp. 2d 80 (D.D.C. 2010) ................................................................................ 11

*Nat'l Tel. Coop. Ass'n v. FCC*,
 563 F.3d 536 (D.C. Cir. 2009) ................................................................................ 20

*Niskanen Ctr. v. FERC*,
 20 F.4th 787 (D.C. Cir. 2021) ................................................................................ 27

*Nken v. Holder*,
 556 U.S. 418 (2009) ................................................................................ 11, 34

*Northern Mariana Islands v. United States*,
 686 F. Supp. 2d 7 (D.D.C. 2009) ................................................................................ 35

*Northrop Grumman Sys. Corp. v. NASA*,
 346 F. Supp. 3d 109 (D.D.C. 2018) ................................................................................ 13

*NTEU v. Trump*,
 No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ................................................ 36

*Occidental Petroleum Corp. v. SEC*,
 873 F.2d 325 (D.C. Cir. 1989) ................................................................................ 11, 19

*Paige v. DEA*,
 665 F.3d 1355 (D.C. Cir. 2012) ................................................................................ 30

*Prill v. NLRB*,
 755 F.2d 941 (D.C. Cir. 1985) ................................................................................ 24

*Pub. Emps. for Env't Resp. v. EPA*,
 No. 24 Civ. 445, 2026 WL 571217 (D.D.C. Mar. 2, 2026) ................................................ 19

*Pursuing Am.'s Greatness v. FEC*,
 831 F.3d 500 (D.C. Cir. 2016) ................................................................................ 11

*Roth v. U.S. Dep't of Just.*,
 642 F.3d 1161 (D.C. Cir. 2011) ................................................................................ 14

*SafeCard Servs. v. SEC*,
 926 F.2d 1197 (D.C. Cir. 1991) ................................................................................ 17

*SEC v. Chenery Corp.*,
 318 U.S. 80 (1943) ................................................................................ 20

*SEC v. Chenery Corp.,*
   332 U.S. 194 (1947)............................................................................................ 20, 21, 25

*Simms v. District of Columbia,*
   872 F. Supp. 2d 90 (D.D.C. 2012) ....................................................................... 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   249 F. Supp. 3d 516 (D.D.C. 2017) ..................................................................... 11

*Tobey v. NLRB,*
   40 F.3d 469 (D.C. Cir. 1994)............................................................................... 30

*Truong v. U.S. Citizenship & Immigr. Servs.,*
   No. 21 Civ. 316, 2022 WL 17356865 (D.D.C. Dec. 1, 2022) ........................................ 31

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press,*
   489 U.S. 749 (1989)...................................................................................... 14, 15

*U.S. Dep't of State v. Wash. Post Co.,*
   456 U.S. 595 (1982)............................................................................................ 14

*Waterkeeper All., Inc. v. Wheeler,*
   330 F.R.D. 1 (D.D.C. 2018)............................................................................... 8, 32

*Wheeler v. U.S. Dep't of Just.,*
   403 F. Supp. 2d 1 (D.D.C. 2005) ........................................................................... 18

*Whitmore v. U.S. Dep't of Just.,*
   132 F. Supp. 3d 69 (D.D.C. 2015) ......................................................................... 17

**STATUTES**

5 U.S.C. § 552.............................................................................................. 1, 13, 14, 25

5 U.S.C. § 552a ................................................................................................. *passim*

5 U.S.C. § 704....................................................................................................... 12

5 U.S.C. § 706......................................................................................... 2, 11, 19, 26

28 U.S.C. § 591..................................................................................................... 22

**FEDERAL RULES**

Fed. R. Civ. P. 65.............................................................................................. 36, 37

**LEGISLATIVE MATERIALS**

S. Rep. No. 1183, 93rd Cong., 2d Sess. (1974) ............................................................... 26

**OTHER AUTHORITIES**

FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y,
     https://www.justice.gov/oip/available-documents-oip ................................................. 6, 25

Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—Review of District
     Court Decisions and Agency Actions* (2007) ..................................................................... 19

Press Release, Office of the Attorney General, Appointment of a Special Counsel (Jan.
     12, 2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1 ....... 23

**INTRODUCTION**

President Biden seeks a preliminary injunction to stop the U.S. Department of Justice (the "Department") from disclosing sensitive law enforcement records—recordings and transcripts of personal conversations that took place at his home in 2016 and 2017—to Heritage Foundation and its staffers. These conversations were never intended to be shared with a wider audience, and the Department has them only because it collected the recordings as part of a criminal investigation that resulted in no charges. Under ordinary circumstances, the Department would vigorously defend the privacy and law enforcement interests at stake in such records, including by applying long-settled principles to withhold them from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Indeed, in litigating this case for almost two years, the Department did exactly that. The Department's decision to defend these long-settled principles was unremarkable—it was the kind of straightforward application of the law that is the daily work of any independent Justice Department. Government lawyers reviewed the case, determined that the FOIA exemptions applied, produced material that was not exempt, and explained their reasoning in detailed declarations filed with the Court.

But these are not ordinary circumstances, and the Department is not operating through normal channels. It is not ordinary for the Department to abandon its duty to protect law enforcement records containing sensitive personal information, instead offering them up to political operatives. It is not routine for the statements of top Department officials to be indistinguishable from the made-for-TV attacks of those political operatives. And it is not normal—nor should it be—for the President of the United States to issue a string of late-night social media posts about litigation to which he is not a party, branding a fellow former President "A Crooked Politician!!!" because the former President has filed a lawsuit so that an impartial

federal court can protect rights that the Department of Justice, operating under President Trump's banner, is failing to defend.

The Department's unexplained deviations from regular practice matter for purposes of the Administrative Procedure Act ("APA"), the statute under which President Biden has challenged the Department's proposed disclosure of his private conversations to the Heritage Foundation and Mike Howell (the "Heritage Plaintiffs"). That statute provides a mechanism for courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). That is, the APA requires agency action to be both rational and rationally explained. The relevant laws have not changed since Department attorneys reached their prior determination in late 2024, but nonetheless, the Department has reversed course. It plans to release the recordings and transcripts at issue to the Heritage Plaintiffs on June 15, 2026, absent a court order barring release. ECF No. 50 at 1. The Department has yet to offer any formal explanation for its decision. That may well be because the decision is nakedly political, lacking any basis in the law.

The Heritage Plaintiffs have no legal right to the recordings or transcripts of President Biden's private conversations, which the Department obtained in the context of law enforcement proceedings. The Department itself has explained as much, in no uncertain terms. In the Department's own words, release of President Biden's sensitive, private conversations "would constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest." Def.'s Mem., ECF No. 33-1 at 1. Such release would also inhibit law enforcement in the future, thereby threatening public safety. The Department's highest-ranking career official, who served across administrations for more than 30 years, explained in a declaration that "the Department takes great care to protect its law enforcement files, consistent

2

with the law, even in closed cases, remaining sensitive to the privacy and reputational interests of uncharged parties," Declaration of Bradley Weinsheimer ("Weinsheimer Decl.") ¶ 24, ECF No. 33-2.  As Weinsheimer explained: the "[r]elease of law enforcement records that reveal non-public private conduct poses substantial threats to [a] core tenet of American justice."  *Id.* ¶ 21. That statement remains true today.

President Biden has now intervened in this litigation to protect his privacy interests and to advocate for the faithful application of the law, given that the Department has abandoned its duty to do so in this matter.  All of the preliminary injunction factors weigh in his favor: (1) he is likely to succeed on the merits of his cross-claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of equities and the public interest support a preliminary injunction.  For the reasons explained below, the Court should set aside the Department's decision and enjoin its disclosure of the recordings and transcripts at issue.

## BACKGROUND

### I.     The Records at Issue and the Special Counsel's Investigation

Beginning in the spring of 2016, President Biden met periodically with his writing partner, Mark Zwonitzer, to discuss what would become President Biden's 2017 memoir, *Promise Me, Dad*.  Weinsheimer Decl. ¶ 10.  In these private conversations—which took place in President Biden's home in 2016 and 2017—President Biden recounted one of the most politically consequential and personally painful years of his life, beginning on Thanksgiving in 2014.  *Id.* ¶¶ 10, 12-13.  Then-Vice President Biden served the final year of his term in that office and considered a run for the Presidency in 2016.  *Id.* ¶¶ 12-13.  All the while, President Biden's eldest son, Beau, battled brain cancer and ultimately passed away on May 30, 2015, at the age of forty-six.  Pressing decisions that President Biden faced about his political future were inextricably intertwined with Beau.  Weinsheimer Decl. ¶ 12.  Candidly reflecting on this difficult and

3

consequential time in his life, President Biden discussed with Zwonitzer a range of sensitive topics, including the toll that Beau's illness and eventual passing took on President Biden and his tight-knit family; the role that Beau's battle with cancer played in President Biden's decision whether to run for President in 2016; and the many other voices and events that factored into that difficult, highly personal decision. *Id.* ¶¶ 13, 16.

Zwonitzer recorded these conversations for his personal use in working with President Biden on *Promise Me, Dad*. *Id.* ¶¶ 10, 13. Both men understood that they were speaking privately, and the recordings were never intended to be released to the public in verbatim form. *See id.* ¶ 13 ("The recorded conversations reflect source material; the book that resulted from that source material was only released to the public after subsequent drafting and editing.").

Years later, in 2020, President Biden ran for and was elected President. In 2023, Attorney General Merrick Garland appointed Special Counsel Robert K. Hur to investigate the possible unauthorized removal and retention of classified documents by President Biden. Weinsheimer Decl. ¶ 5. As the Special Counsel's final report reflects, President Biden cooperated with the investigation—including by sitting for a voluntary interview while he was serving as President— and Special Counsel Hur ultimately concluded that criminal charges against President Biden were unwarranted and that "the evidence d[id] not establish Mr. Biden's guilt beyond a reasonable doubt." Supplemental Declaration of Amy Jeffress in Support of Motion for Preliminary Injunction by Joseph R. Biden, Jr. ("Suppl. Jeffress Decl.") ¶ 8 & Ex. 1 ("Hur Report") at 1, 11.[1]

---

[1] As used in this memorandum, "Supplemental Jeffress Declaration" and "Suppl. Jeffress Decl." refer to the supporting declaration that accompanies the instant motion for a preliminary injunction. "Jeffress Declaration" and "Jeffress Decl." refer to the declaration filed on May 12, 2026, in support of President Biden's motion to intervene, ECF No. 51-2, which is adopted and incorporated into the Supplemental Jeffress Declaration, Suppl. Jeffress Decl. ¶ 3.

In the course of Special Counsel Hur's investigation, the Department obtained materials related to Zwonitzer's conversations with President Biden in 2016 and 2017. Weinsheimer Decl. ¶ 11. The Special Counsel's 345-page final report to Attorney General Garland, which the Department later published on its website, cited limited excerpts of President Biden's conversations with Zwonitzer, all of which focused on President Biden's notes and other records related to official business as Vice President. Hur Report at 65, 75-77, 106, 110-11, 236-37. The Department obtained these materials subject to an agreement between the White House Counsel's Office and the Special Counsel's Office, which provided that "[t]he information produced will be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office." Answer & Cross-Claims Ex. A ("Agreement") ¶ 1, ECF No. 51-4; *see* Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 8. The Agreement also required the Special Counsel's Office to provide President Biden "advance notice and a sufficient opportunity to challenge [any] disclosure" of the materials "outside the Executive Branch, including to the Congress (whether in response to a Congressional subpoena, Congressional request, or otherwise), the Judiciary, or the public." Agreement ¶ 5; *see* Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 9. The Agreement applies to the materials at issue here. Answer & Cross-Claims Ex. B, ECF No. 51-5; *see* Suppl. Jeffress Decl. ¶ 6; Jeffress Decl. ¶ 10.

## II.    Developments in This Litigation and the Department's About-Face

On February 9, 2024, Plaintiff Mike Howell submitted a FOIA request to the Department for certain "[r]ecords [r]elied [u]pon by Special Counsel Robert K. Hur." Am. Compl. Ex. 2 (the "FOIA Request"), ECF No. 6-3. On March 6, 2024, the Heritage Plaintiffs filed this action against the Department, alleging violations of FOIA. ECF No. 1. On October 16, 2024, the Department

issued a final response to the FOIA Request and released 117 redacted pages of transcripts of conversations between President Biden and Zwonitzer that occurred between October 10, 2016, and April 26, 2017.  Weinsheimer Decl. ¶ 4, Ex. B.  In November 2024, the parties filed cross-motions for summary judgment on the validity of the Department's withholdings pursuant to FOIA.  ECF Nos. 33-34.  Those motions have been fully briefed since December 23, 2024.  *See* ECF No. 38.

In the Department's motion for summary judgment on its withholdings, the Department correctly described the "privacy interests" at stake in these materials as "undoubtedly enormous"—the equivalent of "releasing the pages of an unindicted suspect's diary entries, or the private text messages exchanged on the suspect's phone . . . despite no charges having ever been brought, let alone charges relating to that private content."  Def.'s Mem. at 11.  Further, given the Department's publication of Special Counsel Hur's report and the "voluminous information" about the Special Counsel investigation already in the public domain—including hours of congressional testimony by Special Counsel Hur and transcripts of President Biden's and Zwonitzer's interviews with Special Counsel Hur—the Department asserted that "release of the transcripts would do little to advance the public's ability to evaluate Special Counsel Hur's decisions."  *Id.* at 14-15.  Unsurprisingly, the Department concluded that disclosure of the audio recordings and transcripts would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest."  *Id.* at 1.

On May 19, 2025, the Department released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur.  *See* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA

Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip.  On September 23, 2025, the Court entered a minute order stating: "In light of the public release of other audio from the Special Counsel's investigation and developments in No. 24-cv-700, the parties shall file, on or before September 26, 2025, a joint status report as to the state of production in this case and whether the plaintiffs continue to seek release of the requested records." Min. Order (Sept. 23, 2025).  In the joint status report that followed, the parties explained that the Department had not made additional releases of records and was reviewing its withholdings.  ECF No. 42.

On September 27, 2025, the Court stayed this action "to give the defendant time to review its withholdings and to give the parties an opportunity to engage in further discussions to settle this case or narrow the remaining legal issues."  Min. Order (Sept. 27, 2025).  This action remains stayed, and the only substantive activity in the case since September 27, 2025, has been the filing of joint status reports and minute orders extending the stay to allow the parties to continue their discussions.  ECF Nos. 43-50.

On February 25, 2026, pursuant to the Agreement, the Department's Office of the Deputy Attorney General informed President Biden through counsel that the Department planned to produce the audio recordings and transcripts at issue in this action to the Heritage Plaintiffs with only very limited redactions.  Jeffress Decl. ¶¶ 11, 14.  Counsel for President Biden subsequently engaged with the Department in an effort to resolve this matter without litigation.  *See id.* ¶¶ 13-29.  Meanwhile, on March 19, 2026, the Department reported to counsel for President Biden that it intended to comply with a request from Congress for the very same materials the Department intended to produce to the Heritage Plaintiffs.  *Id.* ¶ 20.

On May 5, 2026, the Department informed President Biden it had made a final decision to release the recordings and transcripts at issue—with redactions that are wholly inadequate to protect the privacy interests of President Biden and of third parties—on June 15, 2026, unless President Biden obtains a court order blocking release by that date. *Id.* ¶¶ 25-29.

On May 12, President Biden moved to intervene in this litigation, seeking to enjoin the Department from producing the recordings and transcripts to the Heritage Plaintiffs or to the House Judiciary Committee. ECF No. 51. Recognizing President Biden's "right to protect his privacy interests," the Court granted his intervention motion "as to the Department's production of the Zwonitzer materials to the [Heritage Plaintiffs]." Intervention Order, ECF No. 63 at 5. The Court reasoned that "[t]he sensitive nature of the Zwonitzer materials means that Biden's privacy interests are likely substantial" and that "the audio tapes and transcripts, if disseminated, 'would result in a substantial change in the status quo with respect to those [privacy] interests, such that the task of reestablishing the status quo' would be impossible." *Id.* at 8 (quoting *Waterkeeper All., Inc. v. Wheeler*, 330 F.R.D. 1, 7 (D.D.C. 2018)). The Court also explained that disclosure of these materials would cause "concrete harm to [President Biden's] privacy similar to those injuries addressed by the common-law tort of intrusion upon seclusion" given that the Department's proposed "intrusion into [President Biden's] private affairs, including personal thoughts regarding the death of a family member, 'would be highly offensive to a reasonable person.'" *Id.* at 6 (quoting *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025)). The Court denied intervention as to President Biden's "cross-claims regarding the Department's production of such materials to the House Judiciary Committee," explaining that permitting those claims would expand the action beyond its original scope. *Id.* at 12-13. President Biden has filed a separate action to pursue those claims. *See Biden v. U.S. Dep't of Just.*, No. 26 Civ. 1818 (D.D.C.).

8

**III.     The Purposes of the Disclosure**

The public record reflects striking alignment between Administration officials and the Heritage Plaintiffs in their targeting of President Biden, including on matters related to Special Counsel Hur's investigation and President Biden's mental state.  The alignment between these disparate actors—including parties that purportedly are opponents in this litigation—bears directly on the purposes of the proposed disclosure under the Privacy Act and the Department's reasons for its new position under the APA.

Relevant statements include the following:

- On June 4, 2025, the Trump White House issued a memorandum directing the review of certain presidential actions under the Biden Administration, including "who ran the United States while President Biden was in office."  The memorandum directed investigation on topics related to "Biden's mental state" and "mandate[d] an investigation into the circumstances surrounding Biden's purported execution of the numerous executive actions during his final years in office, examining policy documents signed with an autopen, who authorized its use, and the validity of the resulting Presidential policy decisions."  The memorandum stated that "[t]he combined nature of Biden's documented cognitive decline and the repeated use of an autopen raises serious concerns about the legitimacy of his actions."  Suppl. Jeffress Decl. ¶ 10 & Ex. 3.

- In the same memorandum dated June 4, 2025, the Trump White House expressly linked its claims about President Biden's mental state to Special Counsel Hur's investigation and non-prosecution decision, falsely stating: "Reports indicate that, for years, Biden suffered from serious cognitive decline.  For example, although the Department of Justice found that Biden had violated the law by willfully retaining and disclosing classified materials, it ultimately concluded that Biden was unfit to stand trial given his incompetent mental state." *Id.*

- The same June 4, 2025, memorandum quotes President Trump as saying: "And you know what, they ought to find out who was using that autopen.  Because whoever that person was, he or she was like the President of the United States . . . I think a President should sign it, not use an autopen." *Id.* (alteration in original).

- In a March 6, 2025, post on X, Plaintiff Mike Howell wrote: "There is a constitutional process to deal with an incapacitated POTUS and it doesn't contemplate giving someone else his autopen and authority.  It's called the 25th Amendment and the conspiracy not to invoke it in order to keep whatever they were doing going is a big problem."  Suppl. Jeffress Decl. ¶ 11 & Ex. 4.

- In an August 21, 2025, post on X, Plaintiff Mike Howell wrote: "theres now a generation of dem WH staffers who were planning to rely on titles that showed a proximity to a president that now cant do that they should have to update their linkedins to things like Special Assistant to the Autopen."  Suppl. Jeffress Decl. ¶ 12 & Ex. 5.

- On September 26, 2025, the Heritage Plaintiffs asserted in a joint status report in this litigation: "This case is still of great relevance to on-going national discourse regarding President Joseph R. Biden's use of the autopen and whether President Biden—or a 'politburo' of unelected officials *actually* ran the Country."  ECF No. 42 at 1.

- On October 27, 2025, the Oversight Project of Plaintiff Heritage Foundation issued a report titled "The Autopen Presidency Part IV: Comprehensive Summary of Autopen Use."  Suppl. Jeffress Decl. ¶ 13 & Ex. 6.

- In a December 15, 2025, post on X, Plaintiff Mike Howell explained that, in the summer of 2024, he and his team searched for ways to "accelerate" President Biden's "exit," and that one such way was "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur."  Suppl. Jeffress Decl. ¶ 14 & Ex. 7.

- In the same post, Plaintiff Mike Howell stated that "Joe Biden wasn't the President, an autopen was."  He further stated: "President Trump has brought up the autopen perhaps more than any other topic.  He has called it the scandal of the century."  He then called for the Department of Justice to treat "all autopenned documents" signed by President Biden as "null" and "void."  *Id.*

- In a May 10, 2026, post on X, Jeff Clark, counsel of record for the Heritage Plaintiffs in this matter, referred to this action as "our case against DOJ that started in Biden autopen administration."  Suppl. Jeffress Decl. ¶ 15 & Ex. 8.

- On May 16, 2026, the Heritage Plaintiffs asserted in their opposition to President Biden's motion to intervene in this case: "President Biden clearly was in cognitive decline over his Term and in particular in 2024. . . . President Trump has deemed this issue 'one of the most dangerous and concerning scandals in American history.' Indeed, President Biden's many own senior staff testified to a complete lack of such documentation and authorization for use of the autopen on official documents cloaked by a game of three-card monte."  ECF No. 59 at 4-5 (citation omitted).

- In a May 26, 2026, post on Truth Social, President Trump responded to an article about President Biden's filing of a lawsuit involving the records at issue here with the statement: "A Crooked Politician!!!"  Suppl. Jeffress Decl. ¶ 16 & Ex. 9.

10

**LEGAL STANDARD**

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). "Where a federal agency is the defendant, the last two factors merge." *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 7 (D.D.C. 2025); *accord Nken v. Holder*, 556 U.S. 418, 435-36 (2009).

"Third parties have the right to protect documents with their information from improper disclosure by the government." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 522 (D.D.C. 2017). So-called "[r]everse FOIA cases" challenging agencies' decisions to disclose protected information "seek review of informal agency adjudications, and thus are reviewable under Section 706 of the Administrative Procedure Act ('APA'), 5 U.S.C. § 706." *Nat'l Bus. Aviation Ass'n, Inc. v. FAA*, 686 F. Supp. 2d 80, 84 (D.D.C. 2010) (citing *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989)). Accordingly, the reviewing court must determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979).

**ARGUMENT**

President Biden satisfies all of the preliminary injunction factors: (1) he is likely to succeed on the merits of his cross-claims; (2) he will suffer irreparable harm in the absence of preliminary relief; and (3) the balance of the equities and the public interest weigh strongly in his favor. *See League of Women Voters*, 838 F.3d at 6.

11

I.      **President Biden Is Likely to Succeed on the Merits of His Cross-Claims Challenging the Department's Proposed Disclosure of His Private Information to the Heritage Plaintiffs**

President Biden is likely to prevail on his cross-claims. *See* ECF No. 51-3 ("Cross-Claims") ¶¶ 77-97 (Counts I-IV). The Department's decision to abandon longstanding FOIA principles and disclose President Biden's private information to the Heritage Plaintiffs is a final agency action that is arbitrary and capricious and an abuse of discretion, in violation of the APA. In addition, the Privacy Act prohibits the Department's proposed disclosure to the Heritage Plaintiffs, and the APA authorizes the Court to enjoin disclosure on that basis alone. The "likelihood of success" factor thus counsels in favor of a preliminary injunction.

A.      **The Department's Decision Is a Final Agency Action Subject to Immediate Review**

The Department's decision to produce the materials to the Heritage Plaintiffs on June 15, 2026, absent a court order barring release, constitutes "final agency action . . . subject to judicial review" under the APA. 5 U.S.C. § 704. The decision satisfies the two requirements of final agency action: It "'marks the consummation of the agency's decisionmaking process' and is an action 'by which rights or obligations have been determined, or from which legal consequences will flow.'" *Hill v. U.S. Dep't of the Interior*, 151 F.4th 420, 428 (D.C. Cir. 2025) (citation modified) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Department's decision—communicated by phone to President Biden's counsel on May 5, 2026, Jeffress Decl. ¶ 29, and memorialized in a joint status report filed in this action on May 8, ECF No. 50 at 1—is conclusive, "not tentative, advisory, or interlocutory." *Creed v. Nat'l Transp. Safety Bd.*, 758 F. Supp. 2d 1, 7 (D.D.C. 2010). And, as the Court has recognized, the Department's decision to release President Biden's sensitive information threatens his "legally protected interest in his privacy." ECF No. 63 at 7; *see also id.* at 6 (concluding that, for purposes

12

of the motion to intervene, "production of the Zwonitzer materials will cause concrete harm to [President Biden's] privacy").

Indeed, the Department expressly represented to President Biden's counsel that its decision is final agency action.  Jeffress Decl. ¶ 29; *see Northrop Grumman Sys. Corp. v. NASA*, 346 F. Supp. 3d 109, 115, 118-21 (D.D.C. 2018) (reviewing agency decision to disclose confidential materials where agency "informed [third party] that its decision constituted final agency action with respect to the matter" (citation modified)); *Creed*, 758 F. Supp. 2d at 7 (explaining that agency's communication to third party of its intent to disclose materials publicly was a "conclusive determination[]" and thus "final order[]").

### B.    President Biden's Private Conversations Are Exempt From Disclosure and Properly Withheld Pursuant to FOIA Exemptions 6 and 7(C)

The transcripts and audio recordings that the Heritage Plaintiffs seek are exempt from disclosure under FOIA Exemptions 6 and 7(C).  Indeed, before the Department abandoned its position in this action, it argued forcefully and correctly—relying on sworn statements from a top career official—that these exemptions apply.  *See* ECF Nos. 33, 37.[2]

Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  Because the latter exemption is "broader" than the former,

---

[2] Beyond the arguments set forth in this memorandum regarding the applicability of Exemptions 6 and 7(C), President Biden adopts and incorporates by reference the Department's prior arguments and briefing in this matter.  *See, e.g.*, Def.'s Mem.  In addition, President Biden is prepared to participate in renewed summary judgment briefing on an expedited basis.

where law-enforcement records are at issue, there is "no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 165-66 (2004) (noting that "[t]he adverb 'clearly,' found in Exemption 6, is not used in Exemption 7(C)" and that "whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion" (citation omitted)).

The transcripts and audio recordings at issue satisfy the threshold requirements for both exemptions. They constitute "similar files" to "personnel and medical files," 5 U.S.C. § 552(b)(6), because they include "information that applies to a particular individual," *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (citing *U.S. Dep't of State v. Wash. Post Co.,* 456 U.S. 595, 602 (1982)). And they were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)(C), because they "relate to anything that can fairly be characterized as an enforcement proceeding"— namely, Special Counsel Hur's investigation of President Biden, *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018) (citation omitted). Accordingly, the materials are exempt from disclosure if their disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(7)(C)).

To determine whether an invasion of personal privacy could reasonably be expected to be "unwarranted," "a court must balance the public interest in disclosure against the interest Congress intended the Exemption to protect." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989). The privacy protections enshrined in Exemption 7(C) are robust. As the D.C. Circuit has explained, "rarely does a public interest outweigh an individual's privacy

14

interest when law enforcement information pertaining to an individual is sought." *Martin v. Dep't of Just.*, 488 F.3d 446, 457 (D.C. Cir. 2007) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 768 (D.C. Cir. 1990)).  "[W]hen [a FOIA] requester seeks a private citizen's criminal history information within the government's control," the "privacy interest protected by Exemption 7(C) is . . . at its apex while the FOIA-based public interest in disclosure is at its nadir." *Id.* (quoting *Reps. Comm.*, 489 U.S. at 780).

Applying these standards here, President Biden's privacy interests are tremendous, as the record in this action reflects.  For example, Bradley Weinsheimer, who served as the Department's highest-ranking career official, provided a declaration setting forth the basis for the Department's withholdings in this action.  *See* Weinsheimer Decl., ECF No. 33-2.  As Weinsheimer explained, "[t]he audio recordings at issue here were not originally created by the government; rather, they were created by individuals acting in a private capacity, and they reflect private conversations." *Id.* ¶ 22.  Indeed, "conversations with a writing assistant to aid with drafting a memoir are analogous to an audio version of a personal diary." *Id.*  Further, "the conversations at issue are unusually sensitive," as "[t]hey were created for the purpose of helping create a memoir that focused on a highly emotional period in President Biden's life." *Id.*  "The portions of the audio recordings remaining at issue took place in the context of broader conversations between President Biden and his writing assistant that involved highly personal topics, including the illness and death of President Biden's son." *Id.*  ¶ 23.  "How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights." *Id.*  Moreover, the materials at issue also "implicate substantial privacy interests of . . . Mr. Zwonitzer [and of] other individuals mentioned or included in the unredacted transcripts." *Id.* ¶ 22.  Weinsheimer's testimony regarding the

15

subject matter of the conversations at issue and the privacy interests those conversations implicate remains as true today as it was when he filed his declaration in this action.

Although President Biden was a sitting and then a former Vice President at the time of the conversations at issue, his government service does not transform his private conversations into unrestricted public records, particularly where the Department obtained the material reflecting those conversations through his cooperation with a criminal investigation.  This Court has recognized that "[g]overnment officials do not surrender all rights to personal privacy when they accept a public appointment." *Groenendal v. Exec. Off. for U.S. Att'ys*, No. 20 Civ. 1030, 2024 WL 1299333, at *9 (D.D.C. Mar. 27, 2024) (quoting *Bast v. U.S. Dep't of Just.*, 665 F.2d 1251, 1255 (D.C. Cir. 1981)), *aff'd*, No. 24-5086, 2024 WL 4455868 (D.C. Cir. Oct. 8, 2024).  This is particularly true where, as here, the recordings and transcripts are of conversations in which President Biden participated in his personal capacity, not in his capacity as Vice President or President.  Moreover, while Special Counsel Hur's final report has become public, President Biden retains a "distinct privacy interest in the *contents* of the investigative files." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1092 (D.C. Cir. 2014).

On the other side of the balance, any light that might be shed on the Special Counsel's investigation by the public disclosure of these materials is *de minimis*.  "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Id.* at 1093 (citation omitted).  "That is, the relevant public interest is *not* to find out what [President Biden] himself was 'up to' but rather how the [Special Counsel's Office] carried out [its] statutory duties to investigate and prosecute [alleged] criminal conduct." *Id.* (citation omitted).

The Department already has released the portions of the transcripts of President Biden and Zwonitzer's conversations that Special Counsel Hur cited in his report, which formed part of the basis for the Special Counsel's conclusion that criminal charges against President Biden were unwarranted. *See* Weinsheimer Decl. Ex. B. The remaining materials that the Department proposes to disclose constitute portions of President Biden's conversations with Zwonitzer that Special Counsel Hur may have reviewed but chose *not* to cite in his 345-page report, as well as audio recordings of portions of the conversations that have already been made public in written form. Any nexus between these materials and the public interest in understanding how Special Counsel Hur conducted his investigation of President Biden is tenuous at best, and it is insufficient to overcome President Biden's significant privacy interests in the personal information that appears in these law-enforcement files. Accordingly, the Department correctly concluded that "[t]he release of the unredacted transcripts or the audio recordings would harm substantial privacy interests that are not outweighed by any cognizable public interest." Def.'s Mem. at 6.

The Court need not address whether the Department would have had discretion to release the materials even if it had adhered to its position that they were exempt from disclosure under FOIA, since the Department has not taken that position and cannot adopt it now. *See infra* Argument Section I.C. In any event, such discretion would be significantly limited—at a minimum—by President Biden's unwaived privacy interests in the materials. The D.C. Circuit "has made clear that" individuals involved in law enforcement proceedings "have cognizable privacy interests that may be protected by Exemption 7(C)." *Canning v. U.S. Dep't of Just.*, 919 F. Supp. 451, 455 (D.D.C. 1994) (citing *SafeCard Servs. v. SEC,* 926 F.2d 1197, 1205 (D.C. Cir. 1991)). Significantly, "[t]he privacy interest at stake belongs to the individual, not the government agency." *Whitmore v. U.S. Dep't of Just.*, 132 F. Supp. 3d 69, 78 (D.D.C. 2015). Accordingly,

17

"Exemption 7(C) . . . requires courts 'to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information compiled through the power of the State.'" *Humane Soc'y Int'l v. U.S. Fish & Wildlife Serv.*, 394 F. Supp. 3d 67, 76 (D.D.C. 2019) (quoting *Favish*, 541 U.S. at 172); *cf. AFL-CIO v. FEC*, 177 F. Supp. 2d 48, 63 (D.D.C. 2001) ("[T]he FEC's refusal to apply Exemption 7(C) to bar release of the names and other identifying information of third-party individuals referred to in its investigative files is arbitrary, capricious and contrary to law."), *aff'd*, 333 F.3d 168 (D.C. Cir. 2003).

Here, President Biden has not waived his privacy interests in the audio recordings or transcripts of his conversations with Zwonitzer. *Cf. Harrison v. Fed. Bureau of Prisons*, 611 F. Supp. 2d 54, 66 (D.D.C. 2009) ("[P]ersonal privacy exemptions may be overcome by a waiver signed by the third person whose privacy interest would be affected by the disclosure." (citing *Milton v. U.S. Dep't of Just.*, 596 F. Supp. 2d 63, 65 (D.D.C. 2009))); *Wheeler v. U.S. Dep't of Just.*, 403 F. Supp. 2d 1, 14 (D.D.C. 2005) ("Without those privacy waivers, information concerning third parties who are not requesters is properly withheld under Exemption 7(C) as an unwarranted invasion of that person's privacy."); *Hand v. U.S. Dep't of Just.*, No. 20 Civ. 3690, 2023 WL 2707878, at *5 (D.D.C. Mar. 29, 2023) (similar), *aff'd*, No. 23-5080, 2023 WL 9008705 (D.C. Cir. Dec. 28, 2023). As a result, the Department does not have unfettered discretion to release the materials at issue.[3]

---

[3] Any discretion to release these materials notwithstanding the clear application of Exemptions 6 and 7(C) is further limited by the Agreement governing the production of the materials to the Special Counsel's Office. *See* Agreement ¶ 1 (providing that the materials would "be accessed, reviewed, and used only by the Executive Branch and only for purposes of advancing the investigation, including but not limited to classification review by the intelligence community and further fact-gathering by the Special Counsel's Office"); Suppl. Jeffress Decl. ¶ 5; Jeffress Decl. ¶ 9; *see also* ECF No. 51-5.

**C.    The Department's Contrary Determination Is Arbitrary, Capricious, and an Abuse of Discretion**

President Biden is likely to succeed on Counts I and II of his Cross-Claims because the Department's recent decision to release his private conversations to the Heritage Plaintiffs—a striking about-face from its prior position on withholding—is arbitrary and capricious and an abuse of discretion. *See* Cross-Claims ¶¶ 77-84. "A person whose information is about to be disclosed pursuant to a FOIA request may file a 'reverse-FOIA action' and seek to enjoin the Government from disclosing it." *Canadian Com. Corp. v. Dep't of the Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008). "Reverse FOIA cases seek review of informal agency adjudications, and thus are reviewable under Section 706 of the Administrative Procedure Act." *Pub. Emps. for Env't Resp. v. EPA*, No. 24 Civ. 445, 2026 WL 571217, at *2 (D.D.C. Mar. 2, 2026) (citation omitted); *see Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989). "Accordingly, the [reviewing] [c]ourt must decide whether [the agency's] FOIA determination was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'"[4] *ERG Transit Sys. (USA), Inc. v. Wash. Metro. Area Transit Auth.*, 593 F. Supp. 2d 249, 252 (D.D.C. 2009) (quoting 5 U.S.C. § 706(2)(A); and citing *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1154-55 (D.C. Cir. 1987)).

That standard is met when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

---

[4] "[C]ourts rarely draw any meaningful distinctions between acts that are arbitrary, capricious, or an abuse of discretion." *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review—Review of District Court Decisions and Agency Actions* 167 (2007)). Accordingly, "'[a]rbitrary, capricious, [or] an abuse of discretion' review under § 706(2)(A) is now routinely applied by the courts as one standard under the heading of 'arbitrary and capricious' review." *Id.* (quoting Edwards & Elliott, *supra*, at 167).

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Put simply, the "standard requires that agency [actions] be reasonable and reasonably explained." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009). When an agency fails to meet this standard, "[t]he reviewing court should not attempt itself to make up for such deficiencies" and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) ("*Chenery II*")). It is therefore black-letter law that, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962) and citing *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("*Chenery I*")). And when an agency reverses its prior position, "the familiar 'requirement that an agency provide reasoned explanation for its action' obliges the agency to 'show that there are good reasons for the new [decision]' and to provide 'a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior [decision].'" *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26 Civ. 317, 2026 WL 569034, at *1 (D.D.C. Mar. 1, 2026) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

Here, the Department has not provided any formal explanation of the basis for its sudden abandonment of longstanding FOIA principles. When the Department notified President Biden, through counsel, of its decision to release the materials at issue, it offered no justification for its about-face. Associate Deputy Attorney General Paul Perkins stated only that "[t]he Department of Justice [wa]s planning to produce, in response to a FOIA request that is now in litigation (Heritage v. DOJ; 24-cv-645 (D.D.C.)), certain materials that appear to be covered by an

20

agreement between the former President's attorneys and Special Counsel Hur" and that "[t]he materials at issue are transcripts and audio recordings between President Biden and Mark Zwonitzer referenced in the Hur Report." Suppl. Jeffress Decl. ¶ 4. Perkins permitted President Biden's counsel to review the materials that the Department planned to release, but he offered no substantive justification for the Department's disclosure decision. Moreover, Perkins did not offer the requisite "good reasons" for reversing the Department's prior, well-reasoned position on withholding, *Fox*, 556 U.S. at 515; *see generally* Def.'s Mem., or for "disregarding facts and circumstances that underlay or were engendered by the prior [decision]," *Fox*, 556 U.S. at 516. The Department thereby failed to satisfy the "fundamental requirement of administrative law . . . that an agency set forth its reasons for decision," and this "failure . . . constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation omitted).

In subsequent communications, Department employees have likewise failed to provide any reasoned justification for the Department's new position. To the contrary, their communications have been riddled with legal and factual errors—further evidence that the Department's position is arbitrary, capricious, and an abuse of discretion.

For example, Acting Chief Privacy and Civil Liberties Officer Peter Winn explained that the Department had analyzed the materials at issue under the standard set forth by the Supreme Court in *Favish*, 541 U.S. 157. *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2. Taking the Department's explanation on its own terms, as the Court must do, *see Chenery II*, 332 U.S. at 196, Winn's suggestion that *Favish* demands disclosure here contravenes *Favish* on its face. In *Favish*, the Supreme Court explained that "courts must insist on a meaningful evidentiary showing" that "responsible officials acted negligently or otherwise improperly in the performance of their duties"

21

to overcome an individual's privacy interests in the contents of his law-enforcement investigative files. 541 U.S. at 173-75. But the Department has not identified any evidence that Special Counsel Hur acted negligently or otherwise improperly in investigating President Biden. Instead, Winn claimed that there is a "potential conflict of interest inherent" in a Special Counsel investigation of a President that either satisfies or obviates the *Favish* standard. *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2.

Such an "explanation" is flatly wrong. *Favish* itself involved an Independent Counsel investigation. *See* 541 U.S. at 161, 164. Thus, the mere fact of a Special Counsel investigation cannot possibly obviate *Favish*'s evidentiary requirements. When confronted with this fact, Winn adopted the puzzling position that the lapsed independent counsel statute "eliminat[ed] the potential conflict of interest, but thereby eliminat[ed] the need for heightened public scrutiny." *See* Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (citing 28 U.S.C. §§ 591-599). Yet nothing in *Favish* turned on the structure of the independent counsel statute. Moreover, courts in this district have continued to apply *Favish*'s requirement that FOIA requestors "produce evidence that would warrant a belief by a reasonable person that [an] alleged Government impropriety might have occurred" to "obtain private information under FOIA" in the precise context of a Special Counsel's investigation of a sitting President. *Jud. Watch, Inc. v. U.S. Dep't of Just.*, No. 23 Civ. 1485, 2024 WL 4039924, at *6 (D.D.C. Sept. 4, 2024) (alteration in original) (citation omitted), *appeal dismissed as moot*, No. 24-5255, 2026 WL 303055 (D.C. Cir. Feb. 4, 2026). Such analysis cannot be squared with Winn's assertion that a Special Counsel investigation, as distinct from an Independent Counsel investigation, presents a "potential" "inherent" "conflict of interest" that obviates the evidentiary showing required to overcome an individual's privacy interests. Suppl. Jeffress Decl. ¶ 9 & Ex. 2.

22

Winn also has contended that "Attorney General Garland's . . . decision to make the Hur Report public" reflected a "determin[ation] that the Hur Report addressed 'evidence that would warrant the belief by a reasonable person that government impropriety might have occurred.'" Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (quoting *Favish*, 541 U.S. at 174). But Winn has cited no evidence or authority for the remarkable assertion that public disclosure of an investigative report is evidence of government malfeasance, and Attorney General Garland's own public statements confirm that there is a far simpler explanation: the Department appointed the Special Counsel, and ultimately published the final report, to promote independence and accountability in a matter involving the sitting President. *See, e.g.*, Press Release, Office of the Attorney General, Appointment of a Special Counsel (Jan. 12, 2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1 ("This appointment underscores for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law.").

Winn also relied on *Brennan Center for Justice v. U.S. Department of Justice*, 697 F.3d 184 (2d Cir. 2012), to suggest that the entirety of the transcripts and audio recordings at issue have "become[] disclosable" because Special Counsel Hur considered them during his investigation and cited limited portions of them. Suppl. Jeffress Decl. ¶ 9 & Ex. 2. These assertions are equally flawed. For starters, that doctrine involves privilege waiver by the government. Here, however, President Biden and third parties have distinct privacy interests in the materials at issue that the government cannot waive unilaterally. *See supra* at 17-18. In any event, the Department's analysis does not grapple with the fact that the transcripts of President Biden and Zwonitzer's conversations

that were cited in the Hur Report have already been released to the Heritage Plaintiffs. *See* Weinsheimer Decl. Ex. B.

In sum, Winn's communications regarding the Department's decision to abandon its previously held position reflect that the decision is infected by serious legal and factual errors and is therefore arbitrary, capricious, and an abuse of discretion. *See, e.g.*, *Gomez v. Trump*, 485 F. Supp. 3d 145, 194 (D.D.C. 2020) ("Agency action that 'stands on a faulty legal premise and [lacks] adequate rationale' is arbitrary and capricious." (alteration in original) (quoting *Prill v. NLRB*, 755 F.2d 941, 948 (D.C. Cir. 1985))).

More importantly, and as previously explained, the Department does not write on a blank slate in this action. The Department's new position reflects a dramatic break with its prior, reasoned position on withholding, but the underlying facts and circumstances either have not changed or have evolved to more strongly support withholding. *See Fox*, 556 U.S. at 515. Like Perkins's initial notification, Winn's communications—which are divorced from the personal, private, and sensitive contents of the particular materials at issue—failed to grapple with the "facts and circumstances that underlay" the Department's previous determination that the materials at issue are exempt from disclosure. *Id.* at 516.

Furthermore, since the Department determined that the materials at issue are exempt, the balance has shifted even more sharply in favor of withholding. When this action was filed, President Biden was the sitting President and was running for a second term. Today, he is a private citizen. And in the meantime, the Department has released additional materials related to the Special Counsel's investigation, including more than five hours of audio recordings of President Biden's interview with Special Counsel Hur, further reducing any "incremental public interest in learning how the [Special] Counsel carried out his investigation" that may be served by disclosure

24

of the transcripts and audio recordings of President Biden's 2016 and 2017 conversations with Zwonitzer. *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017); *see* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66; *Interview Between Special Counsel Robert Hur et al. and Joseph R. Biden, Jr. {October 8, 2023 - October 9, 2023}*, FOIA Library, U.S. Dep't of Just. Off. of Info. Pol'y, https://www.justice.gov/oip/available-documents-oip. Thus, not only has the Department failed to explain the departure from its prior decision on its own terms, but it has overlooked intervening events that have strengthened and reinforced its earlier position. *See Fox*, 556 U.S. at 515-16.

"It is a 'simple but fundamental rule of administrative law' that 'a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency.'" *AAR Airlift Grp., Inc. v. U.S. Transp. Command*, 161 F. Supp. 3d 37, 43 (D.D.C. 2015) (first alteration in original) (quoting *Chenery II*, 332 U.S. at 196). Here, "[t]he Court cannot . . . affirm [the Department's] disclosure determination based on a rationale that was not in fact considered or relied upon by the agency." *Id.* at 45. For instance, because the Department's new decision was predicated on the view that it was bound under FOIA to disclose the materials at issue to the Heritage Plaintiffs and that no exemption applied, *see* Suppl. Jeffress Decl. ¶ 9 & Ex. 2 (citing, *inter alia*, 5 U.S.C. § 552(b)), "the possibility of discretion plays no role in judicial review," *Jurewicz v. U.S. Dep't of Agric.*, 891 F. Supp. 2d 147, 153 (D.D.C. 2012), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014). Nor can the Court "be expected to chisel that which must be precise from what the agency has left vague and indecisive." *AAR Airlift Grp.*, 161 F. Supp. 3d at 45 (quoting *Chenery II*, 332 U.S. at 197). Because the Department did not satisfy the APA's requirement to "engage in 'reasoned decisionmaking,'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted), its decision to disclose the transcripts and audio

25

recordings of President Biden's private conversations to the Heritage Plaintiffs must be "set aside,"
5 U.S.C. § 706(2).

### D.      Disclosure to the Heritage Plaintiffs Would Violate the Privacy Act

President Biden is also likely to succeed on his APA claim that the Department's proposed
disclosure to the Heritage Plaintiffs is barred by the Privacy Act and thus is contrary to law.  *See*
Cross-Claims ¶¶ 89-97 (Count IV).  The non-disclosure provision of the Privacy Act bars agencies
from disclosing certain government records about individuals, unless the individual has consented
or one of the enumerated exceptions applies.  *See* 5 U.S.C. § 552a(b).  This provision, working in
tandem with other parts of the statute, "promote[s] observance of valued principles of fairness and
privacy."  *Londrigan v. FBI*, 670 F.2d 1164, 1169 n.28 (D.C. Cir. 1981) (quoting S. Rep. No. 1183,
93rd Cong., 2d Sess., 2 (1974)).

As an initial matter, President Biden may challenge the Department's planned Privacy Act
violation in the form of an APA claim seeking declaratory and injunctive relief.  To be sure, the
Privacy Act does not directly provide for injunctive relief in the context of an unlawful-disclosure
claim; rather, it authorizes claims for monetary damages once the disclosure has occurred.  *See* 5
U.S.C. § 552a(g)(1)(D), (g)(4).  As multiple courts have now recognized, however, plaintiffs may
sue under the APA to enjoin proposed disclosures that are barred by the Privacy Act, on the theory
that the agency action is contrary to law.  *See AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2026
WL 879518, at *19-20 (D.D.C. Mar. 31, 2026) (holding that "the APA could step into the breach
and supply plaintiffs with a cause of action for injunctive and declaratory relief" and that the
"Privacy Act does not preclude plaintiffs' APA claim that the [agency action is] contrary to law");
*League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 113 (D.D.C.
2026) ("Plaintiffs may pursue injunctive relief under the APA for alleged violations of the Privacy

Act."). These recent decisions acknowledge—and are consistent with—the fact that the Privacy Act does not provide its own mechanism for such relief.

The remaining question, then, is whether the proposed disclosure to the Heritage Plaintiffs is prohibited by the Privacy Act and thus would be contrary to law under the APA. For the reasons explained below, President Biden is likely to prevail on the merits of this claim.

"An agency violates the [Privacy] Act when it 'discloses' information in the form of a 'record' from a 'system of records' and the disclosure is not pursuant to a valid exception under the Act." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (quoting 5 U.S.C. § 552a(b)). The enumerated exceptions include disclosures required under FOIA, *id.* § 552a(b)(2), and disclosures for a "routine use" as defined in the statute, *id.* § 552a(b)(3).

Because the records here are exempt under FOIA, *see supra* Argument Section I.B, the (b)(2) exception for required disclosures does not apply. That exception covers disclosures that are "required," not just permitted, "under section 552 of this title." *Id.* § 552a(b)(2). When a record is exempt, FOIA does not, of course, require its disclosure. *See, e.g.*, *Niskanen Ctr. v. FERC*, 20 F.4th 787, 793 (D.C. Cir. 2021); *see also Doe v. Hill*, 141 F.4th 291, 297 (D.C. Cir. 2025) (explaining that § 552a(b)(2) "prohibit[s] agencies from disclosing information about private citizens when a FOIA exemption applies").

Nor would any of the other exceptions to the disclosure bar set forth in § 552a(b)(1)-(13) authorize the Department's proposed disclosure to the Heritage Plaintiffs. For example, while the Privacy Act contains a "routine use" exception, 5 U.S.C. § 552a(b)(3), the disclosure "must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency," *Ames v. U.S. Dep't of Homeland Sec.*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7), (e)(4)(D)); *see Brunotte*

27

*v. Johnson*, 892 F. Supp. 2d 199, 207 (D.D.C. 2012) ("The agency must demonstrate both compatibility and publication in order to invoke the routine use exception."). Here, regardless of the specific routine use notice at issue,[5] the Department cannot satisfy the compatibility requirement because the purposes of the disclosure are at odds with, and indeed would gravely undermine, the purpose for which the records were collected.

Even at this preliminary stage, ample evidence supports the conclusion that the purpose for which the records were collected is incompatible with the purposes of the disclosure. Regarding the purpose of collection, the parties and the Court do not have to guess. This purpose is set forth in the Agreement governing the production of the materials to the Special Counsel's Office, which provides that "[t]he information produced will be accessed, reviewed, and used . . . only for purposes of advancing the investigation." ECF No. 51-4. By contrast, the evidence shows that the Department's reversal is motivated by a desire to further *non-investigative* goals of the Department and the Trump Administration. These goals overlap substantially with the stated objectives of the Heritage Plaintiffs, which may explain why the Department and Heritage Plaintiffs—though ostensibly opponents—are poised to reach a mutually agreeable resolution regarding President Biden's private information.

As noted, both the Trump White House and the Heritage Plaintiffs have expressly tied their attacks on President Biden to materials from Special Counsel Hur's investigation. *See, e.g.*, Suppl. Jeffress Decl. ¶ 10 & Ex. 3 (June 2025 White House fact sheet describing a White House

---

[5] Agencies that wish to rely on a "routine use" for a specific "system of records" must provide notice to the public in the form of a System of Records Notice published in the Federal Register. 5 U.S.C. § 552a(e)(4)(D). Because routine uses are specific to particular "system[s] of records," President Biden may have additional arguments that a "routine use" does not apply, depending on the Department's position on which repositories are at issue.

28

memorandum referencing the Special Counsel's report, "Biden's mental state," and an investigation into the use of autopen); *id.* ¶ 14 & Ex. 7 (December 2025 X post by Plaintiff Mike Howell, stating that pursuing "intense litigation to obtain the audio of President Biden's interview with Special Counsel Hur" was part of an effort to "accelerate" President Biden's "exit" in mid-2024); *id.* ¶ 15 & Ex. 8 (May 2026 post by counsel of record in this case, describing it as "our case against DOJ that started in Biden autopen administration"). In any case, President Biden need not prove the specific motive at issue. To establish that the "routine use" exception is unavailable, it is enough to show that the purpose of disclosure is different from the purpose for which the records were collected. 5 U.S.C. § 552a(a)(7), (e)(4)(D); *Ames*, 861 F.3d at 240. Here, President Biden can easily demonstrate that the Department is pursuing a purpose *other* than "advancing the investigation" of Special Counsel Hur, which concluded in 2024. ECF No. 51-4.

President Biden also is likely to succeed in establishing the other elements of an unlawful disclosure under the Privacy Act. *See* 5 U.S.C. § 552a(b). As noted, the Privacy Act provides that, unless a statutory exception applies, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains." *Id.*; *see Chichakli*, 882 F.3d at 233 (citing 5 U.S.C. § 552a(b)). Thus, in deciding President Biden's claim on the merits, the Court will need to consider whether: (1) the materials are "record[s]" that "pertain[] to" and are "about" President Biden; (2) the materials are "contained in a system of records"; and (3) the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent." 5 U.S.C. § 552a(a)(4), (b). President Biden is likely to prevail on each of these points.

29

First, the materials meet the definition of "record[s]" under the Privacy Act, and those records pertain to and are about President Biden. The Privacy Act defines the term "record" to mean "any item, collection, or grouping of information about an individual that is maintained by an agency . . . and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4). "[T]o be a 'record,' an item must contain 'information that actually describes the person in some way.'" *McCready v. Nicholson*, 465 F.3d 1, 9 (D.C. Cir. 2006) (quoting *Tobey v. NLRB*, 40 F.3d 469, 472 (D.C. Cir. 1994)). The audio recordings and transcripts of President Biden's private conversations certainly pertain to and are about President Biden, as he discusses in those conversations intimate details about himself and his life. The transcripts contain his name, and the Department previously recognized that the audio recordings—which capture President Biden's distinct and widely recognized voice—contain an identifying particular of President Biden. *See* Weinsheimer Decl. ¶ 23 ("How Mr. Biden's voice sounded throughout those conversations thus implicates substantial privacy rights.").

Second, President Biden likely will be able to establish that the records are contained in a "system of records." Under the Privacy Act, a "system of records" is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). In general, a "system of records exists only if the information contained within the body of material is both *retrievable* by personal identifier and actually *retrieved* by personal identifier." *Paige v. DEA*, 665 F.3d 1355, 1359 (D.C. Cir. 2012) (quoting *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010)). Here, President Biden has alleged that the recordings and transcripts are "record[s]" contained in one or more "system[s] of records." *See*

30

Cross-Claims ¶ 70.  His cross-claims identify relevant systems of records; allege on information and belief that Department officials retrieved the materials from a system or systems of records using one or more personal identifiers, such as President Biden's name; and allege on information and belief that Department officials generally used personal identifiers to retrieve information about individuals from the relevant systems of records during the period in question.  *See id.* ¶¶ 71-76.  Because this is a FOIA action, and because the Weinsheimer Declaration and other filings in this case describe the Department's review and withholding of the materials in response to a FOIA request, President Biden is especially likely to prevail in establishing that the materials were contained in, retrievable from, and retrieved from the system of records for "FOIA processing records" (DOJ-004: Freedom of Information Act, Privacy Act, and Mandatory Declassification Review).  *Id.* ¶ 70.[6]

In any case, it is highly probable that the materials at issue were retrieved from at least one Department system of records.  *See Maydak*, 630 F.3d at 172-73 ("[W]here an agency compiles information about individuals for investigatory purposes, 'Privacy Act concerns are at their zenith, and if there is evidence of even a few retrievals of information keyed to [personal identifiers], it may well be the case that the agency is maintaining a system of records.'" (quoting *Henke v. U.S. Dep't of Com.*, 83 F.3d 1453, 1461 (D.C. Cir. 1996))).  Here, while certain details are within the Department's exclusive control, there is sufficient evidence for the Court to find in President Biden's favor on the "likelihood of success" factor.[7]  Notably, "[t]he source of any particular bit

---

[6] President Biden alleged that the Department may also have maintained the materials in the following systems of records, among others: DOJ-003: Correspondence Management Systems for the Department of Justice; DOJ-006: Personnel Investigation and Security Clearance Records for the Department of Justice; FBI-002: FBI Central Records System; and CRM-001: Central Criminal Division Index File and Associated Records.  Cross-Claims ¶ 71.

[7] Although discovery is typically unavailable in APA cases, *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011), courts and parties may look beyond the agency-

of information is a question of fact" that will/should be resolved at a future stage of the litigation. *Armstrong v. Geithner*, 608 F.3d 854, 857 (D.C. Cir. 2010).

Third, it is undisputed that the Department's proposed action involves a "disclos[ure]" to "any person" without President Biden's "written consent."  The Department's own statements in this action establish that it plans to disclose the materials to the Heritage Plaintiffs.  *See* ECF No. 50 at 1.  Moreover, the Department is well aware that President Biden has not consented to the disclosure, and it has not obtained his written consent.  *See* Jeffress Decl. ¶¶ 11-30 (describing negotiations between President Biden's counsel and the Department).

Because the proposed disclosure to the Heritage Plaintiffs would violate the Privacy Act, *see* 5 U.S.C. § 552a(b), the Department's actions are contrary to law under the APA.

## II.    President Biden Will Suffer Irreparable Harm Absent a Preliminary Injunction

The harms that President Biden asserts strongly support the issuance of a preliminary injunction.  To establish irreparable harm, a movant must assert an actual, great, and imminent injury that is beyond remediation.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-98 (D.C. Cir. 2006).  President Biden has done so here.

First, the conversations that the Department plans to disclose to the Heritage Plaintiffs are deeply sensitive and personal in nature, and their disclosure would cause the kind of real and apparent injury that courts have characterized as "severe," "substantial," and "impossible" to redress.  Intervention Order at 8 (first quoting *Jud. Watch*, 876 F.3d at 349-50; and then quoting *Waterkeeper All., Inc.*, 330 F.R.D. at 7).  The disclosure would encompass hours of recordings and

---

compiled record where there is evidence of bad faith or when the record is so sparse on a particular issue as to frustrate the court's review, *see Truong v. U.S. Citizenship & Immigr. Servs.*, No. 21 Civ. 316, 2022 WL 17356865, at *5-6 (D.D.C. Dec. 1, 2022).

32

over 100 transcript pages covering President Biden's intimate reflections on his decision-making both as a public servant and as a husband, father, and grandfather, including his descriptions of conversations with multiple third parties on these subjects. These conversations, which took place in President Biden's home, were never intended to be disclosed in verbatim form. In fact, the Department previously recognized that the materials are "analogous to entries in a personal diary." Intervention Order at 6 (quoting Def.'s Mem. at 1). It would of course "be highly offensive to a reasonable person" to have his personal diary disclosed to someone else. *Id.* (quoting *All. for Retired Ams.*, 770 F. Supp. 3d at 102). And the intrusion is even greater where, as here, the recipient has engaged in repeated public attacks focused on the diary-writer's mental competency. *See supra* Background Section III. Thus, both the "type of information"—a private citizen's sensitive and personal reflections made in the privacy of his own home—and the "breadth of disclosure"—unrestricted disclosure to a national advocacy organization that has expressed an intention to further disseminate the materials, ECF No. 5 at 5—weigh strongly in favor of finding an actual and great harm to President Biden's privacy interests. *Ctr. for Taxpayer Rts. v. IRS*, 815 F. Supp. 3d 1, 60-61 (D.D.C. 2025) (quoting *AFL-CIO v. Dep't of Lab.*, No. 25 Civ. 339, 2025 WL 1783899, at *11 (D.D.C. June 27, 2025)).

Second, there is no dispute that harm is imminent. As the Court wrote in the Intervention Order, President "Biden's injury is imminent given that the Department will produce the materials on June 15, 2026." Intervention Order at 6. Although this deadline does not appear to be tied to any time-sensitive need for the information, the Department so far has not extended it, and the Court has treated it as the operative date. *See* Min. Order (May 28, 2026) (ordering the parties to submit a proposed briefing schedule "[i]n light of the Department's June 15, 2026 disclosure

33

date"). As a result, President Biden will face an "imminent" intrusion on his privacy absent a preliminary injunction. Intervention Order at 6.

-Third, the harm caused by the disclosure of President Biden's private conversations will be irreparable. No judicial remedy could un-ring the bell or fairly compensate President Biden for the perpetual intrusion on his and his family's privacy. For this very reason, courts in this District routinely find that "disclosure necessitates a preliminary injunction when there is an imminent risk that information privately disclosed . . . will either be impermissibly used or publicly disclosed." *AFL-CIO*, 2025 WL 1783899, at \*12; *see, e.g.*, *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (concluding that "disclosure of proprietary information" to "competitors in the market" would constitute irreparable harm); *Council on Am.-Islamic Rels. v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009) (concluding that public disclosure of confidential information, including "personal information" about a party's employees, would cause irreparable harm). As in those cases, "public dissemination of [President Biden's] sensitive, private information is an irreparable harm." *All. for Retired Ams.*, 770 F. Supp. 3d at 108.

## III.    The Balance of Equities and the Public Interest Weigh Strongly in Favor of Preliminary Injunctive Relief

Finally, the balance of equities and the public interest also weigh in favor of a preliminary injunction. *See Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68 (explaining that the balance of equities and public interest factors merge where the government is the opposing party (citing *Nken*, 556 U.S. at 435)). President Biden risks severe and irreparable harm to his privacy interests if the materials are disclosed. By contrast, the Department faces no injury and the public interest is served if the Department is enjoined from disclosing the materials consistent with its obligations under the law. Nor is there any private or public interest the Heritage Plaintiffs could assert that would outweigh the severity of the injury to President Biden's privacy if the materials were

34

released.  The balance of equities and public interest weigh decidedly in favor of a preliminary injunction.

With respect to the Department, it is well established in this Circuit that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Id.* (citation modified); *accord Ctr. for Taxpayer Rts.*, 815 F. Supp. 3d at 68.  In the context of the APA in particular, "[t]he public interest is served when administrative agencies comply with their obligations under the APA."  *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).  As explained above, disclosure of President Biden's sensitive, private conversations to the Heritage Plaintiffs would violate federal law, *see supra* Argument Sections I.C, I.D, and the public interest does not support lawless governmental disclosures of private citizens' private conversations.

To the extent the Heritage Plaintiffs contend that they or the public will be harmed by a preliminary injunction prohibiting disclosure of the materials pending a final decision on the merits, they have identified no time-sensitive need for President Biden's private conversations from 2016 and 2017.  As an initial matter, releasing the materials would "constitute a severe invasion of privacy with little to no meaningful or cognizable counterbalancing public interest," as the Department explained back in 2024.  Def.'s Mem. at 1.  Since then, the balance has tipped even more sharply in favor of withholding.  Today, President Biden is a private citizen rather than the sitting President or a candidate for public office.  And in the meantime, the Department has released more than five hours of audio recordings of President Biden's interview with Special Counsel Hur, further reducing any "incremental public interest in learning how the [Special]

35

Counsel carried out his investigation." *Jud. Watch, Inc.*, 876 F.3d at 350; *see* Status Report at 1, *Jud. Watch v. U.S. Dep't of Just.*, No. 24 Civ. 700 (D.D.C. May 20, 2025), ECF No. 66.

Even if the Heritage Plaintiffs had a valid interest in the materials, that interest does not outweigh the severity of the irreparable harm disclosure will cause President Biden. In the context of a FOIA case, "a movant's general interest in being able to engage in an ongoing public debate using information that it has requested under FOIA is not sufficient to establish that irreparable harm will occur unless the movant receives immediate access to that information." *Elec. Priv. Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 46-47 (D.D.C. 2014); *see also, e.g.*, *Heritage Found. v. EPA*, No. 23 Civ. 748, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (collecting cases). The Heritage Plaintiffs have not attempted to argue that the records they seek will lose significant evidentiary value after a particular date, nor could they: President Biden is not a candidate for any public office. This litigation has been pending with only sporadic activity since early 2024, and maintaining the status quo by continuing to withhold President Biden's private conversations from a decade ago will not cause immediate, severe, or irreparable harm to any interest the Heritage Plaintiffs may assert.

In short, any hypothetical public or private interest in the release of President Biden's private conversations is far exceeded by the irreparable harm that President Biden will face from their release. The balance of the equities and the public interest therefore weigh strongly in favor of granting preliminary injunctive relief.

## IV.    The Bond Requirement Should Be Waived or Set to a Nominal Amount

Finally, the Court should waive Rule 65(c)'s bond requirement or set bond at a nominal amount. Under Rule 65(c), "injunction bonds are generally required," *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025), but district courts have

36

"'broad discretion . . . to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (first quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999); and then citing *Council on Am.-Islamic Rels.*, 667 F. Supp. 2d at 80).  The Department will not suffer meaningful damages or costs if it is temporarily ordered not to disclose the materials to the Heritage Plaintiffs pending a final determination on the merits.  *See* Fed. R. Civ. P. 65(c). Accordingly, President Biden respectfully requests that the Court waive the bond requirement or set bond at a nominal amount.  *Cf. N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (waiving bond requirement); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 64-65 (D.D.C. 2025) (setting nominal bond of $1 and collecting cases imposing the same where "the risk of harm to the government is non-existent or remote" (quoting *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687, 702 (D. Md. 2025))).

## CONCLUSION

For the foregoing reasons, President Biden respectfully requests that the Court grant the motion for a preliminary injunction and waive a security bond under Federal Rule of Civil Procedure 65(c).

Dated: May 29, 2026

Respectfully submitted,

/s/ Amy Jeffress
Amy Jeffress (D.C. Bar No. 449258)
Kaitlin Konkel (D.C. Bar No. 1021109)
Taisa M. Goodnature (D.C. Bar No. 90044537)*
H. Atticus Ballesteros (D.C. Bar No. 90043198)**
Jared M. Hirschfield (N.Y. Bar No. 6296933)*
HECKER FINK LLP
1050 K Street, NW, 10th Floor
Washington, D.C. 20001
Tel: (212) 763-0883
ajeffress@heckerfink.com
kkonkel@heckerfink.com

tgoodnature@heckerfink.com
aballesteros@heckerfink.com
jhirschfield@heckerfink.com

*Counsel for Defendant-Intervenor
Joseph R. Biden, Jr.*

\*Admitted *pro hac vice*

\*\*Application for *pro hac vice* admission
forthcoming

38