# EXHIBIT 2

## Taisa Goodnature

| | |
|---|---|
| **From:** | Amy Jeffress |
| **Sent:** | Thursday, April 16, 2026 12:10 PM |
| **To:** | Winn, Peter A. (OPCL) |
| **Cc:** | Taisa Goodnature; Perkins, Paul (ODAG) |
| **Subject:** | RE: FOIA request |

Peter,

Thank you for your response. I appreciate your willingness to engage on these issues, consistent with the governing agreement.

To the extent your analysis rests on the premise that the Attorney General's appointment of a special counsel negates the requester's burden to "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred," *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004), nothing in the Court's decision in *Favish* turned on the structure of the independent counsel statute. Nor did Attorney General Garland ever suggest that the public release of the Hur Report reflected that a reasonable person would suspect impropriety in Special Counsel Hur's investigation, as you contend below. To the contrary, Attorney General Garland explained that the appointment of a special counsel "underscores for the public the Department's commitment to both independence and accountability in particularly sensitive matters, and to making decisions indisputably guided only by the facts and the law." Press Release, Office of the Attorney General, Appointment of a Special Counsel (Jan. 12, 2023), https://www.justice.gov/archives/opa/pr/appointment-special-counsel-1. In other words, the context of a special counsel investigation here is evidence of the *absence* of government misconduct, not of its existence—and it certainly does not categorically relieve a FOIA requester of the independent obligation to make a "meaningful evidentiary showing" that "responsible officials acted negligently or otherwise improperly in the performance of their duties." *Favish*, 541 U.S. at 174-75.  You may also want to consider the implications that this theory has on other Special Counsel appointments.

Separately, we do not agree that a draft indictment of a sitting First Lady is subject to less public interest and implicates greater privacy interests than an audio recording of highly personal conversations created for purely private use between then-Vice President Biden and his biographer, as appears to be your sole argument to distinguish the D.C. Circuit's instructive opinion in *Judicial Watch, Inc. v. National Archives & Records Administration*, 876 F.3d 346 (D.C. Cir. 2017).

Finally, the Second Circuit's application of the adoption doctrine has no bearing here. That doctrine applies when the government effectively waives deliberative process privilege or attorney-client privilege by incorporating an otherwise privileged document into the working law of the agency. But those privileges do not require balancing public interest against individuals' privacy interests, as Exemption 7(C) does.

As to next steps, I have a trial beginning tomorrow and will be unable to go in and review the additional redactions until the trial concludes. Could we schedule a time during the week of April 27?

Best, Amy

**Amy Jeffress | Hecker Fink LLP**
Partner
1050 K Street NW | 10th Floor
Washington, DC 20001
(W) 202.742.2655 | (M) 202.309.7598
ajeffress@heckerfink.com

---

**From:** Winn, Peter A. (OPCL) <Peter.A.Winn@usdoj.gov>
**Sent:** Wednesday, April 15, 2026 9:40 PM
**To:** Amy Jeffress <ajeffress@heckerfink.com>
**Cc:** Taisa Goodnature <tgoodnature@heckerfink.com>; Perkins, Paul (ODAG) <Paul.Perkins@usdoj.gov>
**Subject:** FOIA request

This email was sent from outside the Firm.

Dear Amy,

Thank you for your email of March 31, and for your helpful comments on our proposed redactions to the audio files and transcript.  Based on your comments, we have expanded our redactions both to the audio files as well as the transcript, providing greater privacy protection to President Biden's family and correcting inadvertent errors on our part.

Nevertheless, we disagree with the approach to the privacy/public interest balance reflected in your email.  That approach appears to be largely based on *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017), which, in connection with the investigation by Special Counsel Ken Starr, gave the privacy interests of the Clintons greater weight than the public interest in the draft indictment containing unproven and unfiled allegations prepared by Starr's office.

Here, by contrast, we are not dealing with a non-public deliberative draft document prepared by a special counsel, or mere evidence collected in connection with his investigation, but a record created by Special Counsel Hur and explicitly relied on in his published Report, to justify his decision—accepted by the Attorney General—to decline prosecution with respect to the admittedly wrongful 2017 disclosure by then Vice-President Biden of classified information to his ghostwriter, who lacked a security clearance.  Hur declined prosecution with respect to this potential charge because, as he explained,

> Mr. Biden's memory appeared to have significant limitations at the time he spoke to Zwonitzer in 2017, as evidenced by their recorded conversations.  Mr. Biden's recorded conversations with Zwonitzer from 2017 are often painfully slow, with Mr. Biden struggling to remember events and straining at times to read and relay his own notebook entries.  Report at 207.

If, as Hur appears to have believed was likely, Mr. Biden had simply forgotten that the information he disclosed to Zwonitzer was classified, it would constitute a complete defense to a criminal offense requiring a finding of willfulness.  The audio and transcripts thus constitute not only the principal evidence on which Hur relied to reach his conclusion that the evidence would not support a finding of willfulness beyond a reasonable doubt but, as to the 2017 wrongful disclosures, what Hur *explicitly relied on in his public report* to justify his decision to decline prosecution for lack of willfulness.

2

Hur's express and public reliance on a particular item of curated evidence we view as akin to the application of the so-called adoption doctrine, where otherwise privileged legal advice becomes disclosable when an agency decision maker explicitly relies on it as the basis of the agency decision, *compare, Brennan Center for Justice v. DOJ*, 697 F.3d 184 (2nd Cir. 2012).  This is because, as in adoption doctrine cases, the fact that as part of his Report Hur publicly and explicitly relied upon a particular item of information as the basis of his decision, increases the public interest in and need to access that item of information—essentially, without such access, the public would lack access to the complete record of the basis of the decision by the Special Counsel.

It goes without saying that at the time of Hur's investigation the subject of the investigation was the President of the United States.  Hur reported directly to the Attorney General who in turn reported to the subject of his investigation.  The potential conflict of interest inherent in this arrangement requires a greater corresponding level of transparency as reflected in the Special Counsel Regulations.  See 28 C.F.R. §600.9.  It is for this reason that the integrity of a Special Counsel's investigation constitutes a matter of paramount public interest.  *See National Archives and Records Administration v. Favish*, 541 U.S. 157, 173-174 (2004).  By contrast, under the Independent Counsel statute, 28 U.S.C. §§ 591-599, which governed Special Counsel Starr's service, he reported to a three-judge panel appointed by the Chief Justice, eliminating the potential conflict of interest, but thereby eliminating the need for heightened public scrutiny.  Because of this, when Attorney General Garland's made the decision to make the Hur Report public, he determined that the Hur Report addressed "evidence that would warrant the belief by a reasonable person that government impropriety might have occurred" (See Favish, at 174).

The question now is, with a FOIA request and Congressional inquiry in hand, whether the public's interest goes beyond the Hur Report itself to any of the evidence referenced in the Report, specifically the limited sections of audio (approximately two and a half hours) out of "Mr. Biden's dozens of hours of recorded conversations with the ghostwriter," which were  curated by Special Counsel Hur, as well as the transcriptions made of those curated audio recordings.

As noted above, Special Counsel Hur created the curated audio recordings and transcripts records not simply as a way to  "store" evidence acquired in connection with his investigation, but because Hur recognized that these materials constituted both the primary evidence of the 2017 wrongful disclosures, as well as the primary basis for his decision to decline prosecution of President Biden with respect to these wrongful disclosures—which is how Hur explicitly refers to them in his Report.  Again, we emphasize that not all evidence acquired in connection with a special counsel investigation thereby becomes publicly disclosable.  Here, however, it is Hur's express reliance on the audio recordings and transcripts as the basis of his decision that dramatically increases the public interest in them.  In other words, in the face of a potential conflict of interest, public access to these materials becomes necessary to show whether in the face of a conflict of interest, Special Counsel Hur "pulled his punches" or acted without impropriety.  For the public to make this determination, the Hur Report alone is incomplete without access to these additional materials.

Of course, as was the case with the release of the Hur Report itself, even in the context of the release of a Special Counsel Report, privacy interests of individuals do not disappear, whether they happen to be the President or other public figures.   But here, the Department continues to be bound by the requirement in 5 USC § 552(b) that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

The redactions we have made reflect our analysis, after consideration of your input, of the privacy interests of the President and other third parties that override the cognizable public interest in the audio and transcript.  As important public figures, the privacy interests of President Biden and certain other third-party public figures were evaluated differently given their status.  Accordingly, as in the case of the Hur Report itself, redactions were not made where we found no serious harm to their interests in the release of the otherwise private information about them in Biden's discussions with his ghostwriter.  We also did not redact content if the information was already public, be it cited in the Hur report, discussed in Congressional testimony, or published in President Biden's memoir.  We did, however, redact the names of non-public figures, who enjoyed the benefit of a more protective test.

We hope that this explanation of our decision making will be helpful to you.  Please note that the Department intends to release to Congress and the FOIA requestor no earlier than Tuesday of next week.  In the meantime, if you wish to review the additional redactions we have made to the transcripts and audio recordings, you will need to arrange to do so before then.

Peter

Peter A. Winn
Acting Chief Privacy & Civil Liberties Officer
United States Department of Justice

---

**From:** Amy Jeffress <ajeffress@heckerfink.com>
**Sent:** Tuesday, March 31, 2026 6:18 PM
**To:** Perkins, Paul (ODAG) <Paul.Perkins@usdoj.gov>; Winn, Peter A. (OPCL) <Peter.A.Winn@usdoj.gov>
**Cc:** Taisa Goodnature <tgoodnature@heckerfink.com>
**Subject:** [EXTERNAL] FOIA request

Paul and Peter,

Thank you for taking the time to meet with us regarding the Heritage Foundation's pending request for the audio recordings and transcripts of President Biden's private conversations with Mark Zwonitzer. I am writing to respond to some of the issues you raised in our discussion, for your consideration as you continue to review the audio recordings and transcripts.

When we met, you questioned the distinction between the Hur Report itself and the raw evidence underlying the Report in making determinations regarding public release. As explained below, even assuming that the same standards were to govern the Department's decision whether to release the Report and whether to release hours of raw audio of private conversations between President Biden and his biographer, applying those standards to these two very different categories of material calls for different results.

As you know, to disclose law-enforcement records that implicate an individual's privacy interest, the Department must balance the privacy interest against the public interest in disclosure. *Elec. Priv. Info. Ctr. v. DOJ* ("*EPIC*"), 18 F.4th 712, 718 (D.C. Cir. 2021). Disclosure of third-party law enforcement information is a rare exception, not the rule. *See Martin v. DOJ*, 488 F.3d 446, 457 (D.C. Cir. 2007).

The public interest in a Special Counsel's report to the Attorney General is far greater than any cognizable public interest in sensitive, private materials collected—but not created, nor expressly relied

upon—by the Special Counsel's Office. A Special Counsel's report is perhaps the best evidence of what the Special Counsel's Office "was up to" over the course of its investigation. *EPIC*, 18 F.4th at 721 (internal quotation marks omitted). By contrast, the audio recordings and transcripts at issue here are private documents that the government "happens to be storing." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 780 (1989). Special Counsel Hur quoted directly from the portions of the Biden-Zwonitzer conversations on which he relied in reaching his determinations, referring to the conversations in multiple instances in his report. With that information already in the public domain, the notion that releasing the audio recordings and transcripts that Special Counsel Hur did *not* cite might further the public interest in understanding the Special Counsel's investigation is speculative, at best, and certainly not "likely." *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004). (The reference in our conversation to *Favish* in support of disclosure in these circumstances misses the point of that decision, which is replete with references to the strength of the privacy interests Congress intended to protect by Exemption 7(C).  *See id*. at 174.)

Moreover, public interest in the undisclosed audio recordings and transcripts is not evaluated in a vacuum, but in light of the information that is already available to the public. Any legitimate public interest in these materials that may have existed is diminished by the "voluminous information already in the public domain" about Special Counsel Hur's investigation. *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 876 F.3d 346, 350 (D.C. Cir. 2017). The public release of the Hur Report counsels against—not in favor of—releasing evidence underlying that report. Further, after the report was released, Special Counsel Hur testified for hours before Congress about the report and his determinations. And the Department has now produced the full transcript and audio recording of Special Counsel Hur's interview with President Biden. Any "incremental public interest in learning how the [Special] Counsel carried out his investigation" by disclosing recordings of private conversations between President Biden and his biographer years before the investigation began is plainly insufficient to overcome President Biden's substantial privacy interests in the materials. *Id*.

And the privacy interests implicated here are acute. Heritage seeks the raw audio of intimate conversations, many of which took place in President Biden's home, which were never intended for public release. The analysis from the *Judicial Watch* decision addressed very similar privacy interests of a public figure, also in the context of a special counsel investigation, and is readily modifiable to these circumstances: "Although the existence of [Special] Counsel [Hur]'s investigation of [President Biden] is public knowledge," and the Hur Report has been publicly released, President Biden "retains a distinct privacy interest in the *contents* of the investigative files," including these recordings and transcripts. *Id*. at 349 (citation modified).

To be sure, the Department's release of the portions of the Biden-Zwonitzer transcripts that were included the Hur Report also implicated President Biden's privacy interests. But whereas the Hur Report quoted a few minutes of discussion, largely focused on President Biden's recordkeeping practices, Heritage now seeks approximately 2.5 hours of recordings, including discussions of highly sensitive topics, such as President and Dr. Biden's reactions to the death of their son, and references to private remarks of numerous other third parties, who were not targets of the investigation. *See 100Reporters LLC v. DOJ*, 316 F. Supp. 3d 124, 162 (D.D.C. 2018) (explaining that Exemption 7(C) protects the privacy interests of individuals who were not subjects of investigation). The invasion of President Biden's privacy that would result from disclosure of hours of audio recordings and transcripts of these conversations is orders of magnitude greater than from release of the Hur Report.

Accordingly, viewing Heritage's request in light of the Department's decision to release the Hur Report to the public only underscores that the Department correctly determined, stating in the memorandum of law in support of summary judgment in this case that releasing the materials at issue "would harm substantial privacy interests that are not outweighed by any cognizable public interest," ECF 33-1.

Please let me know if it would be helpful to discuss further.

Best, Amy

**Amy Jeffress | Hecker Fink LLP**
Partner
1050 K Street NW | 10th Floor
Washington, DC 20001
(W) 202.742.2655 | (M) 202.309.7598
ajeffress@heckerfink.com

---

*This email and its attachments may contain information that is confidential and/or protected from disclosure by the attorney-client, work product or other applicable legal privilege. If you are not the intended recipient of the email, please be aware that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please notify the sender immediately and destroy all copies of the message from your computer system. Thank you.*